# EXHIBIT A TO DUNN AFFIDAVIT



WYATT, TARRANT & COMBS, LLP

400 West Market Street, Suite 2000
Louisville, Kentucky 40202
502.589.5235
Fax: 502.589.0309

Cornelius E. Coryell II
502.562.7376
ccoryell@wyattfirm.com

February 24, 2020

**VIA HAND DELIVERY**

Maya-Lis A. Wright
Agent for Service of Process
Kentucky Colonels International
Globcal International
Ecology Crossroads Cooperative Foundation, Inc.
302 General Smith Drive
Richmond, Kentucky 40475

Re:  The Honorable Order of Kentucky Colonels, Inc. v. Kentucky Colonels
International, et al.; United States District Court for the Western District of
Kentucky; Civil Action No. 3:20CV-132-JRW

Dear Ms. Wright:

Be advised that the enclosed Verified Complaint for Injunctive Relief and Damages and
Motion for Temporary Restraining Order and Preliminary Injunction were filed Thursday,
February 20, 2020 in the United States District Court for the Western District of Kentucky.
Further, be advised that Plaintiff is seeking a hearing on the motion at the Court's earliest
convenience.

Inquiries concerning this matter should be directed to Plaintiff's counsel below.

Sincerely,

WYATT, TARRANT & COMBS, LLP

Corky Coryell /tk

Cornelius E. Coryell II

CEC/tk
Enclosures
100239828

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

*Electronically Filed*

| | | |
|---|---|---|
| THE HONORABLE ORDER OF | ) | |
| KENTUCKY COLONELS, INC. | ) | |
| 943 South First Street | ) | |
| Louisville, KY 40203 | ) | |
| | ) | |
| PLAINTIFF | ) | |
| v. | ) | CIVIL ACTION NO. <u>3:20CV-132-JRW</u> |
| KENTUCKY COLONELS | ) | |
| INTERNATIONAL | ) | |
| 302 General Smith Drive | ) | |
| Richmond, KY 40475 | ) | JURY TRIAL DEMAND |
| | ) | |
| **Serve: Maya-Lis A. Wright** | ) | |
| **302 General Smith Drive** | ) | |
| **Richmond, KY 40475** | ) | |
| | ) | |
| GLOBCAL INTERNATIONAL | ) | |
| 302 General Smith Drive | ) | |
| Richmond, KY 40475 | ) | |
| | ) | |
| **Serve: Maya-Lis A. Wright** | ) | |
| **302 General Smith Drive** | ) | |
| **Richmond, KY 40475** | ) | |
| | ) | |
| ECOLOGY CROSSROADS | ) | |
| COOPERATIVE FOUNDATION, INC. | ) | |
| 302 General Smith Drive | ) | |
| Richmond, KY 40475 | ) | |
| | ) | |
| **Serve: Maya-Lis A. Wright** | ) | |
| **302 General Smith Drive** | ) | |
| **Richmond, KY 40475** | ) | |
| | ) | |
| DAVID J. WRIGHT, Individually and In His | ) | |
| Capacity as President of Ecology Crossroads | ) | |
| Cooperative Foundation, Inc. | ) | |
| 302 General Smith Drive | ) | |
| Richmond, KY 40475 | ) | |
| | ) | |
| UNKNOWN DEFENDANTS | ) | |
| | ) | |
| DEFENDANTS | ) | |

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff The Honorable Order of Kentucky Colonels, Inc. ("Plaintiff" or "the Honorable Order"), by counsel, for its Complaint against Defendants Kentucky Colonels International ("KCI"), Globcal International ("Globcal"), Ecology Crossroads Cooperative Foundation, Inc. ("Ecology Crossroads"), David J. Wright, individually and in his capacity as President of Ecology Crossroads Cooperative Foundation, Inc. ("Wright"), and Unknown Defendants (collectively referred to as "Defendants"), alleges as follows:

### PRELIMINARY STATEMENT

1. This is an action for infringement of the Honorable Order's famous, federally registered trademark, KENTUCKY COLONELS, under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); for trade name infringement, unfair competition, and false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); for dilution under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); for cyberpiracy under the Anticybersquatting Consumer Protection Act, Section 43(d) of the Lanham Act, 15 U.S.C. § 1125(a); and for substantial and related claims under the common law of the Commonwealth of Kentucky, all arising from Defendants' unauthorized use of the KENTUCKY COLONELS Mark in connection with marketing, advertising, promotion and solicitations regarding Defendants' alleged services.

2. The Honorable Order seeks injunctive and monetary relief.

### PARTIES

3. The Honorable Order is a nonprofit, tax-exempt corporation organized and existing under the laws of the Commonwealth of Kentucky. Until February 17, 2020, the Honorable Order had its principal place of business at 1717 Alliant Avenue, Suite 14, Louisville,

Kentucky 40299. As of February 17, 2020, the Honorable Order's primary place of business is 943 South First Street, Louisville, Kentucky 40203.

4. According to the records maintained by the Kentucky Secretary of State, Defendant Ecology Crossroads Cooperative Foundation, Inc. ("Ecology Crossroads") is a corporation organized under the laws of the Commonwealth of Kentucky with its principal place of business at 302 General Smith Drive, Richmond, Kentucky, 40475. Its registered agent for service of process is Maya-Lis A. Wright, 302 General Smith Drive, Richmond, Kentucky 40475.

5. According to the records maintained by the Kentucky Secretary of State, Defendant Kentucky Colonels International ("KCI") is an assumed name of Defendant Ecology Crossroads with its principal place of business at 302 General Smith Drive, Richmond, Kentucky, 40475. Its registered agent for service of process is Maya-Lis A. Wright, 302 General Smith Drive, Richmond, Kentucky 40475.

6. According to the records maintained by the Kentucky Secretary of State, Defendant Globcal International ("Globcal") is an assumed name of Defendant Ecology Crossroads with its principal place of business at 302 General Smith Drive, Richmond, Kentucky, 40475. Its registered agent for service of process is Maya-Lis A. Wright, 302 General Smith Drive, Richmond, Kentucky 40475.

7. Upon information and belief, Defendant David J. Wright is an individual who resides in La Culebra, Amazonas, Venezuela who is a citizen of the Commonwealth of Kentucky. According to the records maintained by the Kentucky Secretary of State, Wright is the President of Defendant Ecology Crossroads, whose registered agent for service of process is Maya-Lis A. Wright, 302 General Smith Drive, Richmond, Kentucky 40475.

8.     Upon information and belief, Unknown Defendants are individual employees, agents, owners, officers, or directors of Defendants Ecology Crossroads, KCI, or Globcal who have transacted business, engaged in conduct, or otherwise participated in the activities described in this Verified Complaint.

## JURISDICTION AND VENUE

9.     This Court has original jurisdiction over this action pursuant to 15 U.S.C. § 1121, 28 U.S.C. § 1331, and 28 U.S.C. § 1338(a) and (b) insomuch as this action arises under the Trademark Act of 1946, as amended, 15 U.S.C. § 1051 *et seq.* This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

10.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claims below occurred in this District and because the intellectual property at issue substantially is located in this District.

11.     This Court has personal jurisdiction over Defendant Wright under KRS 454.210, Kentucky's long-arm statute, because, among other things, he directly and personally engaged in the actions complained of herein within this District, including infringing upon the Honorable Order's trademarks by marketing and promoting services under the mark KENTUCKY COLONELS INTERNATIONAL.  In addition, Defendant Wright engaged in actions within this District, intended to facilitate or allow the infringement upon the Honorable Order's trademarks described herein by registering the assumed names, entities, and organizations described and identified herein, and/or personally directing those Defendants to engage in the conduct described herein.

4

## FACTS

### The Honorable Order and its KENTUCKY COLONELS Mark

12.     On May 2, 1931, Kentucky Governor Flem D. Sampson assembled a meeting of Kentucky Colonels at the State Capitol for the purpose of forming "a society or organization to restore the grandeur and sentiment of the original Kentucky Colonel; to more closely band together this group … for the advancement of Kentucky and Kentuckians…." The minutes from that meeting are attached hereto as Exhibit 1.  Those minutes reflect the prominence of being selected as a Kentucky Colonel: "because of this honor [Kentucky Colonels] are regarded highly in their own country and on their arrival here are treated with high honor and respect."

13.     From its inspired origins in 1931 through the present day, the Honorable Order has existed as a nonprofit organization dedicated to supporting charitable purposes throughout the Commonwealth.  In the last twenty years, the Honorable Order has made more than 3,500 grants to nonprofit organizations across Kentucky totaling in excess of $29 million.  Since 1951, the Honorable Order has made more than 7,300 grants totaling almost $51 million.

14.     The Governor of Kentucky serves as the Commander-in-Chief of the Honorable Order, along with a board of trustees.  From the beginning, the Governor's office recognized the Honorable Order's role, making the Honorable Order responsible for adopting insignia, seals, and other indicia of the honor.

15.     For nearly a century, the Honorable Order has pursued its mission to follow the objectives described by Governor Sampson in 1931, a significant aspect of which is promoting and protecting the goodwill of the KENTUCKY COLONELS Mark.  That Mark plays a critical role in the Honorable Order's fundraising efforts.

16.     The Honorable Order has filed and registered federal trademark applications for, and carefully protected and enforced, the KENTUCKY COLONELS Mark. A chart reflecting the numerous federal trademark registrations and applications owned by the Honorable Order incorporating the KENTUCKY COLONELS Mark, as well as the official documentation reflecting those registrations and applications, is attached as Exhibit 2.

