1              UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF KENTUCKY
2                  LOUISVILLE DIVISION

3

THE HONORABLE ORDER OF          )
4  KENTUCKY COLONELS, INC.,        )
                                  )
5            Plaintiff,            )     Case No. 3:20-CV-132
                                  )
6        VS.                       )
                                  )
7  KENTUCKY COLONELS               )
INTERNATIONAL, ET AL.,          )
8                                 )     March 4, 2020
             Defendants.          )     Louisville, KY
9

10
                         *  *  *  *  *
11
          TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
12              BEFORE HONORABLE DAVID J. HALE
                UNITED STATES DISTRICT JUDGE
13
                         *  *  *  *  *
14
   APPEARANCES:
15
   For Plaintiff:          Cornelius E. Coryell
16                         Julie L. Watts
                          Wyatt, Tarrant & Combs, LLP
17                         400 West Market Street, Suite 2000
                          Louisville, KY 40202
18

19
                     April Dowell, RMR, CRR
20                   Official Court Reporter
                     232 U.S. Courthouse
21                   Louisville, KY 40202
                       (502) 625-3778
22

23

24  Proceedings recorded by mechanical stenography, transcript
   produced by computer.
25

1          (Begin proceedings in open court 10:23 a.m.)

2          THE CLERK:  3:20-CV-132.  The Honorable Order of

3     Kentucky Colonels versus Kentucky Colonels International.

4          THE COURT:  Well, Mr. Coryell, if you wouldn't mind

5     to take the podium there and enter your and your colleague's

6     appearance.

7          MR. CORYELL:  Good morning, Your Honor.  Corky

8     Coryell and Julie Watts on behalf of the plaintiff along with

9     Sherry Crose, executive director of the Honorable Order of

10    Kentucky Colonels.  I know it takes a second for this to warm

11    up.  We're here this morning on the The Honorable Order's

12    motion for a preliminary injunction.

13          As the Court knows the Court has entered a

14    restraining order based on the papers that were filed,

15    verified complaint, and we have tendered a number of things

16    since the filing of the verified complaint.  Essentially,

17    Judge, just by way of explanation on who we are and why we're

18    here, the Honorable Order does two things:  It raises money

19    and it gives that money away to charitable causes big and

20    small throughout the Commonwealth of Kentucky and it has done

21    that for almost a century.

22          And the Kentucky Colonels is the longstanding mark

23    of the Honorable Order through the good works and the

24    philanthropy of the Honorable Order.  That mark has become

25    respected, highly regarded, and frankly world-famous and that

1   is why the defendants are trying to steal it.

2        They are trying to misappropriate the mark for their

3   own personal -- for their own agenda and that agenda includes

4   regrettably the personal financial enrichment of the

5   defendant, David Wright, and they are frankly unapologetic

6   about that.  And that's what we're asking -- that's why we're

7   here today.  We're asking the Court to stop that.  We know

8   that they won't stop unless the Court enters an injunction, so

9   we -- we put in --

10        THE COURT:  Let me stop you there --

11        MR. CORYELL:  Sure.

12        THE COURT:  -- and address a couple of -- well, I

13   hesitate to call them housekeeping matters because they --

14   they end up being of some import, but obviously no one from

15   the defendants has appeared.  And I took the bench a little

16   late.

17        We -- we thought we would give them some time to see

18   if they -- they made an appearance.  No one is here in their

19   behalf.  You mentioned filing a number of materials.  I have

20   reviewed those materials which include your email

21   correspondence with the defendant, David Wright.

22        In that email correspondence am I correct that he

23   essentially acknowledges receiving the complaint as well as

24   the temporary restraining order that you supplied him via

25   email?

1      MR. CORYELL:  He does, Your Honor.  That's correct.

2  If I could just interject one other thing.  Mr. Wright

3  purportedly on behalf of all the defendants -- well, he sent

4  me an email that I received Monday afternoon, I believe.  It

5  might have been yesterday morning -- no, I think it was late

6  Monday afternoon.

7      Included or attached to that email was what he

8  characterized as filing a response to our motion for an

9  injunction and he indicated in his email that he had sent that

10  I think via email and via certified mail to the Court for

11  filing.

12      I did not know whether that would make it into the

13  Court's files certainly before this hearing, so I actually

14  attached it to -- and it's an exhibit to what we filed -- the

15  reply that we filed in support of the motion --

16      THE COURT:  I saw that and reviewed it.  I don't

17  believe we've -- I don't believe the clerk's office has

18  received any filing at all from --

19      MR. CORYELL:  I just wanted to make sure that the

20  Court -- I thought it was important given the nature of the

21  proceedings that the Court be aware of any communications and

22  certainly anything that the defendants consider to be a

23  response or a legal filing.  I wanted to make the Court aware

24  of that.

25      I will say from the -- as a procedural matter -- and

1    the Court may be aware of this because this was referenced in

2    our filings.  I think we do have service on the corporate

3    defendants.  We attempted to serve them personally at the

4    address for the -- for the registered agent.

5          When my process server showed up, somebody -- it was

6    a residential address, it was not a business address, but a

7    woman answered the door and told my process server that the

8    process agent did not live there.  I've come to find out -- or

9    at least it's been represented to me by Mr. Wright in emails

10   that the woman who answered the door was his ex-wife who was

11   not aware of -- I guess that her home had been given as the

12   address for service of process.

13         But in any event, my process server left the package

14   that included the summons and the complaint and the

15   restraining order motion on the front porch.  And I have tried

16   to -- so and I think we have service on them.  And I think

17   that Mr. Wright, the Court -- the Court is correct, he has

18   received and acknowledged receipt of everything that's been

19   filed.

