UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

THE HONORABLE ORDER OF
KENTUCKY COLONELS, INC.,                                                  Plaintiff,

v.                                                       Civil Action No. 3:20-cv-132-RGJ

KENTUCKY COLONELS
INTERNATIONAL et al.,                                                     Defendants.

\* \* \* \* \*

# ORDER

Plaintiff, the Honorable Order of the Kentucky Colonels ("HOKC"), alleges that Defendants misappropriated HOKC's protected marks to redirect donations and goodwill intended for HOKC to Kentucky Colonels International—an unaffiliated entity. (DE 1). HOKC sought injunctive relief (DE 7), and the Court granted a temporary restraining order enjoining Defendants from infringing on HOKC's intellectual property. (DE 14). The Court held a hearing on HOKC's motion for a preliminary injunction, and Defendants failed to appear. (DE 22). Defendant David J. Wright then filed several motions, including a motion to continue the proceedings.[1] (DE 23; DE 24; DE 26). After recusal of the judge then assigned to the case (DE 25), the Court extended the temporary restraining order pending consideration of the newly filed materials and completion of the preliminary-injunction decision. (DE 28). HOKC now moves for a second extension of the

---

[1] Although Wright purportedly responded and filed later motions *pro se* on behalf of himself; Kentucky Colonels International, Ecology Crossroads Cooperative Foundation, Inc.; and Globcal International (collectively "the Corporate Defendants"), Wright is not licensed to practice law in Kentucky. (DE 27-1, PageID # 752) As pointed out by HOKC, although Wright may represent himself *pro se*, he may not appear on behalf of the Corporate Defendants. *See Rowland v. California Men's Colony*, 506 U.S. 194, 201–03 (1993).

temporary restraining order. (DE 31). For the reasons below, the Court will extend the temporary restraining order to provide Defendants with time to file a meaningful response.

**I.**

HOKC is a "nonprofit, tax-exempt corporation" organized in Kentucky and founded in 1931 that represents recipients of the title of "Kentucky Colonel," which the governor bestows. (DE 1, at 2–3). The governor recognizes individuals as Kentucky Colonels for a wide variety of reasons, ranging from public service to celebrity status. Thousands of designations are issued yearly, and HOKC manages the nominations process. (DE 29, at 778–79). HOKC raises money through direct donations and the sale of merchandise bearing the Kentucky Colonels mark. (DE 1, at 5). The funds fuel HOKC's charitable grants across the Commonwealth, and over the last twenty years HOKC has donated about $29 million to various nonprofit organizations in Kentucky. (DE 7, at 149). HOKC considers itself a membership organization, although Wright contests this point. (DE 24-1, at 738). HOKC obtained and registered several trademarks for the term "Kentucky Colonel," including the right to use the mark on various novelty goods, such as clothing, nonperishable food items, key chains, and commemorative license plates. (DE 1-2). HOKC registered these marks in 2004. (*Id*.). HOKC registered its mark for use of "Honorable Order of Kentucky Colonels" in eleemosynary services and charitable services in 2016 and applied to register the mark KENTUCKY COLONELS for social-club services and association services on February 17, 2020. (*Id*.)

According to HOKC, it learned of the allegedly infringing activity when "Colonel David J. Wright" contacted HOKC on Facebook. (DE 1, at 6). Wright stated that he was "soliciting participants for a 'registry'" of Kentucky Colonels—for a fee. (*Id*., at 6). Wright asserts that HOKC approached him and was "interested in our efforts and . . . willing to assist our development

of a registry." (DE 24-1, at 738). Wright is the administrator of a website, "Kentucky Colonels International," which solicits donations from "international members of the order of the Kentucky Colonels." (DE 7-3). Wright also maintains a Facebook page for KCI and a blog about KCI's activities and mission. (DE 7-5; DE 7-6). KCI is an assumed name of Ecology Crossroads Cooperative Foundation, Inc., and associated with Globcal International. (DE 7, at 153). Wright is an "executive" with each of these groups. (DE 1, at 8). Ecology Crossroads is a registered Kentucky corporation committed to spreading awareness of ecology issues, and its corporate charter does not mention the Kentucky Colonels or KCI. (DE 7, at 155). Wright offered to "find a way" for HOKC to merge with KCI. (DE 1, at 7; DE 29, at 781 (Wright proposed that HOKC take over KCI "silently but transparently.")). The executive director of HOKC, Sherry Crose, suggested that Wright submit his proposal in writing. (*Id.*). Wright did so, submitting a "merger proposition" that would allow Wright to serve as a consultant for HOKC and included a six-figure buyout proposal. (DE 6-1). Crose testified that she "felt like [the proposal] was a shakedown . . . and it was clearly a threat to the Honorable Order." (DE 29, at 784).

