**FILED**

VANESSA L ARMSTRONG, CLERK

June 21, 2020

U.S. DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION**

| | | |
|---|---|---|
| THE HONORABLE ORDER OF | ) | |
| KENTUCKY COLONELS, INC. | ) | Civil Action No. 3:20-cv-132-RGJ |
| PLAINTIFF | ) | |
| | ) | **SUPPLEMENT TO AMENDED MOTION TO** |
| v. | ) | **DISMISS AND/OR MOTION FOR** |
| | ) | **SUMMARY JUDGEMENT** |
| DAVID J. WRIGHT, et.al. | ) | |
| DEFENDANT(S) | ) | |

## SUPPLEMENT TO AMENDED MOTION TO DISMISS AND/OR MOTION FOR SUMMARY JUDGEMENT

COMES NOW, **David J. Wright**, Defendant in this action, appearing *pro se* **in Civil Action 3:20-cv-132-RGJ** so that I can defend this case, demonstrate good faith before the Court, and further seek damages caused and expenses incurred by the bringing of this action against myself sometime in the future from the Plaintiff. The Defendant wishes that the Court take exception to permit Defendant to present new information regarding the Plaintiff's trademark(s) obtained from the United States Patent and Trademark Office (USPTO), make new challenges to the jurisdiction of the Court, present additional information about the Plaintiff, about the Defendant and the public domain which is relevant in considering the dismissal of or a remedy in this case. The supplemental details have been learned since Defendant's last appearance before the Court and the entry of Judge Rebecca Grady Jennings Order on June 03, 2020 as *Document 46* **[DE46]**. This motion is presented per Federal Rules of Civil Procedure 15(a)(1)(A), 15(c)(1)(B) and/or 15(d). This Supplement introduces extrinsic evidence which the Plaintiff has not recognized as common knowledge and the Court must consider in adjudication. As well as present additional pleadings before this Court relevant to support his Amended Motion to Dismiss and/or Motion for Summary Judgement **[DE47]** pursuant to Federal Rules of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, and alternatively under Rule

12(b)(6) for failure to state a claim for relief which can be granted requesting summary judgement. Additionally Defendant moves the Court to dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction because the Defendant is a commissioned Kentucky colonel.

## ARGUMENT JUSTIFYING SUPPLEMENT

1. Fed. R. Civ. P. 15(d) provides that this Court "may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened (or has been discovered) after the date of the pleading to be supplemented."

2. The Defendant since June 03, 2020 understands the Court's Order and has not replied to the Renewed Motion for Preliminary Injunction directly and made his Amended Motion to Dismiss and/or For Summary Judgement **[DE47]** on May 26th, as not to moot his former Motion to Dismiss filed May 21st, based on the filing of the Plaintiff's Renewed Motion for a Preliminary Injunction **[DE39]** filed on May 22nd, and now again brings a Reply in Support of Renewed Motion for Preliminary Injunction **[DN48]** and Response to Defendant's Motion to Dismiss **[DN49]**, where no response to **[DE47]** was required. Under Fed. R. Civ. P. 15(a), if a pleading triggers the adversary's right to file a responsive document, then "a party may amend th[at] . . . pleading only by leave of court or by written consent of the adverse party" when the opposing party has already filed the responsive document. The Defendant's claims and arguments over jurisdiction of the Court are not pleadings that warrant answers, objections, replies, or responses from the Plaintiff. In a dismissal hearing it is generally the Defendant that presents their pleadings last prior to adjudication or consideration in jurisdictional challenges before a defendant is required to file an answer.

3. Defendants have filed a motion to dismiss the Plaintiff's complaint, motions for a preliminary injunction, injunctive relief, and their amendments; thus, Plaintiff must seek this court's permission to amend their complaint or secure Defendants' written consent. Likewise granting leave to amend is a

matter within the court's discretion. *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 230 (1962). Generally a court should freely give leave unless facts show "undue delay, bad faith or dilatory motive . . ., repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." Id., 83 S. Ct. at 230..

4.  The **Amended Motion to Dismiss and/or for Summary Judgement** in this action is directed at the Verified Complaint and the Plaintiff's Motion for a Preliminary Injunction, Amended Motions and Renewed Motions have been filed and are now all pending. Defendant's motion challenging jurisdiction of the Court must be considered before the Defendant is required to file an answer or the Plaintiff makes further amendments, claims, responses or replies.

5.  Rule 15(d) provides that, "The court may permit supplementation even though the original pleading is defective in stating a claim or defense." Leave to file a supplemental pleading pursuant to Rule 15(d) "should be liberally granted unless good reason exists for denying leave, such as prejudice to the defendants." *Walker v. United Parcel Serv., Inc.*, 240 F.3d 1268, 1278 (10th Cir. 2001) (citation omitted).

6.  It is not clear as to whether the Plaintiff can cure the jurisdictional defects of the Complaint or Motion for a Preliminary Injunction by means of supplemental or amended pleadings, they have filed over 900 pages to make their case against the Defendant already, but it does appear that they wish to challenge the dismissal or any consideration by the court for summary judgement of this case. In Federal Court the Defendant has <u>an equal or perhaps greater right</u> to be heard because the allegations are *against them and potentially can affect the Defendant's liberty through penalties or the removal of Constitutional rights*; therefore they are compelled to present their defense. Defendants also have the right to have their motions adjudicated without prejudice or discrimination relative to extenuating or irrelevant circumstances based on the Court guaranteeing due process. The Defendant wishes to

move forward to have <u>his motion for dismissal and/or summary judgement considered by the court with this supplement</u> without the Plaintiff bringing further dilatory replies or reassertions of futility, before moving forward to either file an answer Fed. R. Civ. P. 12(a)(4)(A) or prepare for a summary judgement proceeding under Fed. R. Civ. P. 65, if required.

## <u>SUPPLEMENT LEGAL SUMMARY</u>

Based on this **Supplement** and the <u>actions taken by the Defendant(s)</u> since this case began <u>as a live case</u> the Plaintiff's Verified Complaint **[DN1]** has no remedy that can be rendered with adequacy against the Defendant(s) and the Plaintiff's Motion for Injunctive Relief **[DN7]** has been renewed as Plaintiff's Renewed Motion for Injunctive Relief **[DN39]**, therefore **[DN1]** and **[DN7]** should be considered moot or at least subject to dismissal on the jurisdictional issues raised. The Plaintiff's Renewed Motion and this entire case should be dismissed based on this supplementary pleading, its expansion of scope to the motion to dismiss and the evidentiary exhibits being presented. As a result of these <u>new findings</u> detailed further in this Supplement, Defendant presents <u>additional information, pleadings and argument</u> that the Court does not have jurisdiction over the case for one or more reasons, cannot provide relief or a remedy suitable to the Plaintiff, and the case should be dismissed for the reasons stated herein, notwithstanding the removal of my civil rights guaranteed under the First Amendment of the US Constitution and/or restricting access to the public domain[1] where the Plaintiff's claim to its trademark(s) emerged from, live/s and breathe/s, which the Plaintiff has chosen to ignore, but still desires, prays for and seeks based on their actions.

---

[1] The public domain has existed since time immemorial, and was first recognized in the *Statute of Monopolies* and the *Statute of Anne*, which placed time limits on patents and copyrights, after which the invention or work could be copied freely by anyone. The concept was enshrined in the US Constitution and reflected in American patent, trademark and copyright laws. Before 1896, courts referred to matters not protected by patent or copyright law as "public property" or "common property." In 1896, the US.Supreme Court imported the term "public domain" from French law, and it was popularized by Learned Hand in the first decades of the 20th Century. Since 1960, the US Supreme Court has repeatedly emphasized the Constitutional dimensions of the public domain. Those dimensions include two important principles that have been obscured in recent years: public ownership of matter in the public domain and the irrevocable nature of the public domain. Tyler T. Ochoa, *Origins and Meanings of the Public Domain*, 28 U. Dayton L. Rev. 215 (2002)

The Court must not assume or presume that the Plaintiff "The Honorable Order of Kentucky Colonels, Inc." (HOKC) holds adequate legal rights to be called by the name "Kentucky Colonels" for **anything more than the products it sells, manufactures, merchandises, markets or produces** that are it's only registered trademarks, their recent trademark applications 88800020, 88800035, and 88800038  to the US Patent and Trademark Office were refused on May 17th, 2020 with a non-final decision while under examination, **[See Exhibits 11, 12 & 13]** and will face critical challenges prior to being registered, if ever. "Kentucky colonels" are people, not products; Plaintiff alleges "KENTUCKY COLONELS" are trademarks that belong to the HOKC and all are "one in the same" in reference to themselves, which creates ambiguity. Even their website bears the copyright symbol © 2020 Kentucky Colonels. *All Rights Reserved*, which is a clear demonstration of copyfraud. **[See Exhibit 5]**

This Court *has not determined if any infringement has occurred by the Defendant because the defendant has not yet answered the lawsuit or been compelled to answer under* Fed. R. Civ. P. 12(a)(4)(A). Moreover it has not yet been determined that the Plaintiff has an adequate legal right to use the term "Kentucky Colonels" *alone or by itself as its company name* or as a registered trademark for its Internet domain name or for associations, charity organizations, or social events based on the jurisdictional challenges being raised by the Defendant. There is substantial evidence that the term *belongs to the public domain*, the Defendant alleges that the Plaintiff's use infringes on the rights of others, and additionally provides facts stating that the term is not registerable on the Principal or Supplemental Register of the United States Patent and Trademark Office for the purposes which the Plaintiff is currently using it because it is both generic[2] and merely descriptive, which would give the Plaintiff an unfair advantage over other Kentucky colonels.

