UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

|  |  |  |
|---|---|---|
| THE HONORABLE ORDER OF KENTUCKY COLONELS, INC. Plaintiff | ) ) ) ) ) | Civil Action No. 3:20-cv-132-RGJ-RSE |
| vs. | ) ) ) | MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS |
| COL. DAVID J. WRIGHT Defendant | ) ) ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION
FOR JUDGMENT ON THE PLEADINGS**

In the case of Honorable Order of Kentucky Colonels v Kentucky Colonels International, et. al. Plaintiff submitted a complaint for trademark infringement connected to eight other counts related to the alleged infringement. The Defendant has answered the complaint to resolve the dispute and has responded with 18 affirmative defenses and 24 inconsistent claims and defenses that bar this case jurisdictionally and as a matter of law. The court has imposed a preliminary injunction based on the Plaintiff ambiguating six identical descriptive and arbitrary trademarks making a case for protecting the public using three trademarks applied for three days before filing their infringement claim on trademarks that are being obtained inconsistent with Section § 1 of the Trademark Act, 15 U.S. Code § 1051 through acts of fraud. Now that the pleadings are closed the Defendant requests that this court make a judgement on the pleadings pursuant to the Federal Rules of Civil Procedure, Rule 12(c).

Plaintiff made application for the trademarks that were allegedly infringed upon only three days prior to bringing this lawsuit, has had knowledge of the Defendant's existence for over twenty years, members of their board of trustees were participants in social media efforts organized by the Defendant for over five years, gave no notice of their trademark claims to Defendants prior to bringing a lawsuit, cannot prevent others from using their claimed trademark KENTUCKY COLONELS in its merely

1

descriptive meaning and cannot claim exclusive monopolistic use of a generic or descriptive term or claim "actual" infringement of a term that they have admitted as being descriptive under Section § 2(f) of the Trademark Act, 15 U.S. Code § 1052(f). This lawsuit is barred by laches, lack of standing, dirty hands, the merger doctrine, precedential law and a plethora of other defenses asserted by the Defendant in his answer and by this motion. The Defendant argues for the court fashioning an equitable settlement based on a precedential Circuit Court appeal with a great number of similarities. Since the case began the Defendants stopped conducting commerce as "Kentucky Colonels International" on February 27, 2020, unpublished the **[kycolonels.international]** website domain and a preliminary injunction is in place which hampers and restricts the Defendant's Constitutional Rights, withstanding which the Defendant has indicated to the Plaintiff in good-faith, a willingness to negotiate to make permanent under similar compromised terms preliminarily imposed by the Court a permanent settlement that shows equity to fellow Kentucky colonels and the honorable title as a commission awarded by the Governor of Kentucky independently of the Plaintiff. The Plaintiff cannot claim any damages for infringement under the law, as stated in 15 U.S Code § 1111 or hope to potentially gain anything more than they already have or that the Defendant has not already agreed. Based on the facts presented by the Defendant, Plaintiff has gone overboard and is not entitled to the specific relief being sought. Accordingly, in the interest of equity, fairness, justice and as a matter of law the Honorable Order of Kentucky Colonel's claims must fail, the Court must dismiss this case, the relief requested must be granted and judgement entered in favor of Defendant, Col. David Wright.

### MOTION FOR JUDGMENT ON THE PLEADINGS IS TIMELY, DISTINCT FROM DEFENDANT'S PREVIOUS MOTIONS TO DISMISS, AND CAN BE ADJUDICATED

"Fed. R. Civ. P Rule 7(a) provides that the pleadings are closed upon the filing of a complaint and an answer (absent a court-ordered reply), unless a counterclaim, cross-claim, or third-party claim is interposed, in which event the filing of a reply to a counterclaim, cross-claim answer, or third-party answer normally will mark the close of the pleadings." *Sovereign Bank v. Sturgis*, 863 F. Supp. 2d 75,

80 (D. Mass. 2012) Rule 12(c) "a court may enter judgment on the pleadings only if the <u>uncontested and properly considered facts conclusively establish the movant's entitlement to a favorable judgment.</u>" *Patrick v. Rivera-Lopez*, 708 F.3d 15, 18 (1st Cir. 2013) (quoting *Aponte-Torres*, 445 F.3d at 54). Under these standards, Defendant's motion for judgment "on the present record" is timely.

## I.   INDISPUTABLE HISTORICAL BACKGROUND FACTS

Since 1895 the honorable title and commission of the "Kentucky Colonel" has been the highest form of recognition that is bestowed by the Governor or Secretary of State in the Commonwealth of Kentucky. The award is warranted to individuals around the world to recognize noteworthy achievements, contributions to Kentucky society, remarkable deeds, and outstanding service to a community, state, or nation. The Governor of Kentucky bestows the honor of a colonel's commission by issuance of letters patent. Colonels are honorary officers of the state appointed by the governor.

The first Kentucky Colonel commission was granted to John Bowman (American pioneer) by Governor Patrick Henry, Jr. of the Colony of Virginia to oversee the formation of a government in Kentucky County on December 21, 1776. Most major landholders were made colonels normally by other colonels who were responsible for commissioning warranted title deeds and patents for companies. Until 1792 colonels were the highest designated governmental officials and non-governmental commercial authorities in Kentucky. Early colonels had the authority to issue commissions, form militias, establish colonies, create trading companies and designate officers. In 1813 the official title of Kentucky Colonel was designated to Richard Mentor Johnson by the Kentucky Legislature to form a mounted militia during the War of 1812. The first Kentucky Governor to award the title honorarily was Isaac Shelby in 1815 to his future son-in-law Charles Todd as his Aide-de-Camp with the rank of colonel. Over 1,000 honorary Kentucky Colonel Commissions were made to civilians (physicians, attorneys, businessmen and professors) by Col. John Marshall Harlan of Louisville under the orders of President Abraham Lincoln in 1861 to wear the Union Uniform during the Civil War to create an illusion of Union presence in the state, they were commissioned to wear an officer's uniform to work

3

and at home for the duration of the war. In 1890, American author Opie Read wrote a book called, *A Kentucky Colonel* which accounts the adventurous and traditional life of a Southern colonel in post-antebellum Kentucky. In 1895, Kentucky Governor William O'Connell Bradley began using the title officially and honorarily to recognize noteworthy civilians, friends and political allies. The Kentucky Colonel Commission has been awarded by nearly every Kentucky governor since 1895.

Between 1890 and 1931 many businesses, sports teams, social clubs, organizations and musical groups were named and formed around the ideal of Kentucky colonels generically, descriptively and arbitrarily accounting for over 10,000 newspaper articles and at least ten (10) fraternal organizations in various states using the term "Kentucky Colonels" as a descriptive component of their name. In 1920, the book *A Kentucky Colonel* was made into a movie *The Kentucky Colonel*.

Based on the popularity and success of the ideal of the Kentucky Colonel as an icon of the state, in 1932 Governor Ruby Lafoon started an objective with Anna Bell Ward Olson called the **Honorable Order of Kentucky Colonels** as a state order of merit; during his term in office he commissioned over 10,000 honorary officers as colonels and admirals. In 1957 under the leadership of J. Fred Miles the order of merit was privatized from the state to become a non-profit corporation **The Honorable Order of Kentucky Colonels, Inc.**, since has become known as an organization that is philanthropic in nature providing millions of dollars in grants to organizations with funds collected from Kentucky colonels, another description that has been applied is that of a nonprofit collective giving program representative of the continued goodwill of title recipients.

In 1998, the Defendant started the first website for Kentucky colonels **[colonel.org]** that provided web services and offered a public registry for those awarded the honorable title of Kentucky Colonel. In 2009 the Defendant's program re-emerged on Facebook as **Kentucky Colonels International** ("KCI") with the purposes of social media networking and the benevolent fraternal association of fellow colonels. On January 13, 2020 the organization, social media assets and intellectual property developed by the Defendant since 1998 were offered to the Plaintiff in a merger and

consolidation proposal calling for an actual international membership program which was rejected by the board of the Honorable Order. The unincorporated organization remained active until it was incorporated as an assumed name belonging to the Defendant(s) on January 30, 2020, Col. David Wright wrote a critical article disambiguating his effort with the Honorable Order, began requesting donations for a membership development program and re-announced a public registry program he developed, at which time a lawsuit was filed by the Plaintiff.

The Plaintiff applied for three new trademarks on February 17, 2020 and filed its complaint three days later on February 20 against the Defendant(s) alleging trademark infringement, cyber-piracy (cybersquatting), confusing the public, dilution and defamation based on the Defendant writing an editorial commentary (blog article) that disambiguated the differences between the Defendant's organization (now defunct) with the Honorable Order, criticizing impropriety, denouncing political meddling and the Defendant publishing a website using a similar domain name handle to the Plaintiff based on the Defendant's descriptive activity as an international fraternal membership association made up of Kentucky colonels. Kentucky Colonels International ceased doing commercial business on February 27, 2020 and has not engaged in any commercial activity since.

