# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### LOUISVILLE DIVISION

|  |  |  |
|---|---|---|
| THE HONORABLE ORDER OF KENTUCKY COLONELS, INC. **Plaintiff** | ) ) ) ) | Civil Action No. 3:20-cv-132-RGJ-RSE |
| **vs.** | ) ) ) | **MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR DECLARATORY JUDGEMENT** |
| COL. DAVID J. WRIGHT **Defendant** | ) ) ) ) | |

## MEMORANDUM IN SUPPORT
## OF DEFENDANT'S MOTION FOR DECLARATORY JUDGEMENT

In the case before the Court, Civil Action 3:20-cv-00132, The Honorable Order of Kentucky Colonels, Inc. *v.* Kentucky Colonels International, *et al*. in default, surviving Defendant in *pro se*, Col. David J. Wright, seeks a Declaratory Judgment (and relief) as a matter of law to protect the Defendant's civil rights and interests as a United States Citizen under the First Amendment of the Constitution and other laws of the United States. For the reasons stated herein the sole remaining Defendant in this controversy **moves the Court: to enter a judgement of non-infringement; to cancel some of the plaintiff's trademarks; to vacate the preliminary injunction in Order [DE 58]; to impose limitations or restrict the ability of the plaintiff to use their remaining trademarks as a trade name, website name, and as a copyright name to intentionally, cause/create confusion** or bring further harm to the Defendant or others that use the [marks] *as a term,* generically, descriptively and fairly; and to provide relief by holding the Plaintiff responsible to pay reasonable legal expenses, court costs and declare civil liability for damages as a consequence of the acquisition and use of trademarks that were applied for fraudulently to cause harm to the Defendant and create controversial false claims of infringement, dilution, confusion, unfair competition and related activities under the statutory authority of the Lanham

Act and the United States Code. The only confusing activities are those of the Plaintiff and their constructive misuse of federal trademarks as a weapon.

Too frequently in civil cases the facts and issues prior to the dispute and creation of a controversy that the Plaintiff fails to acknowledge, admit, recognize or understand are the greatest issues. In this case it also involves the execution and preparation of the case, what could have been done to avoid this controversy and why this case should not exist from a legal perspective as interpreted by the Court. The Defendant challenges the Plaintiff's claims on serious factual grounds from several perspectives and areas of trademark law.

## INTRODUCTION

Based on the relevant evidence, adjudicative facts and legal authorities presented herein combined with the intentional acts of the Plaintiff, the Defendant requests that the Court recognize the Plaintiff's conduct as that of a "Trademark Bully", which has taken extraordinary actions in over-policing their arbitrary and suggestive trademarks including presenting contradictory, false, fraudulent and irrelevant evidence that overreaches their rights in trademark law to build a monopoly, confuse the public, distort history, misappropriate culture and create legal fiction with the intention to mislead and prejudice this Court in bad-faith against the Defendant to bring irreparable harm and reasonable apprehension to usurp the rights of Kentucky colonels that do not support them as their voluntary subject donors in their **non-profit charitable mission** or as consumers in their **commercial for-profit operation**.

The "idea" KENTUCKY COLONELS being sought under the controlled disguise of a trademark by the Plaintiff will be nothing less than empowerment to continue to usurp the rights of others and legalize a classic trademark bully to create a monopoly, promote a pseudo-historical narrative and is now misappropriating a cultural icon, the "Kentucky Colonel" which is a mainstay of Kentucky culture, folklore and history.

The Plaintiff *has beguiled and enchanted the Court* with their community activities, political connections and time in a charitable activity as a divergence to the real issues of this case involving their

2

own use of a descriptive term (they used to describe themselves) that cannot be trademarked by colonels because it would misappropriate culture, tradition and history, as well as confuse them with the state.

Based on information gathered from American newspaper articles, academic journals and books from the public domain this Court within its own authority should dismiss this case immediately as a matter of law. This is nothing more than a SLAPP suit based on speculative claims, presumptive evidence and a lack of concrete or adjudicative facts that the Defendant(s) infringed, diluted, or defamed the image of Kentucky colonels or anything proprietary belonging to the Plaintiff including their fraudulent trademark, the Court should see to the heart of this matter. The Defendant's crusade against the impropriety of the Plaintiff does not constitute infringement under the First Amendment of the U.S. Constitution or the Lanham Act. Judicially noticeable information submitted by the Plaintiff under close examination in **[DE 1]** and **[DE 7]** combined with the information being presented by the Defendant makes it crystal clear that the Plaintiff, their historical narrative and their trademarks are all fraudulent, their claim speculative and erroneous. The Court has not even considered the Answer **[DN 62]** submitted by the defense or the Motion for Judgement on the Pleadings **[DN 65],** to favor a potential settlement **[DE 77]** which now must withstand new facts learned by the Defendant and this Court with the present motion.

The Plaintiff's law firm likewise, knowingly or unknowingly, is committing fraud by strategic omission in answering certain questions truthfully in their trademark applications unless it is legal absence of doubt, neglect or within their duty as trademark practitioners to not make truthful disclosures on the behalf of their clients when the information is known by a law firm that has represented them over 30 years. Is it wrong not to disclose the names of known possible competitors that also use the "term/trademark" when both the attorney and the Plaintiff know of one or many more? What would the trademark examiner have done if Plaintiff/Applicant was honest and named competitors? Obviously the Plaintiff did not want to admit there are other users or respond to such inquiry.

The only way to make Plaintiff's case believable or viable, is if they either brought it in 2014 or if they filed the new trademarks prior to our trade name registration on January 30, 2020 starting with

free-speech activities up until February 10, 2020. Plaintiff filed for trademark protection based on these free-speech activities on February 17, 2020 averred there was no confusion, and filed a lawsuit alleging confusion 72 hours later with a fully printed quadruplicate lawsuit mailed, sent and filed by the same attorney(s) that filed the trademark applications (inhibited/evasive declarations) under oath.

The Plaintiff should have disclosed the Defendant (and others) as requested by the USPTO to legitimize their application. Supporting information that was not "advertising" or for commercial gain that was submitted to the USPTO was misleading and elusive to make a fraudulent claim to 1995 as an *in-commerce* date. The dates used on the applications were inconsistent with the factual dates submitted on the 1981 application. All of these things infer fraudulent or negligent activity likely to cause mistakes at the USPTO with trademark examiners.

There are dozens of others that used the term in common law responsible for newspaper articles and public relations of Kentucky colonels throughout history. The Defendant has proven in his research that it all started in the Kentucky Territory in 1774-1775, most officially in 1776 when Kentucky became a county of Virginia. Under Virginia common law and tradition colonels could make "lieutenant colonels", who are breveted to a higher rank upon retirement with a land bounty (warrant deed) thus another title bearing colonel. In the lack of government these colonels were always responsible for creating a civil colony, they appointed the first justices of the peace (judges), sheriffs and more "Lt. Colonels" that would soon also be known as colonels.  Failure to credit all 1,000 colonels living in Kentucky before it became a state, and these Kentucky colonels unanimously selecting Isaac Shelby in 1791 as the state's first governor is no coincidence, it is there from 1774-1792 that Kentucky colonels began.

The Defendant's accurate history raises a new controversy where the Plaintiff's fiction, hoax and fraud is challenged by history, integrity and honor. The Plaintiff has been engaged in proliferating an assumed history based on a mythical tale started around 1941, with no factual basis.

The Plaintiff's trademark is one that refers to living people that do not particularly endorse or support the Plaintiff and would result in cultural misappropriation of history and iconography of the Commonwealth. The Defendant contends that it is a merely descriptive and generic term that cannot be trademarked except for selling chicken, t-shirts, bourbon or something that is not descriptive or generic of who, what, why or how of that which "KENTUCKY COLONELS" really are living and deceased.

The Defendant asserts priority claims in common law, assignable and transferable rights to "KENTUCKY COLONELS" as a copyrighted **website title** for COLONEL.ORG starting October 31, 1998 when it was the only website for Kentucky colonels. COLONEL.ORG became KENTUCKY COLONELS INTERNATIONAL between 2007-2009 and firmly established itself on Facebook as the *only page* with social media groups for Kentucky colonels interested in goodwill ambassadorship and Kentucky colonelcy. He also alternately claims rights to use "1st Online" commercial use in non-commercial activities under common law in respect to Kentucky colonels.

The Plaintiff (scienter) cannot overcome seven facts which the Defendant shows Plaintiff's knowledge of Defendant's equal or superior rights to the [disputed] term/mark: (1) Plaintiff's trademark clearance search revealed Defendant's state registration as a legal assumed trade name KENTUCKY COLONELS INTERNATIONAL between February 7-12; (2) the competitor relationship between the two parties in a field where Defendant has enjoyed over "a decade of non-commercial success;" (3) Plaintiff's knowledge of Defendant and its rights to use the term understanding of the same rights to use the term as a descriptive one in their name; (4) Plaintiff's adoption of other service ideas and motives imitating Defendant's; (5) Plaintiff's communications with Defendant in 2014, 2016, 2018 and 2019; (6) Plaintiff had awareness and knowledge of others that use the term descriptively; and (7) the two parties' services appearing in a common social media platform Facebook.

The Defendant can factually show that the Plaintiff's trademark applications contain multiple misleading and deceptive claims using dates, used unqualified specimens, strategically omitted others

legally using term/trademark and was negligently (or fraudulently) submitted by a practicing professional trademark specialist working on the behalf of the Plaintiff.

