**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

**FILED**

Vanessa L Armstrong, Clerk

Dec 30 2020

U.S. District Court
Western District of Kentucky

|  |  |  |
|---|---|---|
| THE HONORABLE ORDER OF KENTUCKY COLONELS, INC. | ) ) ) | Civil Action No. 3:20-cv-132-RGJ-RSE |
| Plaintiff | ) ) |  |
| vs. | ) ) | RESPONSE AND OBJECTION TO SUPPLEMENTAL MOTION TO SHOW CAUSE |
| COL. DAVID J. WRIGHT | ) ) |  |
| Defendant | ) ) |  |

<u>**DEFENDANT'S RESPONSE AND OBJECTION TO PLAINTIFF'S SUPPLEMENTAL MOTION TO SHOW CAUSE WHY DEFENDANT DAVID J. WRIGHT SHOULD NOT BE HELD IN CONTEMPT**</u>

Defendant in *pro se*, Col. David J. Wright, herein responds and objects to The Honorable Order of Kentucky Colonels, Inc. ("Plaintiff")'s, Supplemental Motion To Show Cause Why Defendant David J. Wright Should Not Be Held In Contempt **[DN 83]**, this motion and the previous motion **[DN 78]** must be overruled because they are meant to falsely inflict injury on the Defendant and were made in bad-faith to suppress constitutionally protected free-speech activities with color of the law. Defendant claims that the Plaintiff has brought this Supplemental Motion and the previous Motion to Show Cause in an effort to allege contempt in order to *imbalance, prejudice and taint* the Defendant's position in a Settlement Conference **[DE 77]** held on December 29, 2020 before Magistrate Judge Regina S. Edwards.

**ARGUMENT**

Plaintiff is a known *trademark bully*, attempting to seek equitable protection from the Court to overreach the law based on a collection of six identical [trademarks], *i.e.* KENTUCKY COLONELS, which never should have never been *granted protection* or *been applied for* because: the Plaintiff itself has

1

used the [term] KENTUCKY COLONEL as a <u>generic and merely descriptive idea (element) in its own trade name</u>; the Plaintiff is ambiguating and confusing the generic, descriptive [terms] KENTUCKY COLONEL(S) with itself, the Defendant, other fraternal organizations, the state government, cultural icons, historical figures, living persons, literature, sports teams, former musical groups, products, and services *to legitimize a monopoly*; the Plaintiff is seeking to misappropriate culture by trademarking a historical term and to bring harm to others that do not comply with its objectives or purposes; and the Plaintiff through a professional trademark practitioner has committed fraud on the United States Patent and Trademark Office ("USPTO") by omitting/excluding other known legal users and competitors of the generic term which they were aware of in its applications and have claimed its trademarks using misleading non-factual dates of *first-use* and *in-commerce* in order to make suppletory claims of the term to wrongfully bring an infringement complaint against a <u>known competitor</u> engaged in protected free-speech activities which has used the term for over 20 years, see Defendant's Motion for Declaratory Judgement **[DN 82]** and Motion for Judgement on the Pleadings **[DN 65]**. The Plaintiff cannot be allowed to usurp the generic and descriptive [term] KENTUCKY COLONELS to serve as a [trademark] for their own proprietary or exclusive use under any condition because of the impact it will have on ambiguating cultural values, social esteem, American literature and history continuing the damage it will and already has caused to the Defendant, the Commonwealth of Kentucky, living Kentucky colonels, historians, researchers, businesses and civil society organizations that currently exist, have existed in the past and will exist in the future. The Plaintiff has created an unfair and illegal barrier to trade and competition with their ambiguous and confusing trademarks which must now be cancelled. Plaintiff has also engaged in unlawful behavior such as false advertising and has misused their trademarks to further ambiguate themselves with the Kentucky state of mind. **[See Exhibit 1]**

[A company] "cannot appropriate the English language, and by doing so render a competitor inarticulate." *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 609-10 (7th Cir.1986). Likewise common sense tells us we cannot stop a competitor from accurately, generically and legally describing

themselves, their services or products. The fact remains the Defendant is a Kentucky colonel, his organization, Kentucky Colonels International is made up of Kentucky colonels not affiliated with or endorsed by the Plaintiff, however the organization has been rendered defunct under a wrongfully applied Temporary Restraining Order in February 2020 and a Preliminary Injunction in August 2020 that interferes with non-commercial free-speech activities and renders the Defendant speechless, forcing him to select an alternative term to legally describe his disabled efforts to assemble and exercise his Constitutional Rights under the First Amendment.

