UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

*Electronically Filed*

| | |
|---|---|
| THE HONORABLE ORDER OF | **)** |
| KENTUCKY COLONELS, INC. | **)** |
| | **)** |
| PLAINTIFF | **)** |
| v. | **)**   CIVIL ACTION NO. 3:23-CV-00043-RGJ |
| | **)** |
| GLOBCAL INTERNATIONAL, et al. | **)** |
| | **)** |
| | **)** |
| DEFENDANTS | **)** |

**MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

The Honorable Order of Kentucky Colonels, Inc. ("HOKC") is a Section 501(c)(3), Kentucky nonprofit corporation dedicated to supporting charitable activities throughout the Commonwealth of Kentucky. For decades, HOKC has pursued its charitable mission by, among other things, making annual grants to numerous small, mid-size, and sometimes large Kentucky charities that operate across the state. This grant-making function is in turn funded by the generous donations of HOKC's active members, who reside not only in Kentucky, but also in other states and around the world. HOKC has an incredibly faithful and proud donor base, comprised of individuals who have been selected by a Kentucky Governor to receive the esteemed title of Kentucky Colonel, "the highest title of honor bestowed by the Governor of Kentucky."[1] After receiving this great honor, individual Kentucky Colonels then become members of HOKC, and part of the organization's long history of good works and strong donor relations. In order to protect the reputation and honor bestowed upon its members, HOKC's role includes protecting the KENTUCKY COLONELS trademark and service mark (the

---

[1] *See* HOKC website www.kycolonels.org.

"KENTUCKY COLONELS Mark"), which HOKC uses in connection with the goods and services it provides to its members and the public, as well as the charities served through its philanthropic work.

That valuable trademark continues to be hijacked by Defendant David J. Wright ("Wright") and the Defendant entities which he controls despite this Court's February 23, 2021 Permanent Injunction prohibiting Wright, Defendants, and those involved with Defendants from such behavior. Through a continued byzantine network of strawman organizations, assumed names, and social media handles, Wright continues to operate a competing organization called "Kentucky Colonel$^{TM}$", brazenly attempting to—again—misappropriate the KENTUCKY COLONELS Mark for his own personal financial enrichment.[2] Wright's infringing "organization" is not a charity or even a registered entity, yet he and the other Defendants are actively soliciting donations from Kentucky Colonels under the guise of deductible charitable contributions, thereby intercepting, or attempting to intercept, relationships that HOKC has built over decades using the KENTUCKY COLONELS Mark. HOKC attempted to resolve the matter without this Court's intervention, but Wright disregarded HOKC's cease and desist letter and revved up his online activity, continuing to confuse and mislead a significant number of Kentucky Colonels. Because HOKC's reputation and ability to pursue its mission will be irreparably harmed, HOKC moves the Court to enter an order pursuant to Fed. R. Civ. P. 65 and U.S.C. § 1116 directing Defendants yet again to immediately cease their misappropriation of the KENTUCKY COLONELS Mark.

---

[2] Wright and Defendants improperly use the $^{TM}$ symbol in connection with their infringing use of the KENTUCKY COLONEL mark. Neither Wright nor Defendants own any common law trademark rights to KENTUCKY COLONEL when used in connection with any of the various goods or services for which HOKC holds registrations for the KENTUCKY COLONELS Mark. Further, the exclusion of the "S" on "COLONELS" does not eliminate the likelihood of confusion between Defendants' infringing mark and HOKC's registered KENTUCKY COLONELS Mark.

## FACTUAL BACKGROUND

### A.     For Decades, HOKC Has Been Dedicated to Serving the Commonwealth of Kentucky and its Citizens.

From its inspired origins in 1931 through the present day, the HOKC has existed as a nonpartisan nonprofit organization dedicated to supporting charitable purposes throughout the Commonwealth. [Verified Compl., ¶ 12]. Since 1951, HOKC has granted $60 million to more than 1,700 nonprofits. [*Id.*] In 2022 alone, HOKC granted $3.1 million to 314 organizations who, together, serve more than 3.9 people. [*Id.*] To this day, the Governor of Kentucky serves as the Commander-in-Chief of HOKC, along with a board of trustees. [*Id.* at ¶ 13].

For nearly a century, HOKC has pursued its mission to follow the objectives described by Governor Flem D. Sampson in 1931, a significant aspect of which is promoting and protecting the goodwill of the KENTUCKY COLONELS Mark. [*Id.* at ¶ 14]. From the beginning, the Governor's office recognized HOKC's role, making HOKC responsible for adopting insignia, seals, and other indicia of the honor. [*Id.* at ¶ 13]. HOKC has carefully guarded the KENTUCKY COLONELS Mark which is an essential element of protecting the ability of HOKC to serve its charitable function with an unblemished reputation. [*Id.* at ¶ 15].

### B.     Protection of the KENTUCKY COLONELS Mark is Essential to HOKC's Mission.

HOKC has used the KENTUCKY COLONELS Mark since its inception in 1931, and that mark plays a critical role in the organization's fundraising efforts. [*Id.* at ¶ 14]. The KENTUCKY COLONELS Mark is universally associated with HOKC and with aiding and promoting causes benefiting the health and welfare of Kentuckians. In addition to the KENTUCKY COLONELS Mark, HOKC is also the owner of THE HONORABLE ORDER OF KENTUCKY COLONELS, KENTUCKY COLONELS GOOD WORKS PROGRAM, KENTUCKY COLONELS DAY OF SERVICE, and HOKC logo marks and other registered and

unregistered marks, all of which are critical to HOKC's charitable solicitation efforts.[3] HOKC has continuously used the KENTUCKY COLONELS Mark in connection with its philanthropic, membership, and social activities for decades and, as a result, the KENTUCKY COLONELS Mark carries a positive connotation worldwide. [*Id.* at ¶ 16].

### C.   Defendants are Using the KENTUCKY COLONELS Mark in Violation of this Court's Permanent Injunction.

This is not the first time HOKC has filed suit against Defendants for this same, exact conduct. On February 20, 2020, HOKC filed a verified complaint against Defendants for their unauthorized use of the KENTUCKY COLONELS Mark in connection with marketing, advertising, promotion, and solicitations regarding Defendants' alleged services (the "2020 Complaint").[4] [*Id.* at ¶ 17]. The 2020 Complaint sought redress for a scheme led by Wright, under the guise of Defendant Globcal International ("Globcal") and a now-defunct assumed name entity of Ecology Crossroads called Kentucky Colonels International, and with the assistance of Unknown Defendants, to solicit individuals who had been commissioned as Kentucky Colonels to participate, for a fee, in Wright's newly formed "registry" or organization operating under the infringing KENTUCKY COLONELS INTERNATIONAL mark. [*Id.* at ¶ 19]. In infringing upon and misappropriating HOKC's KENTUCKY COLONELS Mark and the goodwill associated therewith, Wright and the other Defendants used the internet and social media to confuse the public, including individuals commissioned as Kentucky Colonels, and profit from HOKC's KENTUCKY COLONELS Mark. [*Id.* at ¶ 20].

---

[3] A chart reflecting the numerous federal trademark registrations HOKC owns for marks incorporating the KENTUCKY COLONELS Mark, as well the official documentation reflecting those registrations, is attached to the Verified Complaint as Exhibit 2. For the Court's convenience, that material is also attached hereto as Exhibit 1.

