FILED

JAMES J. VILT JR., CLERK
U.S. DISTRICT COURT
W/D OF KENTUCKY

Date: _____Mar 28, 2023_____

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# LOUISVILLE DIVISION

|  |  |  |
|---|---|---|
| **THE HONORABLE ORDER OF KENTUCKY COLONELS, INC.** **Plaintiff** | ) ) ) ) ) | **Civil Action No. 3:23-cv-00043-DJH** |
| **vs.** | ) ) | **MOTION TO TAKE JUDICIAL NOTICE OF ADJUDICATIVE FACTS** |
| **COL. DAVID J. WRIGHT, et.al.** **Defendant(s)** | ) ) ) | |

## DEFENDANTS' MOTION TO TAKE JUDICIAL NOTICE OF ADJUDICATIVE FACTS

COMES NOW, **Col. David J. Wright**, ("Defendant") in *pro se* pursuant to Federal Rules of Civil Procedure 7, 11 and 57, Title 28 U.S.Code §§ 2201, 2202, Title III of the United States Constitution, First and the 14th Amendment, previously recognized understanding this Honorable Court on February 23, 2021 when similar allegations were **dismissed with prejudice, in-law, without any finding in law, justly and under a court mediated settlement resulting in an Agreed Permanent Injunction to evade and prevent this Court from hearing Defendant's Answer and Affirmative Defenses and consider a pending Motion for a Declaratory Judgment to cancel the Plaintiff's registered trademarks in Case 3:20-cv-00132.** This Case "3:20-cv-00132" rests in *res judicata* with dozens of fallacious arguments based on theoretical concepts and speculative conclusions that the Plaintiff is trying to awaken to overturn in an effort to usurp the rights, privileges, and responsibilities warranted to the Defendant in 1996 by Honorable Governor Paul E. Patton of Kentucky.

The Defendant must now demonstrate that this Court has made a grave error understanding and allowing the Plaintiff to continue to beguile the Court with commercial and corporate rights based in a fictional narrative of folklore-like fantasy role-playing of a fictitious unlawful militia made up of

Kentucky colonels with no duties, obligations or rights except to donate money to without any genuine connection other than their honorary standing therein. This Defendant now wants all the donations that have been misappropriated based on a fraudulent, propagandist, racist and zionist narrative to be refunded to all donors and contributors that have supported the organization since 1957. Now the Plaintiff want to bring suit against the only person willing to uncover their dishonorable behavior.

## LAW OF JUDICIAL NOTICE

As a general principle of trial-practice, courts are to be guided, in reaching their conclusions, only by the evidence adduced in the particular case and by the rules of law applicable to it. There are, however, certain classes of facts which are not properly the subject of testimony, or which are regarded as universally established by common notoriety, and these, being held to rest within the knowledge of the judge, need not be proved in the case. There are cases in which this process is not so clear.

Constitution and Laws of the United States. - In the first place, courts are always presumed to know the laws under which they act and which they are to administer. This is obviously essential to the first steps in judicial proceedings. And accordingly, any branch or division of the body of the law which applies to the territory within the jurisdiction of the court need not be established as matter of fact, but will be officially noted. And since the Constitution of the United States, the public acts of Congress, and the treaties made by the Federal Government with foreign nations form a part of the "supreme law of the land," it follows that all courts, whether national or state, will take judicial notice of their provisions.

Public Laws of the State - Since the common or unwritten law of the state, together with its general and public statutes, constitute an integral part of the domestic jurisprudence, these also are proper subjects for the judicial cognisance of the court : *Lane v. Harris*, 16 Ga. 217.

When a court case begins, a complaint by the Plaintiff is presented and heard; the judge comes to understand the information by which allegations are based whether they be in fact or fiction.  In Case 3:20-cv-00132 (which was dismissed with prejudice) the Plaintiff presented a false designation of its origin, established false descriptions as their reality and elaborated substantial facts relative to its own

background, it also omitted a great number of essential facts about its own history (the subject of the case) and information relative to the Defendant which it knew and should have disclosed. This Court is being moved to understand the facts prior to closely examining the Plaintiff's second claim against the Defendant; this Court must understand that the Plaintiff represents a misappropriated false-origin and a fictitious militia with fake generals, they are not legally entitled to the "Kentucky Colonel" title in any way, their registered trademarks "Kentucky Colonels" (with the letter S x 9) are for arbitrary and distinctive products and services, unrelated classes registered in the United States Patent and Trademark Office ("USPTO"). The Defendant is using the Title: "**Kentucky Colonel**" with the "**™ Symbol**" to avoid infringing, which is the appropriate unregistered common-law legal use for a Kentucky Colonel to distinguish themself from the Registered Service mark, Trademark and Wordmark (® Symbol) for the Plaintiff, which is displayed as "KENTUCKY COLONELS" or "Kentucky Colonels ®." The Plaintiff has also demonstrated a reluctance to disambiguate its own use of the terms "Kentucky colonel" and "Kentucky Colonels" into the nine of thirty-four commercial classes under USPTO, despite their legal muscle flexing and bullying of others that choose to use the terms descriptively, literally and selectively fairly. The Plaintiff fails to state a claim and does not present a single actionable charge that can prevent the fair and legal use of the **Title: Kentucky Colonel** described in **Clause 5 of the Agreed Permanent Injunction**; this entire case is based on pure speculation of what the Defendant may do or what the Defendant has within his special rights to do as a professional Kentucky Colonel, the Plaintiff is also preying on the ignorance of the court (lack of experience and knowledge dealing with the subject matter of the Kentucky Colonel). The Plaintiff, states presumptively and vaguely they have all these trademarks reserved for an exclusive legal title (term), but fails to present a single legitimate claim as to which specific one is being violated or show any particular merit as to exactly how or what with great assumption. The Plaintiff is fighting against an ever looming threat in the noosphere over a title that has been famous for almost 200 years, which does not belong to it now or has in the past, the Plaintiff is not the State of Kentucky and has not brought this case on behalf of the Commonwealth, but for its own

benefit as a charity and a commercial enterprise that produces goods and services targeted at the Defendant's letters patent as a Kentucky Colonel.