17.     The Honorable Order has continuously used the KENTUCKY COLONELS Mark in connection with its philanthropic, membership, and social activities for decades, and, as a result, the KENTUCKY COLONEL Mark carries a positive connotation worldwide

### Defendants' Unlawful Activities

18.     In 2019, the Honorable Order was contacted by an individual who identified himself as David J. Wright. Wright purported to be the administrator of a Facebook group called "Kentucky Colonels International," which was allegedly comprised of individuals who have been commissioned as Kentucky Colonels by the Kentucky Governor.

19.     In late 2019, the Honorable Order learned that Wright, under the guise of KCI and Globcal, was soliciting participants for a "registry" of individuals who had been commissioned as Kentucky Colonels. As described by Wright, participation in the registry required payment of a fee.

20.     In late December 2019, Wright approached the Honorable Order to initiate a discussion regarding the activities of KCI. Through direct messages and text message, Wright indicated that he wanted to "find a way" that the Honorable Order could "endorse the International Register and Kentucky Colonels International, with a sponsorship, while [the Honorable Order] silently but transparently takes over the Register and International Concept to become a program belonging to the [Honorable Order]."

21.     When Wright contacted the Executive Director of the Honorable Order to "explore the possibilities of a merger," she suggested that he submit his comments and ideas in writing.

22.     In mid-January 2020, Wright forwarded the Honorable Order a package of documents which included a letter addressed to Sherry Crose, Executive Director of the Honorable Order, a document entitled "Presentation to Honorable Order of Kentucky Colonels, Inc.," and a document entitled "Draft Merger Acquisition and Consolidation Agreement." Copies of those documents are collectively tendered herewith as Exhibit 3.[1] Wright's "proposal" included provisions for generous financial payments to both himself and KCI.

23.     On January 20, 2020, the Honorable Order notified Wright that it was not interested in the merger, acquisition, or transaction reflected in his proposal.

24.     Shortly thereafter, Wright advised the Honorable Order by text message that he and KCI intended to "move forward with our program and the formalization of the KCI agenda."

25.     On or about February 9, 2020, KCI left a comment on the Honorable Order's public Facebook page that also included a hyperlink to KCI's blog (https://blog.kycolonels.international), and referenced an "editorial" blog post purportedly authored by Wright on February 7, 2020. A copy of the editorial (the "Wright Editorial") is attached as Exhibit 4.

26.     In the Wright Editorial, Wright candidly acknowledged that he and his affiliated organizations are soliciting, and will continue to solicit, contributions and payments using the KENTUCKY COLONELS INTERNATIONAL Mark (the "Infringing Mark").

---

[1] Because Wright demanded HOKC execute a confidentiality agreement, the documents comprising Exhibit 3 will be filed under seal for the Court's review pending further orders of the Court.

27.     The Wright Editorial also disparaged the Honorable Order by accusing it of a variety of misconduct, including "misleading their donors and supporters for many years," violating various state and federal statutes, and otherwise engaging in "deception, and fraudulent presumptive behavior."

28.     In early February, the Honorable Order became aware that the "Kentucky Colonel" Wikipedia article had been significantly edited by someone with the username "Problemsmith." A copy of the "Kentucky Colonel" Wikipedia article, as of February 18, 2020, is attached as Exhibit 5. Upon information and belief, those modifications were made by Defendant Wright.  Among other things, "Problemsmith" removed a reference indicating that KENTUCKY COLONELS is a registered trademark of the Honorable Order.

29.     The Honorable Order has experienced actual confusion as a result of Defendants' activities using the Infringing Mark.  For example, on September 23, 2019, one of the recipients of a charitable grant in the amount of $10,000 from the Honorable Order posted a thank you on its Facebook page and specifically recognized the Honorable Order's KENTUCKY COLONELS GOOD WORKS PROGRAM. And, on September 30, 2019, another recipient of a charitable grant from the Honorable Order also posted a thank you on its Facebook page. However, in both of the thank you posts, the grantees mistakenly tagged KCI's Facebook page instead of the Honorable Order's Facebook page. A screenshot of these pages are attached as Exhibit 6. Such actual confusion not only showed confusion by the grantees about who provided the charitable giving, but also caused the viewing public of the posts to be confused about who provided the grants to the organizations.

30.     Wright and the other Defendants are using the internet and social media to confuse the public, misappropriate the goodwill, and profit from the KENTUCKY COLONELS

Mark. Unless they are ordered to cease and desist their improper and unauthorized use of the KENTUCKY COLONELS Mark, Defendants will continue their infringing activity, thereby damaging the goodwill and reputation that the Honorable Order has built over decades.

31.     The Unknown Defendants have aided, abetted, and/or participated in the conduct and activities described above. Those individuals and entities, through their affiliation with and support of Wright, KCI, Globcal, and/or Ecology Crossroads, have irreparably harmed and damaged the Honorable Order through their facilitation of and assistance with the unauthorized and improper use of the KENTUCKY COLONELS Mark described above.

## COUNT ONE
### Federal Trademark Infringement

32.     Each of the foregoing Paragraphs of this Verified Complaint is hereby incorporated in this Count by reference.

33.     Defendants' unauthorized use in commerce of the Infringing Mark as alleged herein is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of Defendants' services, and is likely to cause consumers to believe, contrary to fact, that Defendants' services are offered, authorized, endorsed, or sponsored by the Honorable Order, or that Defendants are in some way affiliated with or sponsored by the Honorable Order. Defendants' conduct therefore constitutes trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

34.     Upon information and belief, Defendants have committed the foregoing acts of infringement with full knowledge of the Honorable Order's prior rights in the KENTUCKY COLONELS Mark and with the willful intent to cause confusion and trade on the Honorable Order's goodwill.

35.     Upon information and belief, Defendants have made and will continue to make profits and gains to which they are not entitled in law or equity.

36.     Defendants' conduct is causing immediate and irreparable harm and injury to the Honorable Order, and to its goodwill and reputation, and will continue to both damage the Honorable Order and confuse the public unless enjoined by this Court. The Honorable Order has no adequate remedy at law.

## COUNT TWO
## Federal Trade Name Infringement

37.     Each of the foregoing Paragraphs of this Verified Complaint is hereby incorporated into this Count.

38.     Defendants' unauthorized use in commerce of the Infringing Mark as alleged herein is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of Defendants' services, and is likely to cause consumers to believe, contrary to fact, that Defendants' services are authorized, endorsed, or sponsored by the Honorable Order, or that Defendants are in some way affiliated with or sponsored by the Honorable Order. Defendants' conduct therefore constitutes trade name infringement in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

39.     Upon information and belief, Defendants have committed the foregoing acts of infringement with full knowledge of the Honorable Order's prior rights in the KENTUCKY COLONELS Mark and with the willful intent to cause confusion and trade on the Honorable Order's goodwill.

40.     Upon information and belief, Defendants have made and will continue to make profits and gains to which they are not entitled in law or equity.

41.     Defendants' conduct is causing immediate and irreparable harm and injury to the Honorable Order, and to its goodwill and reputation, and will continue to both damage the Honorable Order and confuse the public unless enjoined by this Court. The Honorable Order has no adequate remedy at law.

## COUNT THREE
### Federal Unfair Competition and False Designation of Origin

42.     Each of the foregoing Paragraphs of this Verified Complaint is hereby incorporated into this Count.

43.     Defendants' unauthorized use in commerce of the Infringing Mark as alleged herein is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of Defendants' services, and is likely to cause consumers to believe, contrary to fact, that Defendants' services are authorized, endorsed, or sponsored by the Honorable Order, or that Defendants are in some way affiliated with or sponsored by the Honorable Order.

44.     Defendants' unauthorized use in commerce of the Infringing Mark as alleged herein constitutes use of a false designation of origin and misleading description and representation of fact.

45.     Upon information and belief, Defendants' conduct as alleged herein is willful and is intended to, is likely to, and already has caused confusion, mistake, or deception as to the affiliation, connection, or association of Defendants with the Honorable Order.

46.     Defendants' conduct as alleged herein constitutes unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

47.     Defendants' conduct as alleged herein is causing immediate and irreparable harm and injury to the Honorable Order, and to its goodwill and reputation, and will continue to both

damage the Honorable Order and confuse the public unless enjoined by this Court. The Honorable Order has no adequate remedy at law.

<u>**COUNT FOUR**</u><br><u>**Federal Trademark Dilution**</u>

48.     Each of the foregoing Paragraphs of this Complaint is hereby incorporated in this Count by reference.

49.     The KENTUCKY COLONELS Mark is a distinctive and famous mark within the meaning of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

50.     The KENTUCKY COLONELS Mark became distinctive and famous prior to Defendants' acts as alleged herein.

51.     Defendants' acts as alleged herein have diluted by blurring and will, unless enjoined, continue to dilute by blurring, and are likely to dilute by blurring the distinctive quality of the Honorable Order's famous KENTUCKY COLONELS Mark.

52.     Defendants' acts as alleged herein have tarnished and will, unless enjoined, continue to tarnish, and are likely to tarnish, the Honorable Order's KENTUCKY COLONELS Mark by undermining and damaging the valuable goodwill associated therewith.

53.     Defendants' conduct as alleged herein constitutes dilution in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

54.     Defendants' conduct as alleged herein is intentional and willful in violation of Section 43(c)(1) of the Lanham Act, and has already caused the Honorable Order irreparable damage and will continue to so damage the Honorable Order unless enjoined by this Court.  The Honorable Order has no adequate remedy at law.

## COUNT FIVE
### Anticybersquatting Consumer Protection Act

55.     Each of the foregoing Paragraphs of this Complaint is hereby incorporated in this Count by reference.

56.     The KENTUCKY COLONELS Mark is a distinctive and famous mark within the meaning of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

57.     According to publicly available WhoIs Data, on September 29, 2000 the Honorable Order registered the domain name www.kycolonels.org, which it continues to use today. A copy of the relevant WhoIs Data is attached hereto as Exhibit 7.