20         And I think by virtue of the fact that he filed a

21   pro se appearance yesterday, I think he has effectively

22   submitted himself to the jurisdiction of the Court.

23         THE COURT:  And when you say a pro se appearance,

24   you mean by virtue of the fact that he -- he provided

25   this what he called a response?

1          MR. CORYELL:  Yeah.  Judge, if I could just

2     reference exactly what it was that -- yeah.  So he -- and this

3     is attached as Exhibit 2 to the reply in support of the motion

4     for a preliminary injunction that we filed yesterday.  And so

5     it consists of -- I wish I could -- yeah, there we go.

6          So it consists of a couple things, Judge.  First it

7     consists of this which he characterizes as -- can the Court

8     see that?  Is that focused?

9          THE COURT:  Yes.

10          MR. CORYELL:  This is what I -- I guess I would

11     characterize as his entry of appearance or an introduction.

12     This certainly is what I would characterize as an entry of

13     appearance because it says Notice of Appearance.

14          THE COURT:  Right.

15          MR. CORYELL:  And then in addition to that he filed

16     a 28-page document that purports to be an answer to the motion

17     for temporary restraining order and preliminary injunction and

18     then later on a motion to dismiss -- what he characterizes as

19     a motion to dismiss or continue with the time extension.

20          THE COURT:  Well -- yes.  And I -- I saw all those

21     materials that you had attached.  The only distinction that I

22     wanted to make at this point is that we have not yet received

23     those from him.  It's quite possible if he has mailed them

24     that they will show up at a later point.

25          I think it's also important -- you all know this.

1    He can certainly under some circumstances represent himself in

2    a pro se capacity.  He cannot represent a corporate entity in

3    a pro se capacity, and so there is a limitation on his ability

4    to act in behalf of the corporate defendants here, but

5    nevertheless, he is not here.

6          He has not sent counsel in his or the other

7    defendants' behalf to represent them, so we are left with the

8    task of taking up your motion without benefit beyond the

9    materials that you have supplied in his behalf.

10         So I think -- I think probably the best course would

11   be for us to make at least a modest record for -- for the

12   Court to consider.  And so to the extent that you want to

13   address any of the documents that have been previously

14   supplied or provide testimony from your client for the

15   record --

16         MR. CORYELL:  Judge, what I think I would like to

17   do -- and I will say -- and I'll ask for the Court's guidance

18   on how much to do because I don't think -- there's an awful

19   lot of factual material in the record already and I think

20   frankly there is sufficient factual material in the record by

21   virtue of the verified complaint and certainly the affidavit

22   that we submitted yesterday to support the motion, but just

23   out of an abundance of caution, I would like to briefly call

24   one witness to provide some additional factual support or at

25   least perhaps buttress the facts that are already in the

1    record and I think I can do that with just one witness.

2           THE COURT:  I think that would be fine.  Let me --

3    let me ask you to clarify at the outset.  The motion seems to

4    address only the trademark infringement claims brought in the

5    complaint.  Is that -- am I reading that correctly?

6           MR. CORYELL:  Judge, we -- we added -- it's kind of

7    the same thing, but we've added because of recent developments

8    a request that we also -- that the motion also address the

9    cyber piracy claim that's made in the complaint and

10   specifically two things:  The domain name that's being used by

11   this gentleman which is confusingly similar to the Honorable

12   Order's domain name and which was, as the Court will hear,

13   only registered and put into use after his business proposal

14   was rejected in late January and also his Facebook presence.

15          He has a Facebook group that has caused confusion

16   that has a name that's similar to the Facebook group that is

17   used by The Honorable Order, so in addition to the trademark

18   infringement -- and the trademark infringement -- the

19   infringing conduct relates to the cyber piracy too, but we're

20   asking the Court in addition to give -- granting preliminary

21   equitable relief on the trademark issues, we're also asking

22   the Court to give us relief on the cyber piracy relating to

23   the domain name because of the confusion that it's causing as

24   well.

25          THE COURT:  And did your -- again, I read it but off

1   the top of my head without flipping through to it now, does

2   your proposed order that you submitted address the cyber

3   piracy portion as well?

4           MR. CORYELL:  It does.  And, Judge, we actually --

5   there's -- we submitted another proposed order yesterday with

6   our reply and I have copies of that and I'm happy to make sure

7   that the Court has those.

8           THE COURT:  If it's in the docket, that's fine.

9           MR. CORYELL:  It's with the reply yesterday.  The

10  modified order that we submitted with the reply is different

11  than the preliminary injunction that we originally submitted,

12  so the one that we submitted yesterday actually captures the

13  relief that we're asking.

14          THE COURT:  Very well.  Why don't you go ahead and

15  call your witness.

16          MR. CORYELL:  Judge, I would like to call Ms. Crose.

17          (SHERRY CROSE, called by the Plaintiff, sworn.)

18                      DIRECT EXAMINATION

19  BY MR. CORYELL:

20  Q.  Ms. Crose, can you state your full name, please?

21  A.  Sherry Crose.

22  Q.  And are you currently employed?

23  A.  I am with the Honorable Order of Kentucky Colonels.

24  Q.  What is your position at the Hon --

25  A.  Executive director.

1    Q.   How long have you held that position?

2    A.   February of 2017.

3    Q.   Can you tell the Court just kind of generally what your

4    responsibilities are as executive director of the Honorable

5    Order of Kentucky Colonels?

6    A.   I oversee -- the board of trustees does the mission for

7    the organization.  I oversee carrying out that mission and

8    that is everything from human relations with the team to the

9    budgeting process to fundraising for the organization.