HOKC refused the merger proposal. (DE 29, at 789 ("I typed back to him that the executive committee has decided to decline the proposal.")). Wright then made a blog post accusing HOKC of "misleading their donors and supporters for many years," violating state and federal law, and engaging in "impropriety, deception, and fraudulent presumptive behavior. [sic]" (DE 1-4, at 69). HOKC then filed this suit and tried to serve Globcal and Ecology Crossroad's registered service-of-process agent, Maya-a-Lis, without success. (*See* DE 18, at 512). Eventually Wright responded to HOKC's emails, stating that Lis is his ex-wife and that she is not affiliated with any of the Corporate Defendants. (DE 19-1, at 550). Wright also stated that he would be unable to appear in court as scheduled. (*Id.*, at 552). Wright suggested in a subsequent email that he wanted to

settle, an offer HOKC refused.  (DE 19-3, at 579).  Wright stated that he "really cannot believe you rejected our offer" but that HOKC should "[c]onsider the case over and you will win by default judgment." (DE 19-5, at 588). Wright statted that he and the Corporate Defendants have "no funds, no bank account or even donations to speak of."  (*Id.*).

The Court held a hearing on HOKC's motion for preliminary injunction on March 4, 2020. (DE 22)  Later the same day, Wright filed several *pro se* motions with the Court.  Wright moved to continue, and to dismiss.  (DE 23; DE 24; DE 26).  In his motion to continue Wright requested that the Court "grant [Defendants] a continuance in this case in 90–120 days so that we can acquire legal counsel to properly prepare to present our defense and file a counterclaim." (DE 24, at 734). In his response, Wright states that he is citizen of the United States living abroad in Venezuela working with the "indigenous Piaroa tribe." (DE 23, at 717).  Wright claims to have complied with the temporary restraining order by changing the name of his website from "Kentucky Colonels International" to "Kentucky Colonels Foundation." (*Id.*, at 726).  Wright also asserts that HOKC's pursuit of injunctive relief has "resulted in our . . . newly renamed organization to declare itself as an offshore foundation under laws where [HOKC] ha[s] no jurisdictional rights so that we can enjoy freedom as a civil society organization as which we were formed." (*Id.*).  He also makes substantive arguments, alleging that HOKC does not have a property interest in the name Kentucky Colonels and that KCI does not infringe on HOKC's trademarks.  (DE 23, at 724–26).

## II.

The Court must now consider whether extension of the temporary restraining order currently in place is appropriate considering the factual circumstances detailed above.  First, the Court notes that "an extension of the TRO pending a preliminary injunction hearing and decision without consent of the enjoined party is technically a preliminary injunction: it is appealable, and

4

the district court should provide a sufficient explanation of its decision to allow meaningful appellate review." *H-D Michigan, LLC v. Hellenic Duty Free Shops S.A.*, 694 F.3d 827, 845 (7th Cir. 2012) (citing Fed. R. Civ. P. 52(a)(2)); *see also Sampson v. Murray*, 415 U.S. 61, 86–88 (1974) (finding that extension of temporary restraining order past statutory limit effectively creates a preliminary injunction). Because the Court anticipates receiving more briefing and holding a supplemental hearing once the Corporate Defendants retain counsel, this opinion is limited to extension of the temporary restraining order and does not constitute a final decision on HOKC's motion for preliminary injunction.

### III.

In the Sixth Circuit,

> [f]our factors guide the decision to grant a preliminary injunction: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction."

*S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (quoting *Bays v. City of Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012)). "[T]hese are factors to be balanced, not prerequisites to be met." *Id.* (citing *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007)). "For example, 'a finding that the movant has not established a strong probability of success on the merits will not preclude a court from exercising its discretion to issue a preliminary injunction if the movant has, at minimum, shown serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 399–400 (6th Cir. 1997) (internal quotations and brackets omitted). Here, even considering Wright's response, the factors support injunctive relief.