---

[2] Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1141 n.2 (9th Cir. 2002) ("'Generic marks give the general name of the product; they embrace an entire class of products.'" (quoting Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery, 150 F.3d 1042, 1047 n.8 (9th Cir. 1998))); In re Dial-A-Mattress Operating Corp., 240 F.3d 1341, 1344 (Fed. Cir. 2001) ("Generic terms are common names that the relevant purchasing public understands primarily as describing the genus of goods or services being sold."); Self-Realization, 59 F.3d at 909 ("A term is a generic name, not a trade name, if it 'merely identifies the genus of which the particular [business] is a species")

Today, there are literally over 100,000 Kentucky colonels in existence that hold *letters patent* to lawfully use the term "Kentucky Colonel" none of whom are necessarily legally engaged, obligated or belonging to the Plaintiff's organization. There were more than 15 organizations historically (1892-1931) that used the term "Kentucky Colonels" since the ideal became so highly popularized following the Civil War as a descriptive term (part of) in/of their recognized legal names, today there are an estimated 15 or more different organizations that use the term as a general descriptor, and over 50 organizations that use the term for local events. There are over 12,000 references to Kentucky colonels in American newspapers that were printed between 1785-1931 in the Chronicling America Project at the Library of Congress, in another database indexing American newspapers (newspapers.com) there are 100,000-150,000 articles beginning in 1777. "Kentucky Colonels" is simply **too generic, descriptive and historically iconic** to Kentucky and America to belong exclusively to the Plaintiff or be registered as a trademark for any group of Kentucky colonels.

This Court does not have jurisdiction over the subject matter because it is part of the public domain, it does not have jurisdiction over the Defendant because he is a Kentucky Colonel, the Plaintiff does not have standing in this Court to bring this action against the Defendant, the Defendant is protected by the Volunteer Protection Act of the 105th Congress, the Defendant may be immune to this proceeding under the 11th Amendment of the US Constitution, and/or there is no lawful claim for which relief can be granted because there is no bona-fide legal registered trademark or incontestable trademark that has been infringed upon.

The US Supreme Court held that "Section 43(a) of the Lanham Act 15 U.S.C § 1125 does not provide grounds for liability for using public domain." In *Dastar Corp. v. Twentieth Century Fox Film Corp.*, No. 02-428, 539 U.S. (2003). Further 15 U.S.C § 1125(c)(3)(A) specifically permits Defendant to use the term descriptively of ourselves (even if a valid trademark registration were in place). Relative to the Defendant naming the Plaintiff in its blog as a subject of our objective criticism, disambiguation and news commentary 15 U.S.C § 1125(c)(3)(A)(ii) and 15 U.S.C § 1125(c)(3)(B) permits me as an author and donor (member) to

name the Plaintiff by their organization name and registered trademark "HONORABLE ORDER OF KENTUCKY COLONELS".

Under **15 U.S.C § 1111 the Plaintiff is <u>not eligible to seek the relief they are requesting or recover any damages</u>**[3] because no notice was ever given to the Defendant prior to filing the Civil Action with any cease and desist letter, the Plaintiff does not have adequate notice posted on their website, or elsewhere; and the Defendant was using the claimed term prior to the Plaintiff's filing of their application for registration. Still as of this date the Plaintiff does not qualify to use the "Registered Symbol" ® for associations, social clubs, events or charities. Only two days passed from the day they applied for their mark and brought a 300 page civil action, and subsequently the trademark application filed to the USPTO was refused.

.

## <u>SUPPLEMENTAL DISMISSAL PLEADING</u>

It is an indisputable fact that, Kentucky colonelcy was adopted from the **American conscience** by the Commonwealth of Kentucky to <u>serve the state and recognize civilians in homage of the culture, customs and traditions of the Commonwealth,</u> as an award in the form of an honorary commission bestowed upon people of accomplishment in recognition of their deeds, heroic acts, noteworthiness, community service, and personal achievements to be recognized as the state's role models. **[See Exhibit 1]** Kentucky colonels were not created for the specific purpose of particularly serving or benefitting the endless needs of charity or a single private organization that channels the goodwill and charitable giving potential of those who become Kentucky colonels by playing on their self-esteem and heartfelt pride through the sale of medallions that

---

[3] Under 15 U.S.C § 1111 Notwithstanding the provisions of section 1072 of this title, a registrant of a mark registered in the Patent and Trademark Office, may give notice that his mark is registered by displaying with the mark the words "Registered in U.S. Patent and Trademark Office" or "Reg. U.S. Pat. & Tm. Off." or the letter R enclosed within a circle, thus ®; and in any suit for infringement under this chapter by such a <u>registrant failing to give such notice of registration, no profits and no damages shall be recovered under the provisions of this chapter unless the defendant had actual notice of the registration.</u>

distinguish them further through their level of charity to the same organization. Nor is it a title based on being connected through a class of social elitism or politics as it was used for in the 1930s-1980s.

The term "Kentucky Colonels" has been used continually in references to individuals known as Kentucky colonels since the late 1700's and became a very popular term recognized as a Kentucky cultural icon prior to Opie Read's book "*A Kentucky Colonel*" in 1890; the fact is, the ideal of the popularity of the Kentucky Colonel inspired Read to write his book. On February 25th, 2020 the executive director of the HOKC, Col. Sherry Crose said to the *Courier-Journal*, "**Kentucky Colonels** is our <u>federally registered trademark</u> and <u>it represents individuals who honor their commission (as Kentucky colonels) and charitable efforts</u>." This statement clearly demonstrates the Plaintiff's illegal and ambiguous claim, intention to dominate a term which is generic, merely descriptive of herself as a Kentucky colonel, her organization, which disregards history, does not acknowledge the rights of Kentucky colonels who do not support her organization, and is a lawless fraudulent claim based on her presumption that it is already registered to the Principal Register of the USPTO. Once something exists in the public domain it remains a part of the public domain, it cannot be exclusively claimed in its descriptive or generic[4] form or context. Likewise trends, movements and ideals born from the public consciousness are naturally considered public domain.

While the Plaintiff has challenged this Kentucky Colonel to a duel in this Court, the Defendant appears on the behalf of the honorable, traditional and historical values of all Kentucky colonels, their customs, integrity, and individualism which made us all worthy of the prestigious title to become recipients of the commission and serve the state as goodwill ambassadors. The Defendant appears to protect the cultural icon of the Kentucky Colonel *as an author, creative developer, researcher and writer* to keep the Kentucky Colonel free and independent of the Plaintiff, meanwhile no one is objecting to their use of the term as a descriptive and generic element of their business name or their arbitrary use for products. In this action,

---

[4] *Dial-A-Mattress*, 240 F.3d at 1344; see *S.F. Arts & Athletics*, 483 U.S. at 531 n.7. "Because an indication of origin is the key to a non-generic mark, a general rule of thumb is that a generic mark answers the question 'what are you,' while a non-generic mark answers the question 'who are you?'" *Riggs Mktg.*, 993 F. Supp. at 1306 (noting that "Aspirin," "Cola," "Light Beer," and "Super Glue" are generic, but "Coke," "Levis," "Polaroid," and "Trivial Pursuit" are not generic);*Official Airline Guides, Inc. v. Churchfield Publ'ns, Inc.*, 6 F.3d 1385, 1391 (9th Cir. 1993).

however, the Plaintiff is outrightly attempting to adulterate and capitalize on the personages, titulars, commercialize the title, centralize their power, and misappropriate their authority through the USPTO to adapt and ambiguate a popular term for their exclusive use; the Plaintiff has manipulated, misconfigured, and misconstrued it long enough. The term was already very popular, well-recognized, legendary, rooted in culture, and carried significant goodwill long before *the state* began using it as a civilian award, or the Plaintiff's particular use; the Plaintiff's ambiguous obfuscation, their psychological domination of award recipients, and commercialization of the term. "Kentucky Colonels" in arbitrary relation to products is fine, but as a reference to their organization cannot move forward without disclaiming it as a generic and merely descriptive identity. The Plaintiff has taken the honorary title "Kentucky Colonel" and has substantially manipulated it through their historical accounting from the public domain disregarding how it came to become so well known, **[See Exhibits 1, 6, 8, 14, 15].** The Plaintiff's attempt to sequester the term for their own use needs to be stopped.