## II.   INTRODUCTION

This federal lawsuit is antithetical to how the American judicial system is supposed to work. It is brought by the Plaintiff based on their own business decisions to create ambiguity between themselves with a term in the public domain as their trademark and an overwhelming envy relative to the public claims of its subject donors in their desire to control them—represented by counsel—collaterally attacking the ethicality of the Defendant's rights to exercise free speech, freedom of the press, liberty to assemble a fraternal civil society, the right to redress grievances to the government and ability to engage in ethical and lawful business activity to market and sell their intellectual property which has been in development over the course of the past 20 years. The Plaintiff was so threatened by the potential success of the Defendant's objectives to start a true membership development program for Kentucky

colonels they decided to attack with a federal lawsuit, requested a temporary restraining order and seek injunctive and monetary relief to effectively destroy the Defendant's efforts which the Honorable Order helped to inspire with a business model that subjects honorary title recipients to their complete control and domination to continue to do good deeds by making (coerced) donations to their organization and purchase branded goods from a third-party LLC to whom the registered arbitrary KENTUCKY COLONELS marks are licensed to by the Plaintiff.

It is no surprise that a litany of jurisdictional and procedural bars preclude this suit. Plaintiff lacks prudential standing because their allegations rest on purported claims to protect others and errors on the part of the Defendants to disclaim their exempt status with the IRS upon reinstating an organization that was previously recognized as 501(c)(3) nonprofit and 509(a)(1) public charity for almost 15 years. The Plaintiff's case for infringement has no footing in any "actual" instance of infringement and is based on the inference and conclusion that the Defendant's claim as a nonprofit and a membership organization in reformation created some illusion or inkling that some sort of undefined relationship existed between the Defendants and the Plaintiff, despite the Defendant emphasizing that no relationship existed in all of his Blogger articles, social media accounts and website domain with disclaimers and contextual statements.

In essence, the Plaintiff is suing the Defendant because his constitutionally-protected opinions have smeared the Honorable Order's reputation which is built on a misconstrued historical record that disregards the truth, distorts the public integrity of transparency, lends credibility to a fictitious militia headed by so-called generals that subject its donors by calling them honorable and a record of political meddling which the Defendant discovered, exposed and demonstrated in a series of blog posts to comparatively disambiguate his organization with the Plaintiff. The commentaries were both objective and critical that also credited the Plaintiff for their charitable work. The First Amendment implicitly protects such speech no matter the label placed on the claim which the court has recognized, therefore the articles were not affected by the restraining order or the preliminary injunction. To hold otherwise

would eliminate the "breathing space" afforded by the First Amendment. *See Hustler*, 485 U.S. at 52. The Supreme Court recognized long ago that this country's embrace of free speech is fundamental and "reflects a profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open. . . ." *New York Times Co v Sullivan*, 376 U.S. at 270. The Honorable Order is a public entity based on its own exposure at the Kentucky Derby, in local parades, on Facebook and on the Internet based on their own voluntary presence in the public sector. Despite their claims to be a private non-profit organization that is independent of state authority and control which receives their funding and support from Kentucky colonels, they are prejudiced against suggestions and input by their donors, the organization covets the idea that they are the ultimate authority and refuse to collaborate or acknowledge similar organizations that have existed dating back 60 years before they were established in 1957 or any of the fraternal organizations that exist today.

The organization licenses some of its identical trademarks KENTUCKY COLONELS to a third party which is a for-profit limited liability corporation that produces and sells products such as cigars, t-shirts, hats, and food products under these arbitrarily applied trademarks unrelated to this case. However these unrelated identical trademarks have been used in this case *with sophistication* to beguile and bias the court using loaded suggestive language leading it to assume and believe that these trademarks were somehow infringed upon by the Defendant compelling the court to impose a TRO and grant a preliminary injunction which have brought demise to the Defendant to even conduct non-commercial activity or remain online.

According to Kevin J. Lynch, *The Lock-in Effect of Preliminary Injunctions,* 66 Fla. L. Rev. 779 (2015) "Plaintiffs often seek preliminary injunctions before discovery can be completed or even commenced, **meaning that plaintiffs may not have the proof to show they can win**, even where such proof exists. In challenges to federal agency actions, plaintiffs often seek preliminary injunctions before the government has prepared an administrative record, making it difficult to show likelihood of success based on establishing that the record is inadequate or that the challenged action was arbitrary. Finally,

unlike other rulings that occur before trial, such as motions to dismiss or summary judgment, no rules regarding burdens of proof or inferences protect against the imbalances of information that may exist between plaintiffs and defendants.[1]

Preliminary injunctions also can force parties to argue the merits before they have fully developed them. The time pressure on judges, who might be asked to act before some action is taken by the defendants, means that the issues may not be researched thoroughly or sufficiently deliberated upon. The Supreme Court recognized this reality when it stated "[t]he choice for a reviewing court should not be between justice on the fly or participation in what may be an 'idle ceremony.'" [2]

First, [the court] should appraise the likelihood that various views of the facts and the law will prevail at trial. Second, the court should assess the probable loss of rights to each party if it acts on a view of the merits that proves to be erroneous. The court can then chart the course likely to inflict the smallest probable irreparable loss of rights.[3]

Despite the difficulties with weighing the merits at the preliminary injunction stage, the Supreme Court nevertheless asserted that a preliminary injunction is an "extraordinary remedy". *Winter*, 129 S. Ct. at 376 ("A preliminary injunction is an extraordinary remedy never awarded as of right.")" In this case a preliminary injunction was granted **6 months following the Defendant ceasing to engage in commerce**, changing the name of the primary defendant and changing their website domain to reflect a generally descriptive and generic rendition of activities. There is <u>no evidence that warrants the</u>

---

[1] In a motion to dismiss, the plaintiff need only show that a claim is plausible, not that it is certain to prevail. See *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949–50 (2009). On summary judgment, any disputed facts preclude resolution, and all inferences are drawn in favor of the non-moving party. See *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam). In contrast, in the preliminary injunction context, the plaintiff seeking the injunction has the burden to show likelihood of success on the merits even though an informational imbalance may favor the defendant. *Winter*, 129 S. Ct. 365 at 374

[2] *Nken v. Holder*, 129 S. Ct. 1749, 1757 (2009) (quoting *Scripps-Howard Radio, Inc. v. FCC*, 316 U.S. 4, 10 (1941)). Although the Nken Court was discussing a stay pending appeal, the same logic would apply to a preliminary injunction, where the ability to grant interim relief is supposed to allow sufficient time for the merits to be decided.

[3] John Leubsdorf, *The Standard for Preliminary Injunctions*, 91 HARV. L. REV. 525 (1978) at 541. Scholars have labeled this the "Leubsdorf Posner" formulation because Judge Posner later adopted it in one of his cases. See Richard R.W. Brooks & Warren F. Schwartz, *Legal Uncertainty, Economic Efficiency, and the Preliminary Injunction Doctrine*, 58 STAN. L. REV. 381, 390–91 (2005).

imposition of a preliminary injunction or that the Defendant engaged in commerce, offered membership or published anything more than educational materials within 7 days since this case began.

### III.    STANDARD ON MOTION FOR JUDGEMENT ON THE PLEADINGS

"After the pleadings are closed–but early enough not to delay trial–a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "To obtain judgement on the pleadings, the moving party must clearly establish that no material issue of fact remains unresolved (unanswered) and that it is entitled to judgement as a matter of law." *Thunder Wave, Inc. v. Carnival Corp.*, 954 F. Supp. 1562, 1564 (S.D. Fla. 1997) "Judgment on the pleadings should be allowed only if the properly considered facts conclusively establish that the movant is entitled to the relief sought." *Kando*, 880 F.3d at 58 (citing R.G. Fin. Corp., 446 F.3d at 182). "[M]ere threadbare recitals of the elements of a cause of action, supported by conclusory statements, are insufficient to survive a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) "Judgement on the pleadings under Rule 12(c) is appropriate when there are no material facts in dispute, and judgement can be rendered by considering the substance of the pleadings and any judicially noticed facts."  *Hawthorne v. Mac Adjustment*, 140 F.3d 1367, 1370 (11th Cir. 1998)  "If upon reviewing the pleadings it is clear that the **plaintiff would not be entitled to relief** under any set of facts that could be proved consistent with the allegations, the court should dismiss the complaint." *Id.* (citing *White v. Lemacks*, 183, F. 3d, 1253, 1255, (11th Cir. 1999)). In reviewing a defendant's motion under Rule 12(c), the district court views the facts as presented in the pleadings in the light most favorable to the plaintiffs, accepting as true all the allegations in their complaint **and treating as false those allegations in the answer that contradict the plaintiffs' allegations.** *Hoeft v. Tucson Unified School Dist.*, 967 F.2d 1298, 1301 (9th Cir. 1992); *Hal Roach Studios v. Richard Feiner and Co.*, 896 F.2d 1542, 1550 (9th Cir. 1990).