Relying on the recent academic and historical research of the Defendant used in his creative works to develop the website, ***Commonwealth Colonels***, its licensed content and his personal copyright for ***Kentucky Colonels: Forefathers, Founders and Model Figures of Kentucky Culture, Customs, Folklore, History, Music, Society, Traditions, and Values*** treating the ideas of *Kentucky colonelcy* and history; the term, KENTUCKY COLONELS is clearly a generic and highly descriptive term from the public domain that is not eligible for statutory protection under the Lanham Act on the Principle Register of the USPTO as an inherently distinctive trademark for services provided by Kentucky colonels. The Plaintiff has admitted their mark(s) were descriptive to the USPTO and falsely claimed them as having acquired distinctiveness (using dubious specimens), disregarding the unregistered common law rights of other concurrent users and previous users, making the term/mark ambiguous and confusing with the Commonwealth of Kentucky which actually makes 'Kentucky colonels' and is the only source for actual 'Kentucky colonels'. Registration of the term as a mark also confuses the term with other organizations that promote Kentucky colonelcy and individual Kentucky colonels themselves that do not support the endeavors or objectives of the Plaintiff. The Plaintiff is not the only organization made up of Kentucky colonels that use the term to describe themselves.

The Plaintiff is disinterested and oblivious to the rights of others, particularly other Kentucky colonels which it dominantly subjugates. None of the Plaintiff's trademark applications applied for since 1981 admit any concurrent or legal use of the 'trademark or term' by any other party (despite many existing at that time), "either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive." The Plaintiff's *modus operandi* is to (1) file for trademark protection; (2) refuse to admit any similar or dissimilar use by other parties; then (3) bring on a lawsuit as they did in 2002-2004 over t-shirts in *Honorable Order of Kentucky Colonels v. Building Champions, LLC*, 345 F. Supp. 2d 716 (W.D. Ky.

2004). Another *modus operandi* of the Plaintiff is to (1) bring an opposition lawsuit claiming unrelated trademark rights for products as they did in *The Honorable Order of Kentucky Colonels, Inc. v Heritage Tobacco Group LLC*, TTAB, 91203454, June 09, 2011; (2) seeking judgement March 2012; then finally (3) submitted an application for trademark protection consistent with the opposition claim backdated to extend their claim to 2002 on January 17, 2014.

The only difference this time is that the trademark applications were filed concurrently while preparing this lawsuit making their averrance under oath, a completely unbelievable circumstance. Besides the Plaintiff blatantly committing fraud by omission in making their most current trademark applications, they supplied misleading, inconsistent and presumptive information intended to deceive trademark examiners to extend their claim to usurp the rights of others, particularly the defendant's. In their complaint the Plaintiff does not even admit ever knowing about the Defendant prior to December 31, 2019 despite previously communicating with and knowing the Defendant(s) in 2014, 2015, 2016, 2017, and 2019. The Plaintiff had no reason to believe that Defendant(s) was/were not legally entitled to use the trade name KENTUCKY COLONELS INTERNATIONAL or they never would have been capacitated to file the lawsuit.

The so-called *civil* action was brought on February 20, 2020 was made in bad-faith with the intention to inflict as much damage and harm as possible on the Defendant and his non-profit charitable organization that was reinstated in good-standing by January 21, 2020 with the Secretary of State of the Commonwealth of Kentucky to begin the process of re-establishment and reorganization; this was following a legal offer prepared and sent at the request of the Plaintiff regarding a Merger and Consolidation Proposal **[DE 6]** disclosing the Defendant's proposed plans and objectives with the Plaintiff to relinquish KENTUCKY COLONELS INTERNATIONAL social media assets developed since 2007 and 2009 including its most recently developed plans and intellectual property. When they rejected Defendant's proposal and offer for the 11 year Facebook development, the Defendant legalized itself in Kentucky and began a website and receiving donations for the formalization of our Kentucky colonels

organization. Defendants began to seek new sponsors as "Kentucky Colonels International" by engaging in non-commercial activity involving other Kentucky colonels (people) under their First Amendment Constitutional Rights and this lawsuit was brought wrongly.

Defendant contends that he can use the generic and descriptive term "Kentucky Colonels" as part (component term) of his trade name, with names such as; Real Kentucky Colonels, Kentucky Colonels and Pioneers, Original Kentucky Colonels, 1st Kentucky Colonels, International Kentucky Colonels Association, or go back to using his original name Kentucky Colonels International as he has for over at least 11 years. Courts are not in the business of eliminating competitors or causing critical harm to parties unless they are misled by a Plaintiff based on significant unsubstantiated allegations to do so.

The Plaintiff's use of just simply "KENTUCKY COLONELS" as a trademark or trade name brings numerous challenges based on the mark falsely suggesting a connection with persons, institutions, beliefs, the state, or national symbols or the names, portraits, or signatures of living individuals. Additional foundations for challenge include the mark being generic, functional or abandoned or marks that misrepresent source; marks obtained through fraud; marks that are merely descriptive or deceptively misdescriptive; and marks which are confusingly similar to another registered mark or trade name under Title 15 U.S. Code §1052.

## ARGUMENT

The Plaintiff's conduct is particularly egregious, pervasive, ill-intentioned and prejudicial toward the Defendant and other Kentucky colonels. The Plaintiff's actions and recent filing clearly show bad-faith and judicial misconduct toward achieving a fair, equitable or just settlement in a mutually agreed Settlement Conference scheduled for December 29, 2020 ordered by the Court **[DE 77]**. On November 18th, the Plaintiff moved the Court to order the Defendant to show cause why he should not be held in contempt **[DN 78]** accusing the Defendant of contempt of a Court Order **[DE 58]** based on files that were encountered by the Plaintiff located in a hidden web-folder marked "offline" and were not generally accessible to the public, some were pages that have never been published or indexed by search engines.

These files were being preserved as Electronically Stored Information (ESI) in accordance with the Federal Rules of Civil Procedure, Rule 37. The Plaintiff claimed in their "Motion To Show Cause Why Defendant David A. Wright Should Not Be Held In Contempt" **[DN 78]** that these files (webpages) were being used to recruit members and to engage in commerce as the "Kentucky Colonel Foundation" without any evidence that what they stumbled upon was active, being utilized or even listed as a public search result. **See Defendant's Response [DN 79]** and **Declaration Under Oath [DN 80]**. Despite the Defendant's response and objection submitted in good-faith the Plaintiff vehemently maintains their position in their reply without much understanding of the facts presented, the Internet, copyright law or the Defendant's legal rights **[DN 81]**. The Defendant never has been engaged in *any commercial activity* as defined under United States law, has not violated any laws, and shall not be held in contempt of a court order to which he has complied with to create Commonwealth Colonels.

The Plaintiff is engaged in complicating and multiplying this matter based on the Defendant's discovery and publication of relative facts, historical accounts and independent research to execute a pre-registered copyright for a nonfiction book and to develop a non-commercial open-source creative work on the Internet under an *Attribution Noncommercial ShareAlike 4.0 International* (CC BY-NC-SA 4.0) License [https://creativecommons.org/licenses/by-nc-sa/4.0/] based on citations and references from the public domain and other Creative Commons works. Such works as published and collected by the Defendant may not be used for profitability of the Plaintiff or other parties, or included in their website without providing attribution credits to the Defendant, Col. David J. Wright; failure to do so will violate the Defendant's rights as an author, publisher, and webmaster. Violations of a Creative Commons License or any other published creative work license can be protected by the U.S Federal Courts.

The Plaintiff is a ***trademark bully*** seeking to dominate and usurp the rights of others and maintain an upper hand through their disparity of finances, political influence and resources to defeat the truth and justice which must prevail in this case. Trademark rights are very particular and can only be used specifically for the purposes for which they have been granted, they cannot be used as blanket protection or a license to usurp non-proprietary dominion over public knowledge. Now that the Plaintiff understands

Defendant has discovered relevant factual information through an intensive academic pursuit and investigative research of the historical record they are attempting to cover their tracks by making blatantly false, unverifiable statements extralegally in the public sector and in the social media to continue to usurp the rights of others and justify their claims by extending their rights under a deceased governor, see **[Exhibit 4].** The only remedy for the Plaintiff is to settle this matter amicably or voluntarily withdraw their legal persecution to avoid further damages or dismay caused by their own self-inflicted injury based on fraudulent activities or through the Defendant's exposure of the truth and underlying facts.

The Plaintiff has professed and testified to a fictional pseudohistory and mythical account based on non-existent facts to belittle, control, dominate and reconstruct the facts behind the idea of the "Kentucky Colonel" over the past 80 years. In continuing this lawsuit they will be forced to transparently admit and prove factual and documented origins of their tales as an organization based on their actual subjective claims to the United States Patent and Trademark Office (USPTO) and the U.S. District Court. However, the Plaintiff is thoroughly discredited and impeached as a purveyor of historical information making everything and anything they say subject to critical evaluation and inquiry, nothing they say or claim should be accepted on the precept of honor. Currently based on the documents subject to judicial notice and potential counterclaims; the Plaintiff will be forced to provide factual (non-digital) archives evidencing their existence and actual activities in 1931, 1932, 1933, 1934, 1939, 1941, 1951, 1957, 1992 and 1995. They will also be forced to prove how they came to be in possession of a state order of merit without any presumption of fact. These things alone will not prove a case of trademark infringement nor extend their rights under common law, but they may allow the organization's continued existence and create public transparency.

All information, facts and relevant history prior to 1933 with the exception of Plaintiff's mythical 1813 tale (that never occurred) must be acknowledged by this Court as evidence of public domain as demonstrated and proffered in the Defendant's claim that the term "Kentucky Colonels" is a generic and merely descriptive term adopted by the Commonwealth of Kentucky from the "public mindset" between 1895-1899 under Governor 'Colonel' William O'Connell Bradley's Administration (Bradley

Administration) when the idea of the honorable title of "Kentucky Colonel" officially began. Previous to the range of dates when the Commonwealth adopted the title "Kentucky Colonel", "Kentucky Colonels" are already well-known throughout the United States in multiple contexts and descriptions. Under the Bradley Administration, Kentucky colonels were also known as the Kentucky State Guard when their recognition was official as opposed to the honorary recognition of civilian acts and deeds. Previous to the Bradley Administration the "honorable" title of "Kentucky Colonel" did not exist officially, but "COLONEL" did and many Commonwealth governors conferred this rank to recognize members of their staff as members of the State Guard and in other positions such as the Post 7 Drum and Bugle Corps.