"'A [descriptive] mark answers the buyer's questions 'Who are you?' 'Where do you come from?' 'Who vouches for you?' But the [generic] name of the product answers the question 'What are you?' Applying this test strongly suggests that KENTUCKY COLONELS is generic. *Advertise.com, Inc. v. AOL Advertising, Inc.*, Case No. 10-55069 (9th Cir. Aug. 3, 2010) "Generic terms are those that refer to 'the genus of which the particular product or service is a species,' i.e., the name of the product or service itself. 'To determine whether a term [is] generic, we look to whether consumers understand the word to refer only to a particular producer's goods or whether the consumer understands the word to refer to the goods themselves.' A descriptive mark describes the qualities or characteristics of a product. Generic terms cannot be valid marks subject to trademark protection, whereas a descriptive mark can be valid and protectable if it has acquired 'secondary meaning.' 'Whether a mark is generic is a question of fact.'"

The trademark (service mark) might be improved by seeking protection for its own program names "Laffoon's Colonels", "Honorable Kentucky Colonels", "Good Works Fund", "Because a Colonel Gave", or "Governor's Colonels".

## PLAINTIFF IS A TRADEMARK BULLY

The Plaintiff has not been forthcoming with the information presented since the beginning of this offensive claim with the Verified Complaint **[DE 1]** and Motion for Temporary Restraining Order and Preliminary Injunction **[DE 7]** in a case that would normally be barred by the doctrines of laches, dirty

hands, merger, acquiescence, consent, fair-use and equity, see Defendant's Answer, Affirmative Defenses and Inconsistent Claims and Defenses **[DN 62]**. By failing to properly follow the Fed. R. Civ. P. Rule 11 in asserting their claim, the Plaintiff has brought a great controversy disguised as a legitimate case of infringement to a U.S. Federal Court in bad-faith by omitting key facts and details that it prefers to cover up, disregard, falsify, obfuscate and suppress to violate civil court rules, federal due process and statutory law to create a case based in fallible, misrepresented and unrecognizable facts to compel and mislead the Court to provide equitable relief to an unbridled trademark bully in the Bluegrass State.

The Defendant calls the Plaintiff a "trademark bully" because this case and the Plaintiff's actions (now and in past cases) clearly fit the typical profile as described by law professor, author, speaker and contributor to the Federalist Society, Irina D. Manta in her paper *Bearing Down on Trademark Bullies*, 22 Fordham Intell. Prop. Media & Ent. L.J. 853 (2012). Professor Manta's research examines the intersection between intellectual property law and social science, with a focus on psychology. She has recently written about the hedonic value of trademarks and their legal implications and about the problem of cognitive bias in copyright infringement litigation and the role of criminal sanctions in intellectual property. Her work also suggests that courts are often affected by a type of cognitive bias likely to arise in trademark litigation, which is evident in this case with the imposition of a preliminary injunction prior to the court having access to valid factual and historical information on the subject of Kentucky colonelcy researched by the Defendant and now subject to judicial notice **[DN 82-3 Pages 2-9, PageID #: 1952-1959]**.

The Court has been misled to believe that the Plaintiff, HONORABLE ORDER OF KENTUCKY COLONELS is KENTUCKY COLONELS *cognitively, as a trademarked figure of speech* based on an inadequate and incomplete historical account created by the Plaintiff that is inconsistent with the truth and fact due to successfully acquiring mistaken trademarks. The Plaintiff has spent years spinning lies into truth for its own benefit while creating irreparable damage to the idea of Kentucky colonelcy and relative to the Defendant attempting to turn truth into lies. The *only* source of **[KENTUCKY COLONELS]**

(living persons) is the <u>Commonwealth of Kentucky,</u> not the Plaintiff's organization, not the Kentucky Colonels Shop owned by Upper Right Marketing LLC, and not the Defendant's unicorporated group.

The Plaintiff, by nature as a corporation displays the following symtoms of psycopathy: (1) callous disregard for the feelings of others; (2) incapacity to maintain enduring relationships; (3) deceitfiulness - repeated lying and conning others for profit; (4) incapacity to experience guilt; and (5) failure to conform to social norms with respect to lawful behavior. These values are not consistent with Kentucky colonels who are living persons. A corporate person cannot be a Kentucky colonel and cannot emphathize morality.