[4] A true and accurate copy of the 2020 Complaint and its exhibits is attached to the Verified Complaint as Exhibit 3. For the Court's convenience, that material is also attached hereto as Exhibit 2.

On February 21 and 24, 2020, in connection with the 2020 Complaint, HOKC filed its Motion for Temporary Restraining Order and Preliminary Injunction and supplement thereto, seeking to enjoin Defendants from their continued unlawful scheme to infringe upon and misappropriate HOKC's KENTUCKY COLONELS Mark.[5] [*Id.* at ¶ 21]. On August 13, 2020, this Court granted HOKC's Motion for Temporary Restraining Order and Preliminary Injunction.[6] [*Id.* at ¶ 23].

In February 2021, Wright and HOKC agreed to a Mediator's Proposal, resolving the issues in dispute in the 2020 Complaint.[7] [*Id.* at ¶ 24]. Then, on February 23, 2021, this Court so-ordered the Permanent Injunction, which included the following injunctions[8]:

1. Defendants and anyone acting on their behalf, including their owners, members, officers, agents, contractors, employees, attorneys, and any other persons in active concert or participation with Defendants, are permanently enjoined and prohibited from using the KENTUCKY COLONELS Mark, or any mark that is confusingly similar to the KENTUCKY COLONELS Mark, including, but not limited to, KENTUCKY COLONELS INTERNATIONAL and KENTUCKY COLONEL FOUNDATION, on or in connection with the sale of any goods or service including, but not limited to, the solicitation of charitable donations and the promotion of charitable and philanthropic causes.

2. Defendants and anyone acting on their behalf, including their owners, members, officers, agents, contractors, employees, attorneys, and any other person in active concert or

---

[5] A true and accurate copy of the 2020 Motion for Temporary Restraining Order and Preliminary Injunction, Supplement to Plaintiff's Motion for Temporary Restraining Order, and supporting exhibits are attached to the Verified Complaint as Exhibit 4. For the Court's convenience, that material is also attached hereto as Exhibit 3.

[6] A true and accurate copy of the entered Temporary Restraining Order and Preliminary Injunction is attached to the Verified Complaint as Exhibit 5. For the Court's convenience, it is also attached hereto as Exhibit 4.

[7] A true and accurate copy of the Mediator's Proposal is attached to the Verified Complaint as Exhibit 6. For the Court's convenience, it is also attached hereto as Exhibit 5.

[8] A true and accurate copy of Permanent Injunction is attached to the Verified Complaint as Exhibit 1. For the Court's convenience, it is also attached hereto as Exhibit 6.

participation with Defendants, are permanently enjoined and prohibited from using the KENTUCKY COLONELS Mark, or any mark that is confusingly similar to the KENTUCKY COLONELS Mark, including, but not limited to, KENTUCKY COLONELS INTERNATIONAL and KENTUCKY COLONELS FOUNDATION, on any website, social media page, or blog in such a way as is likely to cause consumers to be confused, mistaken, or deceived into believing that HOKC has sponsored, sanctioned, approved, licensed, or is any way affiliated with Defendants or any organization or cause sponsored or supported by Defendants.

3.  Defendants and anyone acting on their behalf, including their owners, members, officers, agents, servants, employees, attorneys, and any other person in active concert or participation with Defendants, are permanently enjoined and prohibited from using the domain names [kycolonels.international], [kentucky.colonels.net], or any other domain name that is confusingly similar to [kycolonels.org], or *any domain name* that incorporates the KENTUCKY COLONELS Mark, or any mark that is confusingly similar to the KENTUCKY COLONELS Mark, including, but not limited to, KENTUCKY COLONELS INTERNATIONAL and KENTUCKY COLONEL FOUNDATION.

4.  Defendants and anyone acting on their behalf, including their owners, members, officers, agents, contractors, employees, attorneys, and any other persons in active concert or participation with Defendants, are permanently enjoined and prohibited from using Facebook or any other social media platform usernames "Kentucky Colonels International" or "Kentucky Colonel Foundation" or any other username or handle that is confusingly similar to the trademark KENTUCKY COLONELS for the purposes of forming a membership organization, a civil society association or other non-commercial activity such as an event or charitable fundraising endeavor.

[*Id.* at ¶ ¶25-26 (citing Permanent Injunction at ¶¶ 1-4)].

The Permanent Injunction also made clear that Wright and other Colonels, as individuals, could use "Kentucky Colonel" or "Kentucky colonels," and/or "Kentucky colonelcy" "as words or terms to describe Kentucky colonels, as an honorary title, or for editorial, educational, informative, journalistic, literary, or other **non-commercial purposes so long as the use is not**

related to the trademark or service mark uses registered, or pending, by the HOKC with the U.S. Patent and Trademark Office." [*Id.* at ¶ 27 (citing Permanent Injunction at ¶ 5) (emphasis added)]. This Court, and specifically the Honorable Judge Jennings, retained jurisdiction as necessary to enforce the Permanent Injunction and the terms of the Settlement Agreement for no less than ten (10) years. [*Id.* at ¶ 28 (citing Permanent Injunction at ¶ 6)].

      D.    **Defendants Continue to Violate the Terms of the Permanent Injunction and Act Unlawfully Through Use of the KENTUCKY COLONELS Mark for Unauthorized and Improper Purposes.**

Despite the Permanent Injunction, Defendant David J. Wright, either alone or with the assistance of others, including those involved with Defendants, has created, maintained, moderated, and/or is involved with various infringing online activities in clear violation of this Court's Permanent Injunction, including the [kycolonelcy.us] domain name; the KENTUCKY COLONEL COMMUNITY Facebook group; the KENTUCKY COLONEL CLUB Facebook group;[9] the KENTUCKY COLONEL Facebook page; the KENTUCKY COLONEL YouTube page using the @Kentucky-Colonel handle; the KENTUCKY COLONEL Twitter account using the @KyColonelcy handle; the KENTUCKY COLONEL LinkedIn page; the KENTUCKY COLONEL Pinterest account with the @kycolonelcy.us handle; and the KENTUCKY COLONEL Crunchbase account.[10] [*Id.* at ¶ 29].

Similar to Defendants' previous website and social media activity leading to the 2020 Complaint and Permanent Injunction, the private KENTUCKY COLONEL COMMUNITY Facebook Group "About this group" states that it is "a grassroots manifestation within the social

---

[9] Membership into the two Facebook groups is private and requires a person to answer several questions and be approved by a group administrator.

[10] Upon information and belief, the Crunchbase account name changed from KENTUCKY COLONEL COMPANY to KENTUCKY COLONEL™ around or after the filing of the Verified Complaint.

media of independent Kentucky colonels to establish a cooperative company and social enterprise." [*Id.* at ¶ 31]. Similarly, the private KENTUCKY COLONEL CLUB Facebook group "About this group" states that it is "an official social media group of commissioned Kentucky colonels living around the world that are connected on Facebook." [*Id.* at ¶ 32]. The KENTUCKY COLONEL Facebook page continues to post about persons being commissioned as Kentucky Colonels and tags itself—the KENTUCKY COLONEL Facebook page—within the posts even though Defendants have no involvement with the commissioning. [*Id.* at ¶ 33].