A great deal of the Plaintiff's evidence seems to be beside the point, first of all, because the confidential nature of the sealed document **[DE-7 from Case 3:20-cv-00132]** (a legal private business merger offer which started the first case resulting in this controversy) is not dependent on whether the information which it contains is available elsewhere; but, on the question of whether it contains useful information which has been compiled by the Defendant for a particular purpose of a merger or consolidation with the Plaintiff and, if it does contain such information and if it has been compiled and handed over to the Plaintiff for a particular purpose, then, in accordance with the law, that document is confidential and the Plaintiff is not entitled to use it for another purpose". When the Plaintiff considered itself to be smarter, better, more original, or somehow rightfully entitled because of their accomplishments it became arrogant and more belligerent. Upon the conclusion of the previous case the Plaintiff began using the information contained in the merger proposal which started the first case without the Defendant's authorization or permission.

## JUDICIAL NOTICE OF ADJUDICATIVE FACTS

When a case is dismissed with prejudice, normally there is an abundance of facts, logic, rationale, reason and indisputable evidence within the context of the dismissed case that would prevent a new case from being entertained by a court in the future. While similar and previous cases serve well to demonstrate facts; there are many sources of indisputable event based facts that can be demonstrated as judicial notice. The earliest use of judicial notice does not come from the rules of evidence for use at trial. Instead, the *first application of judicial notice was at the motion to dismiss stage*. Early American courts *took judicial notice of obvious facts that were omitted from a pleading* (complaint) to avoid having to dismiss a claim.[1]

Although judicial notice would soon become enshrined in the Federal Rules of Evidence and used during

---

[1] See JAMES BRADLEY THAYER, A PRELIMINARY TREATISE ON EVIDENCE AT THE COMMON LAW 279-286 (1898) (explaining that judicial notice was used to circumvent rigid pleading rules which required indispensable words be used to maintain a legal action; for example, "felonice" and "burglariter" were required when referring to a felony or burglary).

trials, it started as a simple means of convenience for the court. While the rule has evolved over the years, the importance of convenience has remained constant, and judicial notice has developed into a tool to circumvent long and inefficient procedural hurdles in all stages of litigation.

The use of judicial notice at trial developed as a matter of common sense and convenience. The opportunity to save time, work, and money made judicial notice a valuable resource. As John Henry Wigmore explained:

> The object of this rule is to *save time, labor, and expense in securing and introducing evidence on matters which are not ordinarily capable of dispute* and are actually not bona fide disputed, and the tenor of which safely be assumed from the tribunal's general knowledge or from slight research on its part. . . It thus becomes a useful expedient for speeding trials and curing informalities. *Rules of Evidence* § 2120 (1910)[2]

Wigmore identified three general classes of matters that were authorized to be judicially noticed:

A. Matters which are necessary for exercising the judicial functions and are therefore likely to be already known to the judge by virtue of his office;

B. Matters which are actually so notorious in the community that evidence would be unnecessary;

C. Matters which are not either necessary for the judge to know nor actually notorious, but are capable of such positive and exact proof, if demanded, that no party would be likely to impose upon the tribunal of a false statement in the presence of an intelligent adversary. *Id.* at § 2130.

This meant a fact could be judicially noticed where it was: (a) already known; (b) obvious; or (c) so easy to prove that no intelligent person would contradict it.

The United States Supreme Court in *Brown v. Piper*, 91 U.S. 37 (1875), provides a good example of judicial notice during the early common law period. In that case, Piper filed an action to prevent Brown from infringing on his patent for preserving fish using a freezing mixture. Brown denied that Piper held a patent on the freezing mixture, and further denied the novelty of the invention. The circuit court upheld the validity of Piper's patent. The Supreme Court reversed. Relying on judicial notice, the <u>Court held that evidence of what is old and in general use at the time of an alleged invention is admissible</u>. *Id. at 38*. In this instance, the Court noted that the freezing mixture was already well-known and used frequently at the

[2] JOHN HENRY WIGMORE, THE POCKET CODE OF THE RULES OF EVIDENCE IN TRIALS AT LAW § 2120 (1910) (emphasis added).

time, for example, in preserving a corpse, or in animals which were found undecomposed in the ice of Siberia and "which must have been embalmed in ice for ages." *Id. at 43* (quoting Tit. "Antiseptic," 1 AMER. ENCYCLO. 570). The fact the Defendant must illustrate in comparison in this case is that "Kentucky colonels existed in the public domain prior to the emergence of the Plaintiff organization", and that "no US law prevents a person that is a Kentucky Colonel from exercising any of the rights, privileges and responsibilities granted by the governors of Kentucky".

The Court added in the Piper Case, that to require proof of every fact "would be utterly and absolutely absurd," and that "[c]ourts will take notice of whatever is generally known within the limits of their jurisdiction; and, if the judge's memory is at fault, he may refresh it by resorting to any means for that purpose which he may deem safe and proper." *Id at 42*. This case illustrates a classic example of the benefits of judicial notice, and the obvious results that stem from its application: a freezing mixture used to preserve fish is not novel when anyone can look around to see ice has been used for years to preserve other items.