58.     According to publicly available WhoIs Data, on January 20, 2020 the domain name www.kycolonels.international registered. Upon information and belief, Defendants registered and now use this domain name. A copy of the relevant WhoIs Data as well as a screenshot of the domain name is attached hereto as Exhibit 8.

59.     Defendants' domain name incorporates the KENTUCKY COLONELS Mark and is identical or confusingly similar to the Honorable Order's domain name, or dilutive of the famous KENTUCKY COLONELS Mark.

60.     Defendants registered, and continue to use, the www.kycolonels.international domain name with a bad faith intent to profit from the KENTUCKY COLONELS Mark.

61.     Defendants' conduct as alleged herein constitutes cyberpiracy in violation of Section 43(d) of the Lanham Act, 15 U.S.C. § 1125(a).

62.     Defendants' conduct as alleged herein is causing immediate and irreparable harm and injury to the Honorable Order, and to its goodwill and reputation, and will continue to both damage the Honorable Order and confuse the public unless enjoined by this Court. The Honorable Order has no adequate remedy at law.

## COUNT SIX
### Defamation

63.     Each of the foregoing Paragraphs of this Complaint is hereby incorporated in this Count by reference.

64.     Defendants, by and through Wright, have made false and defamatory statements regarding the Honorable Order as reflected, among other places, in the Wright Editorial attached hereto as Exhibit 2, including but not limited to accusing the Honorable Order of a variety of misconduct, including:

      (a)     "misleading their donors and supporters for many years";

      (b)     violating various state and federal statutes; and

      (c)     otherwise engaging in "deception, and fraudulent presumptive behavior."

65.     These statements, and others made by Wright on behalf of Defendants, are false, and were made with malicious intent to harm the Honorable Order's ongoing business activities to fulfil its purpose and support its mission.

66.     These statements, and others made by Wright on behalf of Defendants, are defamatory in that they tend to injure the Honorable Order in its community and lower it in the estimation of that same community.

67.     Defendants, by and through Wright, published these statements through social media, blog posts, and websites to an unlimited number of third parties including, but not limited to, members of the Honorable Order as well as "members" of KCI, in the area in which the Honorable Order conducts its activities.

68.     Defendants, by and through Wright, intended to make these statements, made these statements with malice, and did so without any applicable privilege.

14

69.     These statements are actionable as a matter of law because they vilify and falsely imply serious wrongdoing, including criminal wrongdoing, by the Honorable Order.

70.     As a direct and proximate result of Defendants' statements, made by and through Wright,  the Honorable Order has suffered pecuniary damages, as well as harm to its reputation and impairment to its standing in the community.

**COUNT SEVEN**
**Common Law Trademark Infringement and Unfair Competition**

71.     Each of the foregoing Paragraphs of this Complaint is hereby incorporated in this Count by reference.

72.     The KENTUCKY COLONELS Mark is valid and protectable.

73.     Defendants' use of the Infringing Mark is likely to cause confusion about the source or origin of the services in violation of the common law of the Commonwealth of Kentucky, in that such use of the Infringing Mark is likely to impair the goodwill of the Honorable Order's Mark and allow Defendants to unfairly profit from the use of a confusingly similar mark.

74.     Defendants' use of the Infringing Mark is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of Defendants' services, and is likely to cause consumers to believe, contrary to fact, that Defendants' services are sold, authorized, endorsed, or sponsored by the Honorable Order, or that Defendants are in some way affiliated with or sponsored by the Honorable Order when in fact Defendants have no connection or affiliation with the Honorable Order.

75.     Defendants, through their use of the Infringing Mark, have engaged in misrepresentation, unfairly competing with the Honorable Order in violation of Kentucky common law.

15

76.     Defendants' actions constitute trademark infringement and unfair competition in violation of the common law of the Commonwealth of Kentucky.

77.     Upon information and belief, Defendants have made and will continue to make substantial profits and gains to which they are not entitled in law or equity.

78.     Defendants' conduct as alleged herein is causing immediate and irreparable harm and injury to the Honorable Order, and to its goodwill and reputation, and will continue to both damage the Honorable Order and confuse the public unless enjoined by this Court. The Honorable Order has no adequate remedy at law.

### COUNT EIGHT
### Common Law Dilution

79.     Each of the foregoing Paragraphs of this Complaint is hereby incorporated in this Count by reference.

80.     The KENTUCKY COLONELS Mark is well known.

81.     Defendants' use of the Infringing Mark is likely to confuse, and has actually confused, consumers as to the source or sponsorship of Defendants' services.

82.     Defendants' use of the Infringing Mark is causing harm and will, unless enjoined, continue to cause harm to the reputation and goodwill of the KENTUCKY COLONELS Mark.

### COUNT NINE
### Unjust Enrichment

83.     Each of the foregoing Paragraphs of this Complaint is hereby incorporated in this Count by reference.

84.     Defendants are unlawfully using the Infringing Mark to their benefit at the expense of The Honorable Order.

85.    Defendants, through their unlawful use of the Infringing Mark, are soliciting and collecting donations from members of the public who believe they are donating to The Honorable Order.

86.    It would be unjust for Defendants to retain the donations they have received based on their unlawful use of the Infringing Mark.

**PRAYER FOR RELIEF**

**WHEREFORE**, The Honorable Order of Kentucky Colonels prays for and requests as follows:

A.  Trial by jury on all issues so triable;

B.  Judgment in favor of the Honorable Order on all of its claims;

C.  Judgment holding that Defendants have violated Section 32 of the Lanham Act (15 U.S.C. § 1114(1)), Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)), Section 43(c) of the Lanham Act (15 U.S.C. § 1125(c)); and Section 43(d) of the Lanham Act, (15 U.S.C. § 1125(a));

D.  Judgment holding that Defendants violated the common law of the Commonwealth of Kentucky;

E.  Judgment granting preliminary and permanent injunctive relief enjoining Defendants, their employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns, and all of those in active concert and participation with any of the foregoing persons and entities who receive actual notice of this Court's order by personal service or otherwise from:

   i.    selling, marketing, advertising, promoting, or authorizing any third party to sell, market, advertise or promote goods or services bearing the

17

KENTUCKY COLONELS Mark, the KENTUCKY COLONELS INTERNATIONAL Mark, or any other mark that is a counterfeit, copy, simulation, confusingly similar variation, or colorable imitation of the KENTUCKY COLONELS Mark;

ii. engaging in any activity that infringes the Honorable Order's rights in its KENTUCKY COLONELS Mark;

iii. engaging in any activity that infringes the Honorable Order's trade name;

iv. engaging in any activity constituting unfair competition with the Honorable Order;

v. engaging in any activity that is likely to dilute, by tarnishing or blurring, the famousness of the Honorable Order's KENTUCKY COLONELS Mark;

vi. using or registering any domain name incorporating the KENTUCKY COLONELS Mark, the KENTUCKY COLONELS INTERNATIONAL Mark, or any other mark that infringes or is likely to be confused with the Honorable Order's KENTUCKY COLONELS Mark;

vii. publishing, through spoken or written means, any statements about the Honorable Order that are maliciously and intentionally false;

viii. making or displaying any statement, representation, or depiction that is likely to lead the public or the trade to believe that (i) Defendants' services are in any manner approved, endorsed, licensed, sponsored, authorized, or franchised by or associated, affiliated, or otherwise connected with the Honorable Order or (ii) the Honorable Order's goods and services are in

any manner approved, endorsed, licensed, sponsored, authorized, or franchised by or associated, affiliated, or otherwise connected with Defendants;

ix. using or authorizing any third party to use in connection with any business, goods, or services any false description, false representation, or false designation of origin, or any marks, names, words, symbols, devices, or trade dress that falsely associate such business, goods and/or services with the Honorable Order or tend to do so;

x. registering or applying to register any trademark, service mark, domain name, trade name, or other source identifier or symbol of origin consisting of or incorporating the KENTUCKY COLONELS Mark, the KENTUCKY COLONELS INTERNATIONAL Mark, or any other mark that infringes or is likely to be confused with the Honorable Order's KENTUCKY COLONELS Mark, or any goods or services of the Honorable Order, or the Honorable Order as their source; and

xi. aiding, assisting, or abetting any other individual or entity in doing any act prohibited by sub-paragraphs (i) through (x).

F. Judgment granting such other and further relief as this Court may deem proper to prevent the public and trade from deriving the false impression that any goods or services manufactured, sold, distributed, licensed, marketed, advertised, promoted, or otherwise offered or circulated by Defendants are in any way approved, endorsed, licensed, sponsored, authorized, or franchised by or

associated, affiliated, or otherwise connected with the Honorable Order or constitute or are connected with the Honorable Order's goods and services;

G. Judgment directing Defendants to immediately cease all display, marketing, advertising, promotion, sale, solicitation, and/or use of anything that features or bears any designation or mark incorporating the mark KENTUCKY COLONELS INTERNATIONAL or any other mark that is a counterfeit, copy, simulation, confusingly similar variation, or colorable imitation of the Honorable Order's KENTUCKY COLONELS Mark, and to direct all third parties or individuals wherever located in the United States that distribute, advertise, promote, sell, or offer for sale Defendants' goods or services to cease forthwith the distribution, marketing, advertising, promotion, sale, and/or offering for sale of any and all goods, or services, featuring or bearing the mark KENTUCKY COLONELS INTERNATIONAL or any other mark that is a counterfeit, copy, simulation, confusingly similar variation, or colorable imitation of the Honorable Order's KENTUCKY COLONELS Mark, and to immediately remove them from public access and view;

H. Judgment directing, pursuant to Section 35(a) of the Lanham Act (15 U.S.C. § 1116(a)), Defendants to file with this Court and serve upon the Honorable Order's counsel within thirty (30) days after service on Defendants of an injunction in this action, or such extended period as this Court may direct, a report in writing under oath, setting forth in detail the manner and form in which Defendants have complied therewith;

I.  Judgment awarding the Honorable Order all monetary remedies to which it is entitled, including any damages (trebled) sustained by the Honorable Order in accordance with Section 35(a) of the Lanham Act (15 U.S.C. § 1117(a)) and common law;

J.  Judgment awarding the Honorable Order punitive and exemplary damages as this Court finds appropriate to deter any future willful infringement;

K.  Judgment declaring that this is an exceptional case pursuant to Section 35(a) of the Lanham Act (15 U.S.C. § 1117(a)), and awarding the Honorable Order its costs and reasonable attorneys' fees thereunder;

L.  Judgment awarding the Honorable Order interest, including prejudgment and post-judgement interest, on the foregoing sums; and

M.  Such other and further relief as this Court deems just and proper.

## VERIFICATION

The undersigned hereby swears and affirms that she is currently the Executive Director of the Honorable Order of Kentucky Colonels, Inc., that she is authorized to sign this Verified Complaint and that the statements made herein are true and correct to the best of her knowledge.