10   Q.   The Court may already know this, but can you just briefly

11   describe to the Court what the Honorable Order of Kentucky

12   Colonels is?

13   A.   It's a historic organization that has been around since

14   the '30s -- early '30s.  It's made up of Kentucky Colonels

15   that have been bestowed that honor by the governor of the

16   Commonwealth.  It's a fraternal organization.  When the

17   colonel started they were very fraternal and then the '37

18   flood happened.

19        And they always came -- prior to the flood, they

20   always came into Louisville and Bardstown area and did annual

21   events.  When the flood happened, they started raising dollars

22   to give back to the Commonwealth.

23        So from the '37 flood, then the wars happened right

24   after that.  They continued to raise dollars, so there was

25   always that philanthropic effort for the Kentucky Colonels.

1  And then in the '50s we became a bona fide 501(c)(3), and at

2  this point we've given away about 50 million dollars -- a

3  little over 50 million dollars to about 7,000 nonprofits.

4  Q.  Can you just briefly describe to the Court how that -- the

5  grant process works?

6  A.  Yeah, I can.  So the grant process is a six-month process,

7  three different types of grants that we offer grantees.  And a

8  nonprofit has to be in the Commonwealth.  It has to be five

9  years old to apply for the grants.  So we have grants that are

10  $2,500 dollars or below, 25 to 10,000, and 10,000 and above,

11  so different levels to try to make it easier for grantees to

12  fill out applications.

13        After the grants are turned in which in 2020 was

14  February -- mid-February, myself, my grants administrator and

15  the chairman of our grants committee reviewed all the grants.

16  They then go before a grants committee and -- but what makes

17  our grants we think different is then they're divided out to

18  the board of trustees.

19        And the board of trustees are given 15 to 20 grants

20  wherever they live -- we have trustees across the

21  Commonwealth -- and then they actually go out and vet the

22  grants with the grantee.  We give things that are tangible

23  items you can touch and feel such as an awning that would go

24  over a nursing home area, handicap vehicles.

25        And we don't fund things that affect the staff, it's

1    the clients that they're working with, and it's a vast array

2    of nonprofits from Alley Cat Advocates here in Louisville to

3    Merryman House in Paducah.  But the trustees will go out and

4    they'll visit those nonprofits and make sure that they're

5    needs, not wants.

6         The dollars we give away which last year was 2.1

7    million dollars to 265 nonprofits, we're donating 93 cents for

8    every dollar that's out.  All of our trustees I like to say

9    have skin in the game as well as the team members, so they vet

10   those grants very tightly looking at financials and looking at

11   audits to make sure that those nonprofits are spending the

12   money wisely that Kentucky colonels have given to the Order.

13   Q.  Ms. Crose, I have put -- I put a document up on the

14   screen.  Can you see that in front of you?

15   A.  Uh-huh.

16   Q.  Is that the Honorable Order of Kentucky Colonels' logo?

17   A.  That is, yes.

18   Q.  And the -- the name -- the mark at the top of that logo is

19   Kentucky Colonels?

20   A.  Correct.

21   Q.  Is there some importance to the Honorable Order of

22   Kentucky Colonels -- to that Kentucky Colonel's mark?

23   A.  Yes.  We've trademarked it and it's the basis of the

24   Honorable Order.  It's the reason that Kentucky colonels

25   are -- they find that recognition very moving that Kentucky

1   colonels -- a Kentucky colonel is someone who's made a

2   difference in their community and they are trusting us with

3   those dollars.

4          And we have Kentucky colonels in 46 countries, every

5   state of the union, and they're sending their dollars back to

6   the Commonwealth because it's a meaningful representation that

7   they've been honored to be named a Kentucky Colonel.

8   Q.  Do any of the funds that the Honorable Order of Kentucky

9   Colonels raise go to the promotion of individual Kentucky

10  colonels?

11  A.  No, it does not.

12  Q.  Does it go to the enrichment -- the personal enrichment of

13  any individual Kentucky colonel?

14  A.  No, they do not.  And that's not what a Kentucky colonel

15  is.  These are humble individuals.  It's amazing -- my tenure

16  there, as you hear, it's not been extremely long.  It's since

17  '16 and then executive director in '17, but when you talk to

18  these individuals who don't need to call us and donate

19  dollars -- you talk to these individuals, they are just

20  humbled by the fact that they're helping their community and

21  they're helping Kentuckians.

22          They're not out to enrich themselves.  They're not

23  out for social climbing.  It's just the fact that somebody

24  stood up and recognized them for their good works and now

25  they're showing that good works and giving it back to the

1    Commonwealth.

2    Q.  Are you familiar with a gentleman named David Wright?

3    A.  I am, yes.

4    Q.  Are you familiar with a group or an organization that goes

5    by the name Kentucky Colonels International?

6    A.  I am.

7    Q.  Would you tell the Court -- do you understand or is it

8    your understanding that those -- that Mr. Wright is affiliated

9    with that group?

10   A.  Oh, yes.

11   Q.  Can you describe for the Court how you became aware of --

12   familiar with Mr. Wright and Kentucky Colonels International?

13   A.  Oh, I can.  Back in November Mr. Wright wrote an editorial

14   or blog that was posted on the International Facebook page.  A

15   team member came to me and said, "You need to read this."

16   Multi-paragraph piece and halfway through it very

17   condescending on the Honorable Order of Kentucky Colonels and

18   in particular a lot of inaccuracies about the Honorable Order.