### A.     Likelihood of Success on the Merits

HOKC seeks relief under both federal and state law, alleging federal trademark infringement, unfair competition, dilution, and violation of the Anticybersquatting Consumer Protection Act and state-law claims of defamation, common-law trademark infringement, unfair competition, dilution, and unjust enrichment. (DE 1, at 9–16). The thrust of HOKC's argument is that "Kentucky Colonels International" illegally infringes both the established mark of "Honorable Order of Kentucky Colonels" and the recently filed mark for "Kentucky Colonels" as it relates to associations. The claims for unfair competition and unjust enrichment stem from KCI's solicitation of donations from individuals who, according to HOKC, intended to donate to HOKC and not the unaffiliated organization, KCI. HOKC's motion for injunctive relief only addresses the trademark-infringement and cyberpiracy claims. (DE 7). The temporary restraining order prohibits infringement, which also covers the website and domain name at the root of the cyberpiracy claim. (DE 14). Because extension of the temporary restraining order would alleviate HOKC's cyberpiracy injuries as well as its trademark injuries, only the federal trademark-infringement arguments is considered by the Court at this time. (*See* DE 21-3 (proposed order adding language to address cyberpiracy claims)).

The Sixth Circuit evaluates trademark infringement under eight factors:

1. strength of the plaintiff's mark;
2. relatedness of the goods;
3. similarity of the marks;
4. evidence of actual confusion;
5. marketing channels used;
6. likely degree of purchaser care;
7. defendant's intent in selecting the mark; [and]
8. likelihood of expansion of the product lines.

*Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc*., 670 F.2d 642, 648 (6th Cir. 1982). Not all the factors will be relevant in every case, and "[t]he ultimate question remains whether relevant

consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Kellogg Co. v. Toucan Golf, Inc*., 337 F.3d 616, 623 (6th Cir. 2003) (quoting *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc*., 931 F.2d 1100, 1107 (6th Cir. 1991)). The factors enable the Court to decide the key question—whether "consumers," *i.e*., members and donors of HOKC, are likely to donate money to KCI that they intended to donate to HOKC. *See Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997).

### 1.     Strength of Plaintiff's Mark

This first factor "focuses on the distinctiveness of a mark and the public's ability to recognize it." *Toucan Golf*, 337 F.3d at 624. The least distinctive marks are labeled "generic," while the most distinctive marks are "fanciful." *Id*. Marks can become "incontestable." An incontestable mark is entitled to a presumption of validity, as at least a descriptive mark with secondary meaning, if validly registered and unchallenged for five years. 15 U.S.C. § 1065; *see Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc*., 703 F. Supp. 2d 671, 684 (W.D. Ky. 2010), *aff'd*, 679 F.3d 410 (6th Cir. 2012). If a mark is incontestable, it is the defendant's burden to show why it is invalid. *Id*.

HOKC argues that it has a strong mark because of the mark's continuous use since 1931, its strong association with charitable work, and its incontestable status. (DE 7, at 163–64). HOKC points to the lack of confusingly similar marks in commerce as evidence. (*Id*, at 163). The Court notes that not all the claimed marks have become incontestable. The "Kentucky Colonels" marks relating to food products, novelty items, and apparel, as well as the "Honorable Order of Kentucky Colonels" mark for eleemosynary services are incontestable, but the mark for "Kentucky Colonels" as to associations has not yet ripened into incontestability. (*See* DE 1-2).

Wright argues that HOKC "is seeking to dominate something that they borrowed from time and history which does not belong to them, they adopted the term and ideal, not vice versa." (DE 23, at 725). Wright asserts that KCI is not the first organization to use the Kentucky Colonels name in its title and cites several other organizations and Facebook groups to support his claim. (*Id*., at 724). But Wright fails to show that these other groups—which, according to the record, do not solicit donations or claim to support charitable organizations across the Commonwealth—have weakened HOKC's claimed marks. Despite Wright's assertions that the words "Kentucky Colonels" belong to the public domain, HOKC has an incontestable mark in the "Honorable Order of Kentucky Colonels" as it relates to eleemosynary services. (DE 1-2, at 28). To meaningfully contest its strength, Wright would need to present evidence that the mark is invalid. *See Maker's Mark*, 703 F. Supp. 2d at 684. He has made no such showing here.