It is a matter of law that the Plaintiff cannot register as their trademark or utilize <u>a term that is part of the public domain which is descriptive, generic or suggestive relative to themselves</u>, it is *not a term* that is particularly <u>distinctive, arbitrary, fanciful, coined by, or unique to them</u>. In this case, the term "Kentucky Colonels" is well-known in the public domain, it is defined in encyclopedias, and dictionaries; for the Plaintiff it is suggestive, merely descriptive and also already serves as a generic element (descriptor) of their corporate name; "Honorable Order of Kentucky Colonels" (HOKC), which is a reference to their collective philanthropic organization dedicated to the collection and handling of donations that are solicited and received from those who have been commissioned with honorary title of  "Kentucky Colonel" for redistribution to non-profit efforts in the Commonwealth of Kentucky and the payment of their employees, as well as the sale of licensed promotional merchandise bearing the trademark brand name "KENTUCKY COLONELS". **"Kentucky Colonels" as a term cannot serve alone as trademark/servicemark of/for an**

organization or association of/for "Kentucky colonels" because it is merely descriptive and generic[5] under Section 23(c) of the Trademark Act, 15 U.S.C. § 1091(c)  See *In re 1800Mattress.Com IP, LLC*, **586 F.3d 1359 (Fed. Cir. 2009)**. Likewise this case law precludes them from making trademark claims relative to their website domain name [kycolonels.org] because it is also merely descriptive.

It is generally understood by courts around the world *a company cannot claim a generic term to be its proprietary mark.* "If a descriptive (or generic) term such as "orange juice" or "mobile telephone" could receive trademark protection to the goods that they denote the ordinary meaning of those terms would be distorted; in addition, firms possessing those trademarks would have an undue advantage vis-a-vis their competitors." *World Intellectual Property Report 2013*, p 94 ***Every business deserves the right to accurately identify and define the type of goods or services it sells, if a single company is allowed to claim trademark rights to a generic term - it will be against the principle of "fair competition".*** In this case *there is no other term that can be used by the Defendant or other organizations identified by the defendant (incorporated or unincorporated)* that share similar purposes of fraternity, association, events, and all sorts and types of activities which are normally performed by small groups which are made up of Kentucky colonels. The Plaintiff's new trademark applications under examination should continue to be refused, should be subsequently abandoned, and this case should be dismissed based on its subject matter.

Despite this the Plaintiff making claims that they have created goodwill and become identifiable enough using the term since 1951, to make the descriptive and generic term distinctive to them, it is not grounds for an injunction against the Defendant because the term is implicitly protected as one that *freely exists in the public domain*, predates the existence of the state, predates the existence of the Plaintiff, is an essential part of American and state history, has been a subject of American literature, been seen in cartoons, was the title of a film, been the subject of a books, and has become an iconographic reference identifiable notwithstanding the Plaintiff or their particular goals or mission. It is very clear that such a term or subject

---

[5] *Hunt Masters*, 240 F.3d at 255 ("[T]here are two distinct ways in which terms may be classified as generic: (1) where the term began life as a 'coined term'; and (2) where the term was commonly used prior to its association with the products at issue.").

matter belongs to the greater civilization, not the government, not the courts, and not to the HOKC **[Exhibit 1 supra].** If the HOKC manages to legally register the term sometime in the future, the Defendant's use of the term has always been classic descriptive, fair-use for lack of another term, to describe ourselves and began prior to the Plaintiff bringing this suit or filing for registration with the USPTO.

The Plaintiff alleges that the Defendant has used "its trademark" to lend authenticity to an organization dedicated to ourselves is a totally facetious argument with no basis because all of the members of *Kentucky Colonels International* are ***"real"* Kentucky colonels** exercising our lawful First Amendment rights to assemble under the US Constitution with our honorable titles. Our articles and commentary, which they have presented to the Court alleging defamation from our blogs, have all been aimed on disambiguating our organization from theirs and critically addressing issues, which they continue to fail to recognize, respond to or acknowledge. Anyone reading our articles would never become confused, the allegations of us causing confusion are totally inaccurate and ridiculous. The Plaintiff has not presented any evidence or made any allegation relative to our organization selling any of their products or any intent to offer any products they offer or bearing any trademark that is registered as belonging to them.

The Plaintiff's organizational name and registered servicemark is "HONORABLE ORDER OF KENTUCKY COLONELS", the same as their corporate name, it is clearly distinctive, is well-respected and known by the Defendant since 1999. The Defendant donates to them and is recognized as one of their members **[See Exhibit 2]** as well as are many of our other members of our _now_ underscored unincorporated international civil society organization. The Plaintiff's only three registered arbitrary trademarks "KENTUCKY COLONELS" are all for **products** that the HOKC sells and markets through a store called "Kentucky Colonels Store" owned by Upper Right Marketing LLC, however the Kentucky Colonels Store is not a registered "assumed name" of the Plaintiff or the marketing company that owns it, just more presumptuous fiction. It is more likely that the HOKC decided to change their already distinctive name of 60+ years by truncating it after discovering that our full name was more effective in the social media and the Internet than

their own. Instead they have ignored the possibility of using HOKC, which would not only be distinctive, but unique, trademarkable, identifiable and memorable as a domain name. Instead they are pursuing Kentucky Colonels which is not available because it belongs to the public domain, is too generic and is too descriptive to serve as their exclusive servicemark or trademark.

　　*There is nothing more authentic than an organization or association made up of Kentucky colonels dedicated to fraternal endeavors of the same,* which has always been our intended use of the term, "Kentucky Colonels" as an identifiable generic elemental descriptor that is consistent with history, **which we understand cannot be registered** or used in such a way to create confusion, there is no confusion between "Honorable Order of Kentucky Colonels" and "Kentucky Colonels International" or any of the other organizations that exist, except for the obvious fact that we are all organizations that may provide products, services or information that is relative to Kentucky colonels.  It is the Plaintiff that is using their registered product trademark "KENTUCKY COLONELS" in an **ambiguous way** to refer to countless products, their own organization, charitable efforts, private events, their website copyright, and an online store is to intentionally to *create confusion, dominate, influence public opinion, and monopolize a term* **that has always** been in the *public domain* to such a degree that a person does not know whether "Kentucky Colonels" refers to a cigar, barbecue sauce, t-shirts, an organization, an association, a sports team, a musical group, a publication, their charity, or a small group of several Kentucky colonels who have been granted the title who may or may not support the Plaintiff's organization sitting somewhere at a table in a restaurant reserved for them holding a fraternal event dedicated to colonels. Their motivation is based on conducting a land grab, hijacking history, and is inconsistent with Federal and International Law, therefore their claims, allegations and motions must all be dismissed.

　　It would clearly be outside of the authority of this Court to deny the Defendant or any other person that has been conferred or who is beholding the "honorable" title of **Kentucky Colonel** the right to use such title to describe themselves and likewise would be beyond its jurisdiction to injunct our organization or any

other **civil societies and small groups** from the use the term "Kentucky Colonels" as a generic descriptive term or component of their own legal names (e.g. <u>Kentucky Colonels Switzerland,</u> <u>Chicago Kentucky Colonels Club,</u> <u>Kentucky Colonels Club of Dallas,</u> <u>Philadelphia Kentucky Colonels,</u> <u>Georgia Masonic Kentucky Colonels,</u> <u>Kentucky Colonels of Virginia,</u> <u>Kentucky Colonels Spain,</u> <u>UK Brigade of Kentucky Colonels</u>, etc., etc., etc., and other unknown others) **[See Exhibit 14]** because to do so would set an unconstitutional precedent and lead to legal demands by the Plaintiff that infringe on the rights of colonels. None of the organizations that currently hold meetings, conduct events, receive donations from their members in Switzerland, Canada or the United Kingdom should need to change, all of their members have letters patent and they all promote Kentucky as goodwill ambassadors, and that is what it is all about notwithstanding the HOKC.