While a complaint does not need detailed factual allegations in order to avoid dismissal, the plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); see also, *Cuvillier v. Taylor*, 503 F.3d 397, 401

(5th Cir. 2007). A plaintiff's obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. Also, **the Court is permitted to consider matters of public records and other matters subject to judicial notice without converting the motion into one for summary judgment.** See *United States ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 379 (5th Cir. 2003). In reviewing the sufficiency of a complaint, the court determines whether the plaintiff is entitled to offer evidence to support its claims—not whether the plaintiff will ultimately prevail. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) The allegations must contain facts sufficient to state a claim that is plausible, rather than merely conceivable. *In re Motor Fuel Temperature Sales Practices Litig.*, 534 F. Supp. 2d 1214, 1216 (D. Kan. 2008). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, — judgment must be granted. Celotex, 477 U.S. at 322-23.

## IV.    RELEVANT FACTS OF THE COMPLAINT AND THE ANSWER

Based on the allegations presented in the Complaint **[DN 1]**, the settlement offered by the Plaintiff without damages, the Answer and Affirmative Defenses **[DN 62]** and the Defendant's Private Settlement Agreement and Agreed Order (draft) offer to the Plaintiff, this court has adequate information and facts before it to fashion a final judgement on the pleadings in favor of both the Plaintiff and the Defendant without prejudicial consequence to either party by dismissing the case with prejudice.

The Defendant requests that the Court take judicial notice. Under Federal Rule of Evidence 201, the court may take judicial notice of adjudicative facts that are not subject to reasonable dispute because

they are either "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b) The court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2). **(Exhibit 1 - USPTO Refusal)**

To date there are no laws that preclude this Defendant or others from using the merged terms "Kentucky Colonel" or "Kentucky Colonels" in a *generic or descriptive sense* nor shall there be, unless enacted by Congress which has chosen to protect some special words such as "Olympics" or by the Commonwealth of Kentucky by enacting legislation to protect the terms. Just because a party has a trademark on a term from the public domain does not entitle them to a monopoly.

It is a defense to an infringement claim if registration of the mark was obtained **through fraud on the Patent and Trademark Office, or if the mark is or has become generic**. *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194-95 (1985). It is also a defense to a trademark infringement claim to assert that the owner has either acquiesced in its use, or **has delayed unduly in asserting its rights**. *Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d 188, 205 (5th Cir. 1998). Notably, **a court may cancel a registered mark if it is found to be either generic, or descriptive and lacking secondary meaning.** *Xtreme Lashes, LLC v. Xtended Beauty, Inc*., 576 F.3d 221, 232 (5th Cir. 2009) (citations omitted).

Defendant's response points out many facts that are in dispute at this point forward, all of which are questions that a jury may need to answer or consider. Plaintiff is not entitled to any judgment dismissing or striking these defenses.

A.      **Trademark and Trade Name Infringement**

In their complaint, the Honorable Order alleges trade name and trademark infringement based on an application they submitted to the USPTO three days previously. The Plaintiff did not inform the Defendant that it was infringing on any trademarks claimed by the Plaintiff with a cease and desist letter or by publishing notice online in advance of bringing suit; needlessly the Defendant cured the problem

and removed any potentially infringing materials within 7 days of the lawsuit and changed its name. Trade name infringement is completely out of the question because descriptive trade names do not particularly infringe on registered trademarks, but non-descriptive trademarks can infringe on descriptive trade names, moreover at the time this case began the descriptive trade name in question was well-known to the Plaintiff as one belonging to the Defendant preceding their trademark applications. An illustration of this would be that no one can trademark "National Rifle Association" the trade name, but they can trademark the term "National Rifle Company" as a manufacturer of rifles, or "National Rifle" for burnt gunpowder smelling perfume.

Despite the name change from "Kentucky Colonels International" which incorporated the term "Kentucky Colonels" that was registered with the Secretary of State in Kentucky, to a **non-trademarkable generic and unincorporated trade name**, "Kentucky Colonel Foundation", the Plaintiff complained that the new name was even more confusing relative to their legal trade name "Honorable Order of Kentucky Colonels" because some foundations raise and distribute funds like the plaintiff. The Plaintiff ultimately claims in public documents that they are not a mandated state organization and are completely independent of the state as a private non-profit 501(c)(3), yet they insist in *this case* that they are the **only qualified authority in the world** that can lawfully provide services to Kentucky colonels or use the term Kentucky Colonels and they have targeted this Defendant as an overwhelming threat to their existence based on his ideas to restore honor, value and integrity to the title of Kentucky Colonel and attempt to sell intellectual property to the Plaintiff developed over the past 20 years. As a solution the Defendant might go back to its old name it has used prolifically since 2009 or call ourselves "Kentucky Colonel Association", which has not been used since prior to the Plaintiff's existence which would more properly describe our purpose. An equitable judgement and solution are appropriate and in order based on the circumstances of the dispute in this case. See *Blinded Veterans Association v. Blinded American Veterans Foundation*, 872 F.2d 1035 (D.C. Cir. 1989) (quotations omitted in memorandum, content cited in motion)

Upon understanding more about the law, trademarks and trade names it is now the contention of the Defendant that the Plaintiff's <u>unregistered trademark for associations is generic and used too descriptive</u> to serve as a trademark for the Honorable Order or any other organization made up of Kentucky colonels, this is a matter of law, 15 U.S. Code §1052(e)(1), (2), (3) and (5). Moreover for charity and social events (not claimed by Defendant) infringes upon the rights of Kentucky colonels individually as well as many other organizations established for fraternal or benevolent purposes.

**B.     Cyberpiracy under the Anticybersquatting Consumer Protection Act (ACPA)**

The Plaintiff claims that the Defendant violated the Anticybersquatting Consumer Protection Act (ACPA) in light of the fact that the Defendant registered **[kycolonels.international]** to represent itself descriptively as "Kentucky Colonels International" in January 2020 as the representative trade name, because they own **[kycolonels.org]** representing their organization "Honorable Order of Kentucky Colonels" which was claimed for similar descriptive reasons in 2000 preceeding their unrelated registered trademark KENTUCKY COLONELS for goods in 2003. To strengthen their claim in February they applied for the trademark KENTUCKY COLONELS for charity and social events. While the Plaintiff may have a case if the Defendant had registered **[kentuckycolonels.org], [kcolonels.org], [hokc.org]** or **[hokc.international]**, the current claim under the ACPA does not favor the Plaintiff because **[kycolonels]** is simply an abbreviation for Kentucky colonels and too descriptive to make their claim under the ACPA, moreover another Kentucky colonel organization has already registered **[kycolonels.ch]** and yet another party owns **[kycolonels.com]** who has it for sale. KYCOLONELS deserves no more protection than KENTUCKY COLONELS when being used generically and descriptively to identify a social group or website made up of Kentucky colonels. If the Honorable Order were to try to register KYCOLONELS as a trademark it would be flatly refused for being generic and/or merely descriptive of a website handle for Kentucky colonels.

Moreover the Plaintiff was not using their domain **[kycolonels.org]** for commercial trade at the time the alleged acts of cyberpiracy occurred, they had all three of their registered unrelated arbitrary

13

trademarks KENTUCKY COLONELS licensed out to a third-party, Upper Right Marketing owned by Jimmy Dawahare in Lexington who uses them in commerce from the domain **[kycolonelsstore.com]** another descriptive domain name, which is not owned by the Plaintiff, nor does its activities directly or particularly benefit or fund the charitable activities of the Plaintiff.

Additionally, the Plaintiff had prior knowledge of the Defendant's intent to register **[kycolonels.international]** from a business proposal they requested on December 31, 2019 which they received on January 13, 2020 that detailed the Defendant's plans and described his intellectual property ideals to merge and consolidate his organization with the Plaintiff, in their reply to the defendant on January 20 they did not make any contrary claim except indicating they were not interested, so the domain was registered with the Plaintiff's implied consent. The Defendant's use of the domain name **[kycolonels.international]** stands on its own as descriptive fair-use under the Lanham Act because it is being used to describe an organization made up of international Kentucky colonels and is not being used as a brand name or trademark. In addition to the statutory fair use defense to infringement, the Lanham Act addresses the fair use doctrine also in the antidilution and cyberpiracy causes of action. Section 43(c) of the Lanham Act, the dilution prohibition, expressly excludes fair use from the cause of action, rather than listing it as a defense. 15 U.S.C. § 1125(c)(3)(A).

The federal trademark statute separately provides a complete defense to cyberpiracy if the defendant "believed or had reasonable grounds to believe" that the use of the mark in the domain was a "fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii). This leaves the Plaintiff with the burden to prove that the Defendant whom they have known for over 20 years was unfairly using their intellectual property or a domain name that they themselves chose as a descriptive one in 2000 following our registration of [colonel.org] in October 1998 (See Defendant's Answer [DN 62]).