The fact is that colonels in Kentucky have multiple origins: they were actual colonels commissioned by the Governors of Maryland, North Carolina, Pennsylvania, and Virginia during colonial times; they were Kentucky's founding pioneers and settlers in 1775; they were land bounty recipients ranked from private to general during and following the Revolutionary War; they were officers commissioned by former colonel, General George Rogers Clark; they were land owners that adopted the title based on their assumed positions in society; they were members of Kentucky's Militia and Mounted Cavalry Troops appointed by the State Legislature; they are the founding fathers and liberators of Texas; they were (active and retired) commanding officers from the War of 1812, the Mexican-American War and the Civil War; they were honorary uniformed appointed officers created by Col. John Harland on the behalf of President Lincoln to demonstrate a Union presence in Kentucky in 1861; they were aides-de-camp appointed by Kentucky's governors; and they were hospitable older southern gentlemen with white goatees, a split-tailed coat and straw brimmed hat. The aforementioned is all before the Plaintiff was imagined, thought of, or conceived, and also before the Commonwealth adopted the term as one of its common law trademarks, symbols and icons.

No single author, researcher or webmaster has ever published or assembled more content about *Colonels in America* or about the *Kentucky Colonel* than the Defendant at the Commonwealth Colonels website. It would be a clear violation of United States law and suppression of the Defendant's First

Amendment Rights to recognize the Plaintiff's egregious and overreaching claims that extend well beyond the rights granted to trademark holders under the purposes of the Trademark Act.

Actual Kentucky colonels or a group of Kentucky colonels like the Plaintiff's simply cannot become the exclusive trademark or trade name "rights holders" of a term like "Kentucky Colonels" which both describes and classifies them generically, because it would cause harm to others that may want to use the term descriptively and encroach on the rights of title holders. While they may hold many identical trademarks "KENTUCKY COLONELS" for different goods and services arbitrarily, suggestively, and confusingly as a brand name for licensed products they commercialize; it does not prevent others from using the term or their trademark under the fair-use statute or as the only way to describe or generically classify other Kentucky colonels' activities, events, or noncommercial charitable fundraising unrelated to the Plaintiff as a matter of law and social ethics even if some confusion exists. It is the moral obligation of the parties to eliminate the confusion with their names and objective purposes, not assimilate them by promoting ambiguity like the Plaintiff.

There is no confusion if there is no commerce or a commercial source of products that are being commercialized or confused, 'commercial activities' have never been conducted by the Defendant during the course of time 2019-2020 alleged by the Plaintiff, not even through paid advertising. While the Plaintiff has shown that some grant recipients have demonstrated some confusion in social media platforms does not confuse the Plaintiff with the Defendant or vice-versa if there was no commercial activity taking place within the Defendant's business model or purpose, misdirected recognition does not equal confusion. The Preliminary Injunction **[DE 58]** deals with a trade name and a domain name where no commercial activity exists and no commercial activity ever occurred, so this injunction goes beyond its practical application to favor and protect the Plaintiff as if they were entitled to a monopoly. The Court and Presiding Judge should likewise demonstrate good-faith to dispose with the legal fiction generated by the Plaintiff, in this case an injunction was placed that goes beyond the reasonable jurisdiction of the Court and affects the Defendant's "non-commercial use rights" as a civil society organization to use a

generic term and targets a website domain that has never been used in commerce, which the Plaintiff is now responsible for civilly for the damages caused by their actions.

Collecting donations and contributions for non-profit activities or developing a membership organization are not qualified as a "commercial activity" under United States Law nor do they qualify to be considered as a commercial activity unless perhaps an organization pays for commercial advertising or promotion, and even then there are questions related to the purpose of such. Title 26 of the Code of Federal Regulations § 1.892-4T(c)(3) "**Non-profit activities.** Activities that are not customarily attributable to or carried on by private enterprise for profit <u>are not</u> commercial activities." The *Law Insider Dictionary* states that "Commercial activities do not include private, community service, state sponsored, or free speech activities." "Where the pure speech and commercial speech by the nonprofits during these activities is inextricably intertwined, the entirety must be classified as noncommercial and we must apply the test for fully protected speech." *Gaudiya Vaishnava Society v. City and County of San Francisco*, 952 F.2d 1059, 1064 (9th Cir. 1990). "Disclosures about a non-profit organization's financial motivations are considered fully protected, noncommercial speech." *Riley*, 487 U.S. 781. This is because a non-profit organization's solicitation for donations often is "intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues," and secondly, because without such solicitation, "the flow of such information and advocacy would likely cease." *Schaumburg*, 444 U.S. at 632. In short, a non-profit organization cannot solicit donations without also advocating for its mission; and conversely, a non-profit organization cannot advocate for its mission unless it can solicit donations to support its advocacy.

Fair use factors disfavor commercial uses and give preference to nonprofit ones. The first fair use factor explicitly considers commerciality, instructing courts to consider "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S. Code § 107. [1]  Websites (domains) are legally considered vehicles for the delivery of information for

---

[1] 17 U.S. Code § 107 provides: In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

13

commercial or non-commercial purposes, likewise are creative works that are subject to copyright and are registrable with an International Standard Serial Number (ISSN).

In addition to the fair use defense, a number of other sections of the Copyright Act consider whether works are commercial. These include a variety of exemptions and limitations that favor nonprofit educational institutions, public broadcasters, libraries and archives, and others when the uses are not for a "commercial advantage" or when they are conducted by noncommercial entities. 17 U.S.C. §§ 108, 109(b), 110–12, 114, 118. Recent federal regulations that provide exceptions to the Digital Millennium Copyright Act's anticircumvention provisions (that bar evasion of technological protection measures) also favor uses deemed noncommercial. 17 U.S.C. § 1201.

The Plaintiff must be limited, restrained and/or tempered as a well-known trademark bully so they do not continue to cause harm to themselves, the Defendant, the Commonwealth of Kentucky, American history, individual groups of Kentucky colonels or other commercial enterprises with their abusive and overreaching behavior. The law firm that represents the Plaintiff has engaged our organization three or four times over the past 20 years and has been engaged on at least three other occasions judicially to stop others from using the term "Kentucky Colonels" or "Kentucky Colonel" for totally unrelated products such as beer. Only the law firm knows how many cease-and-desist attempts have been made on the behalf of the Plaintiff. The firm has demonstrated a high-rate of success in their legal pursuits for the Plaintiff without admitting any of the historical facts that the Defendant has diligently researched and cataloged to include in a new website "Commonwealth Colonels".

To have standing to sue, a plaintiff  "must have suffered an injury in fact — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"— that is fairly traceable to the challenged conduct. *Lujan*, 504 U.S. at 560 (internal citations, quotation marks, and footnote omitted). These factors have not been demonstrated or fully manifested in this *sophisticated* attempt against the defendant, however the defendant can clearly show the damages and continuing damages being caused by the plaintiff's actions.

Trademark bullies are over-zealous corporations and their IP attorneys who are policing their trademarks and copyrights but seeking to demonize companies that are legitimately running their business and validly using their trade names, domain names, copyrights and in trademark circumstances may have even been the first to use the name in commerce (which provides "common law" rights in the mark and the right to continue to use the mark at issue) who may unknowingly hold these rights both commercially and non-commercially as a matter of law.

Plaintiff cannot state a *prima facie* case of federal trademark infringement because the Defendant has no registered trademarks on which he relies nor has he used the Plaintiff's mark as a trademark for his services. Instead they have placed their entire organization at risk and subject to an investigation by the Internal Revenue Service, Federal Trade Commission as well as academics who are more than upset for their distortive malay on history and the invalidation of published works by promoting a myth and passing it off as fact using their entrusted position and goodwill to create propaganda. A great storm cloud may follow the Plaintiff for many years to come.

## A. PLAINTIFF HAS CREATED LEGAL FICTION TO BIAS THE COURT

Legal fiction is an assumption and acceptance of something as fact by a court, although it may not be, so as to allow a rule to operate or be applied in a manner that differs from its original purpose while leaving the letter of the law unchanged. Legal fiction is created typically to achieve such varied aims as convenience, consistency, equity, or justice. If legal fiction is understood by the court it can bias the case against a defendant or a plaintiff unbalancing the scales of justice. "Constructive" is a sure tipoff that we are dealing with legal fiction. "Constructive" intent is not real intent any more than "constructive" notice is real notice (just as "quasi-contract" is a fiction denoting the nonexistence of a real contract).

Trademark law may create as much confusion in the courts as it eliminates in the marketplace. "Its hallmarks are doctrinal confusion, conflicting results, and judicial prolixity." *HHM Publishing Co. v. Brincat*, 504 F.2d 713, 716 (9th Cir.1974). "In this subtle area of the law, generalizations are especially dangerous. Nonetheless, as principles emerge from the decided cases, such generalizations are made. The

*ratio decidendi* of numerous courts in uncounted cases are transformed into a verbal formula--"generalized into fiction"--which itself becomes the focal point of judicial attention." *Walt-West Enterprises, Inc. v. Gannett Company, Inc.*, 695 F.2d 1050 (7th Cir. 1982).

While broad, the trial court's discretion is not unlimited. The judge must consider the proper mix of factors and juxtapose them reasonably. "Abuse occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them." *Independent Oil and Chemical Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co.*, 864 F.2d 927, 929 (1st Cir. 1988).