The Plaintiff has not been forthcoming with the Court in this instant motion, they beg the question and use the fallacy of the straw man to allege infringement and present inappropriate evidence relative to this case which refers to confusion where no confusion exists in an effort to create confusion itself. The Plaintiff, HONORABLE ORDER OF KENTUCKY COLONELS is not "the Kentucky colonels" nor is it the Commonwealth of Kentucky, it is an organization, it is a business and it does not encompass or factually represent the idea of the Kentucky colonel or the genuine historical values created by the colonels that founded and pioneered the state, see **[Supra DN 82-3 Pages 2-9, PageID #: 1952-1959]**.

## DEFENDANT IS FULLY COMPLIANT WITH THE PRELIMINARY INJUNCTION

It is clear to the Defendant that there is a preliminary injunction in place and the alternatively liable corporate defendants are in default. The Defendant also understands the purpose of the Preliminary Injunction and understands the motivations and purposes for which the Plaintiff filed its trademarks. Likewise the Defendant understands that "[a] **preliminary injunction is a pre-trial order issued with an explicit awareness of the possibility <u>that it will be proved wrong</u>**." Ofer Grosskopf and Barak Medina, *Remedies for Wrongfully-Issued Preliminary Injunctions*, Seattle U. Law Review, Vol. 32:904, citing Douglas Lichtman, *Uncertainty and the Standard for Preliminary Relief* 70 U. CHI. L. REV. 197, 199 (2003) (pointing out that at the preliminary injunction stage courts are typically uncertain about both the likely outcome on the merits and the harms each party faces).

During this period, irreversible events may make the legal remedy ineffective. Preliminary pre-trial remedies are designed to ease this problem by mitigating the risk of the occurrence of such irreversible events. John Leubsdorf, *The Standard for Preliminary Injunctions*, 91 HARV. L. REV. 525, 525 (1978). "It is widely recognized that to meet the due process requirements it is sufficient to offer the defendant a speedy, even if only rudimentary, hearing after the issuance of a restricting order, with the right to damages for wrongful injunctions." *Mitchell v. W.T. Grant Co.*, 416 U.S. 600 (1974) (upholding procedures that offer the defendant a speedy hearing after the state acts, with damages for any improper action); *Friends For All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 832 (D.C. Cir. 1984) (same). See also *Leubsdorf*, at 620-24. In contrast, it is probably unconstitutional to issue a temporary restraining order without any notice to the restrained defendant, when the order inflicts serious injury and the defendant could be given a chance to argue against it without any harm to the plaintiff. Id. at 621.

The decision whether to issue a preliminary injunction-including temporary restraining orders-raises an inherent difficulty. On the one hand, this relief is often an essential tool for protecting the plaintiff's interests, given the legal system's deficiencies in providing final remedies in due course and the prospect of irreparable harms. On the other hand, the fact that the relief is issued without a full inquiry into the merits of the case entails a substantial risk that the issuance of the preliminary injunction will unjustifiably harm the defendant, as well as third parties and the public interest.  FED. R. Civ. P. 65(c). Most states replicate Rule 65(c) with some minor changes. DAN B. DOBBS, LAW OF REMEDIES: DAMAGES, EQUITY, RESTITUTION 196 (2d abr. ed. 1993)., at 187 ("The potential for abuse and error in injunctive orders is usually very large.").

In sum, the decision whether to issue a preliminary injunction should aim at minimizing the expected irreparable social costs that result from the delay in deciding the case on the merits. The decision requires an evaluation of the probability of the alternative possible outcomes of the case. Deadweight-loss should always be considered an irreparable social cost given that compensation for it merely reallocates

the damage but does not eliminate it. In contrast, undeserved-wealth-transfers should be so considered only if an ex-post restitutionary remedy is unavailable, either legally or practically.

The Defendant is in full compliance with the Judge's Order imposing the Preliminary Injunction **[DE 58]**, it was not the intention of the Court to interfere with or suppress the Defendant's civil or First Amendment rights, nor was it determined that the Defendant had violated any statutory laws for which the Plaintiff is seeking equity. The Plaintiff, however, has mistaken the purpose of the Preliminary Injunction and even chooses to call it an "Injunction Order" in **[DN 78]**, **[DN 81]** and **[DN 83]** taking the preliminary injunction for granted and seeing the opportunity to impute more cognitive bias on the Court.