It is readily apparent from Defendants' social media activity as well as their website that Defendants are creating, or attempting to create, an organization or group similar to and competitive with HOKC using the same or similar KENTUCKY COLONELS Mark. "The Kentucky Colonel: Honorable Title and Official" website, located at www.kycolonelcy.us (the "Website"),[11] describes Defendants' organization as a "publication of a cooperative civil rights interest group made up of Kentucky colonels promoting and supporting colonels as goodwill ambassadors for the Commonwealth at home and abroad." [*Id.* at ¶ 39]. The Website discusses the "International Registry of Kentucky Colonels," specifically stating that "The registry will offer colonels a **certificate of registration, a lifetime ID card**, and additional **Internet services**." [*Id.*]. According to the Website, "Kentucky Colonel Badges and Kentucky Colonel Nameplates will not be available until June of 2023," but "To obtain an ID card **a member needs to be enrolled and paying dues in the cooperative for a minimum of 30 days with a a** [*sic*] **$100 or greater investment after signing the cooperative agreement and elaborating a work profile**." [*Id.* at ¶ 41 (emphasis added)].

---

[11]  Numerous screenshots of the Website, which is confusingly similar to HOKC's web address of www.kycolonels.org, are attached to the Verified Complaint as Exhibits 13 – 24. For the Court's convenience, that material is also attached collectively hereto as Exhibit 7.

The Website further states:

> Kentucky Colonel Cooperative is not our name, but it is a term that describes ethically **what we are officially forming in 2023!** The cooperative service organization in formation will be empowered with the same legal "rights, privileges and responsibilities" of the Kentucky Colonel under the same unwritten honorable code of ethics and moral obligations as the **First Pioneer Colonels of Kentucky** (descriptive origin) from 1775 – 1792 also known as "Old Kentucky."

[*Id.*]. Additionally, in a PDF entitled "News for Immediate Release" from the "Office of the Kentucky Colonelcy" (an office that "is not a physical office that you can visit" but rather "refers to the duties and responsibilities of a Kentucky Colonel that has taken an oath to serve the Commonwealth of Kentucky as a colonel professionally among other colonels"), Defendants write that:

> The world's greatest state officials and most popular goodwill ambassadors are getting their jobs back with the professional occupational title: **Kentucky Colonel** by making the Honorable Title more appealing, legal, official, recognized and better understood than it has ever been . . . .
>
> The **cooperative social enterprise based in Richmond, Kentucky** is a decentralized remotely collaborated Internet publishing company focused on the progressive development of Creative Commons content from the public domain . . . . As a cooperative social enterprise they **will issue official ID cards, badges and nameplates**; the cooperative colonels will be connected to a virtual workplace, have company email, and be required to collaborate online or in the community for 50 hours per year. . . .
>
> **The organizer, Col. David Wright, . . . said "Since we won the lawsuit filed by the Honorable Order of Kentucky Colonels in 2020**, we have completely debunked their fictional militia myth of 1813 with the Secretary of State. . . .
>
> The sponsor of the decentralized cooperative development, responsible for technological development using ICT and the Internet is **Ecology Crossroad Cooperative Foundation**, established in 1994 with its registered office in Richmond, Kentucky. The nonprofit was merged in 2020 with Globcal International which previously sponsored the society for its

Kentucky colonels (2008-2020) and others that have gathered as
followers online.

[*Id.* at 42 (bold emphasis added)].

The Website touts the creation of a "Kentucky Colonel Directory," "Kentucky Colonel
Identification (Photo ID Cards)," and "Kentucky Colonel Business Cards"; discusses how to
create a "new branch" of Kentucky Colonel; seeks to identify where to buy "official and
unofficial merchandise from third parties" of "Kentucky Colonel Apparel"; and suggests how to
"Get Involved" through promoting the Commonwealth and doing a community project [*Id.* at ¶¶
43-47]. Notably, to obtain "Kentucky Colonel Identification (Photo ID Cards)," one must be a
"commissioned Kentucky Colonel" and "join [Defendants'] groups on Facebook or LinkedIn
and ***invest in [Defendants'] platform as a cooperative owner***." [*Id.* at ¶ 46 (emphasis added)].

### E.   Defendants Recently Escalated Their Efforts to Misappropriate the KENTUCKY COLONELS Mark for Their Own Financial Benefit.

On January 12, 2023, counsel for HOKC advised Wright that his actions, and the actions
of the other Defendants, were in direct violation of the Permanent Injunction, specifically
through infringing the KENTUCKY COLONELS Mark on the Website and various social media
pages; infringing the KENTUCKY COLONELS Mark in the formation of an organization with a
registry, business cards, photo ID cards, and badges; and infringing the KENTUCKY
COLONELS Mark in the solicitation of donations. [*Id.* at ¶ 52]. In response, Wright posted on
the private KENTUCKY COLONEL COMMUNITY Facebook group that "We [Defendants]
represent **KENTUCKY COLONEL**[TM] which is the legal representative unregistered common-
law designation for one or more **Real Colonels**. . . . The HOKC in law must use **KENTUCKY
COLONELS®** as the mark is registered with the USPTO for arbitrary use to stop confusing
colonels with products and things that are not real Kentucky colonels." [*Id.* at ¶ 53].

Then, on January 22, 2023, "Kentucky Colonel" posted on the private KENTUCKY COLONEL CLUB Facebook group that "It is now the responsibility of the Kentucky Colonel ™ Group and its members to reach 100 members prior to printing ID cards" and that "**we** are looking to **merge** our objective with the Goodwill Ambassador ™ Title **to better protect the Kentucky Colonel Commission and Title**." [*Id.* at ¶ 54]. Further,

> The members of the new group are now the legally obligated cooperatively invested independently owners of the Kentucky Colonelcy website as an asset which was speculatively valued at $1,000,000 in November . . . . [Defendants] offered 1,000 shares of the asset for $1,000 each based on donating to the educational, information, legal and semantic protection of the posterity of the Honorable Title(s).

[*Id.*]

Moreover, the Website, which has been updated since the filing of the Verified Complaint, now has a banner that reads "Colonels Redefined: Independence, Equity, 'Legal Rights, Privileges and Responsibilities' Work as a Licensed Kentucky Colonel" with a link to click to "Make it Official." *See* Website Homepage screenshot, www.kycolonelcy.us, taken on March 10, 2023, attached hereto as Exhibit 8. Clicking on the link to "Make it Official" leads to a form titled "Kentucky Colonel ™ User Application" (the "Form") and reads:

> **Payment is <u>not required</u> to complete this form,** this form is now a **prerequisite to engagement** with the company of colonels. This is an endeavor that is owned, operated and organized by individual Kentucky colonels to develop an equitable protective society and professional cooperative investment group that offers products and services collectively to one another. . . .
>
> . . .
>
> **Please read carefully**, this material is <u>important legal information</u> relevant to your **Letters Patent, Trademark (Title Mark), Qualified Immunity, Legal Rights Privileges, and Responsibilities as a Kentucky Colonel** understanding <u>common-law doctrines and protocols</u> locally, domestically, and internationally. This is being done to protect and uphold the

"**rights, privileges and responsibilities**" of the Kentucky **Colonel**. This effort constitutes an independent objective to identify, license, protect and regulate ourselves as colonels in a collectively private held company under the unregulated common-law trademark (TM) symbol for our exclusive rights used to define the (person and title) Kentucky Colonel in actuality, collectively, descriptively, generically, perceptively and realistically for commercial and non-commercial purposes in the public and private sectors in accordance with **law summarized with emphasis states:**

- **Kentucky colonels** (as individuals) shall not be prohibited (or restricted) from using "**Kentucky Colonel**," "**Kentucky colonels**" and/or "**Kentucky colonelcy**" as words or terms to **describe themselves**, . . . **as an honorary title, for editorial, educational, informative, journalistic, literary or other non-commercial (or lawful) purposes** so long as the use is not related to any trademark or service mark uses registered with the United States Patent and Trademark Office.