Areas in which judicial notice has been used include **verifiable documents, historical events, well-settled scientific facts, literary journals, and most commonly, geographic locations**. This is "for the obvious reason that geographic locations are facts which are not generally controversial[.]" *United States v. Bello*, 194 F.3d 18, 23 (1st Cir. 1999). Other famous, but less obvious examples of judicial notice at common law include *Gilbert v. Flint & P.M. Railway*[3], *Wolfe v. Missouri Pacific Railway*[4], and *Jacob & Flint & PMR Co.*[5]. Facts that are commonly known today are not necessarily facts that were commonly known yesterday, or that will be commonly known tomorrow.

Application of judicial notice in early common law was both broad and specific: broad due to the absence of guidelines in applying the rule, and specific due to its common application in particular areas,

---

[3] 16 N.W. 868, 869 (Mich. 1883) (taking notice that a freight car resting on a highway is not likely to frighten horses of ordinary gentleness).
[4] 11 S.W. 49, 51 (Mo. 1889) (taking notice of the nature, operation, and ordinary uses of the telephone).
[5] 105 Mich. 450, 63 N.W. 502 (Mich. 1895) (taking notice that an ordinarily prudent person would not jump from a moving train).

such as geographical, historical, scientific, and locally known facts. It was in these areas that judicial notice first developed, and it is these areas that judicial notice is still used most frequently today.

Perhaps the best way to view judicial notice during early common law is in comparison to what came after. As Jeffrey Bellin and Andrew Guthrie Ferguson observe in their article "Trial by Google":

> [T]he legitimacy of taking judicial notice came more from the authority of the judge than from the source of the information. If, for example, there was a question about the existence of a river, it could be judicially noticed not because a map showed the fact (the map was unnecessary), but because the judge knew the river existed in that general location. *The judge thereby acted as a proxy for the general knowledge of the community.* Sources could support or confirm the judge's preexisting general knowledge, but did not alter the underlying premise that the judge's knowledge controlled. *Jeffrey Bellin and Andrew Guthrie Ferguson, Trial by Google*: Judicial Notice in the Information Age, 108 NW. U. L. REV. 1137, 1152 (2014) (emphasis added).

On a motion to dismiss a court may take judicial notice of ascertainable facts outside the pleadings that are matters of public record. Fed. R. Evid. 201(b)(2); *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986). However, those facts cannot be "subject to reasonable dispute." Fed. R. Evid. 201(b); *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001). The accuracy of a source of facts subject to judicial notice must traditionally be established by evidence; news reports are typically not held to be an accurate source under Rule 201(b)(2). *Compassion Over Killing v. U.S. Food & Drug Admin.*, 849 F.3d 849 (9th Cir. 2017); 21B C. *Wright & A. Miller Fed. Prac. & Proc. Evid.* § 5106.2 (2d ed.) (2019). Generally, the court may take judicial notice of such news sources only to "indicate what was in the public realm at the time, not whether the contents of those articles were in fact true." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954 (9th Cir. 2010) cert. denied, 564 U.S. 1037, 131 S. Ct. 3055, 180 L. Ed. 2d 885 (2011) (quoting *Premier Growth Fund v. Alliance Capital Mgmt.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006)); *Gerritsen v. Warner Bros. Entertainment, Inc.,* 112 F.Supp. 1011, 1029 (C.D. Cal. 2015). Likewise, a publicly accessible website may be taken notice of to establish "the existence of the website in the public realm, but [not] to notice that the contents of the website are true." *Farrell v. Boeing Employees Credit Union*, 761 Fed.Appx. 682, 685 (9th Cir. 2019) (citations omitted).

## APPLICATION OF JUDICIAL NOTICE

Federal Rule of Evidence 201 allows courts to take judicial notice of adjudicative facts that are "not subject to reasonable dispute" because they are "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." The "adjudicative fact" requirement refers to facts "that relate to the parties."FED. R. EVID. 201(b) Advisory Committee's Notes. These are the "who did what, where, when, how, and with what motive or intent" facts, which typically go to the jury. *Id.*

Pursuant to Rules 201(c)(1) and (2), a court may take judicial notice on its own, or if a party requests such notice and the court is provided the necessary information and sources. Rule 201(d) allows judicial notice to be used at any stage of the proceeding. This includes motions for summary judgment, trial, and appeal. Finally, based on Rule 201(f), in a civil case, the court must instruct the jury to accept the noticed fact as conclusive. The scope of judicial notice is related to the division of function between judge and jury, juries must adhere to the facts of the case and the instructions provided by the judge.

## THREE REASONS TO APPLY JUDICIAL NOTICE

First, judicial notice can be used as a substitute for the presentation of evidence. Generally, a party asserting a fact bears the burden of proving the fact with evidence. Evidence must be supported by authentication. *FED. R. EVID.* 901. Judicial notice allows a party to skip this burden in certain instances. *Castillo-Villagra v. INS*, 972 F.2d 1017, 1026 (9th Cir. 1992)[6] If the appropriate opportunity presents itself, instead of spending time authenticating a document or laying foundation for a witness, consider whether judicial notice would apply.

---

[6] Castillo-Villagra v. INS, 972 F.2d 1017, 1026 (9th Cir. 1992) (Stating "[n]otice is a way to establish the existence of facts without evidence," and holding that to deny aliens an opportunity to be heard on facts of which the Board of Immigration Appeals took notice, that political group Sandinistas were out of power in Nicaragua and that any fear of persecution which aliens might have had could no longer be well-founded, denied aliens due process).

Second, judicial notice is not merely one way to establish a fact. Many have argued it is the most efficient and powerful way to establish a fact. As Leonard M. Niehoff suggests in his article "Judicial Notice: The Deus Ex Machina of Evidence":

> [J]udicial notice is an aspiring star of unfulfilled potential. Its stage presence is extremely powerful because a notice fact is a conclusively established fact. Successfully invoke judicial notice and Voila! The fact in question is not merely supported, it is settled. *27 Litigation 31* (Fall 2000).