_Sherry Crose_
Sherry Crose

COMMONWEALTH OF KENTUCKY ）
                                                     ） :SS
COUNTY OF JEFFERSON             ）

The foregoing instrument was acknowledged before me this _20th_ day of February, 2020, by Sherry Crose.

My commission expires: _December 5, 2022_ .

_Vann Klapheke_
Notary Public
Notary I.D. 612095

Respectfully submitted,

*/s/ Cornelius E. Coryell II*
Cornelius E. Coryell II
Michelle Browning Coughlin
Julie Laemmle Watts
WYATT, TARRANT & COMBS, LLP
400 West Market Street, Suite 2000
Louisville, KY  40202
(502) 589-5235
ccoryell@wyattfirm.com
mcoughlin@wyattfirm.com
jwatts@wyattfirm.com

*Counsel for Plaintiff, Honorable Order of Kentucky Colonels*

100236569.1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

*Electronically Filed*

| | |
|---|---|
| THE HONORABLE ORDER OF | ) |
| KENTUCKY COLONELS, INC. | ) |
| | ) |
| PLAINTIFF | ) |
| v. | ) CIVIL ACTION NO. 3:20CV-132-JRW |
| | ) |
| KENTUCKY COLONELS | ) |
| INTERNATIONAL, et al. | ) |
| | ) |
| DEFENDANTS | ) |

**MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

The Honorable Order of Kentucky Colonels, Inc. ("HOKC") is a Section 501(c)(3),

Kentucky nonprofit corporation dedicated to supporting charitable activities throughout the

Commonwealth of Kentucky. For decades, HOKC has pursued its charitable mission by, among

other things, making annual grants to a large number of Kentucky charities small, mid-size and

sometimes large, that operate across the state. This grant-making function is in turn funded by

the generous donations of HOKC's active members, who reside not only in Kentucky, but also in

other states and around the world. HOKC has an incredibly faithful and proud donor base,

comprised of individuals who have been selected by a Kentucky Governor to receive the

esteemed title of Kentucky Colonel, "the highest title of honor bestowed by the Governor of

Kentucky."[1] After receiving this great honor, individual Kentucky Colonels then become

members of HOKC, and part of the organization's long history of good works and strong donor

relations. In order to protect the reputation and honor bestowed upon its members, the HOKC's

role includes protecting the KENTUCKY COLONELS trademark and service mark (the

---

[1] *See* HOKC website www.kycolonels.org

"KENTUCKY COLONELS Mark"), which HOKC uses in connection with the goods and services it provides to its members and the public, as well as the charities served through its philanthropic work.

That valuable trademark has now been hijacked by Defendant David J. Wright ("Wright") and the Defendant entities which he controls. Through a byzantine network of strawman organizations, assumed names, and social media groups, Wright is operating a competing organization, Kentucky Colonels International ("KCI"), brazenly attempting to misappropriate the KENTUCKY COLONELS Mark for his own personal financial enrichment. Despite the fact that KCI is not a charity (nor, apparently, is the ecological organization that claims KCI as an assumed name), Defendants have attempted to raise funds from Kentucky Colonels under the guise of deductible charitable contribions, thereby intercepting, or attempting to intercept, relationships that HOKC has built over decades using the KENTUCKY COLONELS Mark. Having confused or misled a sufficient number of these individuals, Wright then sprung an unexpected and uninvited demand upon HOKC that it pay him a substantial amount of money in exchange for "merging" his "organization" into HOKC and then hire him as a consultant. When HOKC refused to yield, Wright responded by turning on HOKC, attacking it through the internet and social media with scurrilous accusations and specious claims. Having been rebuffed in demands, whose resemblance to extortion was buttressed by his insistence on silence and a quick payoff, Wright reacted like one would expect an extortionist to react. He retaliated. Because HOKC's reputation and ability to pursue its mission will be irreparably harmed, HOKC moves the Court to enter an order pursuant to Fed.R.Civ.P. 65 and U.S.C. §1116 directing Defendants to immediately cease their misappropriation of the KENTUCKY COLONELS Mark.

**FACTUAL BACKGROUND**

A. **For Decades, HOKC Has Been Dedicated to Serving the Commonwealth of Kentucky and its Citizens.**

On May 2, 1931, Kentucky Governor Flem D. Sampson assembled a meeting of Kentucky Colonels at the State Capitol for the purpose of forming "a society or organization to restore the grandeur and sentiment of the original Kentucky Colonel; to more closely band together this group…for the advancement of Kentucky and Kentuckians…." [Verified Complaint, ¶ 12].  The minutes from that meeting reflect the prominence of being selected as a Kentucky Colonel: "because of this honor [Kentucky Colonels] are regarded highly in their own country and on their arrival here are treated with high honor and respect." [*Id.*]

From its inspired origins in 1931 through the present day, the HOKC has existed as a non-profit organization dedicated to supporting charitable purposes throughout the Commonwealth. In the last twenty years, HOKC has made more than 3,500 grants to non-profit organizations across Kentucky totaling in excess of $29 million. [*Id.* at ¶13]. Since 1951, HOKC has made more than 7,300 grants totaling almost $51 million. [*Id.*] To this day, the Governor of Kentucky serves as the Commander-in-Chief of the HOKC, along with a board of trustees. [*Id.* at ¶14].

For nearly a century, HOKC has pursued its mission to follow the objectives described by Governor Sampson in 1931, a significant aspect of which is promoting and protecting the goodwill of the KENTUCKY COLONELS Mark. [*Id.* at 15]. From the beginning, the Governor's office recognized the HOKC's role, making the HOKC responsible for adopting insignia, seals, and other indicia of the honor. [*Id.* at ¶ 14]. HOKC has carefully guarded the KENTUCKY COLONEL Mark which is an essential element of protecting the ability of HOKC to serve its charitable function with an unblemished reputation.

### B. Protection of the KENTUCKY COLONELS Mark is Essential to HOKC's Mission.

HOKC has used the KENTUCKY COLONELS Mark since its inception in 1931, and that mark plays a critical role in the organization's fundraising efforts. [*Id.*]. The KENTUCKY COLONELS Mark is universally associated with HOKC and with aiding and promoting causes benefiting the health and welfare of Kentuckians. In addition to the KENTUCKY COLONELS Mark, HOKC is also the owner of THE HONORABLE ORDER OF KENTUCKY COLONELS, KENTUCKY COLONELS GOOD WORKS PROGRAM, KENTUCKY COLONELS DAY OF SERVICE, and the HOKC logo marks and other registered and unregistered marks, all of which are critical to the HOKC's charitable solicitation efforts.[2] HOKC has continuously used the KENTUCKY COLONELS Mark in connection with its philanthropic, membership, and social activities for decades and, as a result, the KENTUCKY COLONELS Mark carries a positive connotation worldwide. [Verified Complaint, ¶ 17].

### C. Defendants are Using the KENTUCKY COLONELS Mark for Unauthorized and Improper Purposes.

Defendant David J. Wright purports to be the administrator of a Facebook group comprised of individuals who have been commissioned as Kentucky Colonels. According to Wright, he became the administrator of that group in 2008 and, soon thereafter, he "relaunched" a social media group he called "Kentucky Colonels International."[3]  On January 20, 2020, the

---

[2] A chart reflecting the numerous federal trademark registrations and applications HOKC holds for marks incorporating the KENTUCKY COLONELS Mark, as well the official documentation reflecting those registrations and applications, is attached to the Verified Complaint as Exhibit 2.  For the Court's convenience, that material is also attached hereto as Exhibit 1.

[3] Wright's candid admissions regarding his efforts to misappropriate the KENTUCKY COLONELS brand are reflected in a February 7, 2020 "editorial" blog post from https://blog.kycolonels.international/, which KCI posted to HOKC's Facebook page via a comment on or about February 9, 2020 (hereinafter the "Wright Editorial"). A copy of the Wright Editorial is attached to the Verified Complaint as Exhibit 4.  For the Court's convenience, a copy of the Wright Editorial is also attached hereto as Exhibit 2.

domain name "kycolonels.international" was registered [Verified Complaint ¶ 58] and, shortly thereafter, the website for KCI went live.[4]

KCI's website describes the organization as a "non-profit fraternal and mutual benefit membership organization" which is "incorporated in the Commonwealth of Kentucky" and in "good standing" with the Office of the Secretary of State [Kentucky Colonels International Website ("KCI Website"), 14].[5]  The website represents that KCI is "also known as the Kentucky Colonel Foundation" which it claims was "originally established in 1998 to give prominence to the Kentucky Colonel Commission as a meritory award with diplomatic credence that is respected and understood internationally." [*Id.* at 15].  The KCI Website includes an extensive discussion of the "Order of the Kentucky Colonel" and states that "Kentucky Colonels are recognized and commissioned for their life time to the order with letters patent which permits them to perform and take actions as a commissioned civilian officer of the Commonwealth of Kentucky." [*Id.* at 15-16].