19        And the last paragraph of it or second to last

20   paragraph basically said they were going out soliciting funds

21   for membership programs.  They were -- they didn't like

22   particularly what we did, not being a membership organization,

23   and at that point it was like this group is going in

24   competition.

25        And if they're going to solicit funds from Kentucky

1    colonels, we don't know where those funds go.  They could be

2    very honorable, but we have a very stringent vetting process

3    where we know that the money goes to solid organizations in

4    Kentucky and potentially outside of Kentucky, but we didn't

5    know where those funds are going, so that -- that polled our

6    little -- that took my bells and rang them on it.

7    Q.  Did you actually see this blog yourself?

8    A.  I did.

9    Q.  We've attached to our motion for a temporary restraining

10   order and preliminary injunction, the motion that we're here

11   on today, as Exhibit 2 a copy of that blog site.  And I want

12   to just show you, without going through the whole thing, the

13   very first page of what we've attached as Exhibit 2 to our

14   motion.  Do you recognize that document?

15   A.  Yes.

16   Q.  Is that the first page of the blog that you were just

17   describing?

18   A.  No.  The blog I was referring to was around November --

19   end of November 17th, 18th.  This blog or editorial came out

20   after we rejected the merger.

21   Q.  Okay.  So -- and we're going to talk about that in just a

22   second.  So this was a blog that was generated sometime in

23   late -- or in mid-January, correct?

24   A.  Correct.

25   Q.  Okay.  So --

1            THE COURT:  Mr. Coryell, could I just stop you here

2    for a second just to make sure I understand --

3            MR. CORYELL:  Sure.

4            THE COURT:  -- the testimony thus far?  And is

5    it Crose?

6            THE WITNESS:  It's Crose.  I hear it a lot of

7    different ways.

8            THE COURT:  So, Ms. Crose, is it -- did I hear you

9    correctly that your characterization of Mr. Wright's editorial

10   there is he was criticizing the Honorable Order for not being

11   a membership organization?

12           THE WITNESS:  Correct.

13           THE COURT:  And suggesting that that -- that that

14   was not the best approach for organizing the folks who have

15   colonels?

16           THE WITNESS:  He -- he was pushing on the fact that

17   we were misrepresenting the Honorable Order, that we were

18   misguiding the members of the organization and that we had all

19   these years misguided them which is tarnishing the reputation

20   of the organization.

21           THE COURT:  And how many colonels are there, do

22   you --

23           THE WITNESS:  I have no idea how many colonels there

24   are.  Our database holds about 89,000 colonels.  We have

25   30,000 or so active colonels.  We have tried to find a

1    complete list, but it's in Kentucky archives and libraries,

2    some searchable, some unsearchable, but I don't know exactly

3    how many.

4           The governor's office -- when the governor

5    commissions a colonel, they -- it's pretty sophisticated.

6    They send us an Excel list and we put it into our database and

7    then welcome -- congratulate the individual and welcome them

8    to the Honorable Order and explain our philanthropic side.

9           But we know that not every name comes from the

10   governor's office, but according to that blog, Mr. Wright says

11   we control who gets nominated, we control how many are out

12   there.

13          And I made the determination in November I was not

14   going to go into a social media war with him because that's

15   not what the Honorable Orders do, but there were so many

16   inaccuracies just like that that I don't know -- I don't know

17   where they come from.

18          MR. CORYELL:   Thank you, Your Honor.

19   BY MR. CORYELL:

20   Q.   At some point in time did Mr. Wright after posting that

21   blog -- you -- as I understand it you decided to not try to

22   respond to what you felt were inaccuracies in that blog?

23   A.   Right.

24   Q.   At some point in time did you have an additional

25   interaction with Mr. Wright personally?

1   A.   Personally?  Well, he private messaged me in relationship

2   to a business proposal, yes.

3   Q.   And when did that occur?

4   A.   That was the end of December of '19.  Last year.

5   Q.   And what was your understanding of the reason that he was

6   contacting you?

7   A.   It was a business proposal in relationship to the

8   International Facebook page as well as website and other

9   websites.  In his first set of private messages talked about a

10  sponsorship, so right there he's -- wants sponsorship and he

11  talked about Honorable Order coming in silently but

12  transparently taking over these groups.

13  Q.   Did that -- did -- were those his words, not yours,

14  "silently but transparently"?

15  A.   Yeah.

16  Q.   What did you understand --

17  A.   How do you take over a group silently but transparently?

18  Q.   And did you understand that he was talking about your

19  organization taking over his organization?

20  A.   Correct.

21  Q.   And to that point did you have any understanding of what

22  his organization was?

23  A.   A group of international colonels.  I mean, what I thought

24  the Facebook International group was is individuals who lived

25  out of the country who -- who communicated through Facebook.

1    Q.  Did you have any understanding of whether he had

2    incorporated his group or whether --

3    A.  Oh, no.

4    Q.  -- he had an actual legal entity that he was talking

5    about?

6    A.  No.

7    Q.  So at some -- so you -- as I understand your testimony,

8    did you -- how do you respond to that?

9    A.  I said that we would look at a proposal.  We would look at

10   any business proposal.  Why not?

11   Q.  Did you -- did you get a business proposal?

12   A.  We did get one, yes.

13           MR. CORYELL:  Judge, can I approach?

14           THE COURT:  Yes.

15           MR. CORYELL:  Judge, I'd like to show Ms. Crose and

16   introduce an exhibit -- and I'll represent to the Court that

17   this was an exhibit filed under seal to our verified

18   complaint.  It was Exhibit 3 to the verified complaint.  So

19   the Court already has this -- has access to it.  It's filed

20   under seal.