Likewise, Wright's invocation of *The Honorable Order of Kentucky Colonels v. Building Champions, LLC*, 345 F. Supp. 2d 716 (W.D. Ky. 2004), is misplaced. There, HOKC tried to assert its trademark rights in novelty merchandise sold to supporters of a semi-professional basketball team, the Kentucky Colonels. The district court denied HOKC injunctive relief but found "the strength of mark to be solidly in the Order's favor." *Id*. at 724. The decision that HOKC was unlikely to prevail on the merits turned instead on the "unrelatedness of the underlying activity, the dissimilarity of the overall impression as well as the likelihood of purchaser care"— factors which, as discussed below, weigh in HOKC's favor here. *Id*. *Building Champions* thus supports a conclusion that HOKC's mark is strong.

The Court thus finds, as held in *Building Champions*, that HOKC holds a moderately strong mark. "A mark is strong and distinctive when the public readily accepts it as the hallmark of a particular source; such acceptance can occur when the mark is unique, when it has received

intensive advertisement, or both." *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 793–94 (6th Cir. 2004) (quoting *Daddy's*, 109 F.3d at 280) (internal quotations and citations omitted).  The time the mark has been in use and the mark's distinctive character reinforces HOKC's assertion that it has a strong mark.  This factor therefore weighs in HOKC's favor.

### 2. Relatedness of the Goods

Different trademark disputes turn on different levels of relatedness.  "First, if the parties compete directly by offering their goods or services, confusion is likely if the marks are sufficiently similar; second, if the goods or services are somewhat related but not competitive, the likelihood of confusion will turn on other factors," and finally, "if the goods or services are totally unrelated, confusion is unlikely." *Daddy's*, 109 F.3d at 282.  Here, as asserted by HOKC, KCI and HOKC are competing for the same resource: donations and participation from individuals who want to support Kentucky Colonels.  From the Court's review of the materials submitted in support of the motion for preliminary injunction, KCI is trying to establish a fundraising platform very similar to HOKC's.  In its verified complaint, HOKC asserts that it is "a nonprofit organization dedicated to supporting charitable purposes throughout the Commonwealth" formed as "a society or organization to restore the grandeur and sentiment of the original Kentucky Colonel; to more closely band together this group . . . for the advancement of Kentucky and Kentuckians." (DE 1, at 5).  Following Wright's attempt to comply with the temporary restraining order, the "Kentucky Colonel Foundation" site now describes the group: "*formerly Kentucky Colonels International* is a model not-for-profit, charitable membership organization made up of Kentucky colonels promoting and supporting other Kentucky colonels as goodwill ambassadors for the Commonwealth of Kentucky at home and abroad." (DE 19-6, at 598).  The site also provides a link and QR Code to solicit donations, informing the user that "[y]ou can now donate to Kentucky

9

Colonel Foundation online using a major credit card or your PayPal account." (*Id*., at 649). KCI's blog, while purporting to represent an independent association, features as its banner a picture of the membership certificate and tokens of appreciation that HOKC provides donors. (DE 7-5, at 278; DE 29, at 790 ("[W]hen you look at the image on the page, those pieces are items that we provide Kentucky Colonels who have been very generous to us.")). The site states that to take KCI "where it needs to go, we need donations from the public and will need to charge monthly or annual dues to members in order to provide member benefits and services beyond social media." (DE 7-5, at 291). The claimed mission and vision of KCI reflects that HOKC and KCI seek virtually identical sources of income: donations from individuals who want the Kentucky Colonels name preserved in integrity and put to good use. This factor supports finding infringement.

### 3. Similarity of the Marks

The similarity of the marks is an important factor that should be granted "considerable weight" and requires the Court to "examine the pronunciation, appearance, and verbal translation of conflicting marks." *Daddy's*, 109 F.3d at 283 (citing *Champions Golf Club, Inc. v. Champions Golf Club, Inc.*, 78 F.3d 1111, 1119 (6th Cir. 1996)). Although HOKC has filed for registration of "Kentucky Colonels" as it relates to associations, that mark is not yet registered. (DE 7-1, at 176). HOKC does, however, hold a registered and incontestable trademark for "Honorable Order of Kentucky Colonels" for eleemosynary associations, scholarships, and grants (*id*.), which the Court finds it is appropriate to compare to the claimed mark, "Kentucky Colonels International." Considering the highly similar nature of the words used, the lack of distinguishing logo features found significant in *Building Champions*, and Wright's lack of argument on this point, this factor also favors finding infringement. *See* 345 F. Supp. 2d at 722 (finding that the differences in "style and typography" and presence of a basketball in one logo "lessen[ed] the likelihood of confusion").