This case may involve a dispute that this Court must dismiss with prejudice, because the Plaintiff cannot bring a civil matter against its own donors (which it calls members) or commissioned officers of the Commonwealth who are performing their honorary "unofficial" or "official" designated duties as Kentucky colonels using letters patent..

Over the years the Plaintiff has failed to address issues raised by Kentucky colonels, which has created a non-responsive void within their organization. In a 1947 article *Kentucky Colonels, a Study of Semantics*, a general (board member) from the HOKC was quoted in *American Notes & Queries,* saying, "No Kentucky colonel, in our time, takes his title seriously." **[See Exhibit 8, page 8]** We have adopted a completely different view of Kentucky colonelcy, treating it with a high degree of honor, integrity, regard, and fortitude; making our members feel respected and appreciated despite not donating to us or to the HOKC, but simply based on them holding a Kentucky Colonel Commission and acting themselves as goodwill ambassadors.

Kentucky colonels have traditionally been independently nominated by other Kentucky colonels, until recently, the Secretary of State would send the addresses of those who receive a commission to the

Plaintiff. The Plaintiff in turn would send a membership card and welcome package after learning from the Secretary of State that they were commissioned by the Governor, talking about their charity and solicit contributions directly from Kentucky colonels, we complained about this though because it violated privacy laws and showed preference to the HOKC; while the practice boosts the capacity of the HOKC it does not help colonels fulfill their role as goodwill ambassadors. Now since the date of the filing of this lawsuit the Plaintiff has come into the convenient position of screening applicants and/or gaining access to the data that is being submitted by the public before or after being recommended (by any member of the public instead of exclusively by other colonels) to the Governor electronically. This creates an inappropriate, non-traditional, and immorally implicit relationship between the state and the Plaintiff where no declared or genuine relationship exists, it is also contrary to their own declarations as a private, non-governmental, and independent organization. The practice is not transparent, breaks a 65 year tradition, does not bring honor to those already commissioned as colonels, and results in their own preference. It also demonstrates their political influence over something where none is warranted, welcome, appropriate or practical.

Sending donations has always been voluntary, then in the late 1990s the Plaintiff separated their active donors from inactive donors, terming them as <u>active or inactive members,</u> however the HOKC does not provide actual association membership, voting privileges, benefits, rights, or any influence over the board of trustees, nor do they stand up for their members or assert their rights as Kentucky colonels in the public sector. HOKC has always presumed that all people who are commissioned are implicitly their own members and supporters ever since they managed to get the Secretary of State to share the names and addresses of all those who receive commissions to their private charity. Kentucky colonels who are acknowledged as members possess civil and human rights *to associate or not to associate*, in a dynamic psychological deception calling their voluntary donors (members) and the imposition a pseudo military ideal with generals (trustees) and the governor as the commander-in-chief (an honorary position) the Plaintiff creates a false sense of belonging to a military chain of command, however, the organization fails to provide by-laws for

their supporters and clearly disclaims all members in its Restated Articles of Incorporation stating they have none. **[See Exhibit 3, p.4 Article VI and p. 9 Article XIII Third]**

The Plaintiff may not have standing to bring this action. "The fundamental aspect of standing is that it focuses on the party seeking to get their complaint before a federal court and not solely on the issues they wish to have adjudicated. Organizations *do not have standing* to represent their particular concept of the public interest, but organizations have been permitted to assert the rights of their members.. *U.S. Constitution Annotated*, Article III. Section II, Clause I,   Substantial Interest: Standing Organizations in the case of the Plaintiff they are not representing their members because they have no members to represent. **[*Id* Exhibit 3]**

The purpose of the Court is to arrive at an acceptable conclusion in the eyes of the law, however the Court has decided to test the ripeness of the case prior to adjudication, but this piece of fruit may never ripen or is just may not be palatable, in which case dismissal is necessary. The Plaintiff cries foul at every turn, insists it possesses rights to a monopoly under the law, alluding to their own creation, to behold a term from the public domain that is merely descriptive and generic to its own goals and corporate identity; the Plaintiff speculates the Defendant's intentions, motives and plans with conjecture, lacking any evidence of wrongdoing on our part. The Defendant has offered the Plaintiff numerous settlement proposals and a business offer to assume the rights over our intellectual property, planned program developments, over 13 years of social media formation, undertaking an ethical membership development designed to be consistent with the United States Code and the Model Nonprofit Act for Organizations, and planned activities which have never resulted in any constructive negotiation or counter-offers by the Plaintiff. The Defendant feels it has been targeted by the HOKC, because our program *is a good idea*, it promotes Kentucky colonels' motivations, presents a *viable program reform that appeals to colonels*, and because we have publicly criticized their organization to *disassociate and disambiguate* ourselves with them using information which they cannot respond to or address. So now the Defendant, henceforth, will make his ideals and intentions clear and well-understood before the Court.

This Defendant and his fellow Kentucky colonels of the reforming Kentucky Colonel Foundation and the American Colonel Network, in their official roles as colonels, shall serve other Kentucky colonels as their **disputatious public advocates**, refrain from any and all commercial activity, defend our continued *fair-use* (as defined by the law) of the terms "Kentucky Colonel" and "Kentucky Colonels", challenge or seek cancellation of the Plaintiff's trademark applications and registered trademarks that overlap with the public domain, publish information gathered from the public domain about American Colonelcy, share social media content and news articles about Kentucky colonels through the Defendant's unincorporated civil society on Facebook, use our blog for commentary and to publish original copyrighted works, to republish materials from the public domain project Chronicling America at the Library of Congress, use our website [colonels.net] to develop creative works under a Creative Commons license, and will act as a vigilant watchdog over the Plaintiff and the Kentucky Colonel Commission of the Kentucky Governor addressing its grievances publicly and privately in good faith for the benefit of past, present, and future Kentucky colonels in accordance with the law, honorably and civilly.

The Defendant has alerted the Court that the Plaintiff is engaged in an illegal land-grab, is making a spurious claim to intellectual property that it does not control nor has created, that the disputed term "Kentucky Colonels" belongs to the public domain, that the Plaintiff is attempting to register terms that are merely descriptive and generic relative to all those who are Kentucky colonels, and the Plaintiff has engaged itself in copyfraud and a hijacking. **[supra and infra]**. The Plaintiff feels that they possess implicit rights to dominate a term which existed in the public domain before they came into existence and has *somehow, magically* become their own property based on their adaptation, adoption and acclamation of the term as a descriptive component of their own name after ignoring the needs of its supporters and this international organization that formed spontaneously based on their ignorance towards its donors who live under the assumption that they are their members, the Plaintiff's mightier than thou attitude and failure to take offensive actions in 2001, 2006, 2009 and 2016, leaving the Federal Court to intervene and make legal

decisions that will violate the rights of those who have been granted an honorary title that voluntarily fosters their own existence.

The Plaintiff brought the lawsuit while projecting false information based on allegations against the Defendant resulting in the diminution of another organization, which they included in their furious wrath. **[See Exhibit 4]** Based on news articles that resulted from this lawsuit, there are a number of other exhibits that possibly exist aimed at my credibility that are unfounded and have resulted in damages. In reality, their target is this Defendant who wrote about the Plaintiff objectively, criticizing them, redressing concerns to the governor, made the merger proposal, which they requested and rejected, and organized the development in Facebook. Years of blatant disregard for the fraternal and social needs of Kentucky colonels by the Plaintiff has brought on this lawsuit following this Defendant taking positive actions as a Kentucky colonel. It will be a sad day in Kentucky if its colonels are demoted or devalued further to become mere subjects of a charity organization rather than the state that commissioned them.

The Plaintiff has chosen to selectively ignore other organizations and corporations who may be actually cybersquatting with domain names like [kycolonels.com], [kycolonels.ch], [kentuckycolonels.com], [kentuckycolonels.us], [kentuckycolonels.co], [kentucky-colonels.org], and many others that are already registered; as well as selectively ignore other domains that have not yet been registered such as [kycolonels.store] and [kentuckycolonels.store] which could all be appropriate if the Plaintiff was actually trying to protect its own interests and so-called intellectual property, or the most obvious choice like [hokc.org] which is truly distinctive while all the others are descriptive. Despite our organization abandoning the name we have been using since 2009, "Kentucky Colonels International", changing it to "Kentucky Colonel Foundation", changing our domain name from [kycolonels.international] to [colonels.net] and ceasing all commercial activity to sell our services never offered by the Plaintiff, the Plaintiff continues to seek to dismantle our organization to dissuade any continuing development on our part within our legal

rights as Kentucky colonels, they even allege that we are brazingly defying court orders, which is simply not true.