A claimant in a domain name case must show "confusing similarity" <u>between its mark and the registered domain name</u>. *McCarthy* § 23:19 (5th ed. 2018) (listing "the intent of the actor in adopting and using the **designation**" as a foundational factor in determining likelihood of confusion). In the case

of the new gTLD suffixes, (designations such as **.international**, **.club**, **.xyz** and *100s of others*) the additional information supplied by the suffix must be regarded as more than the addition of letters and may be understood as a suggestion of the content of the website associated with that domain name prior to considering the intent of the registrant. There is no confusion between **[us.com]**, **[us.net]**, **[us.org]** and **[us.gov]** nor should there be because it is the designation that defines the purpose of the registrant. The purposes of the new gTLD suffixes are multifold and in some respects are designed to stimulate creativity as well as more accurately describe their users and create competition. ICANN says, "One of ICANN's key commitments is to promote competition in the domain name market while ensuring Internet security and stability. New generic Top-Level Domains (gTLDs) help achieve that commitment by paving the way for increased consumer choice by facilitating competition among registry service providers. Soon entrepreneurs, businesses, governments and communities around the world will be able to apply to operate a Top-Level Domain registry of their own choosing." So who will get to operate [.colonel]? There are already designations for [.charity], [.store], [.shop], [.law], [.lawyer], [.legal], [.attorney], [.firm], [.foundation], [.fund] and 1,200 others that can all be purchased based on competitive, descriptive or creative uses.

**C.**     **Plaintiff's Trademarks are Being Challenged by Defendant**

This trademark infringement action arises from each party's use of the words "Kentucky" and "Colonels" to use as their trade names and trademarks. The Plaintiff "The Honorable Order of Kentucky Colonels, Inc." applied for the word trademark KENTUCKY COLONELS on February 17, 2020 (three days prior to bringing this action) to provide services under three seperate trademark applications USPTO Serial numbers 88800020, 88800035 and 88800038, with these three new trademark applications the Plaintiff will own a total of eight word marks that include the term KENTUCKY COLONELS, six of them will be identical. On May 12, 2020 the USPTO refused all three of the new applications initially under the Trademark Act § 2(e)(2) as being geographically descriptive. On June 22, 2020 the Plaintiff appealed the non-final action of the USPTO on two of these applications 88800020

and 88800035 by admitting descriptiveness and claiming distinctiveness under the Trademark Act §
2(f), 15 U.S. Code § 1052(f). The Plaintiff already owns five trademarks, three of them are the identical
marks KENTUCKY COLONELS, applied arbitrarily and suggestively to sell products made and sold by
third-party licensees; the fourth and fifth marks are the identical mark HONORABLE ORDER OF
KENTUCKY COLONELS which is a descriptive mark and was claimed as a distinctive mark under §
2(f) after being initially refused in 1983.

   The third application, serial 88800038 for a KENTUCKY COLONELS mark by the Plaintiff for
association services most closely resembles the Defendant's **only use**, was refused by the USPTO for
additional reasons (for being generic, merely descriptive and not showing evidence of use in commerce),
specifically stating "evidence shows that the wording COLONELS in the applied-for mark is merely
descriptive of or generic for applicant's services. The term COLONELS is defined as "an honorary title
bestowed by some Southern states, as to those who have brought honor to the state, prominent
businesspersons, visiting celebrities, or the like."" According to one dictionary definition. "Therefore,
the term COLONELS merely describes the user and/or performer of applicant's services." The USPTO
also said, "Accordingly, when considering the mark in its entirety, it is clear that KENTUCKY
COLONELS is primarily geographically descriptive of association services performed in connection
with honored members of Kentucky society." (*Supra* **Exhibit 1 - USPTO Refusal**) Thus far, the
Plaintiff has not appealed this non-final refusal made by the USPTO nor can they without filing a new
application, the Defendant contends that this statement made by the USPTO would also apply to the
other trademarks if the USPTO had additional information about the Plaintiff and if the marks were not
applied for using omissions of critical requested information by the USPTO which should have been
included about Kentucky colonels under the Trademark Act § 1 (**including naming our organization
KCI and others in their application under § 1(a)(3)(D)(ii)(I)**).

   There is great reason to believe that the Plaintiff applied for "association services" in a
sophisticated planned assault **with full knowledge and awareness that they have <u>no legally bound</u>**

16

**members to which their by-laws apply and they are not engaged in commercializing association services** (both fraudulently and in bad-faith), **which the Defendant was and had been providing**, in order to bring intentional willful harm to the Defendant, interrupt the Defendant's activities, bring duress to the Defendant, acquire a TRO and be granted the standing preliminary injunction which together have resulted in the demise of the Defendant's organization since the action began. The USPTO examining attorney said, "Registration is refused because the specimen does not show the applied-for mark as actually used in commerce in International Class 35." To make a claim under this class the Plaintiff would need to sell membership like the Defendant began to do in January, 2020. Essentially this lawsuit is based on a highly sophisticated type of fraud that has employed the Federal Court to harm the Defendant under the color of law, *this paragraph is the smoking gun*. This affirmative defense is focused on statements made under oath by Plaintiff **when it registered its marks, that it had used the mark** "KENTUCKY COLONELS" in interstate commerce for "association services" and averred that no other organization was using or had any right to use the mark, including other organizations that the Plaintiff has knowledge of and its own board members have been photographed with those organization officers.

The Defendant registered the assumed name KENTUCKY COLONELS INTERNATIONAL with the Secretary of State of the Commonwealth of Kentucky on January 30, 2020 to establish the legal formation of a fraternal membership society **for Kentucky colonels by Kentucky colonels**. The assumed name registration was withdrawn on February 27, 2020 by the sponsor organization Ecology Crossroads which disclaimed it, so this Defendant ceased to do business as "Kentucky Colonels International" and changed the name and purpose of the membership association to an unregistered non-state civil society called "Kentucky Colonel Foundation", *a non-commercial non-state entity dedicated to education and history about the honorable title and commission of Kentucky Colonel*, notwithstanding the Plaintiff. This however did not stop the Plaintiff from insisting that we were in violation of a court order and made false statements based on limited knowledge to perpetuate their

allegations at a court hearing under oath after the Defendant cooperated fully with the TRO issued on February 25, 2020.

Examining the public records of the USPTO, Defendant states that the Plaintiff did not provide adequate information to the USPTO on any of their applications for the service marks filed on February 17, 2020 presenting them as two seperate words instead of as a *single merged term taken from the public domain* and therefore currently plans to oppose them when they are published for opposition on October 20, 2020. Defendant further claims that the Plaintiff's trademark HONORABLE ORDER OF KENTUCKY COLONELS ("HOKC") applied for on February 08, 1983 was obtained fraudulently through the plaintiff's omission of basic required facts from the public record and history that they had **full knowledge and awareness of** when they originally applied for the mark including a large fraternal organization in Louisville called the **Kentucky Colonels Club** in 1903-1940 which was heavily publicized in the Louisville Courier-Journal, additionally there was the **Kentucky Colonels Club of Dallas** in 1905-1950, **California Kentucky Colonels Club** in 1908, **Kentucky Colonels Club of Ohio** in 1975-2013, **Chicago Kentucky Colonels Club** in 1923-1990, (time spans approximated based on American newspaper articles) and other independent organizations that coexisted at the time, like the **Honorable Order of the Blue Goose** which the Plaintiff's founder, Governor Ruby Laffoon belonged to as a member since at least 1912, which had its own group therein of Kentucky colonels. The second HOKC mark applied for on July 12, 2015 is solely based on the fraudulently obtained 1983 mark which omitted history and pertinent information. None of the Plaintiff's trademark application admit the existence of anyone else that was permitted to use the trademark or trade name KENTUCKY COLONELS for any reason, not even unrelatedly despite having knowledge and awareness of their existence including trademarks and trade names registered in the Commonwealth of Kentucky at the time their applications were made.

Both of the HOKC marks would be adequately protected on the *Supplemental Register* as descriptive yet distinctive as their trade names with full disclosure; however because they were applied

for and registered to the *Principle Register* by omitting essential information that was part of the public news record, because the verifier was responsible for disclosure, because other organizations existed before they did (1890-1931) and simultaneously (1932-1983) that they had knowledge of but refused to state or disclose, and because the trademarks were obtained with the claim that they were originally created by the Plaintiff instead of coined by a public official (the Governor in 1932) while in office (as part of the public domain) are all actionable causes for cancellation of the marks based on their fraudulent or mistaken submission in 1983. Submission based on an omission is not a submission at all and is ample grounds to cancel a trademark.

On July 27, 2020 the Defendant submitted confidentially a Letters of Protest ("LOP") on the Plaintiff's trademark applications for the KENTUCKY COLONELS trademarks which is the prevalent standard for giving notice to the USPTO that there is a problem with the trademark under examination. Currently, the USPTO advises those who submit LOPs to file an opposition action once the mark being protested is published for opposition to the Trademark Gazette to preserve their rights and prevent the trademark from being registered.