### B.  TRADEMARKS WERE APPLIED FOR FRAUDULENTLY

Fraud can be perpetrated in many ways, it is often difficult to detect unless you are the victim. Most frequently when it does occur with the assistance of legal counsel experienced in the art of sophistry, it is accomplished through creating a *sophisticated* smokescreen like a divergence, deception, distorting reality, providing false information, with elusiveness, misleading defaults, paltering or the strategic omission of essential factual information.

The Second Circuit has repeatedly held that fraud can be committed by omission, not just misrepresentation. *Crigger v. Fahnestock and Co., Inc.*, 443 F.3d 230, 234 (2d Cir.2006) (common law fraud). An omission is typically found to confer liability only where it is necessary to clarify an ambiguous or partial statement, or it causes another party to act on the basis of mistaken knowledge. *Banque Arabe v. Maryland National Bank*, 57 F.3d 146, 155 (2d Cir.1995). In the blank spaces of the trademark applications the Plaintiff owed a duty of uncompromising candor and good faith in dealing with the Patent and Trademark Office because the application is taken under oath, is being submitted to the Federal Government, may affect the rights of others and is all pertinent material to the decisions made by trademark examiners. "Fraud in the procurement of a trademark registration may be raised in a number of procedural contexts [such as]: ... a ground for cancellation in civil litigation; ... the basis for a defense of unclean hands; ... the basis of a civil action for damages for false or fraudulent registration...." *2 J. Thomas*

*McCarthy*, § 31:21, at 406-07. If you wanted to trademark "supercalifragilisticexpialidocious" one would need to disclaim its use in Disney's Mary Poppins in 1964 and Helen Herman in 1931, it would also be necessary to investigate all of its uses and users in each state, especially neighboring states. By just filing it without disclaiming other known uses or users the trademark examiner could make a mistake based on the information that was not provided by the Applicant.

In order to prevail on a fraud claim the proponent must demonstrate: (1) a false representation regarding a material fact; (2) knowledge or belief that the representation is false ('scienter'); (3) an intention to induce the listener to act or refrain from acting in reliance on the misrepresentation; (4) reasonable reliance on the misrepresentation; or (5) damage proximately resulting from such reliance." *Robert B. Vance & Assocs., Inc. v. Baronet Corp.*, 487 F. Supp. 800 (N.D.Ga.1979), citing, *Prosser, Law of Torts* § 105 (4th ed. 1971). Consequently, the defendant bears the onus of establishing "that at the time of the [applications] for registration, ... [plaintiff] knew that others had the right to use and were using the [term `Kentucky Colonels' as part of a trade name]." *Bart Schwartz International Textiles, Ltd. v. F. T. C.*, 48 Cust. & Pat.App. 933, 289 F.2d 665, 669 (1961).

The requisite fraud on the court occurs where "it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier of fact or unfairly hampering the presentation of the opposing party's claim or defense." *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989). . . . The trial court has the inherent authority, within the exercise of sound judicial discretion, to dismiss an action when a plaintiff has perpetrated a fraud on the court. *Kornblum v. Schneider*, 609 So. 2d 138, 139 (Fla. 4th DCA 1992). Using a new trademark application to instantly bring a federal lawsuit constitutes [ _____ ] on this Court or on the USPTO.

On February 17, 2020, (less than 72 hours prior to filing this lawsuit) Plaintiff filed three applications with the USPTO pursuant to sections 1, 2, 8 and 15 of the Lanham Act, 15 U.S. Code §§ 1051, 1052, 1058, 1065, claiming that the KENTUCKY COLONELS mark(s) have been in continuous use for five years prior to the applications for three different services provided by the Honorable Order of

Kentucky Colonels based on their legally "non-commercial activities" for members. None of the three applications admit that any other persons, companies or organizations are legally entitled to use [the term] or [the mark] or that any others were using it at the time of the application. Recently the Plaintiff also claimed *acquired distinctiveness* on all three applications, but only submitted contemporary (recent) evidence of prior use. The applications were unlike (conflictive) their 1981 and 2016 applications for the mark HONORABLE ORDER OF KENTUCKY COLONELS which claim their first date of use and in commerce May 10, 1957 when they incorporated their organization, in fact the Plaintiff extended the dates on the new applications inconsistent with the 1981 and 2015 applications claiming *first-use* as a trademark in 1931 and the *in commerce* date of 1951 on two of them and 1995 on the third. These applications also use the *unlicensed and unregistered* AKA, "KENTUCKY COLONELS" presumptively as a trade name for "The Honorable Order of Kentucky Colonels, Inc." All three applications were averred under oath and submitted by **Michelle Browning Coughlin** of the Wyatt Firm, an attorney for Plaintiff in this case who stated "To the best of the signatory's knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive." The concurrent users space was left blank. The attorney for the Plaintiff also indicated, "To the best of the signatory's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the allegations and other factual contentions made above have evidentiary support." and "The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements and the like may jeopardize the validity of the application or submission or any registration resulting therefrom, declares that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true." **[DE 1-2 Pages 10-30, PageID# 35-55]**

Registration of (at least) three trademarks were fraudulent because the Plaintiff had intimate knowledge of, recognized and corresponded with other businesses and organizations (including the Defendant) that legally use the "idea" and "term" KENTUCKY COLONEL or KENTUCKY COLONELS

as a part of their name to identify themselves and make their organizations connect with the ideas of the most historical and current local public figures who were or are KENTUCKY COLONELS (persons) both generically and descriptively, in different regions of the world or those that represent the goodwill of the Commonwealth and the honor associated with the "title" notwithstanding the Plaintiff's organization. These organizations are not licensed, endorsed or recognized by the Plaintiff; most <u>do post disclaimers of non affiliation</u> and many of them encourage support of the Plaintiff's objectives as did the Defendant until the lawsuit when we became more critical of the Plaintiff, as a competitor that *was* also a potential ever-constant ally to be respected. The Plaintiff is and has always been aware and knowledgeable of the existence of numerous other entities in other American states, in Kentucky and around the world (which is admitted in their newsletters) in other countries that use as part of their trade name (organization name) the generic and highly descriptive term "KENTUCKY COLONELS" and use it as part of their name to identify and describe themselves and their activities in common American English descriptively based on who, what, why or where they are. **See (Lists of Organizations) on Google Sites Public URL** [sites.google.com/colonels.net/kentucky/resources] Part of Exhibit 1, similarly submitted by the Plaintiff in **[DE 7-3 Pages 49, 50 PageID# 272 & 273].**

Indeed, "[f]raud in trademark cancellation ... must be proved to the hilt with little or no room for speculation or surmise, [but allow] considerable room for honest mistake, inadvertence, erroneous conception of rights, and negligent omission...." *Yocum v. Covington*, 216 U.S.P.Q. at 216. In this case the trademarks which were not potentially confusing according to their averrers, were filed specifically to bring a lawsuit less than 72 hours later alleging confusion, there is no doubt that the actions of the Defendant legalizing his corporate defendants on January 30, 2020 and disambiguating other organizations including the Plaintiff between February 07 to February 10, 2020 in a blog posts exercising their rights brought the current lawsuit. Following a meeting with the Plaintiff constructive legal actions began that ignored our rights of existence previously acknowledged in their averred trademark applications and then acknowledged our rights well enough to file a lawsuit that took at least a week to ten days to prepare with evidence that they knew of many organizations that should have been included on

their own application to the USPTO. If this is not fraudulent, it is certainly illegal, because the trademark examiner would have made a more qualified decision based on a deeper investigation like that which generally must be done by trademark practitioners.

The following statements of fact by the Defendant are actionable by this Court under statutory law and form the basis for declaratory judgement.

1) The willful and deliberate act of omitting information the Plaintiff had intimate knowledge of as requested on a Federal Trademark Registration Application(s) 88800020, 88800035, and 88800038 was within their realm of knowledge, its omission is fraud, even if by mistake by a qualified trademark practitioner, are unmistakable grounds for trademark cancellation. **[Supra PageID# 35-55]**

2) The willful and deliberate act of misdating *first-use* and *in-commerce* information the Plaintiff had intimate knowledge of as requested, submitted or not submitted about competitors on a Federal Trademark Registration Application(s) 88800020, 88800035, and 88800038 was within their realm of knowledge, its amplitude and extension to include earlier dates than actual ones is conspiracy to commit fraud or of a fraudulent nature, even if by mistake, are sustainable grounds for trademark cancellation and demonstrates a blatant attempt to usurp the rights of others. The Plaintiff was not known as "Kentucky Colonels" *in-commerce* in 1995 as stated in USPTO Application 88800035.

3) The second specimen submitted by the Plaintiff on USPTO Application 88800035 from 1995 (newspaper article) does not show the use of the term KENTUCKY COLONELS as a "trademark", this is clear from reading the page, was not paid for by the Plaintiff as advertising, and does not imply common law rights to make claim for the term's use in commerce. All materials developed by the Plaintiff up to and well-beyond 2016 of the charitable organizational aspect of the Plaintiff have been focused on the use of HONORABLE ORDER OF KENTUCKY COLONELS as their trademark and legal business name.

4) These marks makes the use of their identical, products "Marks" KENTUCKY COLONELS for cigars, ball caps, chocolate and salsa confusing and ambiguous with proprietary "Service Marks" KENTUCKY COLONELS for their commercial "non-commercial use" to organize events,

fundraising and membership organizations as the HONORABLE ORDER OF KENTUCKY COLONELS, using KENTUCKY COLONELS as a specious unregistered trade name, copyright name, a keyword, a website description, a Twitter name, website title, page name, etc. confusing with the state as well that has always and previously used the title "Kentucky Colonels" for their pages online and others that have used the term as part of their name.