When Judge Jennings made the Preliminary Injunction it sought to prevent the Defendant from engaging in commercial activities, engorging on profits, and causing "potential" confusion online with the Plaintiff's *trademark* KENTUCKY COLONELS (not with the ideas of the Kentucky Colonel, Kentucky colonelcy or Kentucky colonels); it was not the Judge's intention to *stop the free flow of information* about Kentucky colonelcy, between Kentucky colonels that are members of the Defendant's forums or to prevent the free association of thousands members of a public Kentucky Colonel community from engaging in non-commercial not-for-profit social activities using Facebook.

The Preliminary Injunction was not imposed to inflict harm or force the removal of the Defendant from the landscape or force him to abandon his intellectual property offered to the Plaintiff, in the event that the Court wrongly imposed the Temporary Restraining Order or the Preliminary Injunction the Plaintiff fully understands that it is liable for all damages that have occurred as a result and have posted a bond in good-faith to exonerate the Court. However posting a bond does not make the Plaintiff immune to the allegations raised by the defense, the damages suffered as a result of the Plaintiff's actions imposed by the Court, add credibility to their argument for equity or permit them to continue to overreach its trademark rights with new claims of other descriptive terms as their trademark. The primary function of the bond is to serve as a fund to symbolically ensure compensation to a wrongfully-enjoined defendant

and to facilitate the collection of the damages awarded. Remedies for wrongfully-issued preliminary injunctions serve to mitigate the consequences of the wrongful restriction imposed on the defendant.

If the Defendant was not so inexperienced with the law as a *pro se* defendant, he would have immediately filed a notice of appeal under Rule 4 of the Federal Rules of Appellate Procedure and the Preliminary Injunction would have been in the Sixth Circuit Court of Appeals by now because the Temporary Restraining Order and the Preliminary Injunction both violated some of his rights under the First Amendment of the U.S. Constitution and as a Kentucky colonel under Commonwealth law. Instead the defendant is being held in *res ipsa loquitur* with an imputed bias based on the bad-faith of the Plaintiff and becoming subject of the lock-in-effect that normally accompanies rulings based on showing a "likelihood of success on the merits" and gaining a preliminary injunction by a motivated well-financed and well-connected party engaged in legal abuse as a trademark bully.

The fact is that *no one* ever knew too much about Kentucky colonelcy until the Defendant dug it out of the historical record to post it on his website recently, otherwise we would not be here now. The Court did not know, the public did not know, the governors of Kentucky did not know, Kentucky colonels did not know, the Plaintiff appears not to know and the Defendant did not even know as much as he does today thanks to the help of the Library of Congress, other libraries and the Internet. Most people continue not to know because the Defendant has not published any new articles, launched his documentary, finished writing his book or informed the majority of his 4,000 to 5,000 followers and subscribers in Facebook and other platforms. Now the Plaintiff fears the worst that everyone will soon learn about the roots of Kentucky colonelcy, how it really became so important to the state and how they have had subjective control over the history and culture surrounding the topic for almost 80 years.

U.S. courts consider the possibility of awarding restitutionary remedies for wrongfully-issued preliminary injunctions in some cases. One type involves benefits obtained by restraining the defendant from competing with the plaintiff. It consists, for instance, of cases in which a preliminary injunction was issued to protect a trademark that is eventually declared invalid, thus providing the plaintiff with an

unwarranted monopoly status during the litigation. Similarly, benefits are sometimes derived from postponing the completion of a project that would have adversely affected the plaintiffs interests.

Final judicial decisions are infallible, and as such, they can neither impose illegitimate harm nor confer unjust enrichment.[1] Non-final and interim decisions are fallible, and when such a decision is reversed or set aside, the question becomes, [W]hat harms inflicted and benefits gained as a result of the reversed decision should be reassigned. Other questions also arise when a fallible preliminary ruling is directly challenged or attacked in a legal motion for declaratory judgement under statutory law.