. . .

**Notice**: This Google Form is to **consolidate a multifunctional cooperative business entity and cooperative service organization under 501(f)** that can authorize and facilitate the creation of international employment credentials beginning in 2023. This form is **to purchase a one** [*sic*] **or more cooperative share(s) or a portion of a cooperative share to secure a work credential, ID card and/or cooperators license**. This offer is made in the good-faith [*sic*] of the spirit of cooperatives that is a social enterprise in formation for the desirable nondiscriminatory union of "**Facebook and LinkedIn Users**" that are colonels from privately administered and managed interest groups found online beginning in 2006; . . . to further exercise the rights, privileges and responsibilities of **The Honorable Office of the Colonelcy**. . . .

**Cost of Cooperative Ownership**: 2023 (our charter period) you can join based on a non-refundable donation to our sponsor **Ecology Crossroads Cooperative Foundation** and a full share will be 100% tax deductible and equitable inasmuch as a colonel, after two full years, a colonel will be able to sell, transfer or retire their space in the cooperative based on the actual value of their share, or whenever there is another colonel to take their place. . . .

Doing the math a person can join the cooperative now during the charter stage under one of four options to get the ID Card, Company Login, Workplace and Cloud Identity (**Join us now using PayPal**). PayPal users can adjusted their donation payment to match the amounts displayed below:

1. **$1,000 now, then $25 per month in 2023 (Founder)**
2. **$1,000 now, then $250 per year in 2024 (Charter)**
3. **$389.50 now then $300 per year in 2024 (Professional)**
4. **$164.50 now then $25 per month; (Ten Percenter)**
5. **$139.50 now then $25 per month (Five Percenter)** (Ends February 28, 2023)

All those that join the cooperative will receive legal forms that need to be printed, signed and photographed during the month of January and then in February as the necessary services become available ID Cards will begin arriving in the mail. All members must maintain their monthly payments to maintain services and the shares or a proportional shares they have accrued, **at the end of 2023 all 5 & 10 percenter members are updated to Professionals**.

Kentucky Colonel <sup>TM</sup> User Application, located on Website Homepage at www.kycolonelcy.us, taken on March 10, 2023, attached hereto as Exhibit 9.

The PayPal hyperlink through the Form shows donations being made to **Ecology Crossroads Cooperative Foundation** for "Kentucky Colonel 1775 Title Mark." PayPal screenshot, https://www.paypal.com/donate/?hosted_button_id=TPTE5P294KSYJ, taken on March 10, 2023, attached hereto as Exhibit 10. Defendants' solicitation of funds is also readily apparent from their use of the crowdfunding website crunchbase.com to raise funds for "Kentucky Colonel <sup>TM</sup>." [*Id.* at ¶ 38]. According to the page, "Kentucky Colonel <sup>TM</sup>" is a sub-organization of **Globcal International** and has a "Total Funding Amount" of "$7.5K." [*Id.*]. Based on the total amount raised, it is clear that Wright and the other Defendants have solicited and received contributions and payments using the KENTUCKY COLONELS Mark, and those

contributions have not and will not be shared with HOKC and are not subject to scrutiny by anyone other than Wright himself and the other Defendants.

Despite the Permanent Injunction, Wright and the other Defendants have continuously and extensively used the internet and social media as pulpits to confuse the public by misappropriating the KENTUCKY COLONELS Mark and the goodwill associated therewith while seeking donations for their own organization of Ecology Crossroads Cooperative Foundation, Inc. doing business as Globcal International (neither of which is registered with the Office of the Kentucky Attorney General as authorized to engage in charitable solicitation activities in the Commonwealth,[12] and the Articles of Incorporation of which do not include any "purpose" referring to individuals commissioned as a Kentucky Colonel or any activity related to Kentucky charitable work[13]).

## ARGUMENT

### HOKC IS ENTITLED TO A RESTRAINING ORDER AND INJUNCTION DIRECTING DEFENDANTS TO STOP THEIR CONTINUED MISUSE AND MISAPPROPRIATION OF THE KENTUCKY COLONELS TRADEMARK AND CYBERSQUATTING ACTIVITY.

"The preliminary injunction serves an important purpose—'to allow a victory by [the plaintiffs] to be meaningful.'" *McGirr v. Rehme*, 891 F.3d 603, 614 (6th Cir. 2018) (citation omitted). When considering a motion for preliminary injunctive relief, the Court must weigh the following factors: "'(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance

---

[12] https://www.ag.ky.gov/Resources/Consumer-Resources/charity/Documents/charity.pdf. For the Court's convenience, copies of the pages reflecting Defendants' absence on the list of charitable organizations registered in Kentucky are attached hereto as Exhibit 11.

[13] The Articles of Incorporation of Ecology Crossroads Cooperative Foundation, Inc. are attached hereto as Exhibit 12.

of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.'" *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005) (internal citation omitted). The four (4) considerations applicable to preliminary injunction decisions are to be balanced; they are not prerequisites to be met. *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 400 (6th Cir. 1997). "No single factor will be determinative as to the appropriateness of equitable relief." *Id.*

> For example, "a finding that the movant has not established a strong probability of success on the merits will not preclude a court from exercising its discretion to issue a preliminary injunction if the movant has, at minimum, 'show[n] serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued.'"

*Id.* at 399–400 (quoting *Gaston Drugs, Inc. v. Metro. Life Ins. Co.*, 823 F.2d 984, 988 n.2 (6th Cir. 1987)). "[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing" *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

Here, a victory by HOKC will not be meaningful unless Defendants are ordered—again—to stop infringing upon the KENTUCKY COLONELS Mark. And, they should be ordered to cease immediately, not only because their actions are so egregious, but also because their actions are in clear violation of this Court's Permanent Injunction. With each passing day of Defendants' continuing infringement, HOKC and its valuable trademark is irreparably injured. HOKC's likelihood of success is high, especially given this Court's issuance of the prior Permanent Injunction, and the requested injunction will cause no harm to Defendants, as any self-inflicted wound caused by infringement does not weigh against issuance of an injunction. The public interest is also served by the requested injunction, as it eliminates the intentional

confusion caused by Defendants' infringement. The four injunction factors weigh strongly in HOKC's favor and warrant issuance of injunctive relief.