A judge and jury have a special relationship. In most courtroom settings, the judge is the first person who greets the jury in the morning, and dismisses them at the end of the day. The judge acts as the gatekeeper for evidence the jury can hear, sets the rules by which the trial is performed, provides instructions to the jury and the law on which to base their decisions, and in most instances, is the only *non-biased* party in the courtroom at any given time. Any opportunity to have the judge tell the jury they *should* **"accept this fact as conclusively established"** is a powerful one that should not be underestimated.

Third, judicial notice can be used as a workaround for the exclusion of evidence. Generally, courts cannot consider evidence outside the four corners of the complaint when deciding a Rule 12(b)(6) motion to dismiss. *See Hal Roach Studios, Inc. v. Richard Feiner & Co.* 896 F.2d 1542, 1555 n.19 (9th Cir. 1989)[7] However, facts subject to judicially notice can be considered at this stage. *Mullis v. U.S. Bankr. Ct.*, 828 F.2d 1385, 1388 (9th Cir. 1987)[8] Judicial notice is an opportunity to promote evidence that would otherwise not be seen or considered at the motion to dismiss stage. Judicially noticeable facts involving customary common-law, state traditions, culture and indisputable history written from 95-245 years ago prevent this case from going forward, if it is not dismissed based on Defendant, Col. David J. Wright's motion(s) to dismiss, the facts presented here can be used in all other aspects of trial and are elemental in the credibility of the defense of this case to discredit the plaintiff and prevent constructive fabrications of castles in the sands of the desert.

---

[7] Hal Roach Studios, Inc. v. Richard Feiner & Co. 896 F.2d 1542, 1555 n.19 (9th Cir. 1989) (holding judgment should not have been entered against party who was not named in amended complaint)

[8] Mullis v. U.S. Bankr. Ct., 828 F.2d 1385, 1388 (9th Cir. 1987) (holding that bankruptcy judges are entitled to judicial immunity from civil liability for damages arising from their judicial acts, and taking judicial notice of entries on the docket of underlying bankruptcy case as evidence that party had alternative remedies through appeal or extraordinary writ)

Judicially noticeable facts require neither a witness's personal knowledge nor expert testimony, making judicial notice a powerful, cost-saving tool. Properly used, the doctrine can help resolve litigation at an earlier stage and shed light on the interpretation of a law, and it is sometimes the only way to add information to a limited record.

The **Code of Civil Procedure mandates that a court must take notice of state statutes, ordinances, and <u>common law</u>.** *735 ILCS* 5/8-1001 et seq. **Courts, presumed to be no more ignorant than the general public, also take judicial notice of common knowledge.** *See, e.g., Geddes v. Mill Creek Country Club, Inc*., 196 Ill. 2d 302, 321 (2001). (emphasis added) A court that does not possess the common-law knowledge when it is relative to adjudicate a case must dismiss the case or otherwise dispose of it so it does not go to trial, a United States Court may not have jurisdiction over incidents that occurred prior to its own existence and cannot make decisions outside of its scope of knowledge unless it is supplied with judicially noteworthy information by the parties.

**Examples of facts that courts must take judicial notice of when they are requested to:**

- Information in other court records, particularly involving the same parties, including orders or records (see, e.g., *Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 492-94 (7th Cir. 2011)), filing dates (see, e.g., *Deicher v. City of Evansville*, Wis., 545 F.3d 537, 541-42 (7th Cir. 2008)), or simply the volume of cases filed, either by an individual (see, e.g., *Turner-El v. West*, 349 Ill. App. 3d 475, 481 (5th Dist. 2004)) or in a jurisdiction (see, e.g., *Cradle Society v. Adopt America Network*, 389 Ill. App. 3d 73, 78 (1st Dist. 2009)).

- Required administrative filings by a person or company, such as with the Secretary of State (see, e.g., *Caracci v. Edgar*, 160 Ill. App. 3d 892, 895 (1st Dist. 1987)), the Recorder of Deeds (see, e.g., *Hermitage Corp. v. Contractors Adjustment Co.*, 166 Ill. 2d 72, 91 (1995)), or insurance certificates (see, e.g., *Country Companies v. Universal Underwriters Insurance Co.*, 343 Ill. App. 3d 224, 229 (3d Dist. 2003)).

- Definitions (such as those found in common dictionaries, or more technical or medical sources).

- Maps (see, e.g., *People v. Attaway*, 41 Ill. App. 3d 837, 845 (1st Dist. 1976)).

- Legislative history, such as official reports, bill versions, or floor debates (see, e.g., *Finish Line Express, Inc. v. City of Chicago*, 72 Ill. 2d 131, 135-36 (1978)).

- Price information, such as stock prices (see, e.g., *Pugh v. Tribune Co.*, 521 F.3d 686, 691 (7th Cir. 2008)) or the Consumer Price Index (see, e.g., *Pickett v. Sheridan Health Care Center*, 664 F.3d 632, 649 (7th Cir. 2011)).

- Administrative agency's decisions (see, e.g., *Union Electric Co. v. Department of Revenue*, 136 Ill. 2d 385, 399 (1990)), rules (*Busch v. Bates*, 323 Ill. App. 3d 823, 832 (5th Dist. 2001)), or other records kept by the agency (see, e.g., *Felt v. Board of Trustees of Judges Retirement System*, 107 Ill. 2d 158, 165 (1985)).

**Examples of facts that courts may take judicial notice of when they are requested to:**

- Information provided by the Internet Archive (In 2018, the Wayback Machine's archive of webpages became legitimate evidence that may be used in any litigation, a US appeals court decided.) The second circuit ruling of *United States v. Gasperini,* supported a similar ruling from the third circuit – and, taken together, the decisions pave the way for the Internet Archive's library of webpages to be considered evidence for countless future trials.