The purpose of the KCI Website is readily apparent from the website's "drop down list." The third item on that list is "Donations" which solicits contributions for the "Kentucky Colonel's International Fund" and states that such donations can be made "using a major credit card or your PayPal account." [*Id.* at 18.][6]  The page also includes an image of a QR code to

---

[4] As noted in the Wright Editorial, HOKC directed cease and desist letters to Wright concerning his social media and internet based activities on various occasions in the early 2000's and again in 2016.  Wright significantly curtailed his improper activities after that correspondence was sent.

[5] The KCI Website can be found at www.kycolonels.international, which is confusingly similar to HOKC's web address www.kycolonels.org.  For the Court's convenience, a print out of the KCI Website, from February 17, 2020, is attached as Exhibit 3.

[6] Notably, if you click on the provided donation hyperlink, you are redirected to a PayPal link that states "Donate to Ecology Crossroads Cooperative Foundation" with the "Purpose: Kentucky Colonels International." A copy of that page is attached as Exhibit 4.

allow donations "using a smart phone." [*Id.*] The KCI Website describes the purposes for which donations to the organization are used, explaining that those funds will "promote the careers, individual growth, … and champion the success of Kentucky Colonels all over the world...." [*Id.*]. The website further states that donations will "support the work of the Goodwill Ambassador Foundation and other programs developed by Kentucky colonels [*sic*]...." [*Id.*]. It also represents that the organization is "registered as an international civil society organization (ICSO) under Globcal International which provides us with recognition and legal standing as an international organization." [*Id.* at 19]. Finally, the website represents that donations to KCI are tax-deductible:

> Donations to KCI are now tax deductible in 2020, those who make donations of $25 or more will receive a personal thank you note from a commissioner. Donations of $1,200+ or the equivalent of 2% of a person's annual salary if US residents will also receive a tax-statement by email at the end of the year so they can deduct their contributions.

[*Id.*].

In addition to soliciting donations to "promote the careers" of individuals who have been commissioned as Kentucky Colonels, the KCI Website purports to offer services to members for a fee. For example, the website describes "public relations" services "recognizing fellow colonels." [*Id.* at 36].[7] Particularly concerning, KCI purports to offer an "International Registry of Kentucky Colonels" which entitles subscribers to "a certificate of registration, a lifetime ID card and additional Internet services…." [*Id.* at 5]. The website promises "those who register their title (letters patent) can also demonstrate themselves through a permanent web page which we will develop and maintain on their behalf that is linked to our roster…." [*Id.* at 6].

---

[7] Those services are offered to only "members who support our organization with donations…." [*Id.*].

6

In addition to the website, KCI also maintains a dedicated blog site, a public Facebook page, and a private Facebook group. The blog, located at blog.kycolonels.international is another pulpit for Wright to misuse the KENTUCKY COLONELS Mark and associated goodwill as well as seek donations for KCI. The blog includes a "news release" dated February 7, 2020; the Wright Editorial dated February 7, 2020; and one additional article titled "Reorganizing the Kentucky Colonels International Commission and Foundation," dated January 30, 2020.[8] The KCI Facebook page "About" section states "Kentucky Colonels International is a non-governmental and non-state fraternal membership commission and foundation of *Globcal International* that has been developed to bring international attention to those who have been commissioned as Kentucky colonels...." and that it was "founded" in 1813 (emphasis added).[9] Membership to the KCI private Facebook group requires a person to answer several questions and be approved by the group administrator.

### D. Contrary to the Representations Made on its Website, KCI is not Recognized by the IRS as a Tax Exempt Organization.

The representations regarding the corporate and tax exempt status of KCI are not supported by the records of the Kentucky Secretary of State or the Internal Revenue Service. While KCI represents that "donations to KCI are tax deductible" the IRS has no record of KCI being granted tax exempt status.[10] Similarly, the IRS has no record of granting tax exempt status to the Kentucky Colonel Foundation, the Kentucky Colonels International Fund, or any other organization for which donations are solicited on the KCI Website. Notably, Ecology Crossroads

---

[8] For the Court's convenience, a printout of the KCI blog site from February 19, 2020 is attached as Exhibit 5.

[9] For the Court's convenience, a copy of the relevant portions of the KCI Facebook page is attached as Exhibit 6.

[10] Organizations granted tax exempt status can be identified on the website of the Internal Revenue Service at www.irs.gov/charities-non-profits/tax-exempt-organization-search. For the Court's convenience, a copy of the page reflecting the search results for KCI is attached as Exhibit 7.

Cooperative Foundation, Inc., the entity which only three weeks ago designated Kentucky Colonels International as an "assumed name," has never been certified as a tax exempt organization.[11] Globcal International, another assumed name for Ecology Crossroads Cooperative Foundation, Inc., has never been certified as a tax exempt organization. Thus, the representations made by Wright and KCI concerning the tax deductibility of donations to that organization are demonstrably untrue.

In addition, neither KCI nor any of its affiliates are registered as charitable organizations with the Office of the Kentucky Attorney General. The Attorney General maintains a registry of organizations authorized to engage in charitable solicitation activities in the Commonwealth of Kentucky.[12] KCI is not listed on that registry. Likewise, the list does not include the Kentucky Colonel Foundation, Kentucky Colonels International Fund, Globcal International, Ecology Crossroads Cooperative, or Ecology Crossroads Cooperative Foundation, Inc.[13] HOKC, on the other hand, *is* included on that list.[14]

In additional to misrepresenting the charitable and tax exempt status of KCI, the KCI Website also incorrectly states that KCI is "incorporated in the Commonwealth of Kentucky" and in "good standing" with the office of the Secretary of State. According to the Kentucky Secretary of State, Kentucky Colonels International was registered as an assumed name of

---

[11] An organization with a similar name "Ecology Crossroads Cooperative" apparently once held tax exempt status, but that status was apparently revoked on November 15, 2010. *See* www.irs.gov/charities-non-profits/tax-exempt-organization-search. For the Court's convenience, a copy of the page reflecting revocation of that entity's tax exempt status is attached as Exhibit 8.

[12] *See* https://ag.ky.gov/Priorities/Protecting-Kentuckians/charity/Pages/default.aspx.

[13] For the Court's convenience, copies of the pages reflecting the Defendants' absence on the list of charitable organizations registered in Kentucky are attached hereto as Exhibit 9.

[14] The page reflecting HOKC's inclusion on the registry of organizations authorized to engage in charitable solicitation activities is attached as Exhibit 10.

Ecology Crossroads Cooperative Foundation, Inc. on January 20, 2020, as was Globcal International.[15]  Ecology Crossroads Cooperative Foundation, Inc. was originally registered to do business in the Commonwealth of Kentucky in 1994.[16]  The Articles of Incorporation of Ecology Crossroads Cooperative Foundation, Inc. state that it is a "not-for-profit" corporation that makes "distributions to organizations that qualify as exempt organizations under Section 501(c)(3) of the Internal Revenue Code…."  [*See* Certificate of Organization and Article of Incorporation of Ecology Crossroads Cooperative Foundation, Inc. (included in the documents attached as Exhibit 11), 1].   The twenty-five year old articles do not mention KCI, the Kentucky Colonel Foundation, the Kentucky Colonels International Fund, or any other organization described on the KCI Website.  Significantly, the articles describe the "purposes" of the corporation, but none of those purposes refer to individuals commissioned as a Kentucky Colonel or any activity related to Kentucky charitable work.   Rather, the corporate purpose of Ecology Crossroads Cooperative Foundation, Inc. is described as educating the general public regarding "environmentally sensitive matters," informing the public "regarding natural resource conservation," introducing "sustainable development techniques," and other matters relating to "environmentally and ecologically sustainable intentional communities."  [*Id.* at 2-3].  Notably, the articles expressly state that "no part of the earnings of this Corporation shall ever inure to the particular benefit of, or be distributed to any Member, trustee, officer or individual having a personal or private interest in the activities of this Corporation …." [*Id.* at 3]. The articles are signed by, among others, "Rev. David Wright."  [*Id.* at 5].

---

[15]  The certificate of assumed name available on the Kentucky Secretary of State website is included in the compilation of corporate records regarding Ecology Crossroads Foundation, Inc., collectively attached as Exhibit 11.

[16]  The Articles of Incorporation of Ecology Crossroads Cooperative Foundation, Inc. are included in the corporate documents attached as Exhibit 11.

The records of the Kentucky Secretary of State also reflect that the entities under which Wright and KCI operate have regularly disregarded the legal requirements for maintaining a legitimate corporate existence. According to the Kentucky Secretary of State, Ecology Crossroads Cooperative Foundation, Inc. was formed in 1994, and administratively dissolved on November 3, 1998; reinstated on December 15, 1998, but administratively dissolved again on November 2, 1999; reinstated again on April 22, 2014, but administratively dissolved on October 12, 2015; and only recently reinstated on January 21, 2020.[17]  Thus, KCI's representations regarding its corporate structure, history, and tax-exempt status are simply not supported by the public record.