21           It's not something that we believe is actually

22   confidential or contains confidential or proprietary

23   information, but I will say that Ms. Crose did sign a

24   confidentiality agreement.

25           In light of the fact that I think it's critical to

1    the proceedings here today and in light of the fact that

2    there's nobody here to object to its admission, I'm going to

3    go ahead and admit it or ask -- move for its admission.

4    Q.  Ms. Crose, I'm going to show you a document that we've

5    marked as Exhibit 1.

6              MR. CORYELL:  Judge, I have extra copies if you'd

7    like to --

8              THE COURT:  That's fine.  Thanks.

9    BY MR. CORYELL:

10   Q.  This is a -- Plaintiff's Exhibit 1 is a -- what I will

11   characterize as a multi-document compilation of three

12   different exhibits.  Is that fair?

13   A.  Yes.

14   Q.  And can you just kind of describe -- hopefully they're in

15   the same order that I'm looking at it.  Can you describe what

16   we're looking at?

17   A.  Well, the first letter I would call is an introductory

18   letter to any business proposal.

19   Q.  Is that the first two pages of the exhibit?

20   A.  That -- yes.

21   Q.  And then how would you characterize -- and then there's --

22   the third page of the exhibit --

23   A.  And then the -- the third page would be the proposal.  And

24   then if -- this is -- then there should be a multipage or at

25   least two page, I'm going to say, justification of the

1    proposal in here and why we need to -- there it is.  It's on

2    page -- oh, it is multipage.

3    Q.  So let me just see if I can help.  So the first two pages

4    of what I handed you are a letter, correct --

5    A.  Uh-huh.

6    Q.  -- signed by Mr. Wright?

7    A.  Right.

8    Q.  And then the next looks like --

9    A.  This is multipage why we should do it.

10   Q.  Looks like eight pages are something that's titled

11   Presentation to Honorable Order of Kentucky Colonels, Inc.,

12   correct?

13   A.  Correct.

14   Q.  And then the rest of the exhibit is something that's been

15   called a Draft Merger Acquisition and Consolidation Agreement,

16   correct?

17   A.  Correct.

18   Q.  Who prepared all three of these documents?

19   A.  I have to believe David Wright did --

20   Q.  Okay.  These --

21   A.  -- but I don't know anybody -- I don't know.  I would have

22   to assume his 'cause his name's on it.

23   Q.  No part of these documents were prepared by you or anyone

24   at the Honorable Order of Kentucky Colonels?

25   A.  No, they were not.

1    Q.  So this is -- does this Exhibit 1 represent the proposal

2    that Mr. Wright came to you with?

3    A.  Yes.

4    Q.  And is the date January 13, 2020, about the point in time

5    that you would have received this material?

6    A.  It would have been, yes.

7    Q.  What did you do with this material when you received it?

8    A.  Sent it to my executive committee to see 'cause obviously

9    it's not my loan decision if we were going to go into this

10   major change and I notified Mr. Wright that this would be a

11   major operation for this organization.  And I did that prior

12   to seeing the actual merger.  And I said that our board of

13   directors would have to review it.  So when I received it,

14   downloaded it and emailed it off to our executive committee.

15   Q.  What response did you get from your -- the members of your

16   executive committee?

17   A.  "No."  No, we're not going to do this.  We felt like it

18   was a shakedown.  We felt -- we knew there was going to be

19   some potential dollars with it, but we didn't understand the

20   magnitude of the dollars that he was asking for and it was

21   clearly a threat to the Honorable Order.

22   Q.  Calling your attention to the second page of the letter

23   which is the second page of the document and I've just -- I've

24   taken the liberty, Your Honor, of highlighting what I wanted

25   her to focus on on the second page of that letter.  You can

1    look at your screen, Ms. Crose, and see.

2            The -- next to the last paragraph, did that raise

3    any concerns in your mind and in the mind of the board members

4    on the Honorable Order --

5    A.   Oh, yeah.  When he talks about bringing on private

6    sponsors and I took that as -- that as well as the executive

7    committee, if we did not abide by this proposal, raising

8    questions about HOKC membership.  What is that?  And then the

9    intent to compete.  Right there it says to our executive

10   committee that if we don't again approach this merger that

11   he's going to compete with us.

12   Q.   Did you take that as a threat?

13   A.   Yes.

14   Q.   Were there other aspects of this proposal -- and my

15   question is going to be were there other aspects of the

16   package that you considered to be a threat.  And let me call

17   your attention specifically to page 4 of the second document

18   which is the Presentation to Honorable Order of Kentucky

19   Colonels, Inc., document.

20           And specifically the paragraph that I've underlined

21   there -- or the sentence that I've underlined there he talks

22   about one of the reasons to do this is, (Reading) We

23   understand getting a membership card and annual mailings is

24   based on your donors making a minimum annual donation

25   incorporating our membership.

1      When he says "incorporating our membership" did you

2   understand that to mean the Kentucky Colonels International?

3   A.   I would guess, yes.

4   Q.   (Reading) Is a good way to identify and acknowledge the

5   most active donors in a genuine way that want to be more

6   functional without creating any confusion or permitting them

7   to have influence over your current operations.

8      What did you understand him to mean?

9   A.   That he's going to create -- I look at that as he's going

10  to create confusion.  Right now there is no confusion for HOKC

11  with it and our members.