10

### 4. Evidence of Actual Confusion

"Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion." *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1188 (6th Cir. 1988). But "due to the difficulty of securing evidence of actual confusion, a lack of such evidence is rarely significant." *Daddy's*, 109 F.3d at 284. As evidence of actual confusion, HOKC has submitted Facebook posts by two recipients of charitable grants from HOKC; the posts thanked KCI for the grant. (DE 1-6). According to HOKC, the posts prove that HOKC's current grantees are confused about the identity of KCI, and that a potential donor viewing the posts would be confused by the grantees misdirecting their comments to KCI. (DE 29, at 798 ("That shows that the nonprofits aren't recognizing where the dollars are coming from, but it affects the individual giver.")). Sherry Crose testified about several calls and digital communications that HOKC has received expressing confusion about the identity of KCI, and HOKC submitted a log of such comments at the preliminary-injunction hearing. (DE 29, at 796; Excel Spreadsheet, Pl. Exh. 2). And although Wright's response was voluminous and contained several legal and philosophical arguments, he failed to respond to these instances of actual confusion. (DE 23). Without the aid of meaningful rebuttal testimony and until the Corporate Defendants brief the issue, this factor also supports finding infringement.

### 5. Marketing Channels Used

The record is clear that the marketing channels used by the parties are virtually identical. Both HOKC and KCI rely heavily on Facebook and their respective online platforms to solicit donations and spread their messages. (*See* DE 29, at 770 ("The domain name that's being used by this gentleman that is confusingly similar. . . . And also his Facebook presence.")). Both maintain

membership websites and active social-media presences. (*See* DE 1-6; DE 7-6) At this point, this factor warrants a finding of infringement.

### 6. Likely Degree of Purchaser Care

The Court must next consider whether the "typical buyer exercising ordinary caution" would confuse KCI for HOKC. *Champions Golf*, 78 F.3d at 1120. For reference, homebuyers exercise a high degree of care for their expensive purchases, and fast-food purchasers a low degree of care for their low-risk, cheap purchases. *See Homeowners Grp.*, 931 F.3d at 1111. Here, as pointed out by HOKC, the similarity of the marks somewhat obviates the weight of this factor. (DE 7, at 166; *see Daddy's*, 109 F.3d at 286). The Court also finds that the degree of purchaser care is low because one-time donations can be of any monetary amount and are often made on a whim. *Id*. Because the Court finds a low degree of purchaser care and a high possibility of actual confusion, this factor weighs in HOKC's favor at this point in the litigation.

### 7. Intent of Defendant

HOKC asserts that the Corporate Defendants have chosen their mark to intentionally confuse consumers and members of HOKC, and it points to several instances of threatening language and the proffered "merger agreement" as evidence. (*See* DE 7, at 166–67). Crose testified that Wright's organization and actions were "clearly a threat" to HOKC. (DE 29, at 784). "If a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity." *Homeowners Group*, 931 F.2d at 1111; *see also Esercizio v. Roberts*, 944 F.2d 1235, 1242 (6th Cir.1991) (holding the same). Although Wright asserts that confusion was not his intent (DE 23, at 727), the dipositive fact issue is often whether the defendant knew of the plaintiff's use of its mark before choosing his own mark. *See Champions Golf Club*, 78 F.3d at 1121. Wright claims to have received the title of Kentucky Colonel himself

and to have disclaimed affiliation with HOKC. The current record thus supports a conclusion that Defendants were aware of the existence of HOKC and its marks before choosing KCI as their own. This factor favors finding infringement for now.

### 8. Expansion of Product Lines

This factor generally analyzes whether it is likely that the competing marks will expand their market shares and overlap, leading to more competition and confusion. *See Daddy's*, 109 F.3d at 287. Since both HOKC and KCI are charitable organizations and the Court has already determined that they are in direct competition for donors, this factor has little relevance here. *See Little Caesar Enters., Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 572 (6th Cir. 1987) (finding that discussion of eighth factor is inappropriate where products are in direct competition). This factor is therefore neutral.