The Plaintiff is simply acting as a "middle man" that has placed themselves between Kentucky colonels and the (state) governor utilizing psychodynamic suggestion, which has created a non-democratic corporate governance system to contain, control, disempower, exploit, thwart and temper the abilities, freedoms and goodwill ethics of Kentucky colonels collectively; while they capture the character of individual awardees to reclaim the credit for their good deeds through creating the fictitious authority of fake generals that are *not provided for in contemporary law* or the rich history of the Kentucky colonel. Kentucky colonels are commissioned to work independently of the governor as his aide-de-camp for the state as goodwill ambassadors. The Plaintiff has shown a blatant disregard for their supporters to benefit their elite inner circle and create favors for some while disregarding the rest. By intervening between the governor and the Kentucky colonels that have received the award from the governor, the Plaintiff is filtering the potential and the true *official authority* of colonels as Kentucky's goodwill ambassadors to act in their stead, make themselves wealthy from donations from those awarded the title, and for their own claimed purposes, which clearly benefit the people of the state, but do not create prosperity for colonels themselves or enhance their careers by encourage recipients to use the title. When a colonel calls and asks the Plaintiff what they can do as a Kentucky colonel, the answer is to donate to them and they will ensure that Kentuckians benefit. Our answer to the same question is quite different and results in the personal development of individuals to serve as goodwill ambassadors through the use of the title abroad, promoting tourism, trade, enterprise, culture and economic development resulting in billions of dollars of increased revenues for the state.

The trademark statute permits a word to be withdrawn from the public domain only if, and only to the extent that, it has acquired a proprietary meaning. In *Dastar Corp. v. Twentieth Century Fox Film Corp*. In this decision, Justice Scalia colorfully warned against resorting to trademarks law to achieve protections unattainable by copyright, lest these claims generate "a species of mutant copyright law that limits the

public's 'federal right' to "copy and to use,"' expired copyrights." *Dastar*, 539 US at 34 (quoting *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 165 (1989). This is greatly disturbing and unjust if the Plaintiff can propriete a term that emerged not from an expired copyright of their own, but from the minds of Americans over two centuries ago..

## SUPPLEMENTAL PLEADINGS

**1) The Plaintiff does not have a Registered Trademark for Associations or Membership Services:** According to the public record of the USPTO the Plaintiff's applications for trademarks (serial numbers 88800038, 88800035, and 88800020) that they began to claim ownership of on February 17, 2020 <u>were refused by the USPTO on May 12, 2020</u>, upon closer inspection of these records the Defendant also informs the Court that they are currently unregistrable, if they are approved for publication in the future they will be opposed, and if the Plaintiff manages to register them in the future this Defendant will seek to cancel them in the interest of the public, our organization and as a disputatious public advocate for other Kentucky colonels. **[Exhibits 11, 12, & 13]**

This case is almost entirely dependent on the registration of "Kentucky Colonels" on the Principal Register of the USPTO with these three trademarks and serves as the primary basis for this legal action. There is no possibility that this case has anything to do with the Plaintiff's other three trademarks (serial numbers 86168292, 88423336, and 76499062) because they all are for products and the Plaintiff has not produced any evidence of infringement. The Plaintiff has brought the proceeding in the hope that they could intimidate the Defendant, as they have in the past beginning in 2001 with their initial contact with the Defendant. The term is one that clearly belongs in the public domain which no civil society of commissioned Kentucky colonels should be barred or restricted from using no matter where they live in the world despite the Plaintiff's attempt to register a trademark or its claims that they have built their goodwill from it. The goodwill claimed by the Plaintiff belongs to their organization "The Honorable Order of Kentucky Colonels"

not to their registered trademarks for products or "Kentucky colonels" themselves, individually or collectively, but to those who support their organization which accounts for approximately a third of their collectiveness. Their overreaching generalized claim is a hijack maneuver that implicitly dominates other persons that have chosen not to support the Plaintiff.

**2) Defendant Resents the Court Acknowledging Plaintiff Under an Ambiguous Generic Assumed Name:** In the Court Order dated June 03, 2020 [Document 46], this court referred to "Plaintiff, The Honorable Order of the Kentucky Colonels' ("Kentucky Colonels")," when neither in the past (during their own history) or as of this day has the Plaintiff acquired an **assumed name registration** with the Secretary of State of the Commonwealth of Kentucky or under any other US jurisdiction. Apparently even the Court has become so confused, that it is hard to distinguish the Plaintiff's only legal name is "The Honorable Order of Kentucky Colonels, Inc" as stated by the records of the Secretary of State with its claimed trademark(s). While it is clear that the Court is referring to the Plaintiff, the degree of ambiguity and confusion being created by the Plaintiff is beyond the Defendant's understanding as this same court has in the past referred to the Plaintiff as the "Honorable Order". Whereas, Kentucky Colonels could be referring to all Kentucky Colonels in the world or any one of many organizations and civil societies formed by Kentucky colonels that were not formed or developed by the Plaintiff.

"Kentucky Colonels" is not a registered corporation or legal trade name in the State of Kentucky belonging to the Plaintiff. Currently there are no assumed name registrations owned by the Plaintiff are on file with the Secretary of State.

The Plaintiff's automatic Facebook Transparency Report on their Facebook page **[Exhibit 10]** says the page was established in December 2014 and was started as "Honorable Order of Kentucky Colonels", it was changed to "Kentucky Colonels" in December 2016, then changed to "Kentucky Colonels - National Headquarters" in April 2018, and then in December 2019 was changed back to "Honorable Order of

Kentucky Colonels" They have certainly confused their Facebook followers with these changes and use this *self-created confusion* in the social media as a basis for this lawsuit under the Lanham Act.

Very similarly their official website was changed to disclaim their legal name for the unofficial assumed name that is unregistered, the transformation is reflected in the Internet Archive, these changes demonstrate that the Plaintiff has not performed due diligence and was not familiar with the use of keywords, descriptions and metatags; they have in the past erroneously mistagged pages to achieve search results and distance themselves from their corporate name for a number of unknown reasons and to compete with others for dominance while creating ambiguity over the term "Kentucky Colonels" for their own exclusive unrestricted commercial use. None of these changes they have made are reflected in the official government records such as the IRS, USPTO, Federal Court or with private companies that monitor them for transparency such as the BBB or the Guidestar Non-Profit Monitor, which all continue to recognize the Plaintiff as The Honorable Order of Kentucky Colonels, Inc..

**3) The Defendant(s) has/have Voluntarily Cured the Lawsuit by Changing its Name, Withdrawing its Assumed Name and Changing its WebSite Domain Name to Accommodate the Plaintiff.** On February 28th the Defendants withdrew the assumed name registration for "Kentucky Colonels International" previously owned by Ecology Crossroads Cooperative Foundation, Inc., which officially disassociated and disclaimed it as a child organization and then disbanded it all together. On February 28, 2020, Kentucky Colonels International ceased to exist, and began moving the website domain [kycolonels.international] to [colonels.net] owned by Col. David J. Wright under the presumption that the Plaintiff held a valid registered trademark for "Kentucky Colonels", which after education and investigation I have now come to understand <u>they do not own</u>, but *have only applied to register* and currently have their application under examination. Our organization has <u>stopped selling memberships, changed our name on Facebook for all three social media properties (1 page and 2 groups), unincorporated our organization from the parent organization, and removed our donation page</u> to comply with a Temporary Restraining Order

[DE14] and subsequent renewed orders. On the basis of these voluntary changes and compliance with the Court's TRO the Plaintiff's Verified Complaint became moot, giving the Plaintiff all the remedies that they could ever expect under statutory law 15 U.S. Code § 1111. This is not enough for the Plaintiff leading them to pursue and prosecute the Defendant outside the jurisdiction of the original complaint by filing amendments and crying foul over all the other issues they have raised and creating fiction beyond the scope of their rights to pursue in an effort to destroy and dissuade the Defendant from his advocacy for Kentucky colonels.