## C. (1)   All of the Plaintiff's Trademarks are not Registered, they are Confusing and Subject to Cancellation based on the Omission of Known Information making them Illegally Obtained

Federal registration endows a trademark with a "strong presumption" of validity and shifts the burden to the defendant "to show by a preponderance of the evidence that the mark is not protectable." *Zobmondo Entm't, LLC v. Falls Media*, LLC, 602 F.3d 1108, 1113–14 (9th Cir. 2010) (citing 15 U.S.C. §§ 1057(b), 1115(a); citations omitted). After a registered mark has been in continuous use in commerce for five consecutive years, its owner may apply for incontestable status under 15 U.S.C. § 1065. See *KP Permanent Make-Up*, 408 F.3d at 602–03. Incontestable status is "conclusive evidence of the registrant's exclusive right to use the registered mark," **but remains subject to the defenses and defects enumerated in 15 U.S.C. § 1115(b)**, such as that the status was obtained fraudulently. *Pyrodyne Corp. v. Pyrotronics Corp.*, 847 F.2d 1398, 1400–01 (9th Cir. 1988); see 15 U.S.C. § 1115(b). An action

19

grounded in fraud or mistake "is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake" *Karl Storz Endoscopy Am., Inc. v. Surgical Techs., Inc.*, 285 F.3d 848, 857 (9th Cir. 2002).

Based on this case, besides the trademark being obtained through fraud or mistake by omission of facts requested by the USPTO, it can also be alleged and argued in this case that the Plaintiff is using the mark to violate antitrust laws of United States and attempting to deprive others of their rights as individual Kentucky colonels to exercise their letters patent under the First Amendment of the United States Constitution.

## C. (2)  Plaintiff's Trademarks are not so Famous Withstanding the Commonwealth

"Holders of a famous mark are not automatically entitled to use that mark as their domain name; trademark law does not support such a monopoly.  If another Internet user has an innocent and legitimate reason for using the famous mark as a domain name and is the first to register it, that user should be able to use the domain name, provided that it has not otherwise infringed upon or diluted the trademark." *Hasbro v. Clue Computing*, 66 F.Supp.2d 117 (D. Mass., Sept. 2, 1999) Quoting this citation does not admit that the Defendant acknowledges the Plaintiff's mark as "famous", to date the most famous Kentucky Colonel is Col. Harland Sanders who was not an avid supporter of the Plaintiff, but he used his title to propel himself and his business Kentucky Fried Chicken as a well-known entrepreneur. Most likely the Plaintiff benefits significantly from the late Col. Sanders' promotion of Kentucky colonelcy as his moniker, as much as it does from history, as a state symbol, its branded clothing, cigars, food products, charity or social events, but in reality the mark is not as famous as Plaintiff claims, while many people know of or may have heard of the title of Kentucky Colonel does not credit the Honorable Order directly with the creation of the Kentucky Colonel, very few people outside of Kentucky have ever heard of the Plaintiff unless you are talking directly to one of the 100-150,000 (perhaps 200,000) living recipients of the title. Only the Honorable Order knows the exact number because they consider every Kentucky colonel in the world implicitly as their donors upon

20

receipt of their commissions because they are provided with details as an insider by the Commonwealth to whom they claim to have no affinity or direct relationship.

Based on newspaper articles, the iconographic ideal of the Kentucky colonel was much more prevalent between 1890-1930 before the Plaintiff became established than it was from 1930-1970, while from 1970 forward Col. Sanders remains much more well-known and famous than the Plaintiff. If it were not for the Commonwealth providing (confidential information) the names, addresses and telephone numbers of new Kentucky colonels it creates and the state informing newly designated Kentucky colonels about the eleemosynary organization, providing their address and website with propaganda in the form of an introduction letter (based on a misconstrued mysterious version of history which suggests supporting their efforts) provided by the Plaintiff, the organization would be in the same boat as all the other Kentucky colonel organizations.

While there is clearly a complicated implicit relationship between the state of Kentucky and the Honorable Order, the Plaintiff has repeatedly stated that none exists despite evidence to the contrary. As it states in the State Government Records Retention Schedules, Governor's Office Administration:

Series 04351, *Executive Orders Commissioning Kentucky Colonels File*: "This series documents the execution of the order by the Governor to provide a citizen with a Kentucky Colonel certificate, an honorary title conferred in recognition of a deed or service that merits recognition. The title of Kentucky Colonel originated in the state's early days, when the citizenry maintained a volunteer militia. Colonels were uniformed members of a governor's staff. Today it serves as a public relations tool of the Governor's Office, promoting the Commonwealth. Generally, most are granted the recognition. The Governor's Office mails the Kentucky Colonel certificate to the individual. The Secretary of State's Office processes the Executive Order, keeps one, and **mails a second one to the Order of Kentucky Colonels in Louisville**." "Series contains: Executive Order (duplicate) - name of individual, date, signatures."

Series 04352, *Kentucky Colonel Application Card File*, "This series documents the honorary title as conferred by the governor in recognition of a deed or service that merits recognition. The title of Kentucky Colonel originated in the state's early days, when the citizenry maintained a volunteer militia, and some of its officers were commissioned colonels. Colonels were uniformed members of a governor's staff. As the need for a civilian militia waned, governors continued to grant commissions and the military title came to be associated with civil honor and distinction (courtesy The Kentucky Encyclopedia). Today it serves as a public relations tool of the Governor's Office, promoting the Commonwealth. Generally, most are granted the recognition. Some administrations have had age requirements (18 or older), or prisoners have been denied. Once the Governor signs the order, it is sent to the Secretary of State for his signature and the state seal. The application cards are summarized each month on a list (E0004) and filed

in the Governor's Official Correspondence File (04347)." "Series contains: Name; address; age; occupation; reason for recommendation; who is recommending."

These policies were last updated on February 27, 2017 and may be inconsistent with current practices based on electronic recommendations since former Governor Matt Bevin changed the system in 2016, which required that existing colonels be active donors to the Honorable Order in order to exercise their lifetime privilege to nominate a Kentucky colonel. While the Commonwealth does not admit any relationship it does state that above that a copy of all commissions are sent to the Plaintiff, they do not admit sending address, telephone number or email data to the Plaintiff, the Governor's website likewise does not suggest that information is shared with the Plaintiff on the nomination form it hosts which states "The Honorable Order of Kentucky Colonels is an independent, nonprofit organization. For more information, call 502-266-6114 or visit https://www.kycolonels.org/" Quoted from *Governor, Kentucky Colonel Commission* website, however the Honorable Order somehow manages to obtain such information as name, address, telephone number and email addresses because it contacts title recipients following their receipt of their title, sends a membership card and a letter soliciting a donation at least once.

Making a claim to a "famous" trademark involves making a very significant investment in advertising, generally it does not involve a third party which is already famous like a geographic location or an elected official. When people hear the term "Kentucky Colonel" they immediately think about Kentucky and Colonel Sanders, not about the Honorable Order of Kentucky Colonels. Famous marks are those that have an immediate connection in the minds of a broad range of consumers with a *specific product or service* and the source of that product or service. The Court of Appeals for the Federal Circuit has commented that achieving the legal standard of fame "often requires a very distinct mark, enormous advertising investments and a product of lasting value."

The Court of Appeals for the Federal Circuit has required that the plaintiff prove the following elements to succeed on a dilution by blurring as a cause of action. The plaintiff's trademark must be shown to be **distinctive <u>and</u> famous**; and the defendant must be **using a mark in commerce** that is

diluting the plaintiff's famous mark, the defendant's use of the trademark **must have begun after the plaintiff's mark became famous** and it must be found that the defendant's use **is likely to cause dilution by blurring**. Since the Defendant began using the alleged mark before the Honorable Order created a product line in 2002 to apply it to consumer goods, the burden of proof is upon the plaintiff to prove that the defendant did not exist in 1998, emerged illegally and the defendant is blurring their registered mark that they use for purposes unrelated to that of the defendant which uses the term descriptively, like others have in the past. Even here the plaintiff must overcome the generic and merely descriptive name test applied to the defendant as a group or association of Kentucky colonels commissioned independently without the knowledge or consent of the Plaintiff, under our own authority as Kentucky colonels. While we are all the Plaintiff's potential donors we do not belong to them as their members and have been disclaimed as such in their Articles of Incorporation.

The Trademark Trial and Appeal Board ("TTAB") has determined that multiple marks are famous including: (1) GOOGLE for search engine services; (2) KOHLER for plumbing fixtures; (3) GATORADE for energy drinks; (4) THERAFLU for cold remedies; and (5) UNITED WAY for charity. It is not likely at this point in time that KENTUCKY COLONELS can make a claim or prove that they are famous for cigars, designer labelled apparel, or food products, however they may soon once they make it to Wal-Mart's store shelves.

They may claim that they are famous inside Kentucky for charity or social events, but this does not hold up either because the charitable fundraising and events are focused on and attended by Kentucky colonels and not open to the general public, most of their funds are donated from out of state by Kentucky colonels. The Honorable Order is a 26 U.S. Code § 501(c)(3) organization, it is really not a 26 U.S. Code § 509(a)(1) public charity under the meaning of the Internal Revenue Code because its donations only come from Kentucky colonels which are conveniently claimed in *this case* as members, but because colonels are **legally disclaimed as not being members in the organization's Articles of Incorporation**, they are all considered part of the public (non-member donors) *from the standpoint of the Federal Government* and therefore the Plaintiff *is legally recognized* as a 509(a)(1) public charity.

The organization does not charge membership dues, does not represent donors based on the purposes of Kentucky colonelcy, all donations are made by colonels are tax deductible, donors do not have a hand in the operation of the organization and donors do not vote to select board members. They certainly cannot be recognized by the IRS as an organization without members and be recognized simultaneously to have members by the court.