5) The only mark claimed, owned or used by the Plaintiff at the time Defendant first published [colonel.org] under the title "Kentucky Colonels", was its full-name which was claimed as trademarked HONORABLE ORDER OF KENTUCKY COLONELS, under Registration No. 1227024 for "eleemosynary services-namely, founding of scholarship, equipping playgrounds and the like and to collect historical and cultural material pertaining to Commonwealth of Kentucky on March 01, 1981 claiming first-use and in-commerce as May 10, 1957.; and, trademarked their full trade name again on July 12, 2015 under Registration No. 4939909 for charitable services, namely, providing financial assistance for programs and services of others; providing educational scholarships claims first-use and in-commerce as of May 10, 1957.

6) Only now since the Defendant decided to implement plans and follow through with his legal and disclosed plans to build his organization, KENTUCKY COLONELS INTERNATIONAL, the Plaintiff on February 17, 2020 made three fraudulent filings for the descriptive and distinctive KENTUCKY COLONELS as a trademark for services provided by Kentucky colonels with the USPTO Serial No. 88800020 using the dates of first-use 1931, in commerce 1951; USPTO Serial No. 88800035 using the dates of first-use 1931, in commerce 1995; and USPTO Serial No. 88800038 using the dates of first-use 1931, in commerce 1951. These dates are inconsistent with Plaintiff's previous filings and are not consistent with any fact nor have appropriate exhibits or specimens been submitted to the USPTO that give validity to the use of these service mark claims on the dates specified. These dates were selected to usurp the rights of other Kentucky colonels, these marks are claimed for similar purposes as the full name trademarks.

Case 3:20-cv-00132-RGJ   Document 82-1   Filed 12/16/20   Page 22 of 40 PageID #: 1867

7) The Plaintiff owns three other trademarks that are claimed as suggestive and arbitrary trademarks KENTUCKY COLONELS (products) under USPTO Registration No. 76499062 using the dates of first-use an in commerce October 21, 2002; under USPTO Registration No. 4596450 using the dates of first-use and in commerce November 20, 2002; and under USPTO Registration No. 76499062 using the dates of first-use and in commerce December 12, 2017. These verifiers of these marks refused to claim, admit or acknowledge and omitted under oath that any other concurrent use of the mark by other parties that used the mark at these times were within the Applicant's scope of knowledge or existed, despite filing a lawsuit in this court in 2004 against a registered mark holder Building Champions.

8) The Defendant has never used the term "KENTUCKY COLONELS" without the adjective (purpose) INTERNATIONAL or as a commercial trademark, mostly because we know that the term can only serve as a descriptive merged term that illustrates the idea of a Kentucky Colonel.

9)  From 2017 to 2020 the Plaintiff has been pushing a land grab to take intellectual property rights over others to exclusively use the term "KENTUCKY COLONELS" as a trademark, trade name, d.b.a., a website, a store, and a fictitious/specious copyright claim interferes with other peoples rights under the United States Constitution. The Plaintiff does not hold a copyright on their website as Kentucky Colonels. The Plaintiff does not have a legal registration filed in Frankfort for the assumed name (trade name or dba) "KENTUCKY COLONELS".

Section 43(a) of the Lanham Act provides in relevant part:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. ¶

The likelihood of confusion quickly and naturally enters the equation because the two common words "Kentucky" and "Colonel" which on their own are *extremely* generic and descriptive. The strategy

of the Plaintiff is to deeply ambiguate themselves with the term and dominate the confusion, instead of distinguishing themselves based on their actual trade name.

When searching Google for ["Kentucky" OR "colonel"] 479 million results are produced, searching ["Kentucky" AND "colonel"] 11.7 million results are produced, a more specific search of the generic merged terms together ["Kentucky colonel" OR "Kentucky colonels"] produces 1.06 million results, a more explicit search of ["Kentucky Colonels"] produces 806,000 results. Deeper general searching reveals that approximately 700 of 806,000 or **0.09% (less than 1/10 of 1%) of these results are directly associated with or referential** to the Plaintiff's website [kycolonels.org] and just 98 results (0.012%) are directly associated with the Plaintiff's actual name [Honorable Order of Kentucky Colonels]. There are many other search engine results that illustrate the genericness and descriptiveness including many that do not appear in Google's general search results such as archived records from newspapers, books, magazines, university libraries, governments and other public or private online collections behind registered user-walls that can only be accessed or enumerated using explicit advanced search techniques on Google or visiting the sites individually.

### C.  TERM AS TRADEMARK IS GENERIC & HIGHLY DESCRIPTIVE

Any trademark that is generic or highly descriptive adopted from the public domain is likely to cause confusion, in many cases a trademark applicant can register a term that is descriptive if it is being applied for to use arbitrarily, suggestively, creatively or in another way that makes it inherently descriptive. In some cases a descriptive term can acquire distinctiveness and can be registrable but is not protectable when used in its generic or descriptive sense. Trademark examiners generally review substantive matters such as making sure the applicant's mark is not merely descriptive or likely to cause confusion with a pre-existing, applied-for or registered mark based on the information that is submitted and generally known. Terms, which are not protectable by themselves, such as a generic term or a merely descriptive term that has not acquired a secondary meaning, may become registrable when a Generic Top-Level Domain Name is appended to it. Acquired distinctiveness refers to a trademark's "secondary

meaning", logic has it that it does not supplant or expropriate a term's "primary meaning" or have the "same meaning".

Trademark law does not entitle any party to a monopoly, nor does it permit a trademark holder to interfere with a person's Constitutional Rights to use terms that are clearly nonproprietary, generic or merely descriptive to prevent competition. See *Blinded Veterans Association v. Blinded American Veterans Foundation*, 872 F.2d 1035 (D.C. Cir. 1989). There is **no legitimate protection** that can be afforded to a trademark holder regarding such terms. It is well-established in U.S. law that, "[b]ecause a generic term denotes the thing itself, it cannot be appropriated by one party from the public domain; it therefore is not afforded trademark protection even if it becomes associated with only one source." (*Id.*) An owner of a descriptive mark that has been claimed to have a secondary meaning under Section 2(f), U.S. Code § 1052(f) because it has acquired distinctiveness may not apply the mark to represent its primary meaning or definition or it would fail to function as a trademark.

A list of adjudicative facts based on Exhibit 1 are stated in **[Exhibit 2 - Statement of Facts Under Oath in Support of Declaratory Judgement]** to support that the term KENTUCKY COLONELS is a defined generic and highly descriptive merged idea taken from the public domain including American literature, newspapers, magazines, Kentucky history and encyclopedias.

## LEGAL AUTHORITIES

Notwithstanding the Motion for Declaratory Judgement it can be equitably adjudicated in the Defendant's favor under any precedential court opinions prohibiting the Plaintiff's success on the facts presented based on U.S. Supreme Court and U.S. Circuit Court decisions in similar cases.

1. *Lawrence Mfg. Co. v. Tennessee Mfg. Co.*, 138 U.S. 537
2. *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189
3. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763
4. *OBX-Stock, Inc. v. Bicast, Inc.*, 558 F.3d 334, 339–40 (4th Cir. 2009)
5. *Booking.com B v. v. US Patent & Trademark*, 17-2458 (4th Cir. 2019)
6. *General Mills, Inc. v. Kellogg Company*, 824 F.2d 622 (8th Cir. 1987)

## D. USE OF GENERIC OR DESCRIPTIVE TERM DOES NOT MAKE INFRINGEMENT

In order to infringe a mark owner's rights, the defendant must have (1) used a mark as a trademark (2) in a manner that causes a likelihood of consumer confusion about the source, sponsorship, or affiliation of the parties' goods or services. "The trademark use requirement prevents trademark owners from exercising trademark rights to interfere with First Amendment-protected speech by confining the infringement cause of action to commercial transactions." *S.F. Arts & Athletics v. U.S. Olympic Comm.*, 483 U.S. 522, 566 (1987) (Brennan, J., dissenting) ("A key Lanham Act requirement that limits the impact of trademarks on noncommercial speech is the rule that a trademark violation occurs only when an offending trademark is applied to commercial goods and services."); *Pierre N. Leval, Trademark: Champion of Free Speech*, 27 COLUM. J.L. & ARTS 187, 195 (2004) (explaining that First Amendment protections are built into Lanham Act, in part, through trademark use requirement).

Lanham Act section 45, 15 U.S. Code § 1127 further provides that a mark will be deemed to be in "use in commerce": (1) on goods when — (A) it is placed in any manner on the goods or their containers, or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and (B) the goods are sold or transported in commerce, and (2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce.

These provisions clearly contemplate two separate conditions to infringement liability. First, the defendant must closely associate the allegedly infringing mark (not the mere use of words) with a product or service that it is offering for sale. Second, the defendant's actions must be "in commerce," thus bringing them within Congress's jurisdiction under the Commerce Clause.

Section 45 does not expressly provide that a mark is used in commerce in connection with goods when it is displayed in advertising. It expressly provides that service marks are used in commerce when displayed in advertising, but not trademarks. This limitation seems inconsistent with the language of Lanham Act section 32, 15 U.S. Code 1114 which specifically provides for infringement liability when a trademark is "used in commerce" "in connection with the sale, offering for sale, distribution or advertising of any goods or services."

25

A court cannot deem an unauthorized use of the plaintiff's mark to be an infringing use if it clearly serves only to criticize, identify or parody the plaintiff, *New Kids on the Block v. News America Publ'g, Inc.*, 971 F.2d 302, 306-08 (9th Cir. 1992); *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26, 32-33 (1st Cir. 1987) to express political views, *Lucasfilm Ltd. v. High Frontier*, 622 F. Supp. 931, 934-36 (D.D.C. 1985) to strictly describe aspects of the defendant's product or service, *Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 128-30 (1947); *Smith v. Chanel, Inc.*, 402 F.2d 562, 563-65 (9th Cir. 1968); *U.S. Shoe Corp. v. Brown Group, Inc.*, 740 F. Supp. 196, 198-200 (S.D.N.Y. 1990), aff'd, 923 F.2d 844 (2d. Cir. 1990) or, in the case of domain names, to indicate an address on the Internet *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 408-09 (2d Cir. 2005); *Bird v. Parsons*, 289 F.3d 865, 878 (2d Cir. 2002); *Acad. of Motion Picture Arts & Scis. v. Network Solutions, Inc.*, 989 F. Supp. 1276, 1280 (C.D. Cal. 1997); *Lockheed Martin Corp. v. Network Solutions, Inc.*, 985 F. Supp. 949, 956 (C.D. Cal. 1997), aff'd, 194 F.3d 980 (9th Cir. 1999).