## PLAINTIFF'S EXHIBIT 1 FAILS TO ILLUSTRATE CONFUSION

The efforts of the Plaintiff to ambiguate, confuse, control and dominate the idea of Kentucky colonelcy in general around the world are so vivid they have resorted to submitting irrelevant evidence of confusion to obfuscate their claims to create more legal fiction in thier case. It is very clear from the **Plaintiff's Exhibit 1 [Document 83-1 Page 4, PageID #: 1990]** that the person is not confused because inserting the name of Plaintiff's organization page or their trademark in the place of "Kentucky Colonel" in the post would not make sense in English. It is obvious that the person in the photo Col. David Zawko is very proud of his **[commission/title/award]** as a Kentucky Colonel from *the governor* of the Commonwealth of Kentucky, the person standing with him also looks very pleased. It is not apparent or even suggested from examining the exhibit that *the person making the post* intended to say or lead people to assume that he implicitly belongs to the Plaintiff's organization, is proud to be a member, it does not even infer or relate to making donations, commercial engagement, events, or looking forward to becoming a member of the Plaintiff's organization.

The Plaintiff's exhibit is based on their *overwhelming desire and an arrogant sense of entitlement* to be the **one and only**, official organization for Kentucky colonels and to become one in the same of the

---

[1] RESTATEMENT (FIRST) OF RESTITUTION § 72(1) (1937) ("A person who has conferred a benefit upon another by complying with a judgment, or whose property has been taken thereunder, is not entitled to restitution while the judgment remains valid and unreversed, merely because it was improperly obtained, except in a proceeding in which the judgment is directly attacked.").

title, term and the idea. It is <u>a well-established fact</u> that people become ***Kentucky colonels*** *because the governor has recognized the living person for their deeds and achievements* with the "HONORABLE" title, based on the recommendation of an independent third-party (*anyone* since Governor Andy Beshear) or the nomination of another Kentucky Colonel or the independent unilateral recognition of the Governor, Lt. Governor or Secretary of State. People **do not become Kentucky colonels to voluntarily become supporters or donating members of the Honorable Order of Kentucky Colonels** *because an individual cannot* make himself or herself a colonel *and because* the "Honorable Order" or "HOKC" <u>does not recommend or have *any* influence over</u> *who does or does not* become a "Kentucky Colonel" or are granted the "Honorable" title. The Plaintiff is trying to legally appropriate rights that it does not have and cannot exist in a civil democratic society with equity, the inequitable rights that they seek would result in a monopoly on Kentucky colonels. **The governor does not award commissions to create new members for the Honorable Order and does not make Kentucky colonels to purchase merchandise that is sold by a privately operated limited liability corporation.**

Kentucky's recent governors often mention to those who are named Kentucky colonels "to continue to make a difference in society by supporting the Honorable Order of Kentucky Colonels, a charitable 501(c)(3) organization", the governor's office even includes an information sheet with the award of each commission certificate that includes the Plaintiff's website, contact information and fictional pseudohistory supplanted by the Plaintiff based on a historical act in 1813 that never occurred. Ideally the Plaintiff wants regular people to become their donors so it can make the recommendations themselves and become the original source of Kentucky colonels, but it is not that way. No Kentucky colonel has ever been mandated to join or required to support the Plaintiff's organization or belong to any other organization after being commissioned. The award of the *title* is the top of the iceberg, no further action is required by a Kentucky colonel.

It is a well-known fact in social media that there are official, unofficial and community pages in Facebook. It is true based on the Court Order involving the Preliminary Injunction **[DE 58]** the Defendant

made changes to its Facebook page and groups by changing its usernames and page titles **to be in strict compliance**. Defendant could use Facebook Colonels [**facebook.colonels.net**] instead of Commonwealth Colonels [**commonwealth.colonels.net**], but that would be too generically *misdescriptive* so "Kentucky Colonels International" became the "Kentucky Colonel Foundation" Facebook Page and in August became an **<u>Unofficial Facebook Community Page</u> for the recipients of the "Kentucky Colonel" title with a full disclaimer**. The Plaintiff has no rights to claim "living persons" based on their trademarks which is for their voluntary donors who choose to support them as members. There should be no confusion that the Honorable Order of Kentucky Colonels does not represent every living person who has become or will become a Kentucky Colonel. There cannot be any confusion for the Plaintiff between its organization and its trademarks with the title, the person, the state, or the history of the Kentucky colonel without the Court admitting their actions are usurping the rights of others, or their claims become baseless in trademark law and the U.S. Code of Federal Regulations.