## I.    <u>HOKC is Likely to Succeed on the Merits.</u>

While HOKC's Verified Complaint seeks relief under both federal and state law for civil contempt, trademark infringement, unfair competition, dilution, unjust enrichment, and violation of the Anticybersquatting Consumer Protection Act, HOKC seeks a temporary restraining order and preliminary injunction against Defendants only as to its trademark infringement and cyberpiracy claims.

### A.    <u>HOKC's Trademark Infringement Claim.</u>

Trademark rights in the United States arise from use. As the leading trademark commentator states "the first to use a designation as a mark in the sale of goods or services is the 'owner' and 'senior user.'" *See* 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 16:4 (5th Ed.).[14] Moreover, "[w]ith each sale of goods or services under such a business symbol, the seller builds up greater and greater legal rights in that symbol." *Id.* § 16:1. As the Sixth Circuit has stated, "trademark law now pursues two related goals–the prevention of deception and consumer confusion and, more fundamentally, the protection of property interests in trademarks." *Ameritech, Inc. v. American Information Technologies Corporation*, 811 F.2d 960, 964 (6th Cir. 1987). It is indisputable that HOKC has used the KENTUCKY COLONELS Mark for decades and has clearly-established rights and priority in the use of the KENTUCKY COLONELS Mark in connection with specific goods and services over Defendants. In addition

---

[14] *McCarthy on Trademarks and Unfair Competition* is available electronically and therefore, pursuant to LR 7.1(h), the cited portions are not attached. However, Plaintiff will provide copies to the Court upon request.

to being federally registered, the KENTUCKY COLONELS Mark has become synonymous with HOKC's services to its members and its charitable mission to the Commonwealth and beyond.

The Lanham Act specifically provides for injunctive relief to prevent the violation of any right of a trademark holder. *See* 15 U.S.C. § 1116. HOKC's trademark registrations are prima facie evidence of the validity of its Mark. *See* 15 U.S.C. § 1115. "The touchstone of liability under § 1114 is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods [or services] offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997).

Courts in the Sixth Circuit evaluate likelihood of confusion cases using the eight-factor test set forth in *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642 (6th Cir. 1982). The "*Frisch's* factors," as they have come to be known, consist of: (1) strength of the plaintiff's mark; (2) relatedness of the parties' goods or services; (3) similarity of the parties' marks; (4) evidence of actual confusion between the parties' marks; (5) marketing channels used by the parties; (6) likely degree of purchaser care in the relevant consumer group; (7) the defendant's intent in selecting the mark; and (8) likelihood that either party will expand its product lines. *Id.* at 648; *see also Ga.-Pac. Consumer Prods. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1100-01 (6th Cir. 2012).

While these factors are a guide to determine whether confusion is likely, HOKC does not need to show all, or even most, of the factors to prevail on its claim. *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1186 (6th Cir. 1988); *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991) ("Each case presents its own complex set of circumstances and not all of these factors may be particularly helpful in any given case."). "The 'ultimate

question [is] whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way.'" *Ohio State Univ. v. Thomas,* 738 F. Supp. 2d 743, 749 (S.D. Ohio 2010) (citations omitted). In this case, HOKC's Verified Complaint establishes that Defendants are intentionally and willfully infringing upon its KENTUCKY COLONELS Mark by using an identical or nearly identical mark to offer what purports to be identical services. HOKC is highly likely to succeed on the merits on its claims for trademark infringement and therefore is entitled to the relief it seeks.

i.  ***Frisch's* Factor No. 1*:* KENTUCKY COLONELS is a strong and well-known Mark throughout the world.**

The likelihood that consumers will confuse Defendants' use of HOKC's trademark as being authorized or endorsed by HOKC is extremely high. The stronger a trademark, the broader the scope of protection it enjoys, and the KENTUCKY COLONELS Mark is well-known throughout the world. As the Sixth Circuit recently noted, "[t]he stronger a mark is, the greater the risk of confusion." *Kibler v. Hall*, 843 F.3d 1068, 1073 (6th Cir. 2016) (citing *Homeowners*, 931 F.2d at 1107); *see also Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1117 (6th Cir. 1996). ***A strong mark "casts a long shadow which competitors must avoid."*** *Kenner Parker Toys Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 353 (Fed. Cir. 1992) (emphasis added). Accordingly, "the 'most important *Frisch* factors are similarity and strength of the mark." *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 424 (6th Cir. 2012) (quoting *Gray v. Meijer, Inc.*, 295 F.3d 641, 646 (6th Cir. 2002)).

To determine the strength of a mark, courts in the Sixth Circuit look at the conceptual and commercial strength of a mark. *Butler v. Hotel Cal., Inc.*, 106 F. Supp. 3d 899, 906 (N.D. Ohio 2015) (citing *Homeowners*, 931 F.2d at 1107). The KENTUCKY COLONELS Mark has developed a high level of conceptual strength, or distinctiveness in the marketplace, through its

18

decades of continual use by HOKC. *See id.* The commercial strength of a mark considers the public's recognition of a mark—"the extent to which people associate the mark with the product [or services] it announces." *Kibler*, 843 F.3d at 1074.

In this case, HOKC has continuously and exclusively used the KENTUCKY COLONELS Mark since 1931 [Verified Comp., ¶ 14]. As a result, the KENTUCKY COLONELS Mark has become well-known throughout the world, and it is inextricably intertwined with HOKC, its member services, and its charitable work. Any use of the KENTUCKY COLONELS Mark by Defendants will inevitably cause confusion and create the mistaken impression that HOKC is associated or affiliated with Defendants' organizations and activities, or that HOKC approves of or endorses Defendants' organizations and activities.

Moreover, HOKC has an incontestable registration for KENTUCKY COLONELS. An incontestable registration—based on five (5) or more years' of continuous use on or in connection with certain goods or services provided certain conditions are met—is immune from challenge and presumed to be strong. *See* 15 U.S.C. § 1065; *Jet, Inc. v. Sewage Aeration Sys.*, 165 F.3d 419, 422 (6th Cir. 1999). Finally, the strength of HOKC's Mark is enhanced by the fact that there is no evidence of any other similar marks for similar goods or services actively being used in commerce. *See Daddy's Junky*, 109 F.3d at 281.

ii.  ___*Frisch's* Factor No. 2: The services at issue are directly related and competitive.___

The relatedness of the activities in which Defendants purportedly intend to engage equally supports the injunction requested by HOKC. "Services and goods 'are related not because they coexist in the same broad industry, but are related if the services are marketed and consumed such that buyers are likely to believe that the services, similarly marked, come from the same source, or are somehow connected with or sponsored by a common company.'"

*Daddy's Junky*, 109 F.3d at 282-83 (citing *Homeowners Group, Inc.*, 931 F.2d at 1109). Here, HOKC engages in charitable fundraising services in connection with the KENTUCKY COLONELS Mark. Wright and the other Defendants are also soliciting charitable contributions and funds (although apparently under false pretenses) using an identical or nearly identical mark. Defendants are intentionally using the KENTUCKY COLONELS Mark to confuse the consuming public into believing that they are the official and authorized membership organization for the KENTUCKY COLONELS services. The competing enterprise maintained by Defendants would be—and is—easily confused by the public as being supported by or affiliated with HOKC.