- Newspaper clippings (The Court of Appeals for the Fifth Circuit held that an exception to the exclusionary hearsay rule on newspapers will be made where the evidence in question is necessary and the circumstances under which the declaration was made provide guarantees of trustworthiness.) Older newspaper articles from over 20 or more years ago are generally involving or not involving the parties in a case that may be considered as judicially noticeable facts.

There is no rule of thumb as to what can be considered as verification sources or introduced as authoritative enough or conclusive enough for the court to accept that fall outside the scope of what a court may optionally accept or qualify for the court record. Nearly any material that is part of the public domain or intrinsic to local customs can be submitted to the court; such as the fact that, 1) "*there have been colonels in Kentucky long before it became a state*"; 2) "*the Commonwealth of Kentucky was founded by colonels*"; and 3) "*many of Kentucky's first pioneer settlers were colonels*", none of these facts can be disproven by the Plaintiff or this Court. Sometimes what the court can accept is challenged by the opposing party, the local rules and the scope of knowledge of the court. Courts have been willing to accept

non-governmental institutions as authorities, universities, libraries, including information in the geographical, medical and technical context from private industries where the knowledge is not so wide-spread. Courts have also used and accepted Wikipedia as an information source. *People v. Luna*, 2013 IL App (1st) 072253. There are many similar examples, particularly in unreported decisions.

## JUDICIAL NOTICE OF THE KENTUCKY COLONEL

No one knows less about Kentucky's colonial prehistory, common-law and about its colonels than the US Justice System since at least 1936 when 17,000 existing Kentucky Colonel Commissions were canceled by the Kentucky Attorney General, Beverley Vincent, **[See Exhibit 1]** but this Court may be deceived by counting on any narrative of the Plaintiff, because the Plaintiff has widely spread misinformation based in a fictional narrative about the origin of the Kentucky Colonel since 1941, making the title one best suited for a secret Kabbalah of colonels, an Odd Fellows Lodge or a Freemason Fraternity. Upon the cancellation of the commissions in 1936, the Kentucky Colonel "honorable title, customs and traditions" were recognized in the United States House of Representatives on the Congressional Record by Congressman Edward W. Creal (who was not a colonel). A month later the Kentucky Colonel Commission was restored. It is of paramount importance to this case that these indisputable historical, legal and semantic facts from the Congressman presented to Congress become impasses, guide posts and facts that neither the Plaintiff, Defendant or the Court need to debate in order to end the injustice of the Plaintiff. There are a great number of indisputable facts that *must be applied to this case* in particular to the Kentucky Colonel that must be understood as adjudicative, preeminent and insurmountable facts connected to the history of the Commonwealth of Kentucky that leave and make the "Kentucky Colonel" an inextricably intertwined icon of the state, it does not belong to the Plaintiff, nor is it a creation of the Plaintiff. The first public domain merger (word pairing) to create the lexeme "KENTUCKY COLONEL" to represent a proper name (*noun*) made (merged in the public domain) was in London in 1833 as an exonym to describe a stage character "The Kentuckian". **[See Exhibit 2]**

Rule 201: Judicial Notice of Adjudicative Facts, (a) Scope. This rule governs judicial notice of an adjudicative fact only, not a legislative fact. (b) Kinds of Facts That May Be Judicially Noticed. The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. All of these facts are based on common knowledge, state records, federal records, books from school, that are not so commonly known, but judicially noticeable.

The Defendant introduces for the general knowledge library of the Court the following nine (9) unordered facts that were overlooked, missed, mistaken or unnoticed by trademark office examiners *and the relative content* from official US Government and well-known sources that has been introduced to US Courts, the public record since 1998 including the Library of Congress:

1. **KENTUCKY COLONEL** is a British English lemma (title description) or *lexeme*, a basic lexical unit of a language, consisting of several words, considered as an abstract unit, and applied to a family of words related by form or meaning. These two words "Kentucky" and the title of "Colonel" were combined into the public domain based on three historical events making them conceptual ideas first recorded by American Newspapers starting around 1825 when a quatrain was published cementing the idea of the "Kentucky Colonel" in mind as a paradox, it was written by United States Chief Justice John Marshall **"in the Bluegrass region / a paradox was born / the corn was full of kernels / and the colonels full of corn." [See Exhibit 4]** This creative work in prose immortalized the bond between Kentucky's most iconic ideas: the colonel, corn and bourbon. There is also a clear case in 1833 and 1840 in the most well-read timely literature. Of these historical events the first event is a creative use of the idea based on a two act farce, the other event involves figures of state, and one becomes the 9th Vice President of the United States, after being known publicly as a "Kentucky Colonel."

a. **Colonel Nimrod Wildfire** who appeared at the Covent Garden Theater in London is the first mention of a "Kentucky Colonel" in a US newspaper in 1833 where the term was used as a subjective noun using an uppercase letter C for a character in a two act farce. This news was read by a huge majority of the literate population of the United States. "The piece is intended to give us an idea of Kentucky manners, in their broadest shape, and the beau idea representative of those manners is Colonel Nimrod Wildfire (Mr. Hackett)." Performing additional research into the title, of the farce "*The Kentuckian, or a Trip to New York*" reveals the identity of Colonel Nimrod Wildfire in another stage production "*The Kentuckian, or a Trip to Washington*" in 1830 where Colonel Wildfire is based on the real-life of none other than Colonel David Crockett, statesman and freemason from Tennessee and Kentucky. Senator (Colonel) David Crockett is best known for his conservative position as a friend of the Indigenous peoples of the United States, his frontier knowledge and as the primary nemesis of President (Colonel) Andrew Jackson with the Indian Removal Act, later after Crockett learns he cannot stop Jackson he goes on to the Alamo with Colonel James Bowie from Kentucky, where Colonel Bowie dies and Colonel David Crockett escapes wounded before disappearing. The point of evidence being introduced to the Court is a newspaper article from the frontpage of "*The National Gazette and Literary Register*" April 20, 1833. *See Newspapers.com* First Appearance of the Kentucky Colonel in 1833, London Theatricals **[See Exhibit 2]**