**E.    Defendants Recently Escalated Their Efforts to Misappropriate the KENTUCKY COLONELS Mark for Their Own Financial Benefit.**

In late 2019, HOKC learned that Wright, under the guise of KCI and Globcal International, was soliciting participants for a "registry" of individuals who had been commissioned as Kentucky Colonels.  [Verified Complaint, ¶ 19].  As described by Wright, participation in the registry required payment of a fee.  [*Id.*]

In late December 2019, Wright approached HOKC to "initiate a discussion" regarding the activities of KCI.  [*Id.* at ¶ 20; *see also* Wright Editorial (attached as Exhibit 2) 6].  According to Wright, the purpose of that discussion was to determine whether HOKC would "either assist us in our project or perhaps merge our membership program into their own organization."  [Wright Editorial, 6].  Wright advised HOKC that he wanted to "find a way" that HOKC could "endorse the International Register and Kentucky Colonels International, with a sponsorship, while [HOKC] silently but transparently takes over the Register and International

---

[17] The corporate records reflecting the dissolution and reinstatement history of Ecology Crossroads Cooperative Foundation, Inc. are included in the corporate records attached as Exhibit 11.

Concept to become a program belonging to the HOKC." [Verified Complaint, ¶ 20]. When Wright contacted the Executive Director of HOKC to "explore the possibilities of a merger," she suggested that he submit his ideas in writing. [*Id.* at ¶ 21].

In mid-January 2020, Wright forwarded HOKC a package of documents which included a "Draft Merger, Acquisition and Consolidation Agreement." [*Id.* at ¶ 22]. Not surprisingly, Wright's "proposal" included provisions for generous financial payments to both himself and KCI. [*See* Draft Merger, Acquisition and Consolidation Agreement (included in Exhibit 3 to Verified Complaint), 1-7].[18] On January 20, 2020, HOKC notified Wright that it was not interested in his proposed "acquisition" of KCI. [Verified Complaint, ¶ 23]. Shortly thereafter, Wright advised HOKC that he and KCI intended to "move forward with our program and the formalization of the KCI agenda." [*Id.* at ¶ 24].

### F. After His Proposal Was Rejected, Wright Initiated a Social Media and Internet Campaign Aimed at Disparaging HOKC and Escalating His Misappropriation of the KENTUCKY COLONELS Trademark.

On February 8, 2020, Wright posted his "editorial" on HOKC's public Facebook page, disparaging HOKC and accusing HOKC of a variety of misconduct. [*Id.* at ¶ 25-27]. For example, Wright alleged that HOKC has "been misleading their donors and supporters for many years," has violated various state and federal statutes, and has otherwise engaged in "deception, and fraudulent presumptive behavior." [Wright Editorial (Exhibit 2), 9].

More importantly, Wright expressed his intentions to accelerate and increase his efforts to promote a competing organization using the KENTUCKY COLONELS Mark. Specifically, Wright stated:

---

[18] Because Wright demanded HOKC execute a confidentiality agreement, the package of material reflecting Wright's "acquisition proposal" has been filed under seal for the Court's review pending further orders of the Court.

So it is for these Kentucky Colonels that we are moving forward with our plans by forming our own International Commission to develop a genuine membership organization that is rightly so.  We have taken several major steps already by getting a new dedicated website and forming a small commission of distinguished leaders to serve as the initial officers that share many of my sentiments and concerns.

\* \* \*

To get the organization off the ground I have legalized the commission's formation under the same organization that I founded in 1994 by reinstating it with the Secretary of State in Frankfort on January 21.  Now to take it where it needs to go we need donations from the public and will need to charge monthly or annual dues to members in order to provide member benefits and services beyond the social media.  The online services we have been providing through administering the Facebook groups will remain without any membership fees including our blog and a new website being developed at [kycolonels.international].

\* \* \*

On January 30 the formation of Kentucky Colonels International became official.  We upgraded our status from an unincorporated membership organization and legalized the commission and foundation as an assumed name corporation in the Commonwealth of Kentucky belonging to Ecology Crossroads (est. 1994), who is our sponsor.  To become an independent membership organization like we deserve to be, it is up to our members and other Kentucky colonels to come together and provide us with support we need in the form of donations to better formalize our efforts to succeed.  Contributions can be made online through their sponsor using PayPal or a credit card.

[*Id.* at 10-12].  Thus, in addition to the express solicitations reflected on the Kentucky Colonel International website,  Wright has candidly acknowledged that he and his affiliated organizations are soliciting, and will continue to solicit, contributions and payments using the KENTUCKY COLONELS Mark.  He has also made it clear that those contributions will not be shared with HOKC or subject to scrutiny by anyone other than himself.

After his "acquisition proposal" was rejected, Wright also sought to advance his misappropriation of the KENTUCKY COLONELS Mark by significantly, and erroneously, editing the "Kentucky Colonel" Wikipedia page.  [Verified Complaint, ¶ 28].  Among other

things, Wright, using the username "Problemsmith," removed a reference indicating that "Kentucky Colonels" is a registered trademark of HOKC. [*Id.*; *see* Exhibit 5 to Verified Complaint]. He also added an entire section to the article describing "Kentucky Colonels International."[19] [Kentucky Colonel Wikipedia Article, 2]. Thus, Wright and the other Defendants have extensively used the internet to confuse the public misappropriate the goodwill, and profit from the KENTUCKY COLONELS Mark.

## ARGUMENT

### HOKC IS ENTITLED TO A RESTRAINING ORDER AND INJUNCTION DIRECTING DEFENDANTS TO STOP THEIR MISSUE AND MISAPPROPRIATION OF THE KENTUCKY COLONELS TRADEMARK.

"The preliminary injunction serves an important purpose—'to allow a victory by [the plaintiffs] to be meaningful.'" *McGirr v. Rehme*, 891 F.3d 603, 614 (6th Cir. 2018) (citation omitted). When considering a motion for preliminary injunctive relief, the Court must weigh the following factors: "'(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.'" *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005) (quoting *PACCAR Inc. v. TeleScan Techs., L.L.C.*, 319 F.3d 243, 249 (6th Cir. 2003)). The four considerations applicable to preliminary injunction decisions are to be balanced; they are not prerequisites to be met. *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 400 (6th Cir. 1997). "No single factor will be determinative as to the appropriateness of equitable relief." *Id.*

---

[19] *See* https://en.wikipedia.org/wiki/Kentucky_Colonel. A copy of the Wikipedia Article on "Kentucky Colonel" is attached to the Verified Complaint as Exhibit 5. For the Court's convenience, a copy of the Wikipedia Article is also attached hereto as Exhibit 12.

> For example, "a finding that the movant has not established a strong probability of success on the merits will not preclude a court from exercising its discretion to issue a preliminary injunction if the movant has, at minimum, 'show[n] serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued.'"

*Id.* at 399–400 (quoting *Gaston Drugs, Inc. v. Metro. Life Ins. Co.*, 823 F.2d 984, 988 n.2 (6th Cir. 1987)). "[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing" *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

In this trademark infringement case, a victory by HOKC will not be meaningful unless Defendants are ordered to stop infringing upon the KENTUCKY COLONELS Mark. They should be ordered to do so immediately because, with each passing day of Defendants' continuing infringement, HOKC and its valuable trademark is irreparably injured. HOKC's likelihood of success is high, and the requested injunction will cause no harm to Defendants, as any self-inflicted wound caused by infringement does not weigh against issuance of an injunction. The public interest is also served by the requested injunction, as it eliminates the intentional confusion caused by Defendants' infringement. The four injunction factors weigh strongly in HOKC's favor and warrant issuance of injunctive relief.

### A.    HOKC Is Likely to Succeed on the Merits.

Trademark rights in the United States arise from use. As the leading trademark commentator states "the first to use a designation as a mark in the sale of goods or services is the 'owner' and 'senior user.'" *See* 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair*

*Competition* § 16:4 (5th Ed.).[20]  Moreover, "[w]ith each sale of goods or services under such a business symbol, the seller builds up greater and greater legal rights in that symbol. *Id.* § 16:1. As the Sixth Circuit has stated, "trademark law now pursues two related goals–the prevention of deception and consumer confusion and, more fundamentally, the protection of property interests in trademarks." *Ameritech, Inc. v. American Information Technologies Corporation*, 811 F.2d 960, 964 (6th Cir. 1987). It is indisputable that HOKC has used the KENTUCKY COLONELS Mark for decades and has clearly-established rights and priority in the use of the KENTUCKY COLONELS Mark over Defendants. In addition to being federally registered, the Mark has become synonymous with HOKC's services to its members and its charitable mission to the Commonwealth and beyond.

The Lanham Act specifically provides for injunctive relief to prevent the violation of any right of a trademark holder. *See* 15 U.S.C. § 1116. HOKC's trademark registrations are prima facie evidence of the validity of its Mark. *See* 15 U.S.C. § 1115. "The touchstone of liability under § 1114 is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods [or services] offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997).

Courts in the Sixth Circuit evaluate likelihood of confusion cases using the eight-factor test set forth in *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642 (6th Cir. 1982). The "*Frisch's* factors," as they have come to be known, consist of: (1) strength of the plaintiff's mark; (2) relatedness of the parties' goods or services; (3) similarity of the

---

[20] *McCarthy on Trademarks and Unfair Competition* is available electronically and therefore, pursuant to LR 7.1(h), the cited portions are not attached.  However, Plaintiff will provide copies to the Court upon request.

parties' marks; (4) evidence of actual confusion between the parties' marks; (5) marketing channels used by the parties; (6) likely degree of purchaser care in the relevant consumer group; (7) the defendant's intent in selecting the mark; and (8) likelihood that either party will expand its product lines. *Id.* at 648; *see also Ga.-Pac. Consumer Prods. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1100-01 (6th Cir. 2012).