12  Q.   And then calling your attention to the document that's

13  been titled a draft Merger and Acquisition and Consolidation

14  Agreement, were there any particular aspects of that

15  agreement, that draft merger agreement, that were particularly

16  troublesome to you and the members of the board?

17  A.   Right.  The original "You can merge with us" right off the

18  bat, a $150,000 to $250,000 --

19  Q.   So just -- if you -- in Plaintiff's Exhibit 1 if you -- if

20  I could just get you to turn to the Draft Merger Acquisition

21  Agreement.  And I've taken the liberty of -- of singling that

22  page out and making some highlights to it.  Are we looking at

23  the -- is this marked-up version the same document that's in

24  Plaintiff's Exhibit 1?

25  A.   It is.

1   Q.  And what was your understanding of what he was saying

2   there with respect to that $250,000 USD but not less than

3   $150,000 USD?

4   A.  To move forward with this merger we have to give something

5   between those dollar figures and that's just not appropriate.

6   Q.  In order to acquire his --

7   A.  Right.

8   Q.  In order to acquire Kentucky Colonels International?

9   A.  Correct.

10  Q.  In addition --

11  A.  And some other private groups he talks about, so --

12  Q.  Were there -- were there additional compensation

13  components to this proposal?

14  A.  There -- there was.  We had to hire him.

15  Q.  Let me actually -- just calling your attention to what I

16  believe is the two, three, four, five, six -- seventh page of

17  the agreement that's -- and just so you -- if you would look

18  at the agreement in your hand, Ms. Crose.  And this is

19  provision in the -- this is in the draft Merger Agreement,

20  exhibit -- or I'm sorry -- provision 1.6.  Do you see that?

21  A.  I'm getting there.

22  Q.  Okay.

23  A.  Okay.

24  Q.  Are we looking at the same thing?  Is what I put up on the

25  screen here just a highlighted version of what you're looking

1    at?

2    A.   Yes.

3    Q.   Okay.  Did -- and calling your attention to 1.6(A), did

4    that provide for some payment?

5    A.   Right.  A one-time membership fee to the International

6    group or the Globcal for $5,000.

7    Q.   Do you have any idea of what a goodwill ambassador for

8    Globcal International is?

9    A.   I do not.

10   Q.   Do you know what Globcal International is?

11   A.   I do not.

12   Q.   On the next page calling your attention to subpart B, did

13   that call for payment?

14   A.   Yes.  $100,000 to the treasurer which is his son.

15   Q.   Nicholas Wright?

16   A.   Right.

17   Q.   And then the next paragraph, did that call for some

18   payment?

19   A.   Yes.  A payment to him.  We'd have to contract him for

20   18 -- 12 to 18 months at $500 a week --

21   Q.   And then the --

22   A.   -- for services.

23   Q.   The next paragraph, subpart D, did that call for some

24   payment?

25   A.   It did.  It did.  For social media advertising for $2,500.

1   Q.  So was it your understanding that what Mr. Wright was

2   asking for was payment of all these amounts?

3   A.  Correct.

4   Q.  Did you have any understanding of what the Honorable Order

5   of Kentucky Colonels would get in exchange for payment of

6   the -- of the amounts that are being requested here?

7   A.  No.  He stipulated we would get some followers of the

8   International page, but -- no.

9   Q.  How did -- did the Honorable Order convey a response to

10  Mr. Wright about this proposal?

11  A.  We did.  We -- I typed back to him that the executive

12  committee has decided to decline the proposal.

13  Q.  And how quickly -- or do you recall roughly when that

14  occurred?

15  A.  It was about a week after he gave us a proposal.

16  Q.  So around January the 20th?

17  A.  I would say, yes.  17 -- yeah.  18th, 19th, 20th.

18  Q.  Okay.  So what happened if anything after you conveyed

19  that response to Mr. Wright?

20  A.  He sent me an email that, paraphrasing, said, "I

21  understand you turned it down.  Remember you signed a

22  confidentiality agreement and you can no longer -- you cannot

23  do anything that you saw within the merger agreement."

24  Q.  Okay.  Did he do anything on social media or on the

25  internet in response -- or what you believed was in response

1    to --

2    A.  He did.  On the International page he -- he launched an

3    editorial about restoring the traditions for it and was

4    disparaging for HOKC.

5    Q.  Let me just go back and revisit very quickly the document

6    that was attached as Exhibit 2 to our motion for a preliminary

7    injunction.  I asked you about this a little bit earlier.  Do

8    you recognize the first page of this document?

9    A.  I do recognize the first page.  And what I do think is

10   interesting is he's saying the Kentucky Colonels International

11   is a standalone group, but when you look at the image on the

12   page, those pieces are items that we provide Kentucky colonels

13   who have been very generous to us.

14          There's a pin there that we give to a colonel that

15   has done extraordinary -- it's called a Legion of Merit.

16   There's another pin again that we give as an appreciation

17   gift.  So if he's saying we're -- not competition with us,

18   then why is he using those items?

19   Q.  So this -- you do recognize this --

20   A.  Yes.

21   Q.  -- what's been provided to the Court as the blog that he

22   produced after his proposal was turned down?

23   A.  Right.

24   Q.  Okay.  Did Mr. Wright or Kentucky Colonels International

25   do anything else after you turned down the proposal?

1    A.   They launched a web page with it --

2    Q.   Did you actually see that web page?

3    A.   I did.

4    Q.   Is that what the -- the homepage of the web page looked

5    like at least initially?

6    A.   That's what it looked like then.  It's -- it has shifted

7    now to Kentucky Colonels Foundation, but -- yes.