On balance, the Court finds that HOKC has shown a strong likelihood of success on the merits. The Court notes that this conclusion is subject to change when and if the Corporate Defendants retain counsel and submit opposing argument.

### B. Irreparable Harm to Plaintiff

HOKC has also shown that it is likely to suffer irreparable harm—in the form of loss of charitable goodwill and damage to its reputation—if it is not granted injunctive relief and Defendants continue to infringe HOKC's trademark. *See DaimlerChrysler v. The Net Inc.*, 388 F.3d 201, 208 (6th Cir. 2004) (upholding grant of preliminary injunction for trademark infringement through defendant's website); *Circuit City Stores Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1055 (6th Cir. 1999) (holding that "irreparable damage is presumed" from trademark infringement). The Corporate Defendants' "attempt" to comply with the temporary restraining order appears to have brought the marks even closer together and supports the ongoing need for

injunctive relief. (*See* DE 19; DE 19-6) Any harm KCI, its affiliates, or others may suffer because of the preliminary injunction is outweighed by HOKC's likelihood of success on the merits, the likelihood of irreparable harm, Defendants resistance to court orders, and the public interest. *See Handel's Enters. v. Schulenberg*, 765 F. App'x 117, 125 (6th Cir. 2019) (quoting *FirstEnergy Sols. Corp. v. Flerick*, 521 F. App'x 521, 529 (6th Cir. 2013)).

### C.   Substantial Harm to Others

Enjoining Defendants from infringing HOKC's trademarks will, if it causes harm at all, harm only KCI and its affiliates. On the other hand, if individuals are confusing KCI with HOKC and unknowingly donating money to the wrong organization, the public may be harmed by not maintaining the temporary restraining order. *See Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 550–51 (6th Cir. 2007) (quoting *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005)). As illustrated by witness testimony at the preliminary-injunction hearing, the public continues to confuse KCI (now marketed as Kentucky Colonels Foundation) and HOKC. (DE 29, at 798). Because Wright's attempt to comply with the TRO has perhaps made the distinction between the two entities even less clear (*see* DE 27), this factor supports extension of the temporary restraining order.

### D.   Public Interest

Finally, HOKC has shown that extending the temporary restraining order is in the public interest. Injunctive relief for trademark infringement serves the public interest, since "[t]here is a public interest in 'preventing consumer confusion and deception in the marketplace and protecting the trademark holder's property interest in the mark." *Ignition Athletic Performance Grp., LLC v. Hantz Soccer U.S.A., LLC*, 245 F. App'x 456, 460 (6th Cir. 2007) (quoting *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 383 (6th Cir. 2006)). As noted above, Wright's

14

attempt at compliance appears to have exacerbated the situation. Until the Corporate Defendants have obtained counsel and submitted their opposing arguments, the Court finds that extending the temporary restraining order remains in the public interest.

### III. CONCLUSION

Based on the current record, HOKC has a strong likelihood of success on the merits; that it would suffer irreparable harm in the absence of the extension of the temporary restraining order; that extending the order would not cause substantial harm to others; and that the public interest is served by maintaining the protections in the temporary restraining order. The Court's position on the necessity and propriety of injunctive relief may, however, change if the Corporate Defendants obtain representation and submit meaningful argument in opposition to issuing a preliminary injunction.

It is also unlikely that this matter can be resolved without an injunction based on Defendants' ongoing operation of a website (now called the Kentucky Colonels Foundation) and social-media profiles that appear to infringe HOKC's marks. (*See* DE 19-6) Accordingly, and the Court being otherwise sufficiently advised,

**IT IS ORDERED** as follows:

(1) The Second Motion to Extend Temporary Restraining Order (DE 31) is **GRANTED.**

(2) The temporary restraining order previously entered in this matter (DE 14) is **EXTENDED** for a period of **sixty (60) days** following entry of this Order.

(3) Defendants **SHALL**, after obtaining counsel, file an answer, counterclaim, or any brief in opposition to Plaintiff's motion for preliminary injunction (DE 7) within **sixty (60) days** following entry of this Order.

(4)     The Court anticipates setting a hearing to consider such newly submitted briefing by subsequent order.

Copies to:  Counsel and Defendants via  mail