It is axiomatic that federal courts are courts of limited jurisdiction. The Constitution restricts this Court to the adjudication of "cases" or "controversies." *U.S. Const. Art. III § 2; Allen v. Wright*, 468 U.S. 737, 750 (1984). The mootness doctrine, which is a subset of the Article III "justiciability" requirement, demands that a <u>case present a live case or controversy at all times during the pendency of the case</u>. *Burke v. Barnes*, 479 U.S. 361, 363 (1987). If, for example, a case presented a live case or controversy during the trial phase, but something happened during an appeal that mooted the case, the appellate court is bound to simply remand the case to the trial court with instructions to dismiss the case. *Id.* at 365.

The Sixth Circuit has recognized that "the test for mootness is whether the relief sought would, if granted, make a difference to the legal interests of the parties." *McPherson v. Mich. High Sch. Athletic Ass'n*, 119 F.3d 453, 458 (6th Cir. 1997) (en banc). Mootness, therefore, turns on whether <u>a court can award any effective relief for an allegation of a deprivation</u>. *Church of Scientology of California v. United States*, 506 U.S. 9, 12 (1992).

The Plaintiff, however, is not focused on a cure or a remedy that can be granted by this Court, the Court cannot provide an injunction against a Defendant that is exercising their rights under the US Constitution, that is fairly using descriptive property belonging to the public domain, or even a trademark that is generic or descriptive to themselves, they cannot pursue a Defendant in a US Federal Court that is not engaged in commerce, they cannot engage a Defendant that is ethically addressing grievances and promoting

academic research for the purposes of sharing information in this case history.  Since the TRO was issued the Defendant has removed all hopes of making any money or receiving donations, and resigned to redevelop to form a project that is based on history, news, research and genealogy.

The Defendant and other unknown defendants as honorary Kentucky colonels who are active donors ("members") or inactive donors ("inactive members") of the Plaintiff's organization and all other individuals with letters patent issued by past, present or future  governors are demonstrating concerns within their legal rights to make commentary, criticize, and continue in their quest to unravel the mysteries of American Civil Colonelcy, notwithstanding the Honorable Order of Kentucky Colonels erroneous and misinformed accounts of history and their own formation are well within their rights.

The only remedy or salvation that may exist for the Plaintiff is to amicably settle with the Defendants or perhaps remove themselves from the social media and the public sector since they are a private non-profit organization that is only open to Kentucky colonels who donate, that are their subject and target audience, so that they themselves are not subject to public scrutiny or unmoderated criticism or commentary. There are a number of options available to the Plaintiff including Facebook private groups and operating a website that does not display all of its information publicly and has an enhanced end-user license agreement (EULA). The Defendant on the other hand has chosen to use a Creative Commons License and utilize information obtained from the public domain combined with news articles and current events.

**4) Plaintiff's Renewed Claim for Injunctive Relief is not Relative to the Matter at Hand.** The Plaintiff argues that the Defendant is infringing on its mark "Kentucky Colonels" which is only known and registered in the USPTO as a mark for products like those described by those particular registrations which include barbecue sauce, chocolate sauce, keychains, cigars, baseball caps, and other products that they merchandise through Upper Right Marketing, LLC's website [kycolonelsstore.com] and in the social media.

The Plaintiff continues to allege that the Defendant is and has defied the TRO **[DE14]** however the Defendant was and is in full compliance with the specific Court Order that was actually issued, which did not

follow the Suggested Order of the Plaintiff, that asks the Court to violate our rights. The Plaintiff continues to insist that we have and are now citing their own suggested order and conditions that were not present in the Order that was made by the Court, in an effort to brainwash the court into believing that they were victimized, and allege continued wrongdoing towards them on the part of the Defendant..

Providing the Plaintiff with Injunctive Relief or a Preliminary Injunction would be the same as quashing the Defendant's First Amendment Constitutional Rights to free speech, freedom of the press, right to assemble and right to address grievances to the government. The Defendant has already changed its program development, withdrawn its assumed name registration, changed its domain name, changed its organization name, stopped engaging in commerce with its registry program before this lawsuit was presented, and subsequently truncated its membership development plans once the lawsuit began.

**5) This Defendant has a lot to say and has become the Foremost Authority on Kentucky and American Colonelcy in the US Since this Case Began**. I am absolutely sure that there are no other researchers better capacitated or educated about the history and traditions of colonelcy in Colonial America and where Kentucky colonelcy originated, most of the information I have accumulated is being developed now for publication. My work will address the mystery behind the Southern Colonel, expose corruption, glorify benevolence and chronicle the entire historical origins of Colonial Colonelcy in the 13 Colonies and its expansion to Kentucky, Alabama, Louisiana, Tennessee, Texas, Oklahoma, New Mexico, North Dakota and Utah including its adoption as a rank by the US Military in 1802. Much of this information is far outside the jurisdiction of this court because the origins of Kentucky Colonelcy predate the founding of the United States starting with Colonel Daniel Boone in 1774-1775. Letters patent issued to Kentucky's first colonels were made by the Governor of Virginia to take over the Transylvania Colony starting with Col. John Bowman in 1777 as the chief civil officer of Kentucky County. There were Kentucky Colonels present when Transylvania University was founded in 1780. Twelve years later this was followed by statehood in 1792.

Colonel Isaac Shelby was commissioned in North Carolina before arriving in Kentucky and becoming its first governor. There is a great rich history behind Kentucky Colonelcy.

**6) The Defendant has a License in the Form of "Letters Patent" as an Honorary Officer of the State which Grants him and all other Kentucky Colonels Privileges notwithstanding the Plaintiff.** David J. Wright is a Kentucky Colonel and was *commissioned* by Governor Paul Patton in 1996 for bringing attention and goodwill to the Commonwealth by distributing millions of free trees across the United States from Berea, Kentucky. The colonel has continuously and honorably served the Commonwealth since 1996 and previously as a citizen and resident beginning in 1992. Unless something has changed or superseded the meaning of "letters patent" in Kentucky, the Defendant stands under the authority granted through "letters patent" by the Statute Law of Kentucky 1792 and "letters patent" as cited and described in the Journal of the Senate of the Commonwealth of Kentucky in 1846. *Black's Law Dictionary 4th Edition* says **letters patent** is "an instrument proceeding from the government, and conveying a right, authority, or grant to an individual." *A General Abridgment and Digest of American Law*, (1823) "letters patent under the great seal do amount to a livery in law." *Green v Liter*, 8, Cranch p. 244, "In Kentucky a patent is the completion of the legal title."

A **commission** is "a warrant or authority or *letters patent*, issued from the government, or one of its departments, or a court, empowering a person or persons named to do certain acts, or to exercise jurisdiction, or to perform the duties and exercise the authority of an office." *Bledsoe v. Colgan,* 138 Cal. 34, 70 P. 924.

**7) The Plaintiff Holds No Civil Authority that Supersedes the Law.** It is widely understood that those who are commissioned as Kentucky colonels are also civilian officers, with honorary status, but nonetheless officers of the state, the Plaintiff has decided to file a lawsuit against a Kentucky colonel who was commissioned as an honorary state officer by a past governor. However their lawsuit is not based on misconduct or criminal behavior, it is based on a trademark that they have applied for, but do not legally own, have registered or are even "known by" in their own state except under presumption and the ambiguity

25

they have created over the past several years, even the state continues to recognize them under their full legal name. At the time I established the Kentucky Colonels International and subsequently Kentucky Colonel Foundation I was working in my official capacity as an honorary civilian officer, with letters patent, and on the behalf of our members all of whom are Kentucky colonels. To sue me in US Federal Court the Plaintiff actually may need to joinder the State of Kentucky, because I am acting in my official capacity as a Kentucky Colonel under the flag and the Great Seal of the Commonwealth of Kentucky.