The Plaintiff currently relies very heavily on their co-dependency with the state to produce more and more Kentucky colonels to achieve their goals and the recent decision of the governor to change the traditional method of having only Kentucky colonels make nominations to *allowing anyone* to make a recommendation on February 19, 2020 breaks with a 125 year tradition, has bothered most existing colonels commissioned by previous governors, but nonetheless has proved to be very beneficial to the organization. While it may be convenient to the Honorable Order's bottom line of fundraising, holding events and selling products, more Kentucky colonels overall diminishes the honorable status, dilutes the uniqueness, thus popularity by making it easier to become one, soon a Kentucky colonel will be a title that describes a recipient as one of a million of others instead of one of only several thousand. It also makes it more doubtful that the Governor himself can actually attend to or practically consider more than several hundred Kentucky colonelcies per year, perhaps if he sets aside a half-hour a day he could review 5-10 applications each day. Generally however, the reliance on the state (a third-party) to create more colonels decreases their ability to make a claim to fame as their own. It is sort of a moot point though because the Honorable Order has not stated in their pleadings what their mark is most famous for specifically or which of the identical marks is particularly famous because they have been ambiguous in the claim and fail to discern the difference between Kentucky colonels themselves and the general public which they do not solicit donations from directly. So which is more famous: the Kentucky colonel himself, the title Kentucky Colonel, Col. Sanders or the public charity the Honorable Order of Kentucky Colonels? Once they hit three million colonels the equivalent of 1% of the U.S. will be a colonel, but they will still have a long way to go before they become as famous as Coca-Cola, Gatorade or Google which are all famous enough to be known by 90-100% of the population.

**C. (3)   Infringement of the Plaintiff's Trademarks has Not Actually Occurred**

The following information is presented as a matter of law and is taken from the Wex, Legal Dictionary and Encyclopedia online compiled by the Legal Information Institute at the Cornell Law School.

To prevail on a claim of trademark infringement, that the defendant used the same or a similar mark in commerce in connection with the sale or advertising of goods or services without the plaintiff's consent.  The plaintiff must also show that defendant's use of the mark is likely to cause confusion as to the affiliation, connection or association of defendant with plaintiff, or as to the origin, sponsorship, or approval of defendant's goods, services or commercial activities by plaintiff.  See *1-800 Contacts, Inc. v. WhenU.com, Inc.*, 414 F.3d 400 (2d Cir. 2005).   Thus, "use," "in commerce," and "likelihood of confusion" are three distinct elements necessary to establish a trademark infringement claim.

**"Use"** of a trademark by an alleged infringer must be established as a threshold matter.  Any number of activities may be "in commerce" or may create a "likelihood of confusion." However, without the **use of a trademark**, such activities do not violate the Lanham Act.  The use requirement serves a limiting function by **preventing trademark holders from asserting a generalized right to control language.**  Some conduct through which a seller or producer seeks to capitalize on a competitor's name recognition **does not amount to "use" for purposes of a trademark infringement claim**.   For example, "pop-up" advertisements on the Internet or specific product placement in retail stores may be objectionable to the holder of a trademark, but **such uses would not violate the Lanham Act.**  *Id.*

The statutory requirement that an alleged infringing use of a trademark be "in commerce" to establish a claim of *infrinteringement* under the Lanham Act is derived from trademark law's basis in the congressional power to regulate interstate commerce.  To satisfy the "in commerce" requirement, the plaintiff must demonstrate that the **allegedly infringing activities have a <u>substantial effect</u> on interstate commerce**.  Activities that meet the "in commerce" requirement include:

- advertising by the alleged infringer in more than one state;

- interstate movement of goods bearing an infringing mark from manufacturer to seller;

25

- sending a product to another state for the purpose of registering a trademark;
- advertising in newspapers that have interstate distribution, on billboards near interstate highways, or on radio or television stations with an interstate broadcasting range.

**"Likelihood of confusion"** is the central focus of any trademark infringement claim.  A likelihood of confusion exists when consumers viewing **the allegedly infringing mark** would probably assume that the product or service it represents is associated with the source of a different product or service identified with a similar mark. Courts conducting a likelihood of confusion analysis will apply 2 different standards, depending on whether the accused item directly competes or does not directly compete with the trademarked item (See *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198 (3rd Cir. 2000)):

- When the accused item directly competes with the trademarked item in the goods and services provided:
  - the trial court will rarely look beyond the mark itself; infringement will usually be found if the two marks at issue are so sufficiently similar that consumer confusion can be expected.
- If the goods in question are completely unrelated in the goods and services which provided:
  - the court will typically find that confusion is unlikely, and therefore there is no infringement

**Defenses** - Trademark law is equitable and utilizes the traditional equitable defenses with the added element of a presumption favoring the registrant for trademarks that are registered under the Lanham Act.   In addition to the **equitable doctrines of laches, estoppel, and unclean hands, an alleged infringer may assert the defenses of fair use and collateral use**.  Fair use allows commentary or criticism that incidentally involves the use of a trademark so long as such use is for a purpose other than that normally made of a trademark.  When a party uses a trademarked item as a component of a more complex product, collateral use allows the party to identify that component by its trademarked name.

**Anti-Disparagement Clause** - 15 U.S. Code § 1052(a), also known as the Lanham Act's Anti-Disparagement Clause, prohibits the trademarking of an entity. The clause states that an individual

may not trademark something which "[c]onsists of or comprises immoral, deceptive, or scandalous matter; or matter which may disparage or **falsely suggest** a connection with persons, living or dead, **institutions**, **beliefs**, or **national symbols**, or bring them into contempt, or disrepute."

The Defendant makes no claim to own a trademark nor has applied for one in the USPTO because association services provided to Kentucky colonels cannot be trademarked when applied generically or descriptively to an organization of Kentucky colonels organized by Kentucky colonels. Understanding this the **Chicago Kentucky Colonels Club** successfully registered a hand drawn image of a Southern colonel as a collective membership mark in 1977 for their organization, this example is not only appropriate, but is a legitimate and good use of the Trademark Act in its intentions. See *Chicago Kentucky Colonels Club,* USPTO Serial Number 73083867, Registration 1068342. The indisputable mark was renewed twice and endured for over 30 years and also coincided with the Honorable Order's filing of their 1983 and 2003 trademark applications which they failed to acknowledge existence of, as well as other registered marks that were valid at the time and searchable at the USPTO.

The Plaintiff is precluded from claiming infringement against the Defendant for using their mark as a descriptive component of our merely descriptive and generic trade name and our distinctly different use for membership which Plaintiff has disclaimed in their Articles of Incorporation. The Defendant may also argue that their mark is not registerable in the first place because it incorporates the **institution of the Kentucky Colonel** in a very literal sense (as a service mark), disparages it with a false propaganda, is disreputable to the historical record to change actual history or form a mythical account around reality and the Commonwealth has been well on record to claim the Kentucky Colonel as a state symbol (federally recognized) which is incorporated in its seal and state flag that depicts two colonels, one of which is represented as a statesman and the other as a frontiersman or pioneer.

## V.  PLAINTIFF'S TRADEMARK IS NOT PROTECTABLE

Trademark law protects the goodwill represented by particular marks and serves the twin objectives of preventing consumer confusion between products and the sources of those products, on the

27

one hand, and **protecting the linguistic commons by preventing exclusive use of terms that represent their common meaning, on the other.** *OBX-Stock, Inc. v. Bicast, Inc.*, 558 F.3d 334, 339–40 (4th Cir. 2009). Through their own design of their marketing and business practices the Plaintiff has decided to apply and use six identical trademarks all with different purposes and meanings to claim them ambiguously and create confusion as well as imply them to represent the actual name of their organization in order to create a virtual monopoly. Even the court has become confused and has called the Plaintiff "Kentucky Colonels" by their trademark instead of their legal name, evidenced in this court's orders. The activity of the Plaintiff is inconsistent with the purpose of trademark law in general, it also prevents others from competing and is a violation of antitrust law. There is no way a person can distinguish between the products, services or the organization; the Plaintiff has essentially made their own trademark subject to genericide through its broad application to ambiguously usurp the rights of other Kentucky colonels.

Defendant argues that both the Honorable Order's word marks KENTUCKY COLONELS for services (charity and social events) are not protectable because they are ***not inherently distinctive*** and they are being used both generically and descriptively to describe an organization that is operated by Kentucky colonels which makes their mark *merely descriptive*. In this case the Honorable Order's selection of a trademark to describe itself as a charity made up of Kentucky colonels is ambiguously applied and would create a monopoly because there is no other term that can be used descriptively to define another group of people that have been awarded the honorable title of Kentucky Colonel. Despite the aforementioned argument the Defendant was not using the trademark at the time the case was filed nor had it previously been for the claimed purposes of the Plaintiff; instead the Defendant was using the term "Kentucky Colonels" as the component of his trade name "Kentucky Colonels International" registered with the Commonwealth of Kentucky as an assumed name with the Secretary of State to describe a group of individual "Kentucky colonels" engaged in the development of a fraternal society made up of the same as they have been since 1998 when the Defendant established the first website for Kentucky colonels. If there was a problem with our use of Kentucky Colonels as part of our trade name

it would most likely have been stopped by the Secretary of State who is also responsible for awarding the honorary title.