The "Trademark Use" requirement prevents recognition of rights in gross. A mark is a word, name, symbol, or device that a business uses to identify its goods or services and to distinguish those goods or services from those offered by others. 15 U.S.C. § 1127 (2000); RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 9 (1995). The legal significance of the mark lies in its relationship to the product or service it identifies. The law undertakes to protect the effectiveness of the mark's ability to inform consumers that the product it identifies comes from a particular source. <u>The mark has no legal meaning or existence independent of its role in identifying the product or service with which its owner uses it</u>. *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97 (1918); *American Foods, Inc. v. Golden Flake, Inc.*, 312 F.2d 619, 625 (5th Cir. 1963); MCCARTHY, § 2:15; *Jessica Litman, Breakfast with Batman: The Public Interest in the Advertising Age,* 108 YALE L.J. Thus, the courts have made it clear that there are no **"rights in gross" or "rights at large" in the word, name, symbol, or device that constitutes a mark**. The scope of trademark rights is meant to be much narrower than the scope of a copyright or patent. Only a defendant's actions that interfere with consumers' ability to rely on the plaintiff's mark for information about product source are actionable.

Drawing on the available statutes and case law, "use," for purposes of federal trademark infringement or dilution liability, entails application of the mark in a manner that invites consumers to associate the mark with the goods or services the user is offering for sale or distribution. A defendant must directly present consumers with the allegedly infringing mark in a way that allows consumers to rely on the mark to identify goods or services being offered by the defendant and to distinguish them from the goods or services of others. The use must be a trademark use — a use that permits consumers to identify the source of the user's goods or services engaged in commerce — a predatory intent on the part of the user is not sufficient in itself to constitute an infringing use.

Using a mark in a domain name to identify a working website can constitute the requisite trademark use for purposes of the Lanham Act's infringement, unfair competition, and dilution causes of action. If the defendant domain name user offers goods or services over the website, the inclusion of the allegedly infringing or diluting mark in the domain name may invite consumers to associate the mark with those goods or services and to rely on it for information about their source, sponsorship, or affiliation.

When a defendant uses a plaintiff's mark in a domain name to identify a website that neither sells nor advertises goods or services, this will not mislead consumers about the source of goods or services, nor will it associate the mark with others' goods or services in a manner that will dilute the public's association of the mark with the plaintiff. See *DaimlerChrysler AG v. Bloom*, 315 F.3d 932, 938-39 (8th Cir. 2003) (finding no infringement or section 43(a) violation when defendant operates telephone numbers corresponding to letters in plaintiff's mark, which consumers mistakenly dial in search for plaintiff, when defendant does not sell goods or services to consumers who mistakenly call). As Professor McCarthy has noted: "[D]ilution by blurring is triggered by presenting consumers with two commercial sources under the same mark, not by foreclosing the senior user from a particular venue or medium for advertising its mark. **A nontrademark use of a famous mark does not dilute.**" MCCARTHY, § 25:77, at 25-257 n.13.

"The defendant's reference to the plaintiff's mark in the course of criticizing the plaintiff or its product or service, or making a joke at the plaintiff's expense, may have a negative impact on the plaintiff's business goodwill. However, the trademark laws were never intended to redress all injuries to a

plaintiff's business goodwill or all free riding that might arise through a defendant's unauthorized reproduction of a plaintiff's mark." *1-800 Contacts, Inc. v. WhenU.Com., Inc.*, 414 F.3d 400, 410-11 (2d Cir. 2005) (citing cases and authorities for proposition that free riding in itself is not actionable absent trademark use) "Noncommercial parodies and <u>unfavorable references to the plaintiff through use of its mark may attract greater public notice of the defendant's message, allow the defendant to benefit from public recognition of the plaintiff's mark, and cause the plaintiff commercial injury, but they are not actionable</u>." *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26 (1st Cir. 1987). A consumer's reference to the plaintiff's mark in telling friends that the plaintiff's product is "lousy" may cause the plaintiff to lose sales, for that matter. That doesn't make it trademark infringement or dilution. See Leslie C. Rochat, *I See What You Are Saying*: *Trademarked Terms and Symbols as Protected Consumer Commentary in Consumer Opinion Websites*, 24 SEATTLE U. L. REV. 187, at 626 (2000) ("Judges must remember that consumer opinions are not actionable under the trademark laws, regardless of their form or pervasiveness."). The act of registration is not trademark use, the act of establishing a website under the domain that does not sell, distribute, or advertise goods or services should not be either. *Lockheed Martin Corp. v. Network Solutions, Inc.*, 985 F. Supp. 949, 959-60 (C.D. Cal. 1997) ("The non-commercial use of a domain name that impedes a trademark owner's use of that domain name does not constitute dilution.").

### E.  COLONELS AND GOVERNORS HAVE BEEN DUPED WITH PSEUDOHISTORY

The historical ideas and conclusions which the Defendant has published at "Commonwealth Colonels" which the Plaintiff has clearly targeted in their recent **Motion to Show Cause [DN 78]** and **Reply [DN 81] to Defendant's Response [DN 79]** and **Declaration Under Oath [DN 80]**, is an attempt to suppress the Defendant's Constitutional Rights and prejudice the Court against the Defendant in bad-faith to disgrace him and subdue public knowledge about Kentucky colonels. The Commonwealth Colonels website on Kentucky colonelcy is based on facts collected from over 500 "judicially noticeable" resources from the U.S. Library of Congress and other open source websites such as the Internet Archive and Newspaper Archive **[Supra Exhibit 1]**.

The Plaintiff's organization uses an inaccurate set of facts, most of which cannot be verified in American literature or history. The Defendant using highly qualified referential research and accurate citations from American history texts and newspapers has pieced together an account about "Kentucky Colonels" and everyone's rights (especially Kentucky colonels') to use the term which forms the basis of his published online copyright. The Defendant's research debunks and unmasks the Plaintiff's proposed mythical pseudohistory which, because it was passed off as truth, has caused great confusion and errors printed by hundreds of newspapers and at least several reference works since they emerged in 1933, even the Commonwealth of Kentucky uses an inaccurate pseudohistory passed off by the Plaintiff. **[Exhibit 5]**

The Plaintiff created a mythical tale based on events that never occurred in 1813 and unrecognized false claims made since at least 1941 which continue today that have been mistaken as the actual history of Kentucky. Since 1931 or more properly 1933, 1934, 1936, 1939, **1941** or 1957 the Plaintiff's account of pseudohistory crediting Col. Charles S. Todd becoming the first Kentucky Colonel in 1813 has been represented as fact. **[Supra Exhibit 1 'Website: Myth of the Kentucky Colonel']**. Despite this, the Plaintiff's false account starting in 1941 or earlier: has been understood by some historians; as well as by many, or perhaps most newspaper editors, governors, heads of state, county judges, authors, celebrities; and almost all Kentucky colonels that have ever been commissioned since 1941; *but not all of them!*

## F.  PLAINTIFF USES DECEPTION AS BUSINESS STRATEGY

The Plaintiff has based their success on refusing to acknowledge or recognize other organizations that came before it, or that came into existence after them. By calling themselves a "Headquarters" for "all Kentucky colonels" most people have come to assume that they are some "authority" despite being based on a "pseudohistory" with no reality, a hoax.

The Plaintiff also creates a false illusion of authority through the use of "Generals" on their board of directors. Hal N. Sullivan serves as the Commanding General, Gary Boschert is the Adjutant General, and there are about ten lesser generals; however none really hold the rank of "general" nor were they

appointed by the Governor, their presence in the organization creates a false image of senior authority over "Kentucky colonels" that the organization depends on to fund their operation.

To strengthen the ideal of an order since 1957/1992 the Articles of Incorporation provide for the sitting governor to serve as their Commander-in-Chief, however this position does not provide for any direct involvement, leadership, decision making or actual authority within the non-profit organizational structure and is strictly honorary to form a basis of traditionality. The idea (Plaintiff's Patent) creates the simulation of a symbolic mythical militia headed by fake generals to impose authority and order over their voluntary subject donors which is reinforced by their propaganda and membership cards signed by the generals. Unlike traditional membership organizations, the Plaintiff does not allow members to vote, does not hold a general assembly, members are not engaged democratically to select board members and do not participate in the operational activities. **[See Plaintiff's Articles DN 52-2-8]** The Articles state; "The Honorable Order of Kentucky Colonels has no members."

Most of this is all fine, except when it is passed off as truth to generate pecuniary gain and confuse others through a subjective deception using pseudohistory to psychologically develop deference and control over others. Many or most colonels and even governors since 1941 have come to actually believe the first commission was awarded to Charles S. Todd in 1813 and the misconstrued account that excludes the real Kentucky colonels. Their donors (members) or more appropriately [the public] are confused into believing they are actual members and to show off their solidarity and pride with the falsified idea starting in 1813, they become consumers of products trademarked as KENTUCKY COLONELS through the third-party licensee UPPER RIGHT MARKETING LLC under the presumed unregistered name KENTUCKY COLONELS STORE, a for-profit enterprise assumed to benefit the charitable activities of the Plaintiff, but in actuality is a separate operation.