The Plaintiff is clearly attempting to usurp the Defendant's intellectual property created and legally offered in the Merger and Consolidation Proposal **[DN 6]** entered as evidence by the Plaintiff which is based on an implied duty of good faith and fair dealing. The Plaintiff preposterously states in their motion **[Document 83 Page 2, PageID #: 1981]** in reference to Exhibit 1 [***Supra* Document 83-1 Page 4, PageID #: 1990**], "That post shows confusion by the newly commissioned Kentucky Colonel about the organization to which he is now a member and also causes the viewing public to be confused about the organization as well." alleging contempt seeking that the Defendant abandon a page which predates their own by more than five years in the Facebook platform about and for Kentucky colonels. Being a voluntary donor and member of the Honorable Order of Kentucky Colonels or a product line consumer of the Kentucky Colonels Shop and being a Kentucky Colonel are three completely separate and distinct things, that the Plaintiff is trying to ambiguate in its favor to create legal fiction and impute bias against the Defendant. Neither the person to whom the post is intended to recognize or the person writing the post appear to be remotely confused in any way. The objective of the post was not to become a member of the

Plaintiff's organization or to support their charity, the person reached the goal of becoming a Kentucky Colonel, what he chooses to do next is his own business and right. He might even get together with some friends who have also received a Kentucky Colonel commission and start an organization of Kentucky colonels in his own community; he does not need the governor's authorization to do so and certainly does not need the permission of the Plaintiff.

## COMMONWEALTH COLONELS IS NOT LIKELY TO CONFUSE COLONELS

The common thread between the Honorable Order of Kentucky Colonels, Commonwealth Colonels, Kentucky Colonels Switzerland, the Philadelphia Kentucky Colonels, the UK Brigade of Kentucky Colonels, and other legal organizations in Kentucky, New York, West Virginia, Ohio, Indiana, Germany, Spain, Italy, Canada and Australia is that they are all established by and for Kentucky colonels that hold an honorary commission issued by one or more of Kentucky's governors. From this point forward they all differ based on region, local activities, online presence, purposes, etcetera.

Only the **Commonwealth Colonels** claims a history based in the first Commonwealth of the United States, the <u>Commonwealth of Virginia</u> which gave rise to Kentucky County on January 01, 1777 and 15 years thereafter the Commonwealth of Kentucky was founded by colonels from the Commonwealths of Pennsylvania, Massachusetts and Virginia, the State of North Carolina, the Transylvania Company and by other retired Revolutionary War officers. Commonwealth Colonels is also dedicated to demonstrating the connection between the Commonwealth of Nations honorary colonelcy and the historical origins of American colonelcy which was originated in the English Colonies during the Colonial Era. None of this is similar or associated with the type of colonels emulated by the Plaintiff. Commonwealth Colonels does not claim any affinity to the Plaintiff, the Kentucky Derby or hold debates on whether the leaves of the mint needs to be crushed to make a mint julep.

An alternative objective of the Commonwealth Colonels website is also obviously based in the redevelopment, salvage and survival of the Defendant's assets, honor, integrity and intellectual property

12

that belong to him. It is extremely clear that the website does not intend to confuse anyone to lead them to believe that it is associated, endorsed or sponsored by the Plaintiff and the website does not use any trademark because it is not currently engaged in any trading or commercial activity. The purpose of the website is purely educational and informational which further represents a creative work in progress.

The only factor that potentially confuses anyone is the Plaintiff's ambiguous use of the [term] as a [trademark] and separately as a [service mark] for marketing ten different classes of consumer products including key chains, cigars, barbecue sauce, bonbons, hats, apparel, its organizational events, membership services and other purposes under six identical trademarks. Three of the Plaintiff's marks claim to have special "secondary meanings" under the Trademark Act Section 2(f) as distinctive trademarks; which is confusing in itself with the products that have alternate meanings, purposes and multiple secondary meanings. The [term] has been accurately and generically used to legally describe fraternal organizations since the first three years of the 20th century, not related to the Plaintiff.

It is clear that the Plaintiff is asserting their rights beyond the Preliminary Injunction or misinterpreting the words of the Court in section "b" of **[DE 58 PageID #1235]**. The Court must read the website to make a fair determination if a *reasonable man* or more importantly a *literate Kentucky colonel* would believe that the Defendant is creating confusion or if potential confusion exists between Commonwealth Colonels and the Honorable Order or their trademark.