### iii.   *Frisch's* Factor No. 3: The Parties' Marks are similar.

Here, Defendant is intentionally using a mark that is not just similar, but identical or nearly identical. In assessing similarity, "'courts must determine whether a given mark would confuse the public when viewed alone, in order to account for the possibility that sufficiently similar marks may confuse consumers who do not have both marks before them but who may have a general, vague, or even hazy, impression or recollection of the other party's mark.'" *Maker's Mark*, 679 F.3d at 421 (quoting *Daddy's Junky*, 109 F.3d at 283). The identical or nearly identical nature of the marks, used in connection with essentially identical services, will create a likelihood of confusion. Accordingly, this *Frisch's* factor clearly weighs in favor of HOKC.

### iv.   *Frisch's* Factor No. 4: Actual confusion between the Marks.

"Actual confusion" occurs when a consumer is confused about the source of goods or services because of similarity between two marks. While evidence of actual confusion is "'undoubtedly the best evidence of likelihood of confusion,'" it is very difficult to obtain. *See*

*Daddy's Junky*, 109 F.3d at 284 (citation omitted). "Due to the difficulty of securing evidence of actual confusion, a lack of such evidence is rarely significant . . . ." *Id.* (citations omitted); *see also Maker's Mark*, 679 F.3d at 422.

Here, HOKC has experienced evidence of actual confusion as a result of Defendants' continued activities. In December 2022, four (4) separate Kentucky Colonels contacted HOKC regarding the validity of the KENTUCKY COLONEL Facebook page offering "Kentucky Colonel Photo ID Cards." [Verified Compl., ¶ 55]. One (1) Kentucky Colonel contacted HOKC on December 30, 2022 with concerns over Defendants' creation of badges. [*Id.*] Another Kentucky Colonel contacted HOKC on January 13, 2023 regarding obtaining a badge similar to those discussed on the Website and Defendants' various social media pages. [*Id.*]. Two (2) Kentucky Colonels have contacted HOKC regarding confusion as to the KENTUCKY COLONEL COMMUNITY Facebook group, the KENTUCKY COLONEL CLUB Facebook group, and the KENTUCKY COLONEL Facebook page, believing the accounts to be run by HOKC. [*Id.*]. One (1) of those Kentucky Colonels was particularly confused by a post in the KENTUCKY COLONEL COMMUNITY Facebook group regarding "No More Confusion in the 'Kentucky Colonel Community,'" understanding the post to mean that HOKC was restarting. [*Id.*]. That same Kentucky Colonel was confused as to why he was being asked to contribute financially again. [*Id.*]. This evidence of actual confusion weighs heavily in favor of HOKC.

## v.    *Frisch's* Factor No. 5: The parties use identical marketing channels.

The likelihood of confusion among services is increases when the marketing methods used to promote the services at issue are substantially similar. *Frisch's*, 670 F.2d at 648. Here, both HOKC and Defendants maintain an online presence through social media, including Facebook pages, Kentucky Colonel membership websites, charitable online giving features, and

other similar marketing channels. More importantly, Defendants, through Wright, are intentionally creating confusion through social media accounts and the Website.

      vi.    ***Frisch's* Factor No. 6: The likely degree of purchaser care is low.**

The sixth *Frisch's* factor requires the Court to determine the likely degree of purchaser care, which is not particularly applicable to this set of facts in which Defendants are engaging in purposeful use of the KENTUCKY COLONELS Mark. In this case, the purchaser, even in exercising care, may still be confused because of Defendants' purposeful attempts to appear to be an official organization affiliated with the KENTUCKY COLONELS Mark and to trade off of the goodwill of the KENTUCKY COLONELS brand.

      vii.    ***Frisch's* Factor No. 7: Defendants intended to copy the Mark.**

The intent of defendants is also assessed when determining the likelihood of consumer confusion. "Direct evidence of intentional copying is not necessary to prove intent. Rather, the use of a contested mark with knowledge of the protected mark at issue can support a finding of intentional copying." *Daddy's Junky*, 109 F.3d at 286 (citation omitted). Defendants are clearly aware of HOKC's Mark and know the Permanent Injunction is in place. Nevertheless, Defendants continue to use HOKC's Mark for their own personal and financial gain. In fact, Wright and his affiliated organizations dramatically increased their improper infringement activities *after* this Court entered the Permanent Injunction.

      viii.    ***Frisch's* Factor No. 8: Expansion of product lines.**

In this case, Defendants' fraudulent services are directly competing with HOKC's legitimate services. The Sixth Circuit holds that in such instances, where products or services are directly competing, there "is no need for discussion of this factor." *Little Caesar Enterprises, Inc. v. Pizza Caesar, Inc.,* 834 F.2d 568, 572 (6th Cir. 1987).

ix.   **The *Frisch's* Factors, taken together, weigh strongly in favor of HOKC.**

Certainly, HOKC once again has a strong likelihood of success on the merits in its claim of trademark infringement. ***Cases like this are why trademark laws exist***. Trademark infringement is problematic in any case, but it simply cannot be tolerated when being done not only in blatant violation of a court order but also to divert charitable and membership dollars for Defendants' unjust personal financial gain. To prevent irreparable injury and maintain the status quo, the temporary restraining order and preliminary injunction requested by HOKC should be granted.

B. **HOKC's Anticybersquatting Consumer Protection Act Claim.**

HOKC is also likely to succeed on the merits of its claim under the Anticybersquatting Consumer Protection Act ("ACPA"). Paragraph 3 of the Permanent Injunction states that:

> Defendants, and anyone acting on their behalf, including their owners, members, officers, agents, servants, employees, attorneys, and any other persons in active concert or participation with Defendants, are permanently enjoined and prohibited from using the domain names [kycolonels.internatonal], [kentucky.colonels.net], or any other domain name that is confusingly similar to [kycolonels.org] or *any domain name* that incorporates the KENTUCKY COLONELS Mark, or any mark that is confusingly similar to the KENTUCKY COLONELS Mark, including, but not limited to, KENTUCKY COLONELS INTERNATIONAL and KENTUCKY COLONEL FOUNDATION.

[Verified Compl., ¶ 26 (citing Permanent Injunction, ¶ 3)]. HOKC's domain name is <kycolonels.org>. [*Id.* at ¶ 91]. Defendants' Website domain name is <kycolonelcy.us>. [*Id.* at ¶¶ 29, 63, 92].

The ACPA prohibits cybersquatting, also call cyberpiracy, which refers to a party other than a trademark holder registering a domain name of a well-known trademark in an attempt to profit by either ransoming the domain name back to the trademark holder or using the domain

name to divert business away from the trademark holder and to the domain name holder. *Daimlerchrysler v. The Net Inc.*, 388 F.3d 201, 204 (6th Cir. 2004) (citing *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489 493 (2d Cir. 2000)). The ACPA applies to a party who "registers, traffics in, or uses a domain name" that is "identical or confusingly similar to" a distinctive mark or "identical or confusingly similar to or dilutive of" a famous mark. 15 U.S.C. § 1125(d)(1)(A). To establish a prima facie claim under the ACPA, a plaintiff must show that it (1) owns a valid trademark entitled to protection; (2) the mark is distinctive or famous; (3) the challenged domain name is identical or confusingly similar to or dilutive of the plaintiff's distinctive or famous mark; and (4) defendant registered, trafficked in, or used the challenged domain name (5) with a bad faith intent to profit from the plaintiff's mark. 15 U.S.C. § 1125(d)(1)(A); *Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 546 (6th Cir. 2003).