b. **Colonel Richard Mentor Johnson**, was made a "Kentucky Colonel" to mount the First Kentucky Cavalry in 1813 by the Kentucky State Legislature, notwithstanding the Governor. Facts that cannot be disputed are Col. Richard Mentor Johnson was not liked by Governor (Colonel) Isaac Shelby, who took up his own group and formation in the War of 1812. Governor Col. Isaac Shelby had two aides, one was General John Adair and the other was Major John Crittenden. Colonel Richard Mentor Johnson was frequently criticized and discriminated against for having an octoroon (mixed race) common-law spouse Julia

Chinn. Information about Colonel Richard M. Johnson is at the Smithsonian, Library of Congress and available on _government servers_. There is a lot of information that has become relevant recently regarding the life of "Colonel Dick" as the 9th Vice-President was most frequently referred to he is also credited for the victory of the Battle of Thames in October 1813, and his wife Julia Chinn in "_He became the nation's ninth vice president. She was his enslaved wife. Her name was Julia Chinn._" was published in the Washington Post recently by [Colonel] Ronald G. Shafer. The most recent comprehensive academic work in 2013 by Miles James Smith, "_Richard M. Johnson and the rise of western democracy, 1780_", this work calls Johnson the First Kentucky Colonel. There is also "_The life and times of Colonel Richard M. Johnson of Kentucky_", by Leland Winfield Meyer, PhD. **[See Wikipedia: https://en.wikipedia.org/wiki/Richard_Mentor_Johnson]**

c. **Colonel Charles S. Todd,** in the _Madisonian, in Washington, District of Columbia in a newspaper article on 25 Jun 1840_ where the international diplomat personally debunks his 1813 activity and the activity of others including Colonel Richard M. Johnson and his own father-in-law Col. Isaac Shelby during May 1813, in the first person he affirms facts and information about the "last war" this account combined with a biography started during, but completed and published after his death as the "_Memoir of Col. Chas. S. Todd_" by G.W. Griffin, and other records reflecting the career of Col. Charles Steward Todd at the _Filson Library_ confirms conclusively the origin and source of his colonelcy in 1815 under General Duncan MacArthur for the Brevet Rank of Colonel in Michigan after becoming Inspector of the Northwest Territory for the US Army. Col. Charles Todd, was known as Kentucky's Native Son, his family was at Boonesborough in 1775 and family members included Mary Todd, President Lincoln's wife. Colonel Charles S. Todd is a very important figure in Kentucky history, but he was not commissioned a Kentucky Colonel by his father-in-law, he was not commissioned in 1813, while he returned to Kentucky a hero with a brevet rank of colonel (honorable for service) the origin of his colonelcy was not the Governor of

Kentucky, and he was not a member of the Plaintiff's organization nor was he part of its inspiration in 1933 or 1936 or 1957. **[See Exhibit 5]**

2. The Plaintiff admits their conspiracy to have fun and beguile the general public. To distinguish between historical evidentiary fact from the allegorical fiction of entertainment and folklore the Defendant wants to present evidence of the creation of a false origin of the first Kentucky colonel by the Plaintiff in 1941 at a public event attended by Governor Keen. The Defendant believes that the evidence shows the fact that the Plaintiff's organization was established as a recreational activity, without a true origin, mission, product, or purpose; the evidence also demonstrates the misappropriation of history when the fallacy (propaganda) of Col. Charles Todd is passed off as factual history by a Kentucky newspaper columnist, which has occurred in succession repeatedly by newspaper editors. There are no other sources of the fallacies posed in the "Banquet Program" in 1941. **[See Exhibit 3, prepared by the Plaintiff in 1941]**

3. **The Commonwealth of Kentucky was created by "colonels"**; COLONEL was the highest quasi, ad hoc and extra-officio governmental and non-governmental "title and office" that a person could be recognized by in the Kentucky Territory from 1775-1792, this is just a simple fact and is true in common-law. It is estimated by the Defendant, in his Creative Work (website and book) that there were over 384 +/- colonels in Kentucky before it became a state. Today, there are over 50 Kentucky historical markers that document "colonels". The first governor Isaac Shelby was a colonel and was living in what was known as Kentucky Territory, by logical semantic nature he was a Kentucky Colonel. Many of the "colonels" that went to Kentucky did so because they were granted **land bounties** as payment for their service during the American Revolution from the Government of the Commonwealth of Virginia. There is also evidence that there were many colonels made in Kentucky by Colonel and Brigadier General George Rogers Clark (founder of Louisville) and Colonel James Bowman, the first person designated by the Governor of Virginia as the Colonel of Kentucky County which included the whole state we know today as Kentucky. Among the places this information can be found is at the Secretary of State's Office in Frankfort.