While these factors are a guide to determine whether confusion is likely, HOKC does not need to show all, or even most, of the factors to prevail on its claim. *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1186 (6th Cir. 1988); *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991) ("Each case presents its own complex set of circumstances and not all of these factors may be particularly helpful in any given case."). "The 'ultimate question [is] whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way.'" *Ohio State Univ. v. Thomas,* 738 F. Supp. 2d 743, 749 (S.D. Ohio 2010) (citations omitted). In this case, HOKC's Verified Complaint establishes that Defendants are intentionally and willfully infringing its KENTUCKY COLONELS Mark using an identical mark or nearly identical, offering what purports to be identical services. HOKC is highly likely to succeed on the merits on its claims for trademark infringement and therefore is entitled to the relief it seeks.

1. ***Frisch's* Factor No. 1*:* KENTUCKY COLONELS is a very strong and well-known Mark throughout the world.**

The likelihood that consumers will confuse Defendants' use of HOKC's trademark as being authorized or endorsed by HOKC is extremely high. The stronger a trademark, the broader the scope of protection it enjoys, and the KENTUCKY COLONELS Mark is well-known throughout the world. As the Sixth Circuit recently noted, "[t]he stronger a mark is, the greater the risk of confusion." *Kibler v. Hall*, 843 F.3d 1068, 1073 (6th Cir. 2016) (citing *Homeowners*,

931 F.2d at 1107; *see also Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1117 (6th Cir. 1996). ***A strong mark "casts a long shadow which competitors must avoid."*** *Kenner Parker Toys Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 353 (Fed. Cir. 1992) (emphasis added). Accordingly, "the 'most important *Frisch* factors are similarity and strength of the mark." *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 424 (6th Cir. 2012) (quoting *Gray v. Meijer, Inc.*, 295 F.3d 641, 646 (6th Cir. 2002)).

To determine the strength of a mark, courts in the Sixth Circuit look at the conceptual and commercial strength of a mark. *Butler v. Hotel Cal., Inc.*, 106 F. Supp. 3d 899, 906 (N.D. Ohio 2015) (citing *Homeowners*, 931 F.2d at 1107). The KENTUCKY COLONELS Mark has developed a high level of conceptual strength, or distinctiveness in the marketplace, through its nearly decade of continual use by the HOKC. *See id.* And, understanding the scope of commercial strength of the KENTUCKY COLONELS Mark only requires mentioning a name like *Colonel* Sanders (emphasis added). The commercial strength of a mark considers the public's recognition of a mark—"the extent to which people associate the mark with the product [or services] it announces." *Kibler*, 843 F.3d at 1074.

In this case, HOKC has continuously and exclusively used the KENTUCKY COLONELS Mark since 1931 [Verified Complaint, ¶ 15]. As a result, the KENTUCKY COLONELS Mark has become well-known throughout the world, and it is inextricably intertwined with HOKC, its member services, and its charitable work. Any use of the famous KENTUCKY COLONELS Mark by Defendants will inevitably cause confusion and create the mistaken impression that HOKC is associated or affiliated with Defendants' organizations and activities.

Moreover, HOKC has an incontestable registration for KENTUCKY COLONELS. An incontestable registration—based on five or more years of continuous use on or in connection with certain goods or services provided certain conditions are met—is immune from challenge and presumed to be strong. *See* 15 U.S.C. § 1065; *Jet, Inc. v. Sewage Aeration Sys.*, 165 F.3d 419, 422 (6th Cir. 1999). Finally, the strength of HOKC's Mark is enhanced by the fact that there is no evidence of any other similar marks actively being used in commerce. *See Daddy's Junky*, 109 F.3d at 281.

### 2. *Frisch's* Factor No. 2: The services at issue are directly related and competitive.

The relatedness of the activities in which Defendants purportedly intend to engage equally supports the injunction requested by HOKC. "Services and goods 'are related not because they coexist in the same broad industry, but are related if the services are marketed and consumed such that buyers are likely to believe that the services, similarly marked, come from the same source, or are somehow connected with or sponsored by a common company.'" *Daddy's Junky*, 109 F.3d at 282-83 (citing *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1109 (6th Cir. 1991)). Here, HOKC engages in charitable fundraising services in connection with the KENTUCKY COLONELS Mark. Wright and the other Defendants are also soliciting charitable contributions and funds (although apparently under false pretenses) also using an identical or nearly identical mark. Defendants are intentionally using the KENTUCKY COLONELS Mark to confuse the consuming public into believing that they are the official and authorized membership organization for the KENTUCKY COLONELS services. The competing enterprise maintained by Defendants would easily be confused by the public as being supported by or affiliated with HOKC.

### 3. *Frisch's* Factor No. 3: The Parties' Marks are similar.

Here, Defendant is intentionally using a mark that is not just similar, but identical or nearly identical. In assessing similarity, "'courts must determine whether a given mark would confuse the public when viewed alone, in order to account for the possibility that sufficiently similar marks may confuse consumers who do not have both marks before them but who may have a general, vague, or even hazy, impression or recollection of the other party's mark.'" *Maker's Mark*, 679 F.3d at 421 (quoting *Daddy's Junky*, 109 F.3d at 283). The identical or nearly identical nature of the marks, used in connection with essentially identical services, will create a likelihood of confusion. Accordingly, this *Frisch's* factor clearly weighs in favor of HOKC.

### 4. *Frisch's* Factor No. 4: Actual confusion between the Marks.

"Actual confusion" occurs when a consumer is confused about the source of goods or services because of similarity between two marks. While evidence of actual confusion is "'undoubtedly the best evidence of likelihood of confusion,'" it is very difficult to obtain. *See Daddy's Junky*, 109 F.3d at 284 (citation omitted). "Due to the difficulty of securing evidence of actual confusion, a lack of such evidence is rarely significant ...." *Id.* (citations omitted); *see also Maker's Mark*, 679 F.3d at 422.

In this case, HOKC has already experienced evidence of actual confusion as a result of KCI's activities. In September 2019, two separate recipients of charitable grants from HOKC posted thank yous to their respective Facebook pages. In both posts, however, the grantees mistakenly tagged KCI's Facebook page instead of HOKC's Facebook page. [Verified Complaint, ¶ 29]. Such actual confusion not only showed confusion by the grantees about who provided the charitable giving, but also caused the viewing public of both posts to be confused

by who provided the grants. These incidents illustrate both (i) current grantees of HOKC who tagged the wrong entity in their posts; and (ii) the viewing public who saw the posts and would have assumed that KCI awarded the grants to the non-profit organizations demonstrating the kind of actual confusion that HOKC seeks to avoid by enjoining Defendants' further actions. This evidence of actual confusion weighs heavily in favor of HOKC.

      **5.**       ***Frisch's* Factor No. 5: The Parties use identical marketing channels.**

Where marketing methods used to promote the services at issue are substantially similar, the likelihood of confusion among the services is higher. *Frisch's*, 670 F.2d at 648. Here, both HOKC and Defendants maintain an online presence through social media, including Facebook pages, Kentucky Colonel membership websites, charitable online giving features, and other similar marketing channels. More importantly, Defendants, through Wright, are intentionally creating confusion through social media accounts and the KCI Website.

      **6.**       ***Frisch's* Factor No. 6: The likely degree of purchaser care is low.**

The sixth *Frisch's* factor requires the Court to determine the likely degree of purchaser care, which is not particularly applicable to this set of facts, in which Defendants are engaging in purposeful use of the KENTUCKY COLONELS Mark. In this case, the purchaser, even in exercising care, may still be confused because of Defendants' purposeful attempts to appear to be an official organization affiliated with the KENTUCKY COLONELS Mark and to trade off of the goodwill of the KENTUCKY COLONELS brand.

      **7.**       ***Frisch's* Factor No. 7: The Defendants intended to copy the Mark.**

The intent of Defendants is also assessed when determining the likelihood of consumer confusion. "Direct evidence of intentional copying is not necessary to prove intent. Rather, the use of a contested mark with knowledge of the protected mark at issue can support a finding of

intentional copying." *Daddy's Junky*, 109 F.3d at 286 (citation omitted). Based upon the correspondence between the parties, Defendants clearly are aware of HOKC's Mark and are obviously using it for their own personal and financial gain. In fact, Wright and his affiliated organizations dramatically increased their improper infringement activities after HOKC rejected Wright's extortionate attempt to have KCI "acquired" by HOKC.

### 8. *Frisch's* Factor No. 8: Expansion of product lines.

In this case, Defendants' fraudulent services are directly competing with HOKC's legitimate services. The Sixth Circuit holds that in such instances, where products or services are directly competing, there "is no need for discussion of this factor." *Little Caesar Enterprises, Inc. v. Pizza Caesar, Inc.,* 834 F.2d 568, 572 (6th Cir. 1987).

### 9. The *Frisch's* Factors, Taken Together, Weigh Strongly in Favor of HOKC.

Certainly, HOKC has a strong likelihood of success on the merits in its claim of trademark infringement. ***Cases like this are why trademark laws exist***. Trademark infringement is problematic in any case, but it simply cannot be tolerated when being done to divert charitable and membership dollars for Defendants' unjust personal financial gain, while simultaneously trying to strong-arm a six-figure "merger" deal for yourself. To prevent irreparable injury and maintain the status quo, the temporary restraining order and preliminary injunction requested by HOKC should be granted.

### B. Defendants' Continued Infringement of the Trademark of HOKC Poses a Threat of Irreparable Harm.

In the trademark context, the requirement of irreparable injury is to be interpreted liberally. The Sixth Circuit has unequivocally held that "irreparable harm is *presumed* from defendant[']s infringement of plaintiff's mark." *DaimlerChrysler v. The Net Inc.*, 388 F.3d 201, 208 (6th Cir. 2004) (citations omitted) (emphasis added). "The law of this Circuit holds that no

particular finding of likelihood of . . . irreparable harm is necessary for injunctive relief in trademark infringement or unfair competition cases." *Circuit City Stores, Inc. v. CarMax, Inc.,* 165 F.3d 1047, 1056 (6th Cir. 1999) (citing *Wynn Oil Co. v. Am. Way Serv. Corp.,* 943 F.2d 595, 608 (6th Cir. 1991)). Further, "[o]nce a moving party has demonstrated a likelihood of confusion, a finding of irreparable injury ordinarily follows." *Ohio State*, 738 F. Supp.2d at 755.