8    Q.   Did you have an opportunity to actually explore the web

9    page?

10   A.   I did.  And the web page is very similar in topics to our

11   web page.

12   Q.   Did it include historic description of -- of the Kentucky

13   colonels?

14   A.   It did.  It include -- we do media postings when colonels

15   have been recognized.  It includes that.  It includes

16   achievements which we ask colonels to send us for

17   achievements.

18   Q.   So let me just ask you -- rephrase my question.  Can you

19   tell the Court how the Kentucky Colonels International web

20   page initially was similar to the Honorable Order of Kentucky

21   Colonels' web page?

22   A.   Well, the domains are pretty close.

23   Q.   So the Kentucky Colonels --

24   A.   .org and he's Kentucky Colonels International.

25   Q.   So the domain name was very close?

```
 1    A.   Right.

 2    Q.   Was the content of the web page --

 3    A.   Yes.

 4    Q.   -- similar?  In what respects?

 5    A.   Of the topics that we cover under ours as well as he

 6    covers under his.

 7    Q.   Did the web page that was initially launched by the

 8    Kentucky Colonels International make any effort or make any

 9    reference to generating revenue or soliciting donation?

10    A.   It did.  For membership services as well as lifetime

11    membership cards, taking donation for charitable goods or

12    charitable causes.  And that causes concern for us.

13    Q.   So you did actually look at that website yourself -- the

14    initial website?

15    A.   I did.  In the very beginning, yes.

16    Q.   I'm -- I've got -- I don't -- we provided a printout of

17    the website to the Court -- the initial website to the Court.

18    I want to just focus on one page of that website and that's

19    the donation page initially.  Are you familiar with that page?

20    A.   Yes.

21    Q.   Is -- I projected an image of it up on the screen.  Can

22    you see that?

23    A.   I can.

24    Q.   Do you recognize that as the initial donation page for the

25    Kentucky Colonels International website?
```

1   A.  I do, yes.

2   Q.  This -- one of the -- it references a couple of

3   organizations that donations can be made to.  One of them

4   is -- do you see where it says donate to the Kentucky Colonel

5   Foundation?

6   A.  Correct.

7   Q.  Are you familiar with the Kentucky Colonel Foundation?

8   A.  No.

9   Q.  Is there such a thing to your knowledge as the Kentucky

10  Colonel Foundation?

11  A.  There is not to my knowledge.

12  Q.  Says "Donate to the Kentucky Colonels International Fund."

13  To your knowledge is there such a thing as the Kentucky

14  Colonels International Fund?

15  A.  There is not.

16  Q.  Are you aware of whether the web page initially made any

17  representations regarding whether donations were tax exempt?

18  A.  Yes.  He did denote that they were tax exempt.

19  Q.  Are you aware of whether he denoted that they were tax

20  exempt under the -- by the IRS under the United States tax

21  code?

22  A.  Yes, he denoted that.  Yes.  I know at one point he said

23  you would get a certain -- you would get a tax number or a tax

24  donation at the end of the year if you donate a certain amount

25  of money.

1    Q.  Did you ever click on the PayPal link that's referenced on

2    this page?

3    A.  I did not until later on and when -- later on I did and

4    the link was not completely active.  You could still go there.

5    Q.  Okay.  At some point in time did Mr. Wright -- did the

6    name on the website change?

7    A.  It did.  It's now Kentucky Colonel Foundation.

8    Q.  Okay.  Again, that's -- this is a page of a document that

9    we've provided to the Court.  I believe it's attached to our

10   third supplement, Your Honor, to the motion for a preliminary

11   injunction.  Is this -- are you familiar with this appearance

12   of this page?

13   A.  I am, yes.

14   Q.  Is that what he changed it to?

15   A.  He did.

16   Q.  Are you aware of whether he changed the domain name?

17   A.  No, he has not.  When you link through -- when you go to

18   this it still says Kentucky Colonels International for it and

19   the foundation side leads me more to believe they're

20   competition.

21   Q.  Yeah, I was going to ask you that.  Does the -- does the

22   name -- using of the word "foundation" affect you or does that

23   have any significance to you in the world that you run in?

24   A.  It does affect us.  I'm part of a group called Donor Forum

25   in Louisville and I went through several lines of questioning

1    to make sure we were a grant-giving organization.  Foundations

2    belong to this organization.

3          So this adds more confusion to Kentucky Colonels

4    when they're looking at kycolonels.org or they Google

5    kycolonelsinternational.  It makes it look more like our

6    organization.

7    Q.  Talking about confusion, let's just talk about that for a

8    second.  Have the activities that Mr. Wright or the Kentucky

9    Colonels International or this group engaged in over the last

10   weeks and several months, has that caused any confusion among

11   the people that you deal with?

12   A.  Oh, absolutely.  When the initial editorial came out

13   mid-November, the day after it came out we received a phone

14   call from a Kentucky colonel that said, "Tell me what's going

15   on.  I'm confused.  They seem to say that that they're -- are

16   you affiliated with them?  They seem to say they are the

17   Kentucky Colonels."

18         And we have logged those calls ever since that --

19   mid-November.  And recently -- we had a phone call yesterday

20   of a gentleman that said, "I'm confused.  I've gone to the

21   website.  I'm not really sure if I'm getting to the right

22   Honorable Order website."

23         I've had two phone calls of donors that have wanted

24   to make sure their donations went to the Honorable Order and

25   not the international group and one particular gentleman even

 1   asked me for my EIN number to make sure it didn't go to our

 2   competitor.