According to the Commonwealth, "The highest honor awarded by the Commonwealth of Kentucky is that of Kentucky Colonel." "Today, commissions for Kentucky Colonels are given by the Governor and the Secretary of State to individuals in recognition of noteworthy accomplishments and outstanding service to a community, state or the nation." "In 1932, the Honorable Order of the Kentucky Colonels was formally born. Today, the organization is incorporated as a private non-profit charitable organization with by-laws directing it to be non-partisan, non-profit and dedicated to good works within the Commonwealth of Kentucky." *Secretary of State Michael Adams, Executive Services*, Commonwealth of Kentucky.(2020)

The Supreme Court noted in Graham that an official in an individual-capacity suit may assert the personal immunity defense of qualified immunity, but the only immunities available in an official-capacity suit are those that the entity may possess, such as sovereign immunity or immunity under the Eleventh Amendment. *Graham*, 473 U.S. at 167, 105 S. Ct. 3099

**8) It is the Responsibility of the Plaintiff to Develop a Strong Identity Behind a Distinctive Name.** Without confusing the public, The Honorable Order of Kentucky Colonels spent from 1957 until 2020 almost exclusively using their full corporate name, my membership card from 2020 uses their full corporate name, however their new letterhead uses just "Kentucky Colonels - National Headquarters" and a new unregistered logo presentation that they have marked with ™. (Trademark). **[Exhibit 2 supra]**

**9) The Anticybersquatting Consumer Protection Act (ACPA) does not Apply to this Case.** The ACPA 15 U.S.C. § 1125(d), is a U.S. law enacted in 1999 that established a cause of action for registering,

trafficking in, or using a domain name confusingly similar to, or dilutive of, a trademark or personal name. The law was designed to thwart "cybersquatters" who register Internet domain names containing trademarks with no intention of creating a legitimate website, but instead plan to sell the domain name to the trademark owner or a third party. We have never offered for sale to the Plaintiff our domain name [kycolonels.international] and adopted it as our own based on others using [kycolonels] to descriptively and generically to identify and describe themselves as Kentucky colonels, relative to the scope of Internet name abbreviation contexts and take advantage of the descriptive meaning of our actual name, other registrations including [kycolonels.com], [kycolonels.ch] and [kycolonels.blogspot.com] do not belong to the Defendant or the Plaintiff. The Defendant acquired both its domain names fairly and in good-faith under 15 U.S.C. § 1125(d)(1)(B)(ii). While the Plaintiff owns [kycolonels.net] and [kycolonels.org] they do not own all the primary gTLDs, however they were all available when the Plaintiff started online . The core group of generic top-level domains consists of the **.com, .info, .net,** and **.org** domains. In addition, the domains, **.name**, and **.pro** are also considered generic; however, these are designated as restricted, because registrations within them require proof of eligibility within the guidelines set for each. To demonstrate good faith towards the Plaintiff the Defendant suspended use of [kycolonels.international] and moved it to [colonels.net] while refocusing our development on American Colonelcy instead of concentrating our efforts exclusively on Kentucky Colonelcy.

The Plaintiff registered "KENTUCKY COLONELS" as an arbitrary trademark for products like cigars, chocolate, sauce and promotional products for Kentucky colonels, based on this they allege they implicitly possess the right to the *abbreviated term* "KYCOLONELS" where they *do not sell* these trademarked products. They do not have any implicit rights under trademark law to [kycolonels] as their exclusive domain name because it is both generic and descriptive in its use for an organization not these products. Trademark law generally only provides protection only for "well-known" marks in this respect to

its products or services.[6] the Plaintiff would need to be "well-known to a relevant sector of the public (not the entire country) as well as promotion of the mark (not just its use). The Plaintiff is not well-known enough to qualify for TRIPS Agreement protection since they have a small target audience of approximately 100,000-150,000 Kentucky colonels, which is not considered a substantial portion of the United States or world population.

**10) The Plaintiff bringing this Lawsuit is Inconsistent with the Volunteer Protection Act, Public Law 105–19 of the 105th Congress**. Defendant is a volunteer member and/or considered a voluntary donating member and because the Defendant is a Kentucky Colonel for the Commonwealth of Kentucky serving as an honorary commissioned officer without remuneration as a goodwill ambassador for the Commonwealth.  **Justice Combs said "Kentucky Colonels and notaries public are created in the name of the Commonwealth, by its Chief Executive."** *City of Louisville MH Com'n v. Public Housing Admin.* 261 S.W.2d 286 (1953) Kentucky Colonel <u>commissions are authorized by executive orders signed by the governor</u> and attested to by the Secretary of State. *Secretary of State Michael Adams, Executive Services*, Commonwealth of Kentucky.(2020)

**11) The Plaintiff cannot Register a Trademark of a Pre-existent Common Law Trademark for its Exclusive Use.** In Kentucky there are certain symbols and ideals that have become the common law trademarks of the state which are understood and stimulate the imagination. It is generally understood that symbols of national identity and sovereignty of a state are not protectable. Belonging to the state they also implicitly belong to the people that live there and are thus within the public domain of the state. Among these common law trademarks are place names, venues, slogans, ideals, symbols, images and even colors; these items are used in such a way to project the culture, customs, traditions and values of the state; which in turn

---

[6] Paris Convention for the Protection of Industrial Property and the Agreement on Trade-Related Aspects of Intellectual Property Rights (the TRIPS Agreement). Consequently, not only big companies but also SMEs may have a good chance of establishing enough goodwill with customers so that their marks may be recognized as well-known marks and acquire protection without registration. It is, nevertheless, advisable to seek registration, taking into account that many countries provide for an extended protection of registered well-known marks against dilution (See Art. 16.3 TRIPS)

can be used by its citizens and representatives to ethically and morally instill a sense of the state's prosperity. Some of these "implicit trademarks" are well known across the country and inspire or stimulate imagination. When Americans think of thoroughbreds, bourbon, or bluegrass they most frequently think of Kentucky, likewise in the more descriptive ideal when they think of Kentucky they think of the University of Kentucky, the Kentucky River, My Old Kentucky Home and Kentucky Colonels..

It is also widely understood that the State Seal which is also represented on the State Flag depict a statesman and a pioneer shaking hands, the Defendant suggests that both these men are Kentucky colonels and uses the State's Coat of Arms from 1876 as a symbol of the two friends on his website. Popular belief claims that the buckskin-clad man on the left is Col. Daniel Boone, who was largely responsible for the exploration of Kentucky, and the man in the suit on the right is Col. Senator Henry Clay, Kentucky's most famous statesman, both of them are well-known as Kentucky colonels.

### FACTS SUPPORTING DISMISSAL OR SUMMARY JUDGEMENT

Legal standing and recognition in the United States, the title (term) "Kentucky Colonel" appears over 100 times in the Congressional Record since the 19th century: On February 16, 2000, Congressman Dave Camp from Michigan made a tribute in the House "On February 19th, Marv Valentine will receive the Kentucky Colonels' Award, a high honor reserved by the state for ambassadors of goodwill and fellowship. It is truly well-deserved. Another honor that I might offer Marv, is the knowledge that he will forever be in the hearts and minds of thousands of boys, who will carry his guidance and wisdom like a badge of honor throughout their lifetime." *Congressional Record, Extension of Remarks*, Page E164

In 1912 in the *Congressional Record of the Senate* on page 3879, Senator Luke Lea from Tennessee when addressing the President said, "There is very little light shed upon what the term "organization" means. Yet in that testimony we find expenditures called "general" or "general organization"; and the word "general" occurs so often and for such vast amounts that we can almost draw the conclusion that the

Wisconsin generals are as ubiquitous as the Kentucky colonels." This statement lends credibility to our claim that long before the Plaintiff formed their organization that the term "Kentucky colonels" was part of the public domain and well planted in the American mindset, as a generic term "Kentucky colonels" were ubiquitous by 1912.

In 1936, the Attorney General of the Commonwealth of Kentucky announced the end of the Kentucky Colonel Commission under the Governorship of Albert B. Chandler, this decision provoked an emotional response from Congressman Edward Wester Creal in the U.S. House of Representatives which demonstrates some of the known history of the Kentucky colonel by the public in 1936. Mr. Creal who was not a Kentucky colonel made his comments on April 2 in Washington before Congress. **[Exhibit 6]**

In the *Chronicling America Project* at the US Library of Congress newspaper and magazines collection the term, "Kentucky colonels" or "Kentucky Colonels" appears on 5,214 pages, the term "Kentucky colonel" or "Kentucky Colonel" appears on 5,226 pages outside of Kentucky between 1800-1930, if you add the state of Kentucky to the query these numbers increase by 505 and 504 respectively. These numbers do not include books, songs, pamphlets or other materials that have yet to be indexed or made available online  These search results clearly demonstrate that Kentucky colonels were not only popular, subject to parody, but a distinctive well defined term that was well-planted in the public consciousness of the American public. If we expand this search in the Chronicling America Project in all states to 1800-1963 using the term "kentucky colonels" we get 6,095 results, restricting the search to 1931-1963 we get 381 results, restricting it further to the phrase "Honorable Order of Kentucky Colonels" we get 23 results. Illustration of some of these results appears in part within **[Exhibit 1 supra]** of this supplement.