"Under **settled trademark law if the components of a trade name are common descriptive terms, a combination of such terms retains that quality**. Abbreviations for generic or common descriptive phrases must be treated similarly." *F.S. Service, Inc. v. Custom Form Service, Inc.*, 471 F.2d 671, 674 (7th Cir. 1972). "The major legal distinction between trademarks and trade names is that trade names cannot be [federally] registered...." *Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1534 (9th Cir.1989) "Generic names are not protectable as trade names because doing so would effectively remove words of common usage from the commercial vernacular. To permit exclusive trade name rights in a generic name would grant the owner of the generic name a monopoly because a competitor could not describe his business by its common generic term." *CES Publ'g Corp. v. St. Regis Publications, Inc.*, 531 F.2d 11, 13 (2d Cir.1975) (noting that to permit exclusive trademark rights in a generic mark "would grant the owner of the mark a monopoly, since a competitor could not describe his goods as what they are")

"Marks are classified into categories of increasing distinctiveness: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). "The latter three categories of marks, because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection." *Id*. "At the other end of the spectrum, generic marks are not registrable as trademarks." *Id*. Descriptive marks are not "inherently distinctive" but may be registered if they have "become distinctive of the applicant's goods in commerce." *Id*. Registration by the USPTO provides "prima facie evidence of the validity of [a] registered mark." 15 U.S.C. § 1115(a). Importantly for these purposes, whether a mark is generic, and whether a mark has gained secondary meaning, are both questions of fact. *Id*. at 227; *Board of Supervisors. for LSU v. Smack Apparel Co.*, 550 F.3d 465, 474 (5th Cir. 2008). Defendant argues that Honorable Order's word service marks are not protectable. First, Defendant asserts that the word mark is generic or, in the alternative, it is descriptive and lacks secondary meaning that can be claimed

29

exclusively to define a group made up of Kentucky colonels. Second, Defendant argues that the word mark is not "unique or unusual" and therefore not protectable. As one of the Plaintiff's word marks is registered HONORABLE ORDER OF KENTUCKY COLONELS, this is *prima facie* evidence of validity, however the court has not considered that the Plaintiff's claim of distinction is based on Section 2(f) of the Trademark Act. "Registering a trademark based on acquired distinctiveness is an admission that the trademark is descriptive. This means that, in the future, if the trademark owner is trying to sue a third party for trademark infringement, cannot claim that its mark was distinctive and "actual" and "conceptual" strength are two factors that the U.S. courts generally consider when analyzing an infringement claim." Quoted from: Gerben Law Blog, *How to Respond to a Descriptiveness Refusal on a Trademark Application*, Josh Gerben, Esq., Trademark Expert

A generic term is one that refers, or has come to be understood as referring, to the genus of which the particular product is a species. *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir.1976). A corollary verbal formulation of the meaning underlying the word "generic" is the phrase "the common descriptive name" as a designation for a product. Neither designation affords trademark protection. This is true even though the name acquires a secondary meaning, that is, the product has become identified with a particular producer. As in *J. Kohnstam, Ltd. v. Louis Marx & Co.*, 280 F.2d 437 So if the logical question were posed: **Is a Kentucky Colonel a type of colonel?** With an affirmative yes, then the term Kentucky Colonels is generic if it is applied to a group of people who are colonels.

As explained in *J. Kohnstam, Ltd. v. Louis Marx and Company*, 280 F.2d 437, 440, 47 CCPA 1080 (1960), "no matter how much money and effort the user of a generic term has poured into promoting the sale of its merchandise and what success it has achieved in securing public identification, it cannot deprive competing manufacturers of the product of the right to call an article by its name." *See, accord, Application of Preformed Line Products Co.*, 323 F.2d 1007, 51 CCPA 775 (1963); *Weiss Noodle Co. v. Golden Cracknel and Specialty Co.*, 290 F.2d 845, 48 CCPA 1004 (1961); *Application of Searle & Co.*, 360 F.2d 650, 53 CCPA 1192 (1966).

"No one can claim protection for the exclusive use of a trademark or trade name which would practically give him a monopoly in the sale of any goods other than those produced or made by himself. If he could, the public would be injured rather than protected, for competition would be destroyed. Nor can a generic name, or a name merely descriptive of an article of trade, of its qualities, ingredients or characteristics, be employed as a trademark and the exclusive use of it be entitled to legal protection. As was said in the well-considered case of *The Amoskeag Manufacturing Company* v. *Spear,* (2 Sandf. Superior Ct. 599,) `the owner of an original trademark has an undoubted right to be protected in the exclusive use of all the marks, forms or symbols that were appropriated as designating the true origin or ownership of the article or fabric to which they are affixed; but he has no right to the exclusive use of any words, letters, figures or symbols, which have no relation to the origin or ownership of the goods, but are only meant to indicate their names or quality. He has no right to appropriate a sign or a symbol, which, from the nature of the fact it is used to signify, others may employ with equal truth, and therefore have an equal right to employ for the same purpose." *Lawrence Mfg. Co. v. Tennessee Mfg. Co.*, 138 U.S. 547 (1891)

The questions before the court raised by the affirmative defenses and this memorandum are: Can an organization adopt a name that has been in continuous use by others as a generic descriptive term for more than 100 years before they existed and apply it descriptively to themselves with exclusivity? Can the court grant exclusive rights over a term that exists in the public domain through the merger doctrine since 1776? Can an organization take a trademark they use arbitrarily and suggestively to sell products such as cigars, t-shirts, keychains, and barbecue sauce to ambiguate it to apply universally if it is being used monopolistically?

## VI.   PLAINTIFF LACKS STANDING

"The doctrine of standing … involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Kowalski v. Tesmer*, 543 U.S. 125, 128 (2004) (other quotations omitted). To establish Article III standing, a plaintiff must prove (1) injury-in-fact, (2) traceable to the defendant's conduct, and (3) redressable by a favorable ruling. *Lujan v. Defs. of Wildlife*,

504 U.S. 555, 560 (1992). Prudential limitations further require that a plaintiff "generally must assert *his own legal rights and interests*, and cannot rest his claim to relief on the legal rights or interests of third parties." *Kowalski*, 543 U.S. at 128 (quotations omitted). Here, Plaintiff lacks Article III and prudential standing.

Plaintiff lacks prudential standing because their claims "rest … on the **legal rights or interests** of third parties." *Kowalski*, 543 U.S. at 129 (quotations omitted). "Even if an injury in fact is demonstrated, the usual rule is that a party may assert only a violation of its own rights." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988). Plaintiff's claims are predicated solely on the rights of the public and the public interest (people and organizations of Kentucky), with whom are not engaged in the affairs or commercial activity of the Plaintiff, but are their beneficiaries. They argue the character and nature of the organization that allegedly infringed upon their trademark(s) is not relative to Kentucky colonels and that Defendants were seeking donations without the proper authority of the Internal Revenue Service as the basis for causing confusion, dilution and disparaging. The Plaintiff has not been deputized as an IRS inspector. The Plaintiff's *so-called members* are actually their "donors" and recognized symbolically as members by the Honorable Order based on them receiving the honorable title of Kentucky Colonel, but otherwise the donors do not belong to the organization or have any powers therein, otherwise this case would not exist. The Plaintiff even goes so far as to disclaim members in their Articles of Incorporation **[DN 52-2-8]** and dissociates them by disclaimer on Facebook saying, "The views, thoughts, and opinions expressed by individual Colonels belong solely to them and do not necessarily reflect the mission or views of Honorable Order of the Kentucky Colonels, Board of Trustees, or staff." The Court must apply the "usual rule" here, *Am. Booksellers Ass'n*, 484 U.S. at 392, because there is no "'hindrance' to the possessor's ability to protect his or her own interests," *Kowalski*, 543 U.S. at 129; see *Purpura v. Christie*, 687 F. App'x 208, 210 (3d Cir. 2017) ("[T]o establish third-party standing, a litigant must demonstrate … some hindrance to the third party's ability to protect his or her own interests.") (emphasis added) Because Plaintiffs seek to "assert[] the legal rights of others" who are capable of protecting themselves (by reading), prudential limitations "bar" Plaintiffs'

claims. *Phila. Marine Trade Ass'n-Int'l Longshoremen's Ass'n Pension Fund* v. C.I.R., 523 F.3d 140, 145 (3d Cir. 2008).

Prudential standing aside, Plaintiffs do not and cannot establish any of the requirements for Article III standing. To begin with, no Plaintiff has injury-in-fact nor are their claims redressable by a favorable ruling *de jure,* outside of the Defendant's elimination from the public sphere, an Act of Congress, or through the purchase of his intellectual property which this action seeks to destroy.