The Plaintiff's official beginning relies on the legal credencial authority of two historic governors, the Honorable Flem Sampson and the Honorable Ruby Laffoon, but neither of the governors' ideas were ever fully implemented which is understood by 1941 with their own generals making statements like "The only purpose of this organization is to have a party on Derby eve," and other statements in 1947 like "No

Kentucky colonel, in our time, takes his title seriously". **[Supra Exhibit 1 'Website: Myth of the Kentucky Colonel']**

## G. KENTUCKY COLONELS HAVE BEEN HARMED BY PLAINTIFF

Since the Plaintiff introduced their fictitious narrative in 1941 they have passed much of it off as fact to all subsequent Kentucky colonels who have for the most part believed in the account of Isaac Shelby, Charles S. Todd, 1813 and Todd served under Isaac Shelby during the War of 1812. None of their accounts can be confirmed as factual using resources printed prior to the emergence of the Plaintiff. The motives of the Plaintiff at that time in 1941 or shortly before this date are purely speculative and are not subject to further inquiry, it is most probable that it was either based on poor research, to create credibility or to build a false legacy for Isaac Shelby or Charles Todd. Whatever the actual reason is, it may always be a mystery, but there were plenty of resources in print for them at public, private and university libraries at the time that offer other origins to Kentucky colonelcy.

In 1947, Marion Porter of the Honorable Order of Kentucky Colonels published pages from their scrapbook in the book *Howdy Colonel* where they show a photo of a Union Army (U. S  Army Colonel) in full uniform leading others to believe it was a Kentucky Colonel uniform, this photo has led other Kentucky colonels to create a uniform around 2010 and call it a Kentucky Colonel uniform mistakenly based on the deception or lack of knowledge, displayed here [www.kycolonels.org/history] **[Exhibit 3 - HOKC History]**. While the photo found in an old book in the public domain shows the actual Kentucky colonel uniform used during the late 1800's until 1920 by real Kentucky Colonels, shown with Governor W.O. Bradley at [commonwealth.colonels.net/history] **[Supra Exhibit 1 - Website History]**.

The Plaintiff first claims from 1941, as referred to in their 1947 book *Howdy Colonel* (a scrapbook), and according to their most recent position as of December 2020 that in essence "Governor Isaac Shelby on his second term commissioned Charles S. Todd his aide-de-camp with the rank of colonel in 1813," this is simply not a true account. **The *fact* is Charles S. Todd** from Danville, Kentucky was in the U.S. Army under General William Harrison as his aide-de-camp from 1812 until he retired, Todd was

transferred in the Fall of 1814 to General Duncan McArthur and acted as his adjunct-general, who then promoted him to Inspector General of the Michigan Territory in March of 1815 with the rank of "colonel". Shortly thereafter Todd returned to Kentucky in early 1815, by June he became involved in the Freemasons in Frankfort giving a speech in June 1815, in the Spring of 1816 he opened a law office, met and soon married Gov. Isaac Shelby's daughter, he became Secretary of State in 1816, and was elected to the Legislature in 1817, and soon thereafter in 1820 he became Minister to Colombia and Venezuela, South America and later a foreign diplomat to Russia for the U.S., this according to the ***Memoir of Col. Chas. S. Todd,*** published in 1873. Isaac Shelby did not even know or meet Col. Charles S. Todd until 1816 when Todd wrote a letter to Shelby indicating he was interested in his daughter.

The 'First Kentucky Colonel Story' offered by the Plaintiff has caused several historians and thousands of others to believe a totally fictional pseudohistory contradicting several 19th-century encyclopedias. Any type of fraud perpetrated on the Court, the Federal government, the state or on the public in a case is adequate grounds for dismissal, reimbursement of legal costs and payment of damages. In Court, fraud can be anything that has been passed off as truth for some positional advantage or gain over another party.

## H. COMMON LAW USAGE OF TERM ESTABLISHED BY DEFENDANT IN 1998

Unlike other jurisdictions, mere use of an unregistered common law mark in the United States gives the user territorial priority trademark rights even without requiring a certain level of notoriety. Such earlier use establishes a right of priority even over a later-filed U.S. application to register a similar mark if the first use of the mark of the application was commenced after the prior first use of the unregistered common law mark according to the Lanham Act section 7(c), Title 15 U.S.Code § 1057(c).

In the United States, it is not registration, but actual use of a designation as a mark that creates rights and priority over others. Thus, the rule is that ownership of a mark goes to the first-to-use, not the first-to-file. Under U.S. trademark law, an Applicant that has filed an application to register their mark can assert priority against a user of an unregistered mark, so long as 1) the Applicant has actually used the mark in commerce prior to the unregistered user's use of the mark in commerce in the same geographical

territory [as a mark], or 2) the Applicant is able to successfully register their mark provided that a) the Applicant filed the application for trademark registration prior to the date of actual use of the mark in commerce by the other unregistered user, and b) the Applicant has either actually used the mark in commerce, or has shown a bonafide intention to use the mark in commerce at the time of filing the trademark application, followed by actual use within the specified amount of time.

## COMMON LAW FIRST-USE

The DEFENDANT, Col. David J. Wright was published online from 1998-2001 as "Mayalis Internet Group. All rights reserved." At **[colonel.org]** a website entitled "KENTUCKY COLONELS", subtitled "Registry and Honorarium", with the tagline **"The first international registry and the public's original website for those who have received the honorable title or the commission of a Kentucky Colonel."** was published starting before 29 Nov 1999. The web site allowed persons to mail donations for services provided by the proprietorship to Big Hill, Kentucky, the persons that registered had their names posted in the website. The proof is on a public server called Internet Archive an online server frequently used by U.S. governmental agencies, courts, officials, personnel and by members of Congress: [web.archive.org/web/20010331195318/http://colonel.org/] See **[DN 65-1]**. There is a legal disclaimer published at the bottom of the page, all persons listed there that joined us were aware that we were not the Plaintiff, most persons sent $10 or more.

Understanding that "Kentucky Colonels" is an idea, a descriptive English term and plural representation of Kentucky colonel, the Defendant does not make any claim to its use as a trademark. This, however, does not preclude him from asserting a copyright claim for the website, first-use on the Internet, first-use in commerce and the use of the term as part of his organization's trade name. Currently the Plaintiff is infringing on the Defendant's "website title and common law copyright" at kycolonels.org using "Kentucky Colonels" as their title and making a specious claim to the copyright. Defendant's original unregistered non-exclusive copyright exists in law under Title 17 U.S. Code §§ 104, 104A, 106 other sections of the Copyright Act and the Digital Millennium Copyright Act, these right extend

themselves under the Lanham Act as statutory fair-use and are potentially actionable claims by the Defendant based on damages incurred as a result of trademark bullying and this lawsuit. If the Copyright Office understands "KENTUCKY COLONELS" as a generic, descriptive term from the public domain then the USPTO and the U.S. District Court should as well.

## I.  STATUTORY FAIR USE IS A MATTER OF LAW

The Lanham Act contains a statutory fair use provision, § 33(b)(4), 15 U.S.C. § 1115(b)(4). Because of the narrow scope of the statutory provision, three additional, judge-made categories have arisen in which use of another's trademark may be considered non-infringing. These are: (1) nominative fair use; (2) comparative advertising as fair use; and (3) parody as fair use. Pursuant to § 33(b)(4) of the Lanham Act, a defense to a claim of trademark infringement exists where: the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark . . . or of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin. The statutory fair use defense prevents a trademark owner from monopolizing or appropriating a descriptive word or phrase. In a leading case on this defense, *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786 (5th Cir. 1983), the court noted that "[t]he defense is available only in actions involving descriptive terms and only when the term is used in its descriptive sense rather than its trademark sense." 698 F.2d at 791 (citing *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1185 (5th Cir. 1980)). Some courts have held that "[i]f the defendant's use of the plaintiff's trademark refers to something other than the plaintiff's product, the traditional fair use inquiry governs." *Toho Co., Ltd. v. William Morrow and Co., Inc.*, 33 F. Supp. 2d 1206 (C.D. Cal. 1998).

Fair-use defense allows others to use a mark with descriptive meaning in its ordinary descriptive sense. For example, the term KENTUCKY COLONEL describes a person that has been recognized by the Governor with the HONORABLE title, KENTUCKY COLONELS also happens to be an arbitrary and suggestive trademark owned by the Plaintiff. The descriptive fair use defense allows competitors of the

HONORABLE ORDER OF KENTUCKY COLONELS to use the phrase KENTUCKY COLONELS to describe their own activities, events and organizations <u>even when doing so creates some likelihood of confusion</u>. *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 788 (5th Cir. 1983) at 796. "The purpose is to prevent trademark owners from monopolizing descriptive terms to gain a competitive advantage."

A descriptive fair use includes three elements: the defendant must use the descriptive term (1) otherwise than as a mark (2) only to describe its own goods or services and (3) fairly and in good faith. *15 U.S.C. § 1115(b)(4)*; see, e.g., *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013). Most significantly for our purposes, the degree of likely confusion is relevant to the third element, whether the use is "objectively fair." 15 U.S.C. § 1115(b)(4) (providing a defense for "a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin"); See *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 117-18 (2004) (applying the fair use defense of § 1115(b)(4)) Also see, e.g., *KP Permanent Make-Up*, 543 U.S. at 123. It might also be necessary to inquire into consumer confusion in order to determine whether the defendant is using the term "otherwise than as a mark" for purposes of the first requirement. *Id.*  In other words, "no person shall be liable for using a term with descriptive meaning to describe that person's own goods or services regardless of whether the term is also a mark with secondary meaning and regardless of the impact on consumers."

### RELEVANT AND ADJUDICATIVE FACTS

Most of the following facts are presented to aid the court in making a determination as to the relevance of the information which has been misconstrued as a result of the Plaintiff's manipulation of history and the informality developed over the idea of KENTUCKY COLONELS and to reinforce the claims of the Defendant. All of the foregoing information presented is based on published materials or have emerged as a result of this lawsuit, many of the facts are subject to judicial notice.