The Plaintiff quotes *Kibler v. Hall* to remind the Court "This court may infer a likelihood of confusion from evidence that defendant chose its mark to confuse consumers about the source of the parties' products."). *Kibler v. Hall*, 843 F.3d 1068, 1081 (6th Cir. 2016), petition for certiorari filed (U.S. May 12, 2017) and also claims "Safe Distance Rule" adopted by the Sixth Circuit which is held as an equitable remedy that allows courts to create a zone of safety around trademark holders victimized by unlawful use of a protected mark. The rules require courts to apply [permanent] injunctive relief broadly enough to ensure that a **past infringer** will not have the opportunity to infringe on an owner's right in the future. Neither of these arguments apply to preliminary injunction relief because: (1) the defendant is not

engaged selling any commercial products or services; (2) the website is published for educational and informational purposes; (3) the Defendant is not a *past infringer* nor has it been established that infringement has occurred or that anyone is entitled to equitable relief; (4) the intent of the Defendant is clearly to disambiguate his historical research work on Kentucky colonelcy with the ambiguous and overreaching behavior of the Plaintiff in good-faith to comply with the Court Order from the perspective of the reasonable man; (5) the Defendant has not used the Plaintiff's trademark ever or outside of statutory fair-use; (6) the Defendant is not using Commonwealth Colonels as a trademark or servicemark; (7) the Defendant is not a past infringer; and (8) the Defendant has directly challenged the validity under statutory law in a Motion for Declaratory Judgement **[DN 82]** and in equity in his Answer and Affirmative Defenses **[DN 62]** and in his Motion for Judgement on the Pleadings **[DN 65]**.

## FRAUDULENT TRADEMARKS BLOCK FAIR COMPETITION

The USPTO never would have granted any trademark protection to the Honorable Order of Kentucky Colonels if they had access to the information published on the Defendant's website prior to or during their examination of the Plaintiff's newest trademarks. Most likely the Plaintiff sought the TRO in this case to shut down the Defendant to avoid having the trademark examiner find or encounter the informational website that was published and receiving thousands of hits with very high readership prior to the filing of this case generated by the Defendant's actions using Facebook groups and objectively criticizing the Plaintiff using Blogger.

As a title the "Kentucky Colonel" is the most common and generic type of title given by the Commonwealth of Kentucky, the titles of "Commonwealth Ambassador" and "Kentucky Admiral" have also been granted in recent years by cabinet heads and the secretary of state. It is also one of several titles from a number of states which makes the terms descriptive to Kentucky, because there are other types of colonels, ambassadors and admirals in the world, put it to the legal test. Kentucky Colonel is also an honorary type of award based in the public domain, culture, folklore, history and tradition in literature

describing a type of person that was iconographic of the state before the Commonwealth's 100th birthday in 1892 or even before the Kentucky colonels invented bourbon or started racing horses.

## CONCLUSION

The term and temporary website group name "Commonwealth Colonels" was selected as an *alternative descriptive and historical name* for "Kentucky Colonels International" until this controversy is finally resolved and to respect the Court's Preliminary Injunction which was made at the request of the Plaintiff as not to use their claimed trademark or unfairly receive donations. The [trademark] is now a subject of contention itself as to whether it is legal, can remain as the Plaintiff's trade name, copyright name or will continue to ambiguously serve as a trademark at all, based on the Motion for Declaratory Judgement requested by the Defendant which should resolve the controversy unless the case is settled before the motion can be heard.

It is very clear that the Plaintiff has and wants to ambiguate the [term/trademark] and confuse Kentucky colonels, the Court, the state, the newspapers, historians, search engines, researchers and all those who come in contact with it to **make the public believe** *it is the mistaken source* for "Kentucky Colonels". Trademarks are for trade and commerce they must be specifically applied, not generalized because they will fail to protect non-commercial activities, free speech and the United States Constitution. Respectfully submitted in good-faith,

Caracas, Venezuela
Dated: December 30, 2020

Col. David J. Wright

Col. David J. Wright
Edificio Torre 997, Local B
San Juan, Caracas, Venezuela 1021
david.wright@globcal.net
+1 (859) 379-8277

**<u>Certificate of Service</u>**

I hereby certify that on December 30, 2020, I emailed for filing the foregoing motion with attachments to the Clerk of the Court for the United States District Court of the Western District of Kentucky using the special Pro Se Intake Email per General Orders 20-04 and 20-11 for entry to the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Clerk's Office
601 W. Broadway, Rm 106
Gene Snyder United States Courthouse
Louisville, KY 40202