Here, HOKC has presented sufficient evidence as to the first two elements, namely, that it is the owner of a valid and distinctive trademark entitled to protection. *See, e.g.*, Section I.A *supra*; Verified Compl., at ¶ 15; *see also* Order, Civil Action No. 3:20-cv-132-RGJ, attached hereto as Exhibit 4, at p. 8 ("HOKC has presented sufficient evidence that they have a valid mark entitled to protection that is distinct."). As to the third element, Defendant's Website domain name <kycolnelcy.us> is confusingly similar in sight, sound, and meaning to HOKC's KENTUCKY COLONELS Mark and domain name <kycolonels.org>, which is the only relevant likelihood of confusion analysis for an ACPA claim. *See N. Light Technology, Inc. v. N. Lights Club*, 97 F. Supp. 2d 96, 117 (D. Mass. 2000) (court should make "direct comparison between the protected mark and the domain name itself" and not an assessment of the context in which each is used or the content of the offending website); *see also Omega S.A. v. Omega Eng'g, Inc.*, 228 F. Supp. 2d 112, 126 (D. Conn. 2022); *Newport News Holdings Corp. v. Virtual City Vision,*

*Inc.*, 650 F.3d 423, 436-37 (4th Cir. 2011) (content of the challenged website, including any disclaimer, is irrelevant to analysis). Moreover, it is clear that Defendants registered and are using the Website domain name.

The ACPA requires proof that a defendant had a bad faith intent to profit from the challenged domain name. 15 U.S.C. § 1125(d)(1)(A)(i). When evaluating the fifth element of a bad faith intent to profit, courts generally consider the nine (9) factual scenarios listed in the ACPA that may be relevant to a bad faith determination as well as the unique facts or circumstances of the case and how they affect the evaluation of the nine (9) bad faith factors. *See Rearden LLC v. Rearden Commerce. Inc.*, 683 F.3d 1190, 1220 (9th Cir. 2012). The nine (9) factors from the ACPA for the court to consider include:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
>
> (II) the extent to which the challenged domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
>
> (III) the person's prior use, if any, of the domain name in connection with the bona fide offerings of any goods or services;
>
> (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
>
> (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
>
> (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of [the ACPA].

15 U.S.C. § 1125(d)(1)(B)(i).

The unique facts and circumstances of this case cannot be overlooked when analyzing the nine (9) statutory factors to determine a bad faith intent to profit. Wright and Defendants were "permanently enjoined and prohibited from using the domain names [kycolonels.international], [kentucky.colonels.nret], or any other domain name that is confusingly similar to [kycolonels.org]." [Verified Compl., ¶ 26 (citing Permanent Injunction, ¶ 3)]. The Permanent Injunction also prohibited Defendants from using "*any domain name* that incorporates the KENTUCKY COLONELS Mark, or any mark that is confusingly similar to the KENTUCKY COLONELS Mark." *Id.* Despite the Permanent Injunction, Defendants use the current Website domain name, which incorporates and is confusingly similar to HOKC's Mark and links directly to Defendants' Website, to provide various membership services to compete with HOKC. Furthermore, Defendants, via their Website, seek donations to be "owners" of their "Cooperative," with the donations going to their own entity—Ecology Crossroads Cooperative Foundation. *See* Kentucky Colonel [TM] User Application, attached hereto as Exhibit 9. Taken together with the evidence of confusion discussed in Section I.A above, it is clear that

Defendants have a bad faith intent to profit and HOKC has demonstrated a likelihood of success on the merits of its ACPA claim. Therefore, the temporary restraining order and preliminary injunction requested by HOKC should be granted.

## II.   Defendants' Continued Infringement of HOKC's KENTUCKY COLONELS Mark Poses a Threat of Irreparable Harm.

In the trademark context, the requirement of irreparable injury is to be interpreted liberally. The Sixth Circuit has unequivocally held that "irreparable harm is *presumed* from defendant[']s infringement of plaintiff's mark." *DaimlerChrysler v. The Net Inc.*, 388 F.3d 201, 208 (6th Cir. 2004) (citations omitted) (emphasis added). "The law of this Circuit holds that no particular finding of likelihood of . . . irreparable harm is necessary for injunctive relief in trademark infringement or unfair competition cases." *Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1056 (6th Cir. 1999) (citing *Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 608 (6th Cir. 1991)). Further, "[o]nce a moving party has demonstrated a likelihood of confusion, a finding of irreparable injury ordinarily follows." *Ohio State*, 738 F. Supp.2d at 755.

"The irreparable injury flows both from the potential difficulty of proof of plaintiff's damages, and also from the impairment of intangible values." *Wynn*, 943 F.2d at 608 (internal quotation marks omitted) (citations omitted)). Further, where a defendant is unlawfully infringing upon a trademark, irreparable injury follows from the damage to a plaintiff's reputation and the development of goodwill in its mark. *See DaimlerChrysler*, 388 F.3d at 208. A court may also consider the potential loss of control over the quality of goods associated with the plaintiff's mark and the risk of damage to the plaintiff's reputation and mark. *See Woodroast Sys., Inc. v. Rests. Unlimited, Inc.*, 793 F. Supp. 906, 918 (D. Minn. 1992), *aff'd* 994 F.2d 844 (8th Cir. 1993). The consequences of trademark infringement and unfair competition, including the attendant loss of goodwill and injury to reputation along with control over the nature and

quality of the goods, are intangibles for which the trademark owner cannot later be made whole through an award of monetary damages.

Defendants' use of HOKC's KENTUCKY COLONELS Mark, including through its Website domain name, poses a certain and immediate threat of irreparable injury to the reputation and goodwill of HOKC. The injury to HOKC's goodwill and other charitable interests caused by this conduct will only increase as Defendants' activities continue. Indeed, it is likely that HOKC's support of numerous charities would be irreparably harmed if Defendants are permitted to profit from the KENTUCKY COLONELS Mark and Website domain name. Moreover, unless Defendants are enjoined once again from infringing HOKC's Mark, it will be difficult to subsequently quantify how many contributions were lost due to Defendants' actions. *See, eg., Budish v. Gordon*, 784 F. Supp. 1320, 1337 (N.D. Ohio 1992).

The injury which will be sustained by HOKC is more than financial, however. HOKC has spent many years developing its reputation and goodwill throughout the world. Here, continued use of its Mark by Defendants, including through Defendants' Website domain name, could cause HOKC to suffer a substantial loss of goodwill among its members and the general public, as consumers are confused into thinking that HOKC is acting in concert with organizations and individuals that have no ties to HOKC. The threat that the goodwill of HOKC will be diminished and the prestige and honor associated with the KENTUCKY COLONELS Mark tarnished is an injury which cannot be rectified monetarily. The injury is immediate and continuing and cannot be repaired. *See Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) (holding that "[t]he loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute"); *Michigan Bell Telephone Co. v. Engler*, 257 F.3d 587, 599 (6th Cir. 2001) (noting same); *Genny's Diner & Pub, Inc. v. Sweet Daddy's, Inc.*,

812 F.Supp. 744, 747 (W.D. Ky. 1993) (finding that where confusion is highly likely, the loss of goodwill is irreparable or, at best, only very slowly regained, and noting that damages for such harm are clearly inadequate).