The information was compiled and presented by Kandie P. Adkinson for the National Society Sons of the American Revolution at the Research Library in Louisville, Kentucky, on September 13, 2018. The work a PowerPoint Presentation is about "*Researching Revolutionary War Veterans Who Settled in Kentucky entitled Daniel Boone Enters Cyberspace; An Overview with the Kentucky Land Office*" it is very clear as well that former Secretary of State, Alison Lundergan Grimes was involved in the sourcing of the information presented; the Sons of the American Revolution published the presentation on their website in 2020, the document is strictly based on facts with over 50 historical documents, deeds and titles that are records of the Secretary of State. The document states that the Secretary of State of Kentucky affirmed that **Virginia issued 9441 [title] Patents (1779-1792), Old Kentucky Series: 7668 Patents (1792+); Patents in this area were authorized by: French & Indian War Warrants; Governors', Warrants; Certificates of Settlement; Preemption, Warrants (400a & 1000a); Treasury Warrants; Importation Warrants; Acts for Poor Persons; Special Acts of the Virginia or Kentucky General Assembly; Acts for Academies & Seminaries (1798+ in former Military District); & "Infrastructure" Warrants, ex. Establishing Roads**. Original documents are housed in the Kentucky Secretary of State's Land Office. A lieutenant-colonel from New York from 1776-1779 was eligible to receive 6,667 acres of land from the Governor of Virginia in 1780 as a Colonel in Kentucky. Objectively this information tells us a lot about common-law practicum when the system operated based on assumed, presumed and consensual knowledge in the absence of legal codes and ordinances made up and created by colonels in their position of authority. The evidence of these facts can be found in Kentucky comparing land records and deeds that were transferred to Kentucky from its parent state the Commonwealth of Virginia, reading an assortment of history books.

4.  The **Wilderness Road**, also know at the time as the "Wild Road," was a project that was chartered in March 1775 by **Colonel Judge Richard Henderson** of the Transylvania Company a "colonial charter company" when he commissioned Daniel Boone a "Colonel" to organize a team of axmen

who cleared the way for the settlement of Boonesborough the first colonial government seat in the territory based on five settlements. The acts of the settlements and the Constitutional Convention of Transylvania are recorded events in the archives of North Carolina, Kentucky and Virginia. Five years later, John Filson, Kentucky's First Historian went to Kentucky met with Colonel Daniel Boone and many other pioneer colonels, his map of "Kentucke" (created between 1780-1784) illustrates the presence of various "colonels" in the "Country of Kentucke", the map is included in, "*The Discovery, Settlement and present State of Kentucke and an Essay towards the Topography, and Natural History of that important Country*" which is a 1784 book by John Filson. It describes the discovery, purchase and settlement of Kentucky. The Adventures of Col. Daniel Boon also written by John Filson is credited as the only accurate and true account of the life of Col. Daniel Boone, which inspired many great works of Daniel Boone as a larger than life fictional character and legend.

5. In 1794, the first Kentucky capitol building was built, constructed, designed and financed by colonels in Kentucky. The Kentucky Capitol served as the state's seat of government until it burned in 1813. A new building was built in 1816, but it, too, was destroyed by fire in 1824. The third capitol building was closed in 1899 when the new Governor Goebel was assassinated during the Kentucky Insurrection the decision was made to move the capitol building where it stands now, opening in 1910. The Old Kentucky Capitol became the Kentucky Historical Society which was presided over by a Kentucky Colonel, Hon. George Chinn in 1965. **[Public record]**

   a. **Col. George Morgan Chinn** (January 15, 1902 – September 4, 1987) was an American weapons expert and soldier. He attended Centre College, and played on the 1921 Centre *Praying Colonels* football team, which won the national championship. Chinn then opened a diner in a cave, known as 'The Cave House', which also functioned as an *underground gambling center*. He served as the bodyguard of Happy Chandler while he was governor of Kentucky. Chinn was also Sergeant of Arms for the Kentucky Legislature and a Tour Guide before the state had a tourism department. Later he was the production line inspector for

several weapons' manufacturers, and eventually, a Marine. During World War II, despite being too old and too large, Chinn became a Marine—with Chandler's help. Col. Chinn's legacy includes a statement by KHS curator Bill Bright, "He did for military weapons what Wozniak and Gates did for computers. He added the right pieces to make them reliable and usable. He was what was then called a garage (in his case, cave) inventor. Today we would consider him an extreme maker". This information can be verified by reviewing a blog article from the Kentucky Historical Society, "Recognizing George M. Chinn" that was removed in 2021 by the society, but captured by the Internet Archive. [Also see Wikipedia]

6. The Defendant, **Honorable David J. Wright** is affirmed to be an expert and researcher of history relative to the "KENTUCKY COLONEL" professionally by this Court and the Plaintiff's members on numerous occasions, this *very rare case* is about him being a *Kentucky Colonel*, the case questions what a colonel can say and do, that focuses on history and not the interests of the Plaintiff which Defendant says are unreal and fictional. *It was clearly expressed as well* in settlement leading to the **Agreed Permanent Injunction** entered by this Court. Col. David J. Wright has been involved with Kentucky Colonelcy since 1998 when he pioneered and published as a first online commercial transactions, established a copyright, promoted the first website for Kentucky colonels called "Kentucky Colonels" and also called "Kentucky Colonel" where the contextual meaning of the website title referred to "more than one (1) colonel" or "the idea of the colonel" and not "The Honorable Order of Kentucky Colonels, Inc." (there was always a disambiguating disclaimer on the website indicating to readers that the website was not affiliated or associated with the Kentucky Colonels Basketball Team, the Eastern Kentucky Colonels from EKU, or the Honorable Order of Kentucky Colonels), the website was saved by the US Government through the Internet Archive that works in conjunction with the Library of Congress, Wikipedia and other content publishers. Kentucky Colonels, ©1998, by Col. David J. Wright at [colonel.org] was independently supported by individually designated colonels functioning and viable until 2001, the final date of publication on the [colonel.org] domain was on July 21, 2001 as

"*Kentucky Colonels, Registry and Honorarium*". As an individual (natural person) Col. David J. Wright was extremely active in the development of Internet domains and ideas as a maker of creative works. He sold Nurseryman.com, Greencross.com, Arborday.com and Freetrees.com from the websites he owned and developed, including their content and content usage rights between 1995-2005, the Defendant invested less than $1,000 to realize a return of more than $50,000 in supplemental reported income during that period. The Arbor Day domain was part of a lawsuit which was dismissed based on the passage of Electronic Frontier Foundation (EFF) attorneys lobbying for the 1998 Digital Millennium Copyright Act, which defines digital rights management of copyrighted materials published online such as the first Kentucky Colonels website. The Arbor Day lawsuit was resolved with the purchase of Col. David Wright's website domain rights and a non-compete agreement for a period of 5 years.