"The irreparable injury flows both from the potential difficulty of proof of plaintiff's damages, and also from the impairment of intangible values." *Wynn*, 943 F.2d at 608 (internal quotation marks omitted) (citations omitted)). Further, where a defendant is unlawfully infringing upon a trademark, irreparable injury follows from the damage to a plaintiff's reputation and the development of goodwill in its mark. *See DaimlerChrysler*, 388 F.3d at 208. A court may also consider the potential loss of control over the quality of goods associated with the plaintiff's mark and the risk of damage to the plaintiff's reputation and mark. *See Woodroast Sys., Inc. v. Rests. Unlimited, Inc.*, 793 F. Supp. 906, 918 (D. Minn. 1992), *aff'd* 994 F.2d 844 (8th Cir. 1993). The consequences of trademark infringement and unfair competition and the attendant loss of goodwill and injury to reputation along with control over the nature and quality of the goods are intangibles which cannot later be compensated by an award of money damages.

Defendants' use of HOKC's trademark poses certain and immediate threat of irreparable injury to the reputation and goodwill of HOKC. The injury to HOKC's goodwill and other charitable interests caused by this conduct will only increase as Defendants' activities continue. Indeed, it is likely that HOKC's support of numerous charities would be irreparably harmed if Defendants are permitted to profit from the KENTUCKY COLONELS Mark. Moreover, unless Defendants are enjoined from infringing HOKC's Mark, it will be difficult to subsequently

quantify how many contributions were lost due to Defendants' actions. *See, eg., Budish v. Gordon*, 784 F. Supp. 1320, 1337 (N.D. Ohio 1992).

The injury which will be sustained by HOKC is more than financial, however. HOKC has spent many years developing its reputation and goodwill throughout the world. Here, continued use of its Mark by Defendants could cause HOKC to suffer a substantial loss of goodwill among its members and the general public, as consumers are confused into thinking that HOKC is acting in concert with organizations and individuals that have no ties to HOKC. The fact that Wright and his affiliated organizations have misrepresented their corporate and tax exempt status further exacerbates the reputational harm that HOKC may suffer. The threat that the goodwill of HOKC will be diminished and the prestige and honor associated with the KENTUCKY COLONELS Mark tarnished is an injury which cannot be rectified monetarily. The injury is immediate and continuing and cannot be repaired. *See Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) (holding that "[t]he loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute"); *Michigan Bell Telephone Co. v. Engler*, 257 F.3d 587, 599 (6th Cir. 2001) (noting same); *Genny's Diner & Pub, Inc. v. Sweet Daddy's, Inc.*, 812 F.Supp. 744, 747 (W.D. Ky. 1993) (finding that where confusion is highly likely, the loss of goodwill is irreparable or, at best, only very slowly regained, and noting that damages for such harm are clearly inadequate).

HOKC has sufficiently demonstrated the irreparable harm which it will suffer if the injunctive relief sought is not granted. The motion for a temporary restraining order and a preliminary injunction should be granted.

### C.   The Balance of Injuries Weighs Decidedly in Favor of HOKC.

Harm caused to apparent infringers is not entitled to consideration. *Worthington Foods, Inc. v. Kellogg Co.*, 732 F. Supp. 1417, 1461 (S.D. Ohio 1990). "[I]f the plaintiff alleging

trademark infringement can show a likelihood of success, the 'harm to others' factor of the preliminary injunction standard would normally favor the plaintiff as well." *Id*. at 1462. The threatened injury to HOKC therefore far outweighs whatever harm the issuance of an injunction may cause Defendants.

The relief requested by HOKC prohibits Defendants from doing what it should not be doing in the first place—using a trademark to which it has no legal right. "Where the harm to an alleged infringer from a preliminary injunction is self-inflicted, courts typically find that such harm is a natural consequence of infringing activity that does not weigh against issuance of an injunction." *Anderson v. TOL, Inc.,* 927 F. Supp. 2d 475, 488 (M.D. Tenn. 2013). Any harm to Defendants is self-inflicted, as Defendants knew of the HOKC's longstanding rights in the KENTUCKY COLONELS Mark. *See Papa John's Int'l, Inc. v. Specktacular Pizza, Inc.*, No. 3:05-cv-515-H, 2005 WL 3132337, at \*5 (W.D. Ky. Nov. 21, 2005); *see also KFC Corp. v. Goldey*, 714 F. Supp. 264, 267 (W.D. Ky. 1989) ("As to the threatened harm to plaintiff compared with the threatened harm to the defendant, the courts have usually held that where the plaintiff is an authorized trademark holder and the defendant is improperly using the trademark, then the threatened harm to the trademark owner outweighs the threatened harm to the defendant.").

In fact, the relief requested will only prevent Defendants from doing what they should not be doing in the first place. "Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense 'merits little equitable consideration.'" *Budish v. Gorden*, 784 F.Supp. 1320, 1338 (N.D. Ohio 1992) (citations omitted). *See also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 253 F.Supp.2d 943, 973 (E.D. Ky. 2003) ("One cannot build a business based upon infringing

24

another's intellectual property rights, and then be allowed to complain that making them stop will cause harm"). Furthermore, when a plaintiff has made a substantial investment of time and money in its mark as opposed to the investment by the infringer, the balance of hardships tips in the plaintiff's favor. *See Woodroast Sys., Inc. v. Restaurants Unlimited, Inc.*, 793 F.Supp. 906, 919 (D. Minn. 1992), *aff'd* 994 F.2d 844 (8th Cir. 1993).

HOKC has invested nearly a century in developing the goodwill behind its KENTUCKY COLONELS Mark. Defendants are using HOKC's trademark to lend authenticity to an organization which, by its own admission, is dedicated to promotion of the "careers and successes" of its individual members. Such self-promotion for individual and personal enrichment is completely inconsistent with the mission of the HOKC and contrary to the historical use of the KENTUCKY COLONELS Mark. It is particular harmful to HOKC's reputation since the individuals and entities misappropriating the Mark are misrepresenting their tax exempt status and have a history of utterly disregarding the law on corporate governance, formation, and status. Accordingly, as the only potential injury to Defendants would be profits lost from their infringing activities, the balance of equities lies heavily in favor of HOKC. The motion for injunctive relief should be granted.

### D.    Granting Injunctive Relief Is In the Public Interest.

The injunctive relief sought by HOKC is clearly in the best interest of the public. Unlike other types of preliminary injunction matters, in a trademark infringement matter, "a third party, the consuming public, is present and its interests are paramount."  *See* 1 McCarthy, *supra* p. 8, § 2:22 (quoting *James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 274 (7th Cir. 1976)). When a trademark is infringed, what is actually infringed is the right of the public to be free of confusion and the synonymous right of the trademark owner to control its product's (or service's) reputation. *Id.* As a result, public policy concerns often "weigh in favor of preliminary

injunctive relief because an injunction would halt confusion in the marketplace." *Ohio State*, 738 F. Supp. 2d at 756-57. In the present case, it is certainly in the public interest to prevent confusion between the services provided by HOKC and the activities of others improperly using the KENTUCKY COLONELS Mark.

HOKC is a non-profit organization that distributes grants to non-profit organizations. To raise money for charity, HOKC solicits contributions from appointed Kentucky Colonels, holds an annual barbeque picnic, and engages in service, sells a wide variety of merchandise that bears the KENTUCKY COLONELS Mark, and other such fundraising activities. On an annual basis, HOKC raises and distributes millions of dollars to charitable and educational organizations across the Commonwealth and beyond, and confusion or harm to its goodwill could impair HOKC's efforts to raise money for such worthy causes. HOKC's motion for a temporary restraining order and a preliminary injunction is in the public interest and should be granted.

## <u>CONCLUSION</u>

HOKC is suffering irreparable injury from Defendants' infringement of its trademark, and membership of HOKC is being duped by Defendants for Defendants' own financial gain. HOKC has offered sufficient evidence to show that Defendants' use of the KENTUCKY COLONELS Mark is harming HOKC, and is causing actual confusion to the public. HOKC respectfully requests that its motion for a temporary restraining order and a preliminary injunction be granted and that the proposed Orders be entered with all possible haste.

Respectfully submitted,

*/s/ Cornelius E. Coryell II*
Cornelius E. Coryell II
Michelle Browning Coughlin
Julie Laemmle Watts
WYATT, TARRANT & COMBS, LLP
400 West Market Street, Suite 2000
Louisville, KY  40202
(502) 589-5235
ccoryell@wyattfirm.com
mcoughlin@wyattfirm.com
jwatts@wyattfirm.com

*Counsel for Plaintiff, the Honorable Order of Kentucky Colonels, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 21, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.  I further certify that a true and correct copy of the foregoing has been served upon the following, via U.S. Mail, on the 21st day of February, 2020:

Kentucky Colonels International
c/o Maya-Lis A. Wright
302 General Smith Drive
Richmond, KY 40475

Ecology Crossroads Cooperative Foundation, Inc.
c/o Maya-Lis A. Wright
302 General Smith Drive
Richmond, KY 40475

Globcal International
c/o Maya-Lis A. Wright
302 General Smith Drive
Richmond, KY 40475

David J. Wright
302 General Smith Drive
Richmond, KY 40475

*/s/ Cornelius E. Coryell II*
*Counsel for Plaintiff, the Honorable Order of Kentucky Colonels, Inc.*

100234362.2

27