 3              MR. CORYELL:  Judge, may I approach?

 4              THE COURT:  Yes.

 5   Q.  I'm going to show you a document, Ms. Crose, that we've

 6   marked as Exhibit -- Plaintiff's Exhibit 2.  Can you tell me

 7   if you've seen that document before?

 8   A.  I have.

 9   Q.  Can you describe to the Court what it is?

10   A.  So when the blog came out, I asked my team to start

11   recording any comments in an Excel file of calls that we've

12   gotten for confusion or complaints or positive affirmations or

13   any of that, so that's what this document is.

14   Q.  Is it -- does that also register emails that you've

15   received from --

16   A.  It's emails as well as phone calls, yes.

17   Q.  Okay.  And so that is the log that you were just referring

18   to of the complaints that you've gotten just in -- what's the

19   period of time?

20   A.  It started November 18th through yesterday.

21   Q.  Okay.  Can you just by looking at it describe how many

22   different instances generally -- approximate how many

23   different instances are reflected on that log?

24   A.  There's probably ten of "Thank you for clarifying.  I was

25   confused when I went on websites."  There are two that in

1      particular are trustees or commissioners of the International

2      group that are saying, "Please don't get us involved.  We

3      aren't comfortable with what Mr. Wright is doing."

4              There is several that were new colonels that said,

5      "I joined the International group" -- one in particular lived

6      in London at the time.  "I joined the International group.  I

7      thought they were the group -- the HOKC."  She has currently

8      moved to Lexington.  She goes, "I understand now why it's

9      not."

10             So it's -- and then there are items here -- you see

11     people here that say, "The Honorable Order is a very reputable

12     organization and don't let the International group tarnish

13     this image."

14     Q.  So in addition to what is on that log, there were a couple

15     of things that we referenced in our brief to the Court and I

16     think -- I want to ask you if you're familiar with them.

17     There were a couple of postings on Facebook where apparently

18     the -- the poster believed that they were posting to the

19     Honorable Order's Facebook page and they --

20     A.  Yeah.

21     Q.  Are you familiar with those instances?

22     A.  Yeah, I am familiar with those.  There were two grantees

23     in 2019 by --

24     Q.  By "grantees" you mean --

25     A.  Nonprofits that we gave dollars to.  And they were --

1   Q.   Okay.   What happened --

2   A.   -- $10,000 gifts to the nonprofits.   Those two particular

3   grantees at different times thanked the International group

4   for their donation that they received from the Honorable

5   Order.

6   Q.   How does that -- it seems like an honest mistake on their

7   part.   How does that affect the Honorable Order of Kentucky

8   Colonels?

9   A.   That shows that the nonprofits aren't recognizing where

10  the dollars are coming from, but it affects the individual

11  giver.   It affects that nonprofit -- that individual colonel

12  that we have that they think that their dollars are going to

13  Kentucky and then someone else is potentially getting credit

14  for it and it hurts our image.

15           MR. CORYELL:   Judge, I think that's -- unless the

16  Court has any questions, I think that's all the questions I

17  have.   Thank you, Ms. Crose.

18           THE WITNESS:   Do you want me to bring these --

19           MR. CORYELL:   Yeah.   And, Judge, I'd like to move

20  for introduction of Plaintiff's 1 and 2.

21           THE COURT:   They'll be admitted.

22           (Plaintiff Exhibits 1 and 2 admitted in evidence.)

23           MR. CORYELL:   Judge, so with Ms. Crose's testimony

24  in addition to what we've already presented to the Court and I

25  think the factual record, it supports our motion -- and I

1    think that if the Court looks at what Mr. Wright filed

2    yesterday, it only goes to further support our motion and

3    demonstrate what -- and what he's done frankly in response to

4    the TRO that was entered by the Court in making subtle but

5    non-important changes to the website trying to skirt this

6    Court's order I think shows that absent the relief that we

7    have asked for, he's going to continue to do what he is doing

8    and he apparently believes that the fact that he has moved his

9    operations offshore -- in his words, not mine -- somehow

10   prevents -- takes him outside of the jurisdiction of this

11   Court.

12           I don't believe that's true, but I think that that

13   shows what we're dealing with here and that is one of the

14   reasons that we're asking for the relief that we're

15   requesting.  It is offensive to engage in conduct like he's

16   engaging in.  It's reprehensible when that conduct affects a

17   charitable organization like the Honorable Order of Kentucky

18   Colonels.

19           So, Judge, I'm happy to address any questions that

20   the Court has or to provide any additional information, but

21   absent that we would make a motion that the order that we

22   tendered yesterday with our reply be entered.

23           THE COURT:  Thank you.  I don't have any further

24   questions.  And we have the TRO in place.  It doesn't expire I

25   think for a few more days which will give me a bit of time to

1    take this under advisement and sort through what you've

2    provided.  So unless you all have anything else, I appreciate

3    the singular effort.

4              MR. CORYELL:  Yeah.  Well, thank you, Your Honor.

5    That's all we have.

6              THE COURT:  Thank you.

7    (Proceedings concluded at 11:16 a.m.)

8

9                    C E R T I F I C A T E

10       I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

11   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

12

13
     _____          _____
14   s/April R. Dowell                 3/16/20
     Official Court Reporter, RMR, CRR          Date

15

16

17

18

19

20

21

22

23

24

25

1                               INDEX

2      WITNESSES:

3      SHERRY CROSE
            Direct Examination By Mr. Coryell                 9
4

5                             EXHIBITS

6       PLAINTIFF:
        Exhibits 1 and 2                                      36
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25