Our organization came along with the ideal of establishing a *true fraternal membership program* and mutual benefit society of Kentucky colonels with voting members that have a voice, can express their ideals, and share in the benefits of a membership program; much like a Masonic Lodge or model membership

organization. Which we feel we have a right to do, under the laws of Kentucky and the United States; however exercising this right brought this lawsuit..

Similarly another group of individual colonels "Kentucky Colonels Association" in 1931 which opposed Governor Sampson's "liberal approach" of making appointments to children, began to create an organization to bring integrity to Kentucky colonel commissions. Gov. Sampson viewed this as an attempt to undermine his authority so he used his political influence to establish the HOKC and maintained control under Governor Ruby Laffoon who was credited as the founder of the HOKC on May 04, 1934. Much like Sampson, Laffoon also further disgraced the ideal by appointing children and celebrities resulting in its cancellation of Kentucky Colonelcy in 1936 once he left the governor's office.

It is clear from the public record that Governor Flem Sampson in 1931 was perhaps most responsible for initially diminishing the honorability, importance and significance of the title of the Kentucky Colonel in the state by naming infants, children and big shots. Those already holding the title wanted to bring more integrity to the commissioning of Kentucky colonels based on Sampson giving out more than 500 commissions and naming children as colonels so they banded together to form the Kentucky Colonels' Association and announced their incorporation as a civil society to introduce a code of ethics under Andrew Morris. "The Kentucky Colonels' Association hoped to revive an old custom of giving colonels' commissions only in recognition of outstanding public service, either for the commonwealth or for the nation." Governor Sampson with several months left in his term used the opportunity to call for the formation of a brotherhood (an order) giving rise to the Plaintiff's organization under the next governor snubbing out Morris' Kentucky Colonels Association.. Under the Laffoon administration even more children were added to the governor's staff and celebrities were added to the ranks to convert the prestigious title to benefit the state; then in 1936 Attorney General Beverly M Vincent got involved and banned the Kentucky Colonel title and the Governor from making such commissions demoting 17,000 Kentucky colonels. This did not last long though Governor Albert B. Chandler was disturbed with the ban of Kentucky Colonel commissions, so exactly one month

following the ban, James E. Wise while acting as governor restored all 17,000 Kentucky Colonels with good standing, and the Governor continued in the tradition, however much more conservatively than previous governors. **[Exhibits 8 & 9]** The next governor, Keen Johnson was much more conservative with his commissions. In light of the events that occurred between 1931-1936, it is clear that impropriety, control, and politics flourished around the ideal of Kentucky Colonelcy and gave root to the establishment of the Plaintiff's organization which has continued to the present day.

<u>**CONCLUSION**</u>

Notwithstanding the motion to dismiss the Defendant is willing to challenge the Plaintiff's trademark rights in law before this Court in this action, and with the US Patent and Trademark Office by filing a claim that their trademark infringes on the public domain and the Constitutional Civil Rights of the Defendant, other Kentucky Colonels, and the general public. The Defendant takes this step independently of the pending action before this Court addressing it through the Trademark Trial and Appeal Board (TTAB) and with a Letter of Protest to the Deputy Commissioner.

The Plaintiff alleges that we are confusing the public under the Lanham Act; this is simply untrue because we do not sell nor have we sold or attempted to sell any of the products that the Plaintiff has registered under its trademarks, nor has the Plaintiff provided any evidence that we have. All confusion stems from the Plaintiff's drift away from the use of their Corporate Name, their own intentional actions in the social media, and desire to use the name of their products which they have chosen to confuse consumers with by making all of their claims to trademarks ambiguous and synonymous with themselves and services that they offer to their donors.

Since we have been engaged in the social media there have only been several instances of any actual confusion, all the instances of confusion that have existed have been due to the social media user typing in Kentucky Colonels rather than Honorable Order first, this may be because the <u>Plaintiff has changed their</u>

name three times in Facebook confusing their own followers. Their allegations of *us* causing confusion are totally unwarranted and false. This is an issue that is best resolved by the Plaintiff educating social media users and the Plaintiff creating a stronger identity behind their corporate name which has not been done recently. **[Exhibit 10 supra]** Many of the services and advice that the Plaintiff requires to make their organization more complete was offered to them in our confidential merger proposal.

The owners of a trademark can only prevent others from using their mark in commerce for identifying similar products or services. Words, symbols, colors, designs, etc. that are in the public domain can be used as trademarks and are suitable for trademark protection if nobody is already using them as trademarks. *That does not mean that such things leave the public domain.* In fact they remain available for being used by the public for any purposes *other than as trademarks* for a competitor's products or services.

This case is one that is a bit unusual because the Plaintiff was working for many years to strengthen their name identification "The Honorable Order of Kentucky Colonels" or "HOKC" and then around 2001 started to focus on building their identity around the ideal of adapting their corporate name to "Kentucky Colonels" and building a merchandise brand as they stated in the case *HOKC v. Building Champions*. **[Exhibit 7]** However they did not want to simply change their name because of the history and distinction associated with the longer more formal name that they began with in 1932 as a state chartered association followed by actual incorporation in 1957. The organization never formed as a brotherhood or a true "Order" (by definition) of "Kentucky Colonels" instead focused on charitable development projects, social elitism and over the years controlled their constituents psychologically to channel support (encourage giving) for these projects while creating a sense of belonging to a higher cause. As an organization under the guidance of the state they never held membership meetings or general assembly meetings, but did hold annual events and dinners with the more prestigious, politically connected and preferred individuals, relating themselves as responsible patrons of the Kentucky Derby. In 1957 they incorporated themselves as a charity and incorporated a concept involving "Generals" which would act as their board members and commanders

despite the actual Commonwealth of Kentucky not having such a provision for this and named the Governor as the acting "Commander in Chief" in a totally fictitious ideal based on a **mythical militia made up of prestigious civilians and well-known public figures** from around the world. In 1992 upon restating their Articles of Incorporation they changed a few things to empower the organization from within, while taking away any remaining powers of its honorary members by disclaiming them, removing so-called members' ability to have a voice in the charitable efforts that they perform or are engaged in operating. **[Exhibit 3 supra]** None of these things however changed the actual commission or ever made it their own.

On December 31, we began pitching our ideal to the HOKC and delivered a proposal for merging our ideal with theirs after they expressed an interest in our objectives, especially the registry which their own executive director signed up for.the previous month in November 2019. The HOKC felt threatened enough after fully understanding our plans, to take offensive actions against us and began trademarking "Kentucky Colonels" to remove it from the public domain in a land-grab to restrict its use by organizations that may want to represent civil societies made up of Kentucky colonels. On February 17, 2020 they filed for registration of three (unregistered) trademarks one for charities, one for membership associations and one for social events in an attempt to ambiguate and encumber what I claim is part of the public domain through a type of copyfraud which is evident on their website, **[Exhibit 8]**, however the law does not preclude or prohibit our use of the term because it is being used descriptively and generically referring to ourselves using our letters patent.

While trademark owners are able to trademark specific words, images, etc., it doesn't mean they have a monopoly on their use. They just have the right to use their mark in commerce and to stop others who offer the same type of goods or services from using a confusingly similar trademark. In our case we were not using the term as a trademark at all, but as our name. Despite this trademark law allows us to make "fair use" of someone else's trademark without getting permission. You can use a trademark in a descriptive sense, in

both fiction and nonfiction. Using a trademark to describe goods or services, and in such a way that doesn't suggest an association with those goods or services, is also fair use. See 15 USC § 1115(b)(4).

If you use someone's trademark to express an opinion, or to inform or educate others, there's no infringement. That's because you're not using the trademark as a trademark — you're not using it to sell goods or services. Use is informational, not commercial.

Trademarks identify brands so people can identify the source of goods or services. You violate another's trademark when you sell competing goods or services with the same, or a confusingly similar, mark. There are other exceptions such as when products, goods or services are directly associated with a particular audience and not the general public, such as those products in the Kentucky Colonels Store, which are marketed almost exclusively to Kentucky Colonels themselves, which are not considered the public because the organization calls them members.

We hope and pray that this Honorable Court has adequate information provided with this Supplement to dismiss this case or render a summary judgement in the favor of the Defendant, if not for one reason, then for another, for the sake of Kentucky and our fellows, in their representation of the state with dignity and honor as its goodwill ambassadors. Respectfully submitted in good faith and the interest of justice.


Caracas, Venezuela
Dated: June 21, 2020


Col. David J. Wright
Edificio Torre 997, Local B
San Juan, Caracas
Distrito Capital, Venezuela 1021
david.wright@globcal.net
+58 (426) 111-0529