### VII.  LAWSUIT IS JURISDICTIONALLY FLAWED AND PROCEDURALLY BARRED

Beyond the lack of standing, at least eight independent jurisdictional and procedural bars definitively doom this lawsuit. Defendant presents 18 affirmative defenses and 24 inconsistent claims beginning on page 27 of the Defendant's answer filed with the Court Clerk on August 25th **[DN 62]**. If the Court determines that an answer, affirmative defenses or inconsistent claims and defenses are inadequately pled (or lacking) by the moving party to adjudicate a matter brought before it, a court may direct or instruct a *pro se* party to amend the answer, file a supplement to the motion for judgement on the pleadings for further consideration or convert the motion into one for summary judgement.[4] Regardless of the pleadings to this point of procedural arcana, it is clear that § 1915(d) review provides a potential opportunity for cursory and liberal treatment of meritorious and equitable *pro se* pleadings.[5]

### VIII.  DEFENDANT IS ENTITLED TO JUDGEMENT AS A MATTER OF LAW

Upon granting a preliminary injunction in favor of the Plaintiff and defaulting on the other Defendants the presiding Judge made an Order **[DN 58]** under Rule 16 moving the case to the Magistrate Judge for a Rule 26 Discovery and Scheduling Conference without instructing the Defendant to file his answer after denying a dispositive motion for dismissal pushing the case to discovery before the Defendant could answer. Understanding the rules of civil procedure the Defendant in *pro se* filed his

---

[4] While the Supreme Court has held that pro se pleadings should be viewed with special care, see *Haines v. Kerner*, 404 U.S. 519 (1972), a litigant with counsel may allege crucial facts a pro se litigant would not think to include in his pleadings. Moreover, pleadings drafted by counsel not only may be phrased more artfully, but also may allege viable causes of action which might not occur to the pro se litigant, or for that matter, to the court. See Recommended Procedures at 13-14 (cited in note 24); *Westling and Rasmussen*, 16 Loy.U.Chi.L.J. at 309 (cited in note 25) (a good case can be lost by poor presentation).

[5] 28 U.S.C. § 1915(d) (1982). Courts construing pleadings pursuant to this statute use the same lenient standard applicable to construction of pro se pleadings in a fuller proceeding on the merits. See *Haines v. Kerner*, 404 U.S. 519 (1972), discussed in section III.A.

Answer, Affirmative Defenses, and Inconsistent Claims and Defenses **[DN 62]** within 14 days Fed. R. Civ. P. 12(a)(4)(A), more than 30 days have elapsed since this filing and the Plaintiff has not controverted any of the facts presented in the Defendant's pleading and has indicated to the Magistrate Judge readiness for discovery. The Defendant has not indicated that he is ready to the court and withdrew from the Joint Rule 26(f) Report ordered by the court because Plaintiff's counsel submitted it prematurely treating it as a priority matter, taking charge of it without fully discussing the planning with the Defendant, delivering a draft hours after a short 15 minute phone call focused mostly on settlement. **[DN 63]** and **[DN 64]**

### IX.  PLAINTIFF IS NOT ENTITLED TO LEAVE TO AMEND COMPLAINT

The Honorable Order has not sought leave to amend their complaint, they have not controverted the facts presented by the Defendant in his answer in accordance with L.R. 7.1(c), they have indicated to the court that they are ready for discovery, they have offered a negotiated settlement in the form of a consent decree based on the preliminary injunction with an Agreed Judgement resulting in a Permanent Injunction without negotiation. The Defendant, willing to negotiate settlement on the basis of the Plaintiff's Agreed Judgement in *good-faith with equity in consideration of the facts*, insisted on a joint motion for dismissal with prejudice based on a **Private Settlement Agreement and Agreed Order** including **all the terms initially required by the Plaintiff resulting in a Permanent Injunction**. **(See Exhibits 2 and 3)** The Plaintiff countered the Defendant's offer in bad-faith to suppress the constitutional rights of the Defendant with an agreement that was totally inconsistent with the Defendant's offer and ignored all the facts of the Defendant's answer. If the Honorable Order was not engaged in a fishing expedition to seek information about the Defendant that it is not entitled to or seeking to destroy the Defendant at the time this motion for judgment on the pleadings was filed, their failure to seek leave to amend *would end this case with justice* because "[a] district court is not required to grant a plaintiff leave to amend a complaint *sua sponte* when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court." *Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002) (en banc). The court "need not

allow an amendment (1) where there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments previously allowed; (2) where allowing amendment would cause undue prejudice to the opposing party; or (3) where amendment would be futile." Fed. R. Civ. P. 15(a). See also *Corsello*, 428 F.3d at 1014.

## X.  COURT IS OBLIGED TO CONSIDER DEFENDANT'S MOTION TO SETTLE DISPUTE

When considering a motion for judgment on the pleadings, the Court must accept all well-pleaded facts in the complaint as true and draw all reasonable inferences in favor of the plaintiff, the non-movant. *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006)  However, "the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." *Long v. Fulton County Sch. Dist.*, 807 F. Supp. 2d 1274, 1282 (N.D. Ga. 2011) (internal quotation omitted). A complaint will survive judgment on the pleadings if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).

Fed. R. Civ. P. 10(c) provides that "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." A court conducts the same analysis for both motions to dismiss and motions for judgment on the pleadings to decide if attached exhibits are outside the pleadings and the motion must be converted into one for summary judgment. *Whittaker v. Deutsche Bank Nat. Trust Co.*, 605 F. Supp. 2d 914, 924-925 (N.D. Ohio 2009). "In ruling on a motion to dismiss or motion for judgment on the pleadings, the <u>Court may only consider documents attached to, incorporated by, or referred to in the pleadings.</u>" *Id*. at 924. Therefore the court should consider [DE 1], [DE 6], [DE 24, 37, 47], [DE 52], [DE 52-2], [DE 52-2-1] through [DE 52-2-15], and [DE 58] referred

to in   [DN 62] as well as take judicial notice of the evidence and information presented in this memorandum.

## XI.  SUMMARY & CONCLUSION

As demonstrated in the Complaint and the Answer the dispute began with the Defendant offering to merge and consolidate his association's assets built over a period of as much as 20 years to cede them to the Plaintiff for "a price" and to affect changes in the Plaintiff's organization to which he donates periodically but has no input or authority therein, which has been called extortion by the Plaintiff, but in reality must be accepted by the court as a good-faith business offer to the Plaintiff because the offer does not violate any laws. Based on the differences of opinion of the Defendant and the Plaintiff's unwillingness to assume the assets as proposed began this dispute, Defendant followed through with his plans to convert his unincorporated organization to establish a legal formation and wrote an editorial that openly criticized the operations of the Plaintiff within his rights as an American citizen. This led to the Plaintiff making a fraudulent and spurious claim as an organization providing association services for Kentucky colonels which it does not commercialize which was refused by the USPTO. The Plaintiff then attacked by filing a complaint for alleged trademark infringement, cyberpiracy and other charges connected to infringement seeking an injunction and monetary damages for trademarks they applied for three days before filing the lawsuit for **services that they did not offer**. The actions of the Plaintiff and subsequent actions taken by the court caused the Defendant to make changes and resulted in effectively closing his organization which was legally operational commercially for only 21 days after existing for more than 20 years. The Defendant beholds a great interest in the honorable title of Kentucky Colonel from an academic and historical perspective, he is not inclined to seek damages relative to Defendants' short time doing business, but is likely to defend against the actions of the Plaintiff in further desecrating or demeaning the commission, manipulating history, creating propaganda and abusing the civil rights of Kentucky colonels or misusing their trademarks to control and dominate fellow colonels. As an alternative to dismissal the Defendant in good faith is willing to let the matter stand as it is now at this time by making **the Preliminary Injunction permanent based on the entry of Defendant's proposed**

**Agreed Order <u>combined by the Court</u> with his Private Settlement Agreement that shows equity**, considers his standing as the creator of the first website for Kentucky colonels **[colonel.org]** in 1998 as demonstrated in his answer and prevents the Plaintiff from usurping on his intellectual property rights which were disclosed in the Merger and Consolidation Proposal dated January 13, 2020 **[DN 6]**.

Effectively, considering that the Plaintiff is not eligible to seek damages for trademark infringement under 15 U.S. Code § 1111 and the Defendant is willing to make *a version* of the standing preliminary injunction permanent which gives the Plaintiff everything that they can seek and have indicated that they will accept, a judgement on the pleadings and dismissal with or without prejudice on the terms proposed by the Defendant are reasonable, just and appropriate to settle this dispute as a matter of law or simply dismiss the action. Aggrieved Defendant waives his right to appeal, filing a counterclaim or otherwise seeking damages for his losses or the losses of the Defendants in default against the Plaintiff withstanding the requested dismissal with or without prejudice or other type of fair and final judgement on the pleadings imposed by the Court to end the dispute.

Caracas, Venezuela
Dated: September 30, 2020

Col. David J. Wright
Edificio Torre 997, Local B
San Juan, Caracas, Venezuela 1021
david.wright@globcal.net
+1 (859) 379-8277

**Certification:** Defendant certifies that this Memorandum in Support of his *pro se* Motion for Judgement on the Pleadings was filed accordance with L.R. 7.1(d) and is within the 40 page limit using 12 point text, interlined double spaced page format using Times New Roman font type.