1.  From at least 1941 until 2020 the Honorable Order of Kentucky Colonels has proliferated a mythical pseudo-historical account (fictional narrative) stating that Col. Charles S. Todd was commissioned as

the first KENTUCKY COLONEL by Governor Isaac Shelby as his "aide-de-camp" in 1813 which has no actual basis in documented fact. This account directly contradicts the *Memoir of Col. Chas. S. Todd*, records of the Kentucky Volunteer Army, the Kentucky militia and United States military as well as all printed literature prior to the emergence of the Plaintiff in 1933-1941. Some of the original writings of Charles Todd are located at the Filson Library in Louisville, none show that the Plaintiff's story is based on fact.

2. The honorable title, KENTUCKY COLONEL has been awarded to hundreds of highly noteworthy and respectable individuals including prominent businesspeople, politicians, celebrities, attorneys, scientists, academics, military veterans, public figures, newspaper editors and contemporary heroes since the late Nineteenth Century commissioned honorarily by the Governors of Kentucky. Collectively all of those people are KENTUCKY COLONELS that belong to the Commonwealth.

3. Since at least May 02, 1941 *all* KENTUCKY COLONELS, GOVERNORS and *most* members of the PUBLIC have relied on a fictional account of historical events (pseudohistory) promoted by the late COL. ANNA SAFRON FRIEDMAN MAYER, Secretary and Keeper of the Great Seal of The Honorable Order of Kentucky Colonels who provided the "tale" at an annual Derby eve event.

4. The Honorable Order of Kentucky Colonels was started/founded in 1933 by GOVERNOR RUBY LAFFOON who was well-known as a flamboyant, warm-hearted, and slightly eccentric governor during the depression who willfully acknowledged making over ten thousand Kentucky colonels for political gain, prosperity and to generate income for the Commonwealth during the Great Depression.

5. GOV. RUBY LAFFOON had a lot of fun with the idea of the HONORABLE ORDER, Laffoon commissioned hundreds of celebrities including Shirley Temple, Mae West, W.C Fields and Gene Autry or anyone who contributed to the state. He also commissioned many politicians, socialites, and businesspeople. He even commissioned fictitious characters like Mickey Mouse and Santa Claus which illustrates the importance of the title "to him". His most famous and well-known commission was to Harlan David Sanders who went on to start Kentucky Fried Chicken, by the 1960's Colonel Sanders became known as "The Colonel".

6. KENTUCKY COLONELS INTERNATIONAL, the Defendant's trade name (organization name) was used legally providing social media services to Kentucky colonels on Facebook for doing business as [facebook.com/kentuckycolonels] from March 06, 2009 until February 25, 2020, 11 years. It was changed to KENTUCKY COLONEL FOUNDATION at the request of PLAINTIFF to pick a *different* name, until August 13, 2020 then stopped by a Court Order **[DE 58]**. Now the Facebook 'business' page has been changed to just "KENTUCKY COLONEL" a Facebook 'community' page at [facebook.com/colonels.net] under the temporary/permanent management of the generic  "AMERICAN COLONELS NETWORK" and the unofficial, authoritative Commonwealth Colonels.

7. The PLAINTIFF knows of the DEFENDANT and his WEBSITE since at least 2001. The PLAINTIFF knew of the DEFENDANT(S) activities on FACEBOOK since at least 2009 or sooner through two Facebook Groups, one was entitled KENTUCKY COLONELS INTERNATIONAL in 2007 and another called KENTUCKY COLONELS ON FACEBOOK that were independently administered by KENTUCKY COLONELS (individual people). Both groups make a disclaimer of non-affiliation with the PLAINTIFF, "The Honorable Order of Kentucky Colonels." Some of the Plaintiff's own board members "generals" were participants.

8. The PLAINTIFF is mostly known online for the products they market through the KENTUCKY COLONELS STORE which is owned and commercially operated by UPPER RIGHT MARKETING, LLC to actual consumers who are commissioned KENTUCKY COLONELS many of whom are also donors to the HONORABLE ORDER OF KENTUCKY COLONELS.

9. The Plaintiff was mostly known in Kentucky and border states as the HONORABLE ORDER OF KENTUCKY COLONELS until the Plaintiff's logo and logotype update they demonstrated in December 13, 2016 a desire to change their name from HONORABLE ORDER OF KENTUCKY COLONELS to KENTUCKY COLONELS according to Facebook's Public Transparency Report at [facebook.com/kycolonels]. In April of 2018 they changed their name again on Facebook to KENTUCKY COLONELS — NATIONAL HEADQUARTERS; then on December 04, 2019

changed their name back to HONORABLE ORDER OF KENTUCKY COLONELS according to the same transparency report.

10. Plaintiff averred under oath on February 17, 2020 on three U.S. trademark applications for [the mark]. "To the best of the signatory's knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive." Plaintiff left the 'concurrent users' space on the three (3) applications blank. **[Supra PageID# 35-55]** The Trademark Practitioner and Attorney in this case was a knowledgeable scienter in this fraudulent trademark manifestation between February 11-17 and the subsequent lawsuit less than 72 hours later which was filed with the Court and mailed to the Defendants on February 20, 2020 alleging confusion and infringement.

11. Plaintiff never directly informed or sent notice to the USPTO that they were suing a third-party that was claiming legal use of a trade name that is being confused with the trademark they applied for, despite amending the applications as distinctive, once rejected as descriptive. Their applications were treated as factual during the litigation of the case. Plaintiff filed the AO 120 **[PageID #: 399]** once they were sure the trademark examiner was assigned and the applications entered the "privacy bubble" at the USPTO, strictly between the examiner and the applicant. Form AO 120 is supposed to be served by Certified Mail or other postal delivery to the USPTO, not just filed with the Court. The U.S. District Court nor the Plaintiff ever directly informed the USPTO of the lawsuit for the newly submitted trademark applications alleging confusion, because no confusion existed when averred three days previously or in the preparation of the complaint.

12. Form AO 120 exists to facilitate 15 U.S.C. § 1116(c), which states: "It shall be the duty of the clerks of such courts within one month after the filing of any action, suit, or proceeding involving a mark registered under the provisions of this chapter to give notice thereof in writing to the Director setting forth in order so far as known the names and addresses of the litigants and the designating number or numbers of the registration or registrations upon which the action, suit, or proceeding has been

brought…" The information relative to potential confusion existing over the mark and the other users of the term was essential information on the application and essential to the trademark examiner which *should have* been amended to the applications.

13. The date of the Defendant's First Amendment activities online at his blog and the development of a plan of action by the Wyatt Firm which they began to execute seeking trademark protection to claim the same trademarks that the lawsuit was based on is all part of the same activity and collaboration for the Plaintiff to allege confusion in the U.S. District Court against the Defendant. The trademark practitioner for the three dubiously applied for applications and one of the Plaintiff's counsel in this matter are the same person.

## CONCLUSION

The fruit has never been riper; waiting any longer to resolve this complaint, will result in spoilage and potential damages resulting in a crop of corn vinegar for all the Kentucky colonels instead of bourbon, leaving the parties dry in a field of damaged cultural and historical integrities. A thousand colonels and a thousand more from history that want their names recognized with the idea that they were the first Kentucky Colonels before they grew the corn in Kentucky, like Col. Daniel Boone, Col. John Bowman, Col. Richard Henderson, and Col. James Harrod. The same colonels, that Isaac Shelby worked with for the Transylvania Company as a surveyor in August 1775 before becoming a colonel himself in North Carolina. They were the forefathers, founders, first settlers, and pioneers of the Commonwealth of Kentucky, its Kentucky Colonels. The idea does not belong to the Plaintiff. Col. John Marshall Harlan was credited to have said, [i]n Kentucky where the "corn is full of kernels, and the colonels full of corn" (1874). Some say the quatrain has older origins as early as 1825 and others credit it to William James Lampton in 1895.

The Defendant asserts his right under statutory law clearly stating a greater case against a Plaintiff that is making legal demands and usurping rights to proffer a **"historical term"** under the cover of their *false trademark* to attempt to extend their rights far beyond their scope. The Plaintiff is just one of several organizations that is and has been using KENTUCKY COLONELS as a **part of their name**. There are at

least 50 organizations or fraternal endeavors that have been or will continue to be affected, now and in the future, if the Plaintiff becomes known as KENTUCKY COLONELS instead of HONORABLE ORDER OF KENTUCKY COLONELS; a prevailing effect many others will be affected by for years to come. The Court should find that Declaratory Judgement will protect the term through the cancellation of KENTUCKY COLONELS trademarks for services provided by the Honorable Order of Kentucky Colonels (one group of Kentucky colonels). All Kentucky colonels must be allowed to compete by using the term KENTUCKY COLONELS as a descriptive element of their organizations, clubs, associations and local events. A "Supplement to Memorandum in Support Motion for Declaratory Judgement" will be made available upon the request of the Court or if the present motion needs to be re-submitted as a counterclaim.

The Court now has numerous grounds under statutory law to understand why the Plaintiff's trademark does not function as a trademark, any one reason of which the District Court provides relief for, the Court should make a Declaratory Judgement on all these facts. The motion should be heard, but it should not delay the Settlement Conference on December 29, 2020 in which the pending motion may be considered before it is heard unless the case is resolved sooner or on that day.

Caracas, Venezuela
Dated: December 16, 2020

Col. David J. Wright
Edificio Torre 997, Local B
San Juan, Caracas, Venezuela 1021
david.wright@globcal.net
+1 (859) 379-8277

Certification: This memorandum of support is within the 40 page limit using justified 12 point text and was filed in compliance with "Instructions for Filing a Motion Pro Se in the United States District Court for the Western District of Kentucky" located at: Instructions for Filing a Motion [kywd.uscourts.gov] on December 16, 2020.