HOKC has sufficiently demonstrated the irreparable harm which it will suffer if the injunctive relief sought is not granted. The motion for a temporary restraining order and a preliminary injunction should be granted.

## III.   <u>The Balance of Injuries Weighs Decidedly in Favor of HOKC.</u>

Harm caused to apparent infringers is not entitled to consideration. *Worthington Foods, Inc. v. Kellogg Co.*, 732 F. Supp. 1417, 1461 (S.D. Ohio 1990). "[I]f the plaintiff alleging trademark infringement can show a likelihood of success, the 'harm to others' factor of the preliminary injunction standard would normally favor the plaintiff as well." *Id*. at 1462. The threatened injury to HOKC therefore far outweighs whatever harm the issuance of an injunction may cause Defendants.

The relief requested by HOKC prohibits Defendants from doing what it should not be doing in the first place—using a trademark to which it has no legal right and cybersquatting— and enforcing the Permanent Injunction already in place. "Where the harm to an alleged infringer from a preliminary injunction is self-inflicted, courts typically find that such harm is a natural consequence of infringing activity that does not weigh against issuance of an injunction." *Anderson v. TOL, Inc.,* 927 F. Supp. 2d 475, 488 (M.D. Tenn. 2013). Any harm to Defendants is self-inflicted, as Defendants knew of the HOKC's longstanding rights in the KENTUCKY COLONELS Mark and were very much aware of the Permanent Injunction permanently prohibiting its current conduct. *See Papa John's Int'l, Inc. v. Specktacular Pizza, Inc.*, No. 3:05-cv-515-H, 2005 WL 3132337, at *5 (W.D. Ky. Nov. 21, 2005); *see also KFC Corp. v. Goldey*, 714 F. Supp. 264, 267 (W.D. Ky. 1989) ("As to the threatened harm to plaintiff compared with

the threatened harm to the defendant, the courts have usually held that where the plaintiff is an authorized trademark holder and the defendant is improperly using the trademark, then the threatened harm to the trademark owner outweighs the threatened harm to the defendant.").

In fact, the relief requested will only bring Defendants into compliance with the Permanent Injunction and prevent them from doing what they should not be doing in the first place. "Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense 'merits little equitable consideration.'" *Budish v. Gorden*, 784 F.Supp. 1320, 1338 (N.D. Ohio 1992) (citations omitted); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 253 F.Supp.2d 943, 973 (E.D. Ky. 2003) ("One cannot build a business based upon infringing another's intellectual property rights, and then be allowed to complain that making them stop will cause harm"). Furthermore, when a plaintiff has made a substantial investment of time and money in its mark as opposed to the investment by the infringer, the balance of hardships tips in the plaintiff's favor. *See Woodroast Sys., Inc. v. Restaurants Unlimited, Inc.*, 793 F.Supp. 906, 919 (D. Minn. 1992), *aff'd* 994 F.2d 844 (8th Cir. 1993).

HOKC has invested nearly a century in developing the goodwill behind its KENTUCKY COLONELS Mark for use in connection with various goods and services. Defendants are using HOKC's trademark to lend authenticity to an organization which, by its own admission, is creating a competing "new group" "empowered with the same legal 'rights, privileges and responsibilities' of the Kentucky Colonel." It is particularly harmful to HOKC's reputation since the individuals and entities misappropriating the Mark are not registered with the Office of the Kentucky Attorney General as authorized to engage in charitable solicitation activities and the Articles of Incorporation for the entity ultimately receiving the donations make absolutely zero

reference to individuals commissioned as a Kentucky Colonel or any activity related to Kentucky charitable work in its states purposes. Accordingly, as the only potential injury to Defendants would be profits lost from their infringing activities, the balance of equities lies heavily in favor of HOKC. The motion for injunctive relief should be granted.

**IV.**     <u>**Granting Injunctive Relief is in the Public Interest.**</u>

The injunctive relief sought by HOKC is clearly in the best interest of the public. Unlike other types of preliminary injunction matters, in a trademark infringement matter, "a third party, the consuming public, is present and its interests are paramount." *See* 1 McCarthy, *supra* p. 8, § 2:22 (quoting *James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 274 (7th Cir. 1976)). When a trademark is infringed, what is actually infringed is the right of the public to be free of confusion and the synonymous right of the trademark owner to control its product's (or service's) reputation. *Id*. As a result, public policy concerns often "weigh in favor of preliminary injunctive relief because an injunction would halt confusion in the marketplace." *Ohio State*, 738 F. Supp. 2d at 756-57. In the present case, it is certainly in the public interest to prevent confusion between the services provided by HOKC and the activities of others improperly using the KENTUCKY COLONELS Mark.

HOKC is a nonpartisan nonprofit organization that distributes grants to nonprofit organizations. To raise money for charity, HOKC solicits contributions from appointed Kentucky Colonels, holds an annual barbeque picnic, engages in service, sells a wide variety of merchandise that bears the KENTUCKY COLONELS Mark, and participates in other such fundraising activities. On an annual basis, HOKC raises and distributes millions of dollars to charitable and educational organizations across the Commonwealth and beyond, and confusion or harm to its goodwill could impair HOKC's efforts to raise money for such worthy causes. Defendants' infringement of HOKC's KENTUCKY COLONELS Mark and cybersquatting

activity violates HOKC's statutory rights and increases the chances of additional consumer confusion, especially with regard to donations. HOKC's motion for a temporary restraining order and a preliminary injunction is in the public interest and should be granted.

## **CONCLUSION**

HOKC is suffering irreparable injury from Defendants' continued infringement of its trademark and cybersquatting activities, and membership of HOKC continues to be duped by Defendants for Defendants' own financial gain, all in violation of this Court's Permanent Injunction as well as HOKC's statutory rights. HOKC has offered sufficient evidence to show that Defendants' continued use of the KENTUCKY COLONELS Mark is harming HOKC and continues to cause actual confusion to the public. HOKC respectfully requests that its motion for a temporary restraining order and a preliminary injunction be granted and that the proposed Orders be entered with all possible haste.

Respectfully submitted,

*/s/ Cornelius E. Coryell II*
Cornelius E. Coryell II
Julie Laemmle Watts
WYATT, TARRANT & COMBS, LLP
400 West Market Street, Suite 2000
Louisville, KY  40202
(502) 589-5235
ccoryell@wyattfirm.com
jwatts@wyattfirm.com

*Counsel for Plaintiff, the Honorable Order of Kentucky Colonels, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.  I further certify that a true and correct copy of the foregoing has been served upon the following, via U.S. Mail and/or electronic mail, on the 13th day of March, 2023:

Globcal International
c/o Maya-Lis A. Wright
302 General Smith Drive
Richmond, KY 40475

Ecology Crossroads Cooperative Foundation, Inc.
c/o Maya-Lis A. Wright
302 General Smith Drive
Richmond, KY 40475

David J. Wright
302 General Smith Drive
Richmond, KY 40475
David.wright@globcal.net

*/s/ Cornelius E. Coryell II*
*Counsel for Plaintiff, the Honorable Order of*
*Kentucky Colonels, Inc.*

101055398.1