> (Note: This may be a good option for the Plaintiff in the current case because there are no other laws that can prevent Colonel David J. Wright from talking about, writing about or being a Kentucky Colonel since 1996. However after 20 years of development and gathering information for his book the price tag of his rights bundled will cost much more than $50,000.) The Plaintiff, the Magistrate of the Agreed Permanent Injunction settlement and the people of the United States are all aware of this intellectual property that is herein claimed by the Defendant, but no one has acknowledged its existence or the Defendant's rights with it, until now with this exhibition of Judicial Notice. This intellectual property owned by the Defendant is not acknowledged by the Plaintiff, this is where the controversy arises.

7. **The Kentucky Colonel: A Study in Semantics** was published in 1947 by an academic authorship called American Notes and Queries, A Quarterly Journal of Short Articles, Notes and Reviews is [was] a quarterly academic journal, affiliated to the University of Kentucky, which features short research-based articles about the literature of the English-speaking world and the language of literature. The article was immediately republished in several major Kentucky Newspapers like the Lexington Herald Leader and the Louisville Courier-Journal, the article was reprinted in its entirety. This article is judicially noticeable because of the source, when, where and with whom the research was performed and the fact that the writer met and talked with one of the two original non-Kentucky incorporators, Charles C. Pettijohn of the Plaintiff organization, who diminished the

importance of the title and its origin, with no justification, based on his willful ignorance and actual knowledge.

8. **Colonel Harland David Sanders** founded Kentucky Fried Chicken. Sanders was commissioned as a Kentucky Colonel in 1935 by Kentucky governor Ruby Laffoon. His local popularity grew, and, in 1939, food critic Duncan Hines visited Sanders's restaurant and included it in Adventures in Good Eating, his guide to restaurants throughout the US. The entry read: Corbin, KY, Sanders Court and Café at highway 41 — Jct. with 25, 25 E. ½ Mi. N. of Corbin. Open all year except Xmas. A very good place to stop en route to Cumberland Falls and the Great Smokies. Continuous 24-hour service. Sizzling steaks, fried chicken, country ham, hot biscuits. L. 50¢ to $1; D. 60¢ to $1. In 1952, Sanders franchised his secret recipe "Kentucky Fried Chicken" for the first time, to Pete Harman of South Salt Lake, Utah, the operator of one of that city's largest restaurants. The company's rapid expansion to more than 600 locations became overwhelming for the aging Sanders. In 1964, then 73 years old, he sold the Kentucky Fried Chicken corporation for $2 million ($17.5 million today) to a partnership of Kentucky businessmen headed by John Y. Brown Jr., a 29-year-old lawyer and future governor of Kentucky, and Jack C. Massey, a venture capitalist and entrepreneur. Sanders became a salaried brand ambassador.

Before his death, Sanders used his stock holdings to create the Colonel Harland Sanders Charitable Organization, a registered Canadian charity. The wing of Mississauga Hospital for women's and children's care is named The Colonel Harland Sanders Family Care Centre in honor of his substantial donation. Sanders' foundation has also made sizable donations to other Canadian children's hospitals including the McMaster Children's Hospital, IWK Health Centre, and Stollery Children's Hospital. The Toronto-based foundation disbursed $500,000 to other Canadian charities in 2016, according to its tax return filed with the Canada Revenue Agency.

This Court should not doubt that Col. Harland Sanders was and remains the most famous and well-known Kentucky Colonel in the world, was a well-respected and beloved Kentucky personality and resident.

9. In 1965 the **Commonwealth of Kentucky made a short film made by Kentucky colonels**, which featured two of the most famous Kentucky colonels which possessed very different caricatures. Independently the state sponsored film professed Col. Harland Sanders explaining how to make a mint julep and Col. George Chinn talked about Daniel Boone as the first Kentucky Colonel.

## CONCLUSIONS

This Motion to Take Judicial Notice of Adjudicative Facts was prepared in good faith as a partial responsive pleading as ordered by the Court based on Defendant's [DE 7] "Motion for Extension of Time to File Answer [being] GRANTED to the extent Defendant [Col.] David J. Wright may have to and including March 27, 2023 to file an answer or responsive pleading." The Defendant reserves the right to amend, modify or adapt this initial responsive pleading to serve in preventing this case from continuing. A supplemental motion for dismissal, defendant's answer with affirmative defenses, and Kentucky Anti-SLAPP case is currently under development with the Court's permission.


Respectfully submitted in good-faith,

Rio Orinoco, Colombia
Dated: March 27, 2023

*Col. David J. Wright*

Col. David J. Wright
david.wright@globcal.net
+1 (859) 379-8277

**Certificate of Service**

I hereby certify that on March 28, 2023, I emailed for filing the foregoing motion with attachments to the Clerk of the Court for the United States District Court of the Western District of Kentucky using the special Pro Se Intake Email per General Orders 20-04 and 20-11 for entry to the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Clerk's Office
601 W. Broadway, Rm 106
Gene Snyder United States Courthouse
Louisville, KY 40202