```
 1                      UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF KENTUCKY
 2                          LOUISVILLE DIVISION


 3
     THE HONORABLE ORDER OF        )
 4   KENTUCKY COLONELS, INC.,      )
                                   )
 5            Plaintiff,           )      Case No. 3:20-CV-132
                                   )
 6        VS.                      )
                                   )
 7   DAVID J. WRIGHT,              )
                                   )      April 25, 2023
 8            Defendant.           )      Louisville, KY

 9

10                         *  *  *  *  *

11                            VOLUME 1
                  TRANSCRIPT OF SHOW CAUSE HEARING
12            BEFORE HONORABLE REBECCA GRADY JENNINGS
                  UNITED STATES DISTRICT JUDGE
13
                           *  *  *  *  *
14
     APPEARANCES:
15
     For Plaintiff:        Cornelius E. Coryell
16                         Julye L. Watts
                           Wyatt, Tarrant & Combs
17                         400 W. Market Street, Suite 2000
                           Louisville, KY 40202
18
     For Defendant:        Appearing pro se via Zoom
19

20
                         April Dowell, RMR, CRR
21                        Official Court Reporter
                          232 U.S. Courthouse
22                        Louisville, KY 40202
                             (502) 625-3778
23

24   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
25
```

1          (Begin proceedings in open court 11:16 a.m.)

2          THE COURT:  We are going on the record in

3     3:20-CV-132.  Can I have appearances?

4          MR. CORYELL:  Good morning, Your Honor.  Corky

5     Coryell and Julye Watts counsel for the plaintiff The

6     Honorable Order of Kentucky Colonels.  With me here this

7     morning is Sherry Crose, the executive director of The

8     Honorable Order.

9          And, Your Honor, I have two other gentlemen here who

10    are witnesses; Jim Rogers and Colonel Michael Little.  I don't

11    know what the court's preference is with respect to

12    separation, if the court would prefer to have them wait out in

13    the hall, but I wanted to make introductions preliminarily.

14         THE COURT:  Okay.  All right.  Sir, on Zoom, can you

15    hear us, Mr. Wright?

16         MR. WRIGHT:  Yes, I can hear you.

17         THE COURT:  All right.

18         MR. WRIGHT:  My name is Colonel David Wright and I'm

19    here representing myself.

20         THE COURT:  Okay.  All right.  So let's just do a

21    little housekeeping here.  I think Docket Entry 114 was the

22    motion filed yesterday to appear via Zoom and we'll go ahead

23    and grant that for the purposes of today's hearing.

24         There are several motions that the court has before

25    it.  There's Docket Entry 99 which is the Kentucky Colonels

1    motion to enforce judgment.  There is Mr. Wright's motion to

2    take judicial notice at 103, his motion to dismiss at 104.

3    There was also a motion to waive Pacer access fees at 106,

4    honorable Order of Kentucky Colonels' motion at 112 for

5    sanctions for failure to comply with discovery order, and then

6    Docket Entry 113, an emergency motion for expedited

7    consideration of relief to avoid irreparable harm and damages,

8    and motion to charge plaintiffs for contempt, so there's a lot

9    before the court.

10          This hearing was originally scheduled as an

11   evidentiary hearing for the purposes of Docket Entry 99.  So

12   before we get into really any of the other motions, I want to

13   make sure with our time here today that we get through that

14   because we have witnesses here.

15          And so I think my first intention here today is to

16   go ahead and address the evidentiary issues that are necessary

17   for Docket Entry 99 so that no matter what else happens, we

18   know we got through the witnesses and get that portion of it

19   taken care of.

20          And then with whatever time we have left we can,

21   generally speaking, address with oral argument that motion as

22   well as the remaining motions that have been filed.  What I'd

23   like to have at the end of today is some idea of where we're

24   going to proceed from here so that we stop the filing of

25   motions because we're definitely getting a lot of motions all

1   surrounding kind of the same couple of issues and I think we

2   need to tamp that down and ensure that we get whatever we need

3   taken care of today.

4           So I'm going to -- because it is your motion to

5   enforce -- and obviously we've done this slightly procedurally

6   different bringing it over into this 2020 case creating a case

7   for enforcement.  I think we'll start with you-all to present

8   the evidence you have.

9           Mr. Wright, we have a few issues as you know.  One

10  of the primary issues is the inability to represent the

11  entities.  So we will have to address that at some point in

12  time today, but I'm going to allow you to cross-examine today

13  on behalf of yourself any of these witnesses.  So once they

14  present their witnesses and ask their questions -- and of

15  course you're entitled to object to questions if you believe

16  that they are inappropriate via the evidentiary rules, but

17  otherwise, I'll let you cross-examine after they present their

18  witnesses.  Do you understand that?

19          MR. WRIGHT:  Yes, Your Honor.

20          THE COURT:  Okay.  All right.  That's how we'll

21  proceed today and then we'll take up any other issues at the

22  end.  You are welcome if it would help to just make a brief

23  statement about generally who you plan on presenting today.

24          Because Colonel Wright is pro se, I'm going to

25  invoke 615 just generally speaking and request separation of

1   the witnesses on his and everyone's behalf 'cause I think that

2   would be what would be done most customarily under the

3   circumstances.  There are rooms out there -- I don't know if

4   those rooms are open right now, but there are rooms out there

5   for the witnesses.

6         MR. CORYELL:  We believe they are, Your Honor.  They

7   were a second ago.

8         THE COURT:  Okay.  All right.  So there's obviously

9   one individual at table, Colonel Wright, which is permitted as

10  the corporate representative and then we've asked the other

11  witnesses to leave the room.  That's known as separation of

12  witnesses, and so we're going to keep that in place today and

13  then move forward.  But you're welcome to give, you know, just

14  a five minute here's what I'm going to present today and

15  here's how it feeds into the Rule 99 -- or the Docket Entry 99

16  motion or you can just launch in whatever you think would be

17  most helpful to the court.

18        MR. CORYELL:  I'm happy to give a brief presentation

19  and overview of what I think our case will be.  Judge, just by

20  virtue of introduction too, I did not introduce Stacey

21  Showalter who is my paralegal who is not going to testify here

22  today, but is only here --

23        THE COURT:  I can't even see her with the screen,

24  so --

25        MR. CORYELL:  She's here for technical assistance

1    only.

2              THE COURT:  Okay.  All right.  Wonderful.

3              MR. CORYELL:  And if I could have the -- April, if

4    you could hit the computer and I could demonstrate to the

5    court.

6              THE COURT:  All right.  So, Mr. Wright, what are you

7    able to see?  Is he able to see any of this?

8              THE CLERK:  No.

9              MR. CORYELL:  Judge, pursuant to the court's

10   instructions yesterday, I've emailed Mr. Wright a PDF of all

11   of the -- well, all but two of the documents -- I think

12   actually all but one of the documents, so he has -- and I can

13   alert the court as to what he doesn't have.  All of the things

14   that I'm going to talk about right now he has.  I sent them,

15   anyway.

16             THE COURT:  If you could as you go through just

17   maybe reference what you're talking about since he can't see

18   it on the screen and I can, okay?

19             MR. CORYELL:  Mr. Wright, for your reference and

20   ease of reference, the documents that I've shown -- I'm

21   showing the court right now a cover page for Document 1.

22   That's the exact same as -- organizationally as the set of

23   documents I sent you yesterday, so when I talk about Document

24   1 to the court, it will be the same as Document 1 I sent to

25   you.

1          MR. WRIGHT:  Okay.  I understand.

2          MR. CORYELL:  Judge, again, Corky Coryell and Julye

3     Watts for The Honorable Order of Kentucky Colonels.  The

4     defendants in this action, Mr. Wright and his corporate

5     entities, tried to misappropriate the Kentucky Colonels

6     trademark back in 2020.

7          We thought we had put a stop to it in February of

8     2021 when Mr. Wright said all he wanted to do was to be able

9     to refer to himself as a Kentucky Colonels as a personal

10    descriptor and write a book or other scholarly work on the

11    history of Kentucky Colonels.

12         We signed a mediator proposal -- both parties signed

13    a mediator's proposal that was the product of good work

14    performed by Judge King in a settlement conference.  That

15    mediator's proposal reflected a couple of things, first, that

16    the parties will move the court to enter an agreed permanent

17    injunction.  Second, it reflected that Mr. Wright -- and

18    I'm -- what I'm talking about is highlighted here -- and this

19    is Document 1, Mr. Wright.

20         Plaintiff -- that's The Honorable Order -- agrees

21    not to interfere with Mr. Wright's use of the honorable title

22    Kentucky Colonel as a personal descriptor.  And on the last

23    page the plaintiffs, The Honorable Order, agreed we would not

24    interfere with any book Mr. Wright intended or wished to

25    publish regarding the history of Kentucky Colonels, Kentucky

1    colonelcy so long as those efforts did not conflict with the

2    terms of the permanent injunction.

3          Mr. Wright signed that mediator's proposal on behalf

4    of himself and as the agent for the Kentucky Colonels

5    International which was a defendant back in that case.

6    Globcal International was a defendant in that case and is also

7    a defendant today and Ecology Crossroads Cooperative

8    Foundation; a defendant back then and also a defendant today.

9          Consistent with that agreement, the court entered a

10    permanent injunction.  This permanent injunction was attached

11    as an exhibit to that agreement.  The permanent injunction was

12    effective against -- it was agreed to by Mr. Wright and his

13    corporate entities as well as The Honorable Order and it

14    prohibited Mr. Wright or anyone acting on his behalf or on

15    behalf of the corporate entities from using the Kentucky

16    Colonels mark or any mark confusingly similar to the Kentucky

17    Colonels mark essentially for any commercial purpose or for

18    purposes of forming a membership, organization, or a civil

19    association or the solicitation of charitable donations for

20    the promotion of a charitable purpose.

21          Beginning last May -- May of 2022 -- Mr. Wright

22    began blatantly and repeatedly violating the terms of this

23    injunction by establishing and maintaining Facebook accounts,

24    internet sites, usernames, and handles that are confusingly

25    similar to the Kentucky Colonels mark and using those sites

1    and those handles and those accounts to sell memberships and

2    products and services relating to a new organization that he

3    is attempting to establish known as the Kentucky Colonel --

4    it's gone by different iterations.  The current iteration

5    appears to be Kentucky Colonel Cooperative.  At one point it

6    appeared to be Kentucky Colonel Company.  It has gone by a

7    number of different iterations and that seems to change on a

8    daily basis.

9           In addition to that, he is attempting to raise funds

10   through a crowdfunding website under the name Kentucky Colonel

11   which according to that website has raised at least $7,500 to

12   date.  So we believe that those -- that that conduct and other

13   conduct that we will point out to the court violates the

14   mediator's proposal and the agreement between the parties and

15   blatantly violates the permanent injunction that was entered

16   by the court.

17          We're prepared to show the court that the terms of

18   the permanent injunction are clear and unambiguous.  We're

19   prepared to show the court by clear and convincing evidence

20   that Mr. Wright has violated the injunction on a number of

21   occasions and that Mr. Wright knew exactly what he could and

22   could not do under the injunction and when he was asked to

23   stop he refused.

24          We will also show the court through the testimony of

25   witnesses that Mr. Wright's activity has caused considerable

1    confusion to both the general public and the individuals who

2    are associated with The Honorable Order of Kentucky Colonels;

3    confusion which has caused Honorable Order of Kentucky

4    Colonels members to unwittingly and unknowingly join

5    Mr. Wright's social media group and solicit information

6    concerning the badges -- ID badges -- law enforcement

7    prototype badges and other things that he is marketing through

8    his elicit activity.

9           We'll also show the court that Mr. Wright's activity

10   has -- by confusing the general public has impeded the

11   Kentucky Colonels ability to go on with their good works and

12   particularly go on with the business of establishing chapters

13   and local clubs and things of that nature.

14          The evidence that I just described and the images

15   are -- the evidence that I just described is consistent with

16   paragraphs 27-54 of the verified complaint.  The verified

17   complaint was signed by Ms. Crose because she, as the

18   executive director, is acutely aware of Mr. Wright's activity

19   both by viewing them online and by getting reports of them

20   from her membership.  And there are many images of his -- of

21   that activity.

22          Mr. Wright has not denied those allegations.  He

23   hasn't denied that he's responsible for the websites and the

24   social media accounts that I've described and that are

25   described in the complaint.  We served requests for admissions

1  on Mr. Wright pursuant to the court's order that were really

2  just simply attempting to confirm that he was responsible for

3  those activities since he has not filed an answer.

4         He has not -- he declined to answer any of our

5  discovery, so we have not received any discovery response --

6  responses from Mr. Wright.  I think it would be appropriate,

7  Your Honor, to ask the court to deem those requests admitted

8  under Rule 36 and to deem as admitted all of the -- that

9  Mr. Wright is responsible for the internet and social media

10  activity that's described in the verified complaint.

11         If the court does not believe that's appropriate,

12  I'm prepared to examine Mr. Wright today to confirm that he's

13  responsible.  And then we will offer -- I would propose to the

14  court that that would be the first order of business and then

15  we will offer proof regarding the confusion that his

16  activities have created.

17         THE COURT:  All right.  I'm going to let you present

18  your case however you see appropriate.  Obviously the standard

19  is slightly different today because we're talking about

20  enforcement, so whether he violated the agreement.  So I think

21  to your point whether he violated the agreement is really the

22  first order of business.  So if you want to present him as

23  your first witness, I don't see a problem with that.

24         Mr. Wright, how this works when you're pro se is

25  that they are entitled to question you as if you were in the

1    room, and I don't know if you can see, but you actually appear

2    like you're in the witness box anyway the way our screens are

3    lined up, so he would question you.

4           At the end of that, you're either entitled to

5    provide the court a list of questions to ask you or you're

6    allowed to make a statement under oath, so those are sort of

7    your two choices as a pro se individual being questioned in

8    this type of environment, okay?

9           MR. WRIGHT:  Okay.

10           MR. CORYELL:  With that said, Your Honor, I now

11   would call Mr. Wright, David Wright, as our first witness.

12           THE COURT:  All right.  So, Mr. Wright, you've been

13   called as the first witness if you'll raise your right hand to

14   be sworn in by the court reporter.

15           (DAVID J. WRIGHT, called by the plaintiff, sworn.)

16                     DIRECT EXAMINATION

17   BY MR. CORYELL:

18   Q.  Mr. Wright, we've never met in person, I don't believe.

19   I'm Corky Coryell.  I know we've exchanged correspondence.  As

20   you're aware, I represent The Honorable Order of Kentucky

21   Colonels.  Do you have the documents that I sent you yesterday

22   and the one document I sent you this morning in front of you,

23   sir?

24   A.  Yes.

25   Q.  Mr. Wright, you were involved in litigation with The

1    Honorable Order of Kentucky Colonels in 2020, correct?

2    A.  Yes.

3    Q.  That litigation was resolved by settlement, correct?

4    A.  Yes.  It was a confidential settlement conference.

5    Q.  And the terms of that settlement were reflected in a

6    document called a mediator's proposal, correct?

7    A.  Yes.

8    Q.  And that mediator's proposal is the document that I sent

9    you marked as Document 1, correct?

10   A.  Right.

11   Q.  And you signed that document on behalf of yourself and on

12   behalf of the corporate entities that are designated there on

13   the fourth page of the document, correct?

14   A.  Well, the corporate entities, they were -- they were in

15   default at the time that we had that conference and it's also

16   my belief that they're still in default because the court has

17   not set aside their default.

18   Q.  Mr. Wright, if you look at the signature page on the

19   document, it indicates that you signed as executive director

20   and authorized agent for Kentucky Colonels International,

21   Globcal International, and Ecology Crossroads Cooperative

22   Foundation, Inc., correct?

23   A.  Yes.

24   Q.  And in the mediator's proposal, The Honorable Order of

25   Kentucky Colonels agreed not to interfere with your -- the --

1    in the second -- on the second page -- third page, the second

2    bullet down, The Honorable Order of Kentucky Colonels agree

3    not to interfere with your use of the honorable title Kentucky

4    Colonel as a personal descriptor, correct?

5    A.  Yes.

6    Q.  And on the next page on the first bullet down -- the first

7    full bullet -- The Honorable Order agreed that it would not

8    interfere with any book you wish to publish regarding the

9    history of Kentucky Colonels, correct?

10   A.  Yes.

11   Q.  And the mediator's proposal provided for -- and as part of

12   the settlement of this action that's reflected in the

13   mediator's proposal -- there was to be a permanent injunction

14   issued as part of the settlement, correct?

15   A.  Yes.  And there are also quite a few other bullet points

16   there that -- that need to be considered --

17   Q.  And you -- you had an opportunity to --

18   A.  -- which essentially -- excuse me -- which essentially

19   make the agreed permanent injunction an equitable agreement.

20   If it were not equitable, there would be no settlement.

21   Q.  And the -- you had an opportunity to review the permanent

22   injunction before it was presented to the court for entry,

23   didn't you?

24   A.  Yes.  Yes.

25   Q.  And the permanent injunction that was entered by the court

1    and was reviewed by you prior to entry of the court is

2    document two, correct?

3    A.   Yes.

4    Q.   And the permanent injunction prohibited you and anyone

5    acting on your behalf from the activities that were described

6    in that injunction order, correct?

7    A.   In items number 1-4, yes.

8    Q.   And the very first paragraph of the permanent injunction

9    prohibits you or anyone acting on your behalf from using the

10   Kentucky Colonels' mark or any mark that is confusingly

11   similar to the Kentucky Colonels' mark in connection with the

12   sale of any goods or any services or the solicitation of

13   charitable donations, correct?

14   A.   Yes, that's correct.

15   Q.   And paragraph two of the injunction order prohibits you

16   from using the Kentucky Colonels' mark or any mark that is

17   confusingly similar to the Kentucky Colonels' mark on any

18   website or in social media in any way that was likely to cause

19   confusion, correct?

20   A.   Right.  Essentially -- essentially what that meant was

21   anything that doesn't include the letter *s*.

22   Q.   And paragraph three of the injunction order prohibits you

23   from using any domain name on the internet that incorporates

24   the Kentucky Colonels' mark or any mark that is confusingly

25   similar, correct?

1    A.  Again, anything without the letter *s*.

2    Q.  And paragraph four of the injunction order prohibits you

3    from using any mark confusingly similar to the Kentucky

4    Colonels' mark for purposes of forming a membership

5    organization or a civil society association or any fundraising

6    endeavor, correct?

7    A.  Yes.  Yes.  Again, without the letter *s*.

8         THE COURT:  I'm sorry.  Can you follow-up on his

9    response 'cause I'm not sure I understand what he's saying.

10   Q.  Mr. Wright, as I understand it, it's your position that

11   using the term Kentucky Colonel is not confusingly similar to

12   the Kentucky Colonels' mark.  Do I understand your position

13   correctly?

14   A.  Yes.

15   Q.  So as I understand it -- and just so -- the court's asked

16   me to follow-up --

17        (Overlapping speech.)

18        THE COURT:  One at a time.

19        MR. CORYELL:  I'm sorry.

20   BY MR. CORYELL:

21   Q.  So it's your position that you can use the term Kentucky

22   Colonel for any of those things that were described in the

23   injunction order?

24   A.  Not necessarily.  We don't have any interest in competing

25   with The Honorable Order of Kentucky Colonels.

1    Q.  So it's your position that you can start and promote an

2    organization using the term Kentucky Colonel without an *s* that

3    does not violate the injunction order; is that correct?

4    A.  Yeah, I believe so.  As long as we're -- we're very

5    clearly disambiguating ourselves from The Honorable Order of

6    Kentucky Colonels.  So we went ahead and added the TM symbol

7    because that's an unregistered form of a trademark and we're

8    calling it title mark because essentially by using that we're

9    telling everyone that we are unregistered and we're also

10   individuals.  We're using that in the sense of common law

11   which is essentially the same way it's used on the

12   certificates that are granted by the governor; Kentucky

13   Colonel.  Nothing else.  And it --

14            MR. CORYELL:  Judge, does that --

15   A.  -- it's -- it's sort of an identifier, but, I mean, this

16   is a title.  This is a title.  This is not a trademark and we

17   don't use it as a trademark.

18            MR. CORYELL:  Judge, does that sufficiently clarify

19   for the court?

20            THE COURT:  Yes, it does.

21   BY MR. CORYELL:

22   Q.  Mr. Wright, calling your attention to Document 3 in the

23   compilation I sent you.

24   A.  Yeah, let me look at it.

25   Q.  In May 2022 a Facebook group with the name Kentucky

1   Colonel posted this on Facebook.

2   A.   Yes.  Yes, I see that.

3   Q.   This post purports to offer to sell -- in the words of the

4   post -- the trademark Kentucky Colonel website with four

5   domains.  Is it true that you were responsible for this post?

6   A.   Yeah.  But, I mean, what -- what I was talking about was

7   the State's trademark.  The State has a trademark.  I mean,

8   the Kentucky Colonel is a trademark of the State of Kentucky.

9   Q.   Yeah.  And so you say -- I'm sorry, sir.  You say that --

10  that you're offering to sell the trademark Kentucky Colonel

11  website with four domains.  What four domains are you

12  referring to?

13  A.   Kycolonelcy.us and also kycolonelcy.org and

14  kycolonelcy.com.

15  Q.   And you were representing those four domains to be the

16  trademark Kentucky Colonel domains, correct?

17  A.   No.  No.  To be websites.  To be websites.  To be Creative

18  Commons websites.  They're the official -- they're the

19  official narrative for the historical context of the Kentucky

20  Colonel.

21  Q.   And you also --

22  A.   It's based on -- it's based entirely on the Creative

23  Commons information that's been sourced from 1775 to 1927

24  which is a period of time that also I believe The Honorable

25  Order of Kentucky Colonels is trying to take advantage of

 1    except they have not admitted anyone's existence prior to

 2    themselves.

 3    Q.   Yes, sir.  Your posting on this page also indicates that

 4    it includes -- the offer to sell also includes the social

 5    media account ideas affiliated with that website, correct?

 6    A.   Yeah, of course.  All the social media intellectual

 7    property that we've created.

 8    Q.   And it indicates that all of those social media accounts,

 9    infrastructure and intellectual property, are now ripe for

10    commercial development, correct?

11    A.   They're now ripe for essentially development so that ads

12    can be sold on those websites --

13    Q.   So you were offering --

14    A.   -- websites --

15    Q.   Yes, sir.  So you were offering the -- what you called the

16    trademark Kentucky Colonel website with four domains for sale

17    for commercial development, correct?

18    A.   For commercial development for advertising, yes.

19    Q.   Did -- did the accounts -- social media account ideas,

20    infrastructure and intellectual property that you were

21    offering for sale, did that include a Facebook group called

22    Kentucky Colonel Community?

23    A.   No.  No.  That's --

24    Q.   Are you responsible for --

25    A.   -- that does not include the Facebook group.

```
 1    Q.  Are you the administrator for a Facebook group called

 2    Kentucky Colonel Community?

 3    A.  Yes, I am.  I started that group in --

 4    Q.  Are you the administrator for --

 5            THE COURT:  All right.  You got to let him finish

 6    the question and the answer.

 7            MR. CORYELL:  I'm sorry.

 8            THE COURT:  Mr. Wright, will you answer that

 9    question again?

10    A.  Yeah.  I started that group in -- yes.  I started that

11    group in 2006.

12    Q.  Are you the administrator for a Facebook group called

13    Kentucky Colonel Club?

14    A.  Yes.  That's a group that coincidently my son started when

15    he became a Kentucky Colonel in 2009 with some other friends

16    in Berea.  I never knew about it, but I'm the administrator of

17    that as well now.

18    Q.  Are you the administrator for a Facebook group known as

19    Kentucky Colonel?

20    A.  Kentucky Colonel ID but not any other groups on Facebook.

21    Q.  Are you the administrator or did you start a YouTube page

22    name Kentucky Colonel?

23    A.  Yes.  Yes, I did.

24    Q.  Did you start a Twitter account named Kentucky Colonel?

25    A.  No.  On Twitter we have an account called Kentucky
```

1    Colonelcy or KY Colonelcy.  That's the name of the account.

2    Q.  I'm sorry, sir.

3    A.  That's the name of the account.

4    Q.  Are you responsible for a LinkedIn page named Kentucky

5    Colonel?

6    A.  Yes.

7    Q.  Are you responsible for a Pinterest account named Kentucky

8    Colonel?

9    A.  Yes.

10   Q.  Are you responsible for a Crunchbase crowdfunding site

11   named Kentucky Colonel?

12   A.  Yes, I am.

13   Q.  Referring back to Document 3, did you have any inquiries

14   from people who were interested in purchasing the websites

15   that are referenced there?

16   A.  I had some interest from advertisers, but I decided not

17   to -- not to sell it.  And then -- and then shortly after that

18   I received a letter from you guys regarding --

19   Q.  Right.

20   A.  -- saying we were somehow violating the injunction by

21   selling published work that fell within the terms and rules of

22   the agreed permanent injunction.  All the content on the

23   website is a publication.  It is part of the book.  It is

24   informative.

25   Q.  Just -- I'm sorry, sir.  Just to make sure I understand

1    and to keep clear what you're talking about, you indicated

2    that shortly after you published document number three, you

3    received correspondence from legal counsel for The Honorable

4    Order of Kentucky Colonels, correct?

5    A.  Yes.  Yes.

6    Q.  And is that document Document 4 in the package I sent you?

7    A.  Let me look.

8    Q.  Document 4 just for the record is a letter to you dated

9    May 16, 2022, from Ms. Watts who's sitting at the table with

10   me concerning among other things the Facebook post we just

11   looked at.  Is that the letter you're referring to?

12   A.  Yes.  And I responded to that -- that letter I sent -- and

13   I have a receipt somewhere that she received it.

14   Q.  Did you -- did you understand that Ms. Watts on behalf of

15   The Honorable Order of Kentucky Colonels was asking you to

16   take that post down?

17   A.  Well, I think I had already taken it down.  If not, there

18   were -- there were several posts.  One of them may not have

19   been taken down but others were taken down --

20   Q.  Did you understand Ms. Watts was asking you to stop using

21   the Kentucky Colonel Facebook page that that was posted on?

22   A.  No, I don't -- I don't understand that because these --

23   the rights to that page were part of the confidential

24   settlement agreement and part of the confidential settlement

25   conference.  And also, Mr. Coryell, I told you yesterday

1    I'm -- I'm asserting petition clause immunity under -- under

2    the Noerr-Pennington doctrine because you're -- you're

3    essentially attacking my rights to petition government and --

4    and change how Kentucky Colonel -- how Kentucky Colonel

5    commissions are issued.  There's letters and petitions to the

6    governor, to the Secretary of State and to others, and this

7    lawsuit is basically an interference with that.

8    Q.   Mr. Wright --

9    A.   We publish --

10   Q.   Mr. Wright, I don't --

11   A.   -- strictly educational information.

12   Q.   -- I don't mean to interrupt and I really don't mean to be

13   rude, but I want to make sure you understand my question.  I

14   know what your arguments are, sir, and I'm sure that the court

15   will let you make those arguments, but my question to you has

16   to do with this letter that is Document 4.

17        And my question to you was simply is it fair -- or

18   did you understand that Ms. Watts in that letter was asking

19   you to take that posting down and to stop using the Kentucky

20   Colonel Facebook group?  Did you understand that that's what

21   Ms. Watts was asking you to do?

22   A.   Yes.  But I don't -- I don't understand where Ms. Watts --

23   based on the confidential court mediator's proposal, what

24   position Ms. Watts plays in asking me to remove

25   anything from any of the intellectual property which was

1    disclosed and dealt with in the -- in the settlement

2    conference --

3    Q.  And, Mr. Wright --

4    A.  -- Mr. Coryell.

5    Q.  Mr. Wright, is it fair to say that you refused to honor

6    Ms. Watts' request to stop that activity?  You refused to

7    honor that request, didn't you?

8    A.  I don't think she has any position to make the request.

9    Q.  So you refused to honor that request, correct?

10   A.  It was just a basic logic judgment on her part that we may

11   be violating one of her client's rights, but that's not the

12   case.  I looked at it and we're not violating the -- the

13   agreed permanent injunction.

14   Q.  Did you honor Ms. Watts' request, Mr. Wright?  That's a

15   yes or no, sir.

16   A.  I honored it in part.

17   Q.  How did you honor her --

18   A.  Remove -- where I did not honor it, the page was removed

19   by your law firm contacting Facebook.  The page was removed

20   from Facebook.  A page that was established in 2009 which was

21   my intellectual property, so that's damage where you have

22   claimed and you have violated essentially the court mediator's

23   agreement and went to Facebook and had a page removed by

24   Facebook --

25   Q.  And --

```
 1    A.  -- that I established in 2009.

 2    Q.  -- and you're referring to --

 3    A.  The mediator's agreement says that you won't do that.

 4    Q.  Yes, sir.  Mr. Wright, you're talking about -- it's your

 5    belief that we had or somebody on behalf of The Honorable

 6    Order of Kentucky Colonels had Document 3 removed from

 7    Facebook?

 8    A.  You had the page removed.

 9    Q.  Okay.  Do you continue to use the Kentucky Colonel

10    Facebook group or page?

11    A.  No.  We started a new page.

12    Q.  Okay.  What's the name of that new page?

13    A.  The same -- the same name, Kentucky Colonel.

14    Q.  Okay.  In January 2023 a LinkedIn page under the name

15    Kentucky Colonel had the post that's reflected in Document 5.

16    Do you see Document 5, Mr. Wright?

17    A.  Let me look at it.

18              MR. CORYELL:  Judge, just for the record --

19              THE COURT:  This is Document 5?

20              MR. CORYELL:  Document 5 is also -- there's two

21    cover pages there --

22              THE COURT:  I was going to say there's a seven on

23    it.

24              MR. CORYELL:  And that's because on some of these

25    documents you will see that there's a seven on it and
```

1    that's -- I left that on just because that's Exhibit 7 to the

2    verified complaint.

3              THE COURT:  Okay.

4              MR. CORYELL:  So if it's --

5              THE COURT:  Understood.

6              MR. CORYELL:  It's Document for purposes of an

7    exhibit in this proceeding --

8              THE COURT:  This hearing it's 5?

9              MR. CORYELL:  Yes.  And, Judge, at the end, if it

10   pleases the court, I have a compilation of exhibits that I

11   will just introduce --

12             THE COURT:  Do you have something you can email --

13   I'm not really a paper person.

14             MR. CORYELL:  I'm happy to do that.

15             THE COURT:  It will be easier -- I'm an electronic

16   person all the way around, so --

17             MR. CORYELL:  And, Your Honor, just for ease of

18   reference, when you get it, if you had paper, there would be

19   tabs, but those tabs would correspond to the document number

20   as opposed to the exhibit number if that makes sense.

21             THE COURT:  Yeah, that's fine.

22   BY MR. CORYELL:

23   Q.  Mr. Wright, is it true that you were responsible for the

24   creation of the LinkedIn page that is Document 5?

25   A.  Yes.

1    Q.  And that LinkedIn page is called Kentucky Colonel with a T

2    and an M behind it, correct?

3    A.  Yes.

4    Q.  The post that we've included in Document 5 indicates

5    that -- on the second page it indicates -- there's a post that

6    says, "We have talked long enough and planned around the laws

7    we established for Kentucky Colonel in 2021."  Is that -- is

8    that your entry?  Did you author that?

9    A.  Yes, I did.

10   Q.  And by the "laws established for Kentucky Colonel in

11   2021," were you referring to the injunction that was

12   entered -- the permanent injunction that was entered in

13   February 2021?

14   A.  Yeah, I see it.

15   Q.  And you indicated -- you indicated that -- in this post

16   that your attorneys have given you a green light to start a

17   collective licensing program.  What are the names of those

18   attorneys?

19   A.  Well, I prefer not to say.  I mean, this is, like I said,

20   under my petition clause immunity.

21   Q.  Can you please provide me with the names of those

22   individuals, Mr. Wright?

23          THE COURT:  He's entitled to ask you the question

24   and you're required to respond.

25   A.  Well, Terry Collingsworth is one of them and the other one

1    is -- is in Washington, but I haven't -- I haven't ever heard

2    back from him.

3    Q.  Where does Mr. Collingsworth live?

4    A.  In Washington DC.

5    Q.  And what is the name of the individual -- the name of the

6    individual who lives in Washington?

7    A.  I don't -- I don't recall his name.  Like I said, we only

8    spoke once.  I believe it was Mr. Haley [phonetic].  He was

9    going to -- pro hac vice appearance on our behalf, but we

10   never followed up with it because he wasn't willing to do it

11   for the organization.

12   Q.  The collective licensing program that you're referring to

13   or describing in that -- in that LinkedIn entry, is that what

14   you call the Kentucky Colonel Cooperative?

15   A.  Yes.  Yes.

16   Q.  Who are -- you indicate that you're starting that program

17   through our sponsors which are all colonels.  Who are the

18   individuals that you're referring to in that post?

19   A.  Well, I can only tell you right off the top of my head.

20   We have Godfrey Braudcad [phonetic] who is a resident of

21   northern Ireland.  We have Louis Cruz Diaz.  He's a resident

22   of Puerto Rico.  We have my son, Nicholas Egner Wright, and

23   he's a resident of Kentucky.  And there's several others.  Let

24   me see.  Let me see if I can inform you a little bit more.

25            Give me one second.  I can give you at least two

1    more names, I think.  We have David Mandrake [phonetic].  He

2    lives in Australia.  And we have Stephan Pigsma [phonetic] who

3    is in Sweden.  And some others just aren't showing up on my

4    list right now.  Oh, I know how to find them.  There we go.

5    Q.  You have a list of those individuals, Mr. Wright?

6    A.  No, I don't have a list.  I don't -- I don't make lists.

7    Q.  In that post you also -- in that post and the post

8    immediately below it, you indicate that you're promising

9    Kentucky Colonels over 21 years of age a program to -- in the

10   word of that post -- have a professional career as a Kentucky

11   Colonel and make your old career secondary.  Did I read that

12   correct?

13   A.  Yes, sir.  Yes.

14   Q.  In addition to -- and does that LinkedIn page, does it

15   still exist?

16   A.  LinkedIn?

17   Q.  Yes, sir.

18   A.  Yeah, sure.

19   Q.  So that -- you've not taken that LinkedIn page down,

20   correct?

21   A.  No.

22   Q.  In addition to the Kentucky Colonel Facebook page we saw

23   earlier, there's a Facebook group known as the Kentucky

24   Colonel Community, and as I understand your testimony, you're

25   responsible for establishing that group, correct?

1   A.   Yes.  And just for the record, I mean, those groups are

2   private groups.  In order to be in those groups, you're

3   supposed to follow the rules and not take anything out of

4   those groups.  And apparently The Honorable Order of Kentucky

5   Colonels know someone who is essentially violating Facebook's

6   policy in order to present this evidence to you --

7   Q.   Can I get you to look at Document 6, please?

8   A.   -- and that information --

9   Q.   Document 6, Mr. Wright.

10  A.   Document 6?  Let me look at it.

11          MR. CORYELL:  And again, Judge, the exhibit -- it's

12  Document 6 for purposes of this hearing.  It's Exhibit 8 to

13  the verified complaint.

14  A.   Okay.

15  Q.   Are you familiar with this posting on the Kentucky Colonel

16  Community Facebook group?

17  A.   About this group?  Yeah.

18  Q.   Are you responsible for this posting?

19  A.   Yes.

20  Q.   And this posting indicates that the group has 2,000

21  members, correct?

22  A.   Yes.  The group has approximately 2,000 members.

23  Q.   And it indicates that it's a community consisting of

24  Kentucky Colonels commissioned by a Kentucky governor,

25  correct?

1   A.  Yes.

2   Q.  And isn't it true that the purpose of this group is to

3   solicit individuals who have been commissioned Kentucky

4   Colonels to become members of the collective licensing program

5   that was described in the LinkedIn page we just looked at?

6   A.  No.  That's not the purpose of the group.  It's not the

7   reason the group was founded either.  The group was founded in

8   2009 -- or 2007 this group.

9   Q.  And in the bottom paragraph of this -- well, in the --

10  next to the last paragraph of this posting, there's a

11  reference to Kentucky Colonel badges, ID cards, and

12  nameplates, correct?

13  A.  Yes.  Yes.

14  Q.  And you indicate in this posting that Kentucky Colonel

15  badges and ID cards and nameplates will be issued to

16  cooperative employees and sponsors beginning on January 1,

17  2023.  Are you referring to members of the group that you

18  described -- the collective licensing program that you

19  described in the LinkedIn page we just looked at?

20  A.  No.  We're talking about -- what we were talking about,

21  Mr. Coryell, is we're talking about the authors of the

22  creative work, the website, the book, the people who are

23  registering themselves who are Kentucky Colonels that want to

24  register those as -- as --

25          (Zoom difficulties.)

1          THE COURT:  You have frozen up on the Zoom link, so

2     I'm going to need you to go back.  You were explaining that it

3     included authors of the creative work, the website, the book,

4     the people who register themselves, and then after that we

5     didn't hear anything further.

6     A.   Right.  The people that register -- the people that

7     register -- (inaudible) -- exercising their -- their

8     privileges and responsibilities that are -- (inaudible) -- in

9     an effort to write a book and better inform the public and

10    also to stay true to the (inaudible) of the Commonwealth of

11    Kentucky.

12    Q.   Mr. Wright, can you hear me?

13    A.   Yes.

14    Q.   You promised that badges, ID cards, and nameplates will be

15    available to cooperative capital investors and network

16    platform users that support the cooperative as partial owners,

17    correct?

18    A.   Yes.

19    Q.   And the notification at the bottom of the page refers to

20    members here together, correct?

21    A.   Yes.

22    Q.   So this is -- as your description, this is a membership

23    group, correct?

24    A.   Well, it's not really a membership group any more than IBM

25    is a membership group or the court is a membership group.  I

1    mean, people have their roles.  People would have their roles.

2    They would -- they would need to select roles.  They would

3    need to correspond, they would need to write, they would need

4    to collect information in order to be able to be considered

5    collaborators and --

6    Q.  And owners, correct?  You're selling ownership in shares

7    in this group, correct?

8    A.  Well, I mean, there -- they become owners in the book --

9    in the book rights and the rights to the website.

10   Q.  And at the bottom of this -- this page, there's a tag and

11   the tag -- one of the tags at the bottom of this page is

12   entrepreneurship and startups, correct?

13   A.  Yes.

14   Q.  In addition to the Kentucky Colonel Facebook group and the

15   Kentucky Colonel Community Facebook group, you created the

16   Kentucky Colonel Club Facebook group, correct?

17   A.  We already went over this --

18   Q.  And Document --

19   A.  -- (inaudible).

20   Q.  -- Document 7, sir, is a posting from the Kentucky Colonel

21   Club Facebook group, correct?

22   A.  Let me see.  Document 7?  Yeah.

23   Q.  The post says this group consists of individuals who had

24   been commissioned Kentucky Colonels by -- well, commissioned

25   Kentucky Colonels, correct?

1    A.   Right.

2    Q.   And the post touts the group as a forum to discuss using

3    the commission to exercise the rights, privileges, and

4    responsibilities while treating the certificate as a vehicle

5    to personal success, correct?

6    A.   Yes.

7    Q.   And it indicates that the group -- the official websites

8    for the group -- there are a number of official websites for

9    the group, correct?

10   A.   There's several listed there.

11   Q.   And there are three -- three websites listed there,

12   correct?

13   A.   Yeah.  Colonels.net, Kentuckycolonelcy.org, and the

14   Wikipedia page for the Kentucky Colonel.

15   Q.   Can I get you to look at Document 8, sir?  We've talked

16   about your Kentucky Colonel Facebook group.  Document 8 is a

17   posting from that -- that Facebook group, correct?

18   A.   Yeah.

19   Q.   Document 8 is a screenshot from one of those posts,

20   correct?

21   A.   That's a screenshot actually from a Facebook page --

22   Q.   And that --

23   A.   -- but --

24   Q.   -- that Facebook page includes multiple posts about people

25   being commissioned as Kentucky Colonels, correct?

1    A.   Yes.

2    Q.   And you're responsible for this post, correct?

3    A.   Yes, I am.

4    Q.   Would you agree with me that this Facebook page includes

5    multiple posts from people being commissioned as Kentucky

6    Colonels tagging itself the Kentucky Colonel Facebook page

7    with these posts?

8    A.   I don't understand that question.

9    Q.   What is the purpose of making the post about people being

10   commissioned as Kentucky Colonels on the Kentucky Colonel

11   Facebook page?

12   A.   When we see in Google news that someone has been

13   commissioned a Kentucky Colonel, we normally share that

14   especially if it does not name The Honorable Order of Kentucky

15   Colonels.

16   Q.   Do you share them if it does name The Honorable Order of

17   Kentucky Colonels?

18   A.   Sometimes.  It depends on who it is.  If it's a public

19   figure that's actually been recognized or if it's a story

20   which has reached a certain level, we'll go ahead and share

21   it.

22   Q.   Would you look at Document 8A, sir?  In December 2022 you

23   made a post on the Kentucky Colonel Facebook page regarding

24   photo ID cards and additional exclusive benefits for the

25   Kentucky Colonel 1775 Company and Cooperative, correct?

1    A.   Right.

2    Q.   And you were talking about the Kentucky Colonel

3    Cooperative that you described in the earlier post and in the

4    LinkedIn page, correct?

5    A.   Yes.

6    Q.   And you instructed readers to like the post to receive

7    additional notifications, correct?

8    A.   Right.

9    Q.   You also represented that "As a Kentucky Colonel,

10   employees of our cooperative will have qualified immunity in

11   civil matters and will receive many more benefits, privileges,

12   and responsibilities than most have ever realized or

13   understood until now."  Did I read that correctly?

14   A.   Yes, sir.

15   Q.   Who told you that?

16   A.   What's that?

17   Q.   Who told you that -- that -- what I just read there, who

18   told you that was accurate?

19   A.   Well, we're not here to challenge that.

20   Q.   Sir --

21           THE COURT:  Just answer the question, please.

22   A.   I'm an official Kentucky Colonel.  If you're asking me as

23   a Kentucky Colonel, I may need to tell you that I'm an officer

24   of the State of Kentucky, which I am, but --

25   Q.   Mr. Wright, what civil matters are you referring to there

1    that employees will have qualified immunity to?

2    A.   There's been -- there's been quite a few civil matters in

3    the U.S. District Court involving Kentucky Colonels in the

4    past dating back into the 19th century.  And there -- there

5    have been quite a few immunities granted to Kentucky Colonels

6    in the State of Kentucky -- in the Commonwealth of Kentucky.

7    Q.   Mr. Wright, what -- what employees are you referring to

8    there -- employees of the cooperative?

9    A.   Well, when a person becomes a Kentucky Colonel, the

10   Commonwealth is actually only authorized to allow them to be

11   goodwill ambassadors as honorary-type of role but in a very

12   official way because it is with letters -- patented that a

13   person becomes a Kentucky Colonel.  And there are rights,

14   privileges, and responsibilities that come with the Office of

15   the Kentucky Colonel.

16   Q.   So is it true, Mr. Wright, that in this post, the purpose

17   of this post is to solicit individuals to join what you call

18   the Kentucky Colonel Cooperative?

19   A.   In order to get people to help -- help promote the website

20   and write the website.  Yes, sir.

21   Q.   And as a solicitation or an inducement to those

22   individuals to join the Kentucky Colonel Cooperative, you

23   offer badges, nameplates, and additional exclusive benefits,

24   correct?

25   A.   We don't make the badges, ID cards, or nameplates.  All

1    these things --

2    Q.  Well, I'm just --

3    A.  -- are done by the individual.

4    Q.  Sir, I'm just --

5    A.  We are -- we are simply --

6    Q.  -- I'm just reading from the post.

7              THE COURT:  Wait.

8    A.  Mr. Coryell --

9    Q.  Mr. Wright, I'm just reading from the -- I'm asking --

10             THE COURT:  Sir, wait.  Both of you.  Stop.

11   Mr. Wright, finish answering the question he just asked.

12   A.  The ID cards, badges, and nameplates are things that are

13   made and approved by us that each person can make on their

14   own.  And if we had gotten far enough, we would have one

15   supplier for the ID cards that everyone could have went to,

16   but with your lawsuit interrupting everything right as we were

17   getting ready to start printing or publishing any ID cards,

18   your lawsuit was started, so everything was put on hold by --

19   Q.  Okay.  So -- thank you, sir.  So it was your intention to

20   begin producing ID cards, badges, and nameplates before the

21   lawsuit was filed and the lawsuit precluded you from doing

22   that, correct?

23   A.  Right.  It was based on a person essentially joining the

24   authorship group, the cooperative, as we're calling it.

25   Q.  The screenshot shows that 49 people liked or loved the

1   post.  Do you see that?

2   A.  Yes.

3   Q.  And presumably therefore those individuals received the

4   notifications that you referenced in the post, correct?

5   A.  No.  But they received notifications by Facebook.

6   Q.  And one of those individuals is named Jim Rogers, do you

7   see that?

8   A.  No.  Oh, yeah; Jim Rogers.  He's one of HOKC's board

9   members, correct?

10   Q.  Document 9, Mr. Wright, are you familiar with crowdfunding

11   website known as Crunchbase?

12   A.  Yes.

13   Q.  And I believe you testified earlier that you set up a

14   Kentucky Colonel page on Crunchbase, correct?

15   A.  Yes, I did.

16   Q.  And is that the page that's depicted in Document 9?

17   A.  Yes.

18   Q.  Is it true that this account was originally called the

19   Kentucky Colonel Company?

20   A.  It may have been.  We have several different names we have

21   listed there.

22   Q.  And the "about" section of this website indicates that the

23   organization is the source of Kentucky Colonel trademark and

24   license, correct?

25   A.  Yes.

1    Q.  The page indicates -- or designates $7,500 as the amount

2    being sought, correct?

3    A.  That's the amount we were -- we were hoping to raise,

4    yeah.

5    Q.  Were there any contributions made to this account?

6    A.  When we started the -- the -- when we started the

7    crowdfunding and we had an application which is still

8    online -- you have that as one of your evidence as well before

9    people stopped visiting it -- we had I believe around $1,700

10   come in.

11   Q.  Where are those funds now?

12   A.  Those funds have been spent.

13   Q.  Who spent them?

14   A.  I spent them.

15   Q.  What did you spend them on?

16   A.  I spent them on setting up another group, I spent them on

17   artwork which we had done, layout and scale -- scale drawings

18   of a new logo or a new seal for the State which is -- which is

19   what we're calling the official Kentucky Colonel seal.  And

20   that is essentially a very critical piece of artwork --

21   Q.  You indicate --

22   A.  -- and there were also other expenses; website expenses,

23   networking expenses.

24   Q.  You indicate on this website that the Kentucky Colonel

25   organization is a suborganization of Globcal International,

1   correct?

2   A.  Well, it is in a sense that it's an initiative that is --

3   Q.  Sir, I'm just asking you -- asking you what you put on the

4   website.  And on the website you indicate --

5   A.  It's an initiative, Mr. Coryell -- it's an initiative,

6   Mr. Coryell, of five of the Globcal members.

7   Q.  And the website says it's a suborganization of Globcal

8   International, correct?

9   A.  That's what it says but that's not what it is.  It's an

10  unincorporated initiative.

11  Q.  The third page of the website -- the second full paragraph

12  on the third page of the website says, "We are authorized as a

13  collective group to license under our common law trademark

14  rights and/or tradename rights and letters patented in various

15  forms."  Did I read that correctly?

16  A.  Yes.

17  Q.  Then it goes on to say, "We are at the disposal of

18  multiple brands and marketing companies to develop the common

19  law trademark rights into their themed products."  Did I read

20  that correctly?

21  A.  Yes.

22  Q.  And then it goes on to say in the next paragraph, "Soon

23  the Transylvania company will introduce Kentucky Colonel beer,

24  the Kentucky Colonel quarter horses, Kentucky Colonel

25  cannabis, Kentucky Colonel carbon credits, Kentucky Colonel

1    cash cryptocurrency, and official Kentucky Colonel ID card

2    which is an international work credential."  Did I read that

3    correctly?

4    A.  Yes, you read it correctly.

5    Q.  And were you -- are you responsible for that entry on this

6    page?

7    A.  Yes, I am.

8    Q.  And the next sentence says, "As a cooperative work group,

9    we require an investment of $10,000 with a ten percent good

10   faith deposit waiver, $1,000, to get into the cooperative and

11   sign the NDA."  Did I read that correctly?

12   A.  Yes.

13   Q.  Then two sentences later -- this is not highlighted, but

14   you say, "An investor that is not a Kentucky Colonel will now

15   become one by investing in this Kentucky business."  Did I

16   read that correctly?

17   A.  Yes.

18   Q.  The last sentence in that paragraph says, "A Kentucky

19   Colonel can however become a single share or partial share

20   investor by joining the cooperative and working as a Kentucky

21   Colonel."  Did I read that correctly?

22   A.  Yes.

23   Q.  And the bottom of this page in the frequently asked

24   questions, you indicate that Kentucky Colonel has raised

25   $7,500, correct?

1   A.   Right.  But that's not an accurate figure.  That was our

2   goal.

3   Q.   But the -- the entry there is "How much funding has

4   Kentucky Colonel raised to date," correct?

5   A.   Right.  But --

6   Q.   And the response to that is -- and the response according

7   to this page is Kentucky Colonel has raised $7,500, correct?

8   A.   Again, the actual amount is under $2,000.

9   Q.   Well, that's not what the page says, is it?

10  A.   No.  I was overreporting.

11  Q.   Document 9A --

12  A.   That document is only -- only in responsibility with those

13  who invest, Mr. Coryell.  It's -- there's nothing wrong with

14  us inflating the amount of money that we claim to have in a --

15  in a project like this which is based in an initiative.

16         When the program actually starts and we have a

17  public responsibility, then those figures may need to change,

18  but in -- in a development world, speculating how much we plan

19  to raise or hope to raise as an amount already raised is not a

20  crime and certainly not any sort of violation against The

21  Honorable Order of Kentucky Colonels.

22  Q.   Just so I understand, are you telling the court that that

23  statement that $7,500 had been raised, are you telling the

24  court that was untruthful?

25  A.   That's an overreporting which was done by one of our

1    members to makes us look good.

2    Q.   Document 9A, Mr. Wright.  Do you recognize Document 9A?

3    A.   Let's look at it.

4    Q.   I believe this is a posting from one of your websites.

5    A.   Yeah, I see it.

6    Q.   Is it true that this is a posting from one of your

7    websites?

8    A.   Yes.

9    Q.   And it describes a new cooperative organizational

10   development that you are starting, correct?

11   A.   Yes.

12   Q.   And the second page of Document 9A identifies or says, "On

13   December 13 a resolution was passed allowing the group

14   formation to move forward as a cooperative by the executive

15   directors commission of Globcal International."  Did I read

16   that correctly?

17   A.   "The executive officers commission" -- yes.

18   Q.   The next highlighted sentence says, "The business plan has

19   not been fully drafted or written.  It will develop -- it will

20   be developed democratically over a period of six to nine

21   months by the founders and investors using the cooperative

22   methods under the special set of bylaws for the charter phase

23   of the Transylvania company," and then there's other

24   references there.  Did I read that correctly?

25   A.   Yes.

1   Q.  Can you identify the 13 commissioners who you were

2   referring to there?

3   A.  No.  No, I can't identify them all.

4   Q.  Can you not identify them or are you simply refusing to

5   identify them?

6   A.  No, I can't identify them.  Some of them have essentially

7   gone their way, become alienated to us because of the lawsuit,

8   so I'm not at liberty to necessarily identify all of them.

9   Q.  On the fourth page of Exhibit -- or Document 9A you state,

10  "The cooperative" -- and this is highlighted, Mr. Wright --

11  "The cooperative will be consensually organized and

12  cooperative shares will be issued based on a block chain based

13  ID card contract that has been tested and developed to be

14  digitally managed as cryptocurrency citizenship which will be

15  issued as a work credential with the current occupation of

16  Kentucky Colonel."  Did I read that correctly?

17  A.  Yes.

18  Q.  The last sentence in that paragraph says, "The cards will

19  be based on the Real ID design and have other programable

20  features."  Did I read that correctly?

21  A.  Yes.

22  Q.  The next paragraph says, "The step creating ID cards has

23  been fully suggested by a majority of the 13 cooperative

24  commissioners meaning the cards will be made available to a

25  minimum of 1,000 members before a practical or functional

1    platform will generate any potential values for its users."

2    Did I read that correctly?

3    A.  Yes.

4    Q.  The next sentence says, "It will be up to these first

5    1,000 members if they will allow to be" -- "there to be 10,000

6    or 100,000 members."  And you're talking about your Kentucky

7    Colonel Cooperative there, correct?

8    A.  Right.

9    Q.  And you're saying the first 1,000 voting members will pay

10   350 U.S. dollars for a cooperative share, correct?

11   A.  Yes.

12   Q.  And this is for a share in the Kentucky Colonel

13   Cooperative that is -- was also the subject of your LinkedIn

14   page, correct?

15   A.  No.  It's actually -- it's actually a share in Globcal

16   International.  It's not a share in the Kentucky Colonel

17   Cooperative, but it's all the same organization in reality.

18   It's the goodwill ambassadors, it's Kentucky Colonels, it's

19   Tennessee Colonels, everything, and it all comes under the

20   idea of a trademark which we're working on developing called

21   Honorific which is what we're going to be calling our

22   trademark.

23   Q.  And marketing among other things under the name or the

24   phrase or the term "Kentucky Colonel," correct?

25   A.  Right.  There's Kentucky Colonels out there, there's

1    Nebraska Admirals, there's Texas Colonels.  There's lots of

2    different honorable titles across the United States that we

3    work with.

4    Q.  And this -- this posting, though, is on a website and the

5    top of the website is Kentucky Colonel, correct?  That's

6    what's at the top of this page?

7    A.  Right, Kentucky Colonel.  It's focused on Kentucky

8    Colonel.

9    Q.  Sir, the bottom of the page we were just talking about,

10   the last entry there is the suggested annual budget and cost

11   to provide the mutually beneficial employee services,

12   smartphone application, functional social media reference

13   network is approximately $350,000 per year with the staff of

14   three, correct?

15   A.  Yeah.

16   Q.  Then at the top of the next page, you indicate -- you

17   state -- and you're responsible for all of these -- all of

18   this information, correct?

19   A.  Yes.  Yes.  I wrote it all.

20   Q.  And at the top of the next page, the highlighted section,

21   you indicate, "Our foundational basis is estimated or

22   speculated to have a pre-money valuation on Crunchbase of a

23   million dollars per year and has already allocated $7,500 from

24   private investors during the concept stage."  Did I read that

25   correctly?

1    A.   Yes.

2    Q.   And you represent that it's currently ranked at the top

3    20,000 global tech startups, correct?

4    A.   Yes.  And --

5    Q.   And then you solicit individuals to join the cooperative

6    and become a cooperator, correct?

7    A.   Right.

8    Q.   And then at the top of the sixth page there's a paragraph

9    that starts, "For a licensed volunteer, freelance, or paid

10   self-employment as a professional Kentucky Colonel."  Do you

11   see that, sir?

12   A.   Where's that?  Yeah, okay.

13   Q.   The fourth line of that paragraph says, "Following our

14   guide, a very active Kentucky Colonel as a goodwill ambassador

15   can earn from 1 to $100,000 per year tax exempt income."  Did

16   I read that correctly?

17   A.   Yeah.  Yes.

18   Q.   "As an online nonpolitical or nonreligious activist for

19   social events and environmental causes engaging in full-time

20   promotional activities, making endorsements, hosting events,

21   organizing fundraisers, and performing sales without even

22   being a celebrity."  Did I read that correctly?

23   A.   Yes.

24               THE COURT:  All right.  I'm going to interrupt you

25   briefly here.  We are at 12:35 at this point in time.  As

1    seems to be the case, this is not going to fit into the period

2    of time that we have designated for it.  Am I correct at that

3    assumption?

4              MR. CORYELL:  Your Honor, I'm not sure if I'm aware

5    of how much time the court had designated for it.  And I

6    apologize --

7              THE COURT:  I think we designated an hour, so now

8    we're definitely over that at this point in time.

9              MR. CORYELL:  Yes, Your Honor.

10             THE COURT:  So I'm -- I have some questions which

11   are where are we going with this, what are the other witnesses

12   intending to provide?  Because I think here unlike proving the

13   original claim, right here we're proving whether or not he

14   violated the agreement.

15             MR. CORYELL:  Correct.

16             THE COURT:  So I just don't know -- are we going to

17   need more time to present witnesses other than what we have

18   here today?  I mean, we can probably go --

19             MR. CORYELL:  Well, the answer's yes.  And we can go

20   out of order, Your Honor, because at least one of my witnesses

21   is from out of town and he made a considerable effort to get

22   here.

23             THE COURT:  Okay.

24             MR. CORYELL:  And the witnesses will be directed at

25   establishing confusion.

1      THE COURT:  All right.  How long will that witness

2  be?

3      MR. CORYELL:  I can try to go quickly with him, Your

4  Honor.  I can try to complete him in 20 minutes.

5      THE COURT:  Okay.  And here's why I'm asking.  I

6  mean, the question here is not whether Mr. Wright has caused

7  confusion.  The question here is whether he violated the

8  agreement --

9      MR. CORYELL:  Yes, Your Honor.

10     THE COURT:  -- itself --

11     MR. CORYELL:  Yes, Your Honor.

12     THE COURT:  -- which is why I think we started where

13  we did today.  So I'm happy to hear from him.  I'm going to

14  take a five-minute recess here.  We have hearings at 1:00

15  o'clock and we have hearings all afternoon, so I'm trying to

16  figure out if we can get him in in time.  Mr. Wright, do you

17  intend to cross-examine this witness?

18     MR. WRIGHT:  It depends on what this person may be

19  confused about.  All of our websites and most all of our

20  material has disclaimers on it.  If someone can't read, I

21  mean, the burden is on them to claim ignorance, but --

22     THE COURT:  Okay.  So there are two ways we can

23  proceed.  And likely because it's -- my fear is if I start

24  this witness and Mr. Wright would like to cross, then I have a

25  problem and I'd have to bring him back or I can see -- if

1    Mr. Wright will agree, we can put him on Zoom at another time

2    if we need to continue the hearing.

3               MR. CORYELL:  I can represent to the court that he

4    would be available by Zoom.

5               THE COURT:  Okay.

6               MR. CORYELL:  I would like to proceed with whatever

7    portion of the direct examination we can proceed with within

8    the time constraint, Your Honor.

9               THE COURT:  Okay.  All right.  Let's take a

10   five-minute recess.  We'll come back and we'll get a game

11   plan, okay?

12              (Recess at 12:38 p.m. until 12:53 p.m.)

13              THE COURT:  So here's what I'm going to propose.  I

14   think the question here is really whether or not the agreement

15   was violated and more specifically whether or not the

16   inclusion or exclusion of the *s* on the end of Kentucky

17   Colonels by law makes it nonconfusing.

18              I think trademark law might say otherwise; that just

19   removing the *s* does not make something not confusing, and so I

20   think the question then is not whether we need to prove actual

21   confusion but whether or not the actions that he took which he

22   seems to have admitted at this point would violate the

23   agreement 'cause other than removing the *s*, I'm not really

24   seeing much different than prior actions; is that correct?

25              MR. CORYELL:  That's correct.

1           THE COURT:  Okay.  So I think maybe we need to

2      regroup a little bit here before proceeding because we may end

3      up getting far afield of where we actually need to be as far

4      as the specifics of the violation of the agreement.

5           Now, what is it specifically that The Honorable

6      Order of Kentucky Colonels is asking for in the enforcement

7      action?  There were obviously lots of things listed there

8      including damages and what I'm trying to get at is what all

9      has to be proved evidentiarially in terms of are you asking

10     for specific damages, what would -- do you have to prove those

11     up at this point, what am I needing to give you time

12     specifically to prove, potentially?

13          MR. CORYELL:  So yes we are asking for damages.  The

14     damages that we would be asking for, Judge, would consist of

15     disgorgement of the funds that have been raised in violation

16     of the injunction -- or in contempt of the injunction --

17     which -- and we would ask for a triple of that to occur.

18          And we think the proof is already that 75 -- at

19     least $7,500 has been raised, so we would ask the court to

20     triple that.  We would also ask the court for The Honorable

21     Order's attorneys' fees and costs in pursuing the contempt

22     action which I believe as a matter of law is an appropriate

23     remedy for civil contempt.

24          THE COURT:  Okay.

25          MR. CORYELL:  We -- I will tell the court that we --

1    we do have proof of significant confusion just in the last

2    four months.  It is very difficult to attach a dollar amount

3    to that.  What's not --

4              THE COURT:  Because it's reputational?

5              MR. CORYELL:  It's largely reputational.  It's

6    prohibited to our mission because it takes -- but you can't --

7    it's hard -- I can't tell the court that I'm going to bring

8    somebody in that says they gave a thousand dollars to

9    Mr. Wright and they were going to give it to us.  That --

10   that's not there, but what I can say is that the attorneys'

11   fees and the costs are real.  And it looks like the -- what we

12   claim to be infringing activity has in fact resulted in funds

13   going to his organization at least on the Crunchbase account.

14             THE COURT:  And we would still have to get to --

15   which questions that weren't asked yet, but the timing of that

16   and when specifically it was raised and when it was put up and

17   things of that nature.

18             MR. CORYELL:  Yes, Your Honor.

19             THE COURT:  So here's what I'm going to suggest.  I

20   think we need to maybe slightly narrow down the issues a

21   little bit.  To the extent we're going to prove up damages, I

22   understand that.  There's no way we would get to the rest of

23   Mr. Wright's testimony as well as his cross-examination of any

24   witnesses here today.  We're just -- there's just not

25   enough -- there's not enough time here --

1           MR. CORYELL:  I understand.

2           THE COURT:  -- and we have to give Mr. Wright an

3    opportunity to cross-examine any witnesses that you put on as

4    well and I always prefer to kind of do that together if I can.

5    I think it's easier for Mr. Wright, certainly, and easier for

6    the court to keep track of the issues.

7           So I am going to propose the following.  Mr. Wright,

8    there are some very concerning issues here.  I think there is

9    a misconception that simply removing the *s* has brought you

10   into compliance with that agreement which you signed in the

11   last iteration of this lawsuit.  I think --

12          MR. WRIGHT:  It hasn't in accordance with number

13   five of the agreed permanent injunction.

14          THE COURT:  Okay.  I'm not completely sure that that

15   is the case.  I think trademark law would say otherwise and we

16   will continue to explore that and you'll have an opportunity

17   to present your arguments and any witnesses that you wish to

18   present as well, but I have some very serious concerns that if

19   the proposal is "I've removed the *s* and therefore what I'm

20   doing is appropriate," that is not the way trademark law

21   works.

22          I mean, you can't just call it Coca-Colas and it not

23   be confusingly similar to Coca-Cola, so there are some very

24   serious issues that need to be explored here.  They are

25   requesting damages and attorneys' fees for violation of the

1    agreement and they will have to prove that -- the amount of

2    that -- before the court as well.

3            So we have the underlying issue of whether or not

4    there's a violation and then we have proof of damages.  My

5    position is that we're not going to get to that today just in

6    general, so what I'm going to propose is that we continue this

7    hearing to May 9th.  We're going to put it on at 1:30.  You

8    may participate by Zoom, Mr. Wright, as you have today.

9            I'll allow any witnesses that need to be presented

10   to be presented by Zoom as well.  Obviously if somebody's

11   close by and it's just as easy for them to be here, I'm fine

12   with that, but for individuals who are coming from further

13   away, we can accommodate that via Zoom as we have Mr. Wright

14   here today.

15           MR. WRIGHT:  Your Honor?

16           THE COURT:  Yes.

17           MR. WRIGHT:  Actually an afternoon time is not very

18   convenient for me here because of the amount of electricity

19   that's used here in Columbia to keep things cool.  There's

20   very frequent power outages as people turn off -- turn on

21   their air conditioners.  If we could have a morning time, that

22   would be -- that would facilitate me attending and not being

23   cut off.

24           THE COURT:  How about we start at 10:00, Mr. Wright?

25           MR. WRIGHT:  That's fine.  That's excellent.

1          THE COURT:  Okay.  All right.

2          MR. CORYELL:  Your Honor?

3          THE COURT:  Yes.

4          MR. CORYELL:  I apologize because I know that

5    there's a lot of beating of a dead horse that's gone on and --

6          THE COURT:  Which is why -- what I was asking you in

7    asking you about damages, are you starting to prove that up as

8    well which I think is what you're doing somewhat by beating a

9    dead horse, but I understand the need to do it.  I'm not going

10   to cut you off from being able to continue with that.

11         MR. CORYELL:  I will tell the court too because I

12   don't want to get in here May 9th and then air these

13   grievances with the court, but part of the difficulty of

14   proving damages, I mean, we've got the website that says they

15   raised $7,500, but Mr. Wright's refusal to respond to our

16   discovery is a real impediment to us being able to prove, you

17   know, real damages -- consequential damages -- other than the

18   attorneys' fee.

19         I mean, we can -- we'll be prepared to come in and

20   tell the court on May 9th what they've paid in legal fees, but

21   the refusal of Mr. Wright to comply with discovery is an

22   impediment to that.  I want to raise that with the court now

23   rather than wait until May 9th to raise it.

24         THE COURT:  So it does seem that there are some

25   conflicting motions, but there certainly is the motion on

1    there for sanctions for failure to comply with the court's

2    discovery order at 112.  So, Mr. Wright, it doesn't seem like

3    you've responded to the discovery requests, correct?

4         MR. WRIGHT:  I don't believe I'm required to respond

5    to discovery or --

6         THE COURT:  Why do you think that?

7         MR. WRIGHT:  -- bringing forth documents because as

8    I said previously -- and I'll read it -- I'm asserting

9    petition clause immunity and I'm arguing that the claimed

10   concerns is conduct protected under the First Amendment under

11   the Noerr-Pennington doctrine --

12        THE COURT:  Okay.  But that's a -- Mr. Wright, that

13   is a legal argument and before the legal arguments come the

14   discovery.  So the first thing that happens is discovery in a

15   civil case and then comes argument.  My concern here --

16        MR. WRIGHT:  In the past -- Your Honor, discovery

17   was called off in the past in favor of a -- a court-mediated

18   settlement.  And there were -- there were things discussed

19   during the court-mediator's settlement that involved all my

20   intellectual property which the plaintiff is coming here to

21   attack now --

22        THE COURT:  Okay.

23        MR. WRIGHT:  -- and that could have been dealt with

24   in the court-mediated settlement.  And the plaintiff has

25   essentially stated they're not interested in any of our

1    intellectual property and that we may retain all of this

2    intellectual property.  Now this intellectual property is

3    causing a problem for the plaintiff because we have changed

4    our story from the 1813 narrative, which is a fictitious

5    narrative, to Daniel Boone which is factual narrative and this

6    has --

7              THE COURT:  Okay.  Sir, here's -- I understand

8    your -- I understand your perspective, but we have already

9    gone through the settlement process.  An agreement was signed.

10             MR. WRIGHT:  Yes.

11             THE COURT:  So now we're at the point of this --

12   hold on, sir.  Now we're at the point of this proceeding where

13   we figure out whether or not your actions are in violation of

14   that settlement agreement.  To do that, I have ordered

15   discovery.  I'm ordering it now again.  The discovery requests

16   that have been sent to you need to be answered.

17             You are also entitled to send discovery requests to

18   The Honorable Order of Kentucky Colonels.  So you are entitled

19   to do the same thing that they are doing, but I am going to

20   require that before May 9th you respond to those discovery

21   requests in writing as you've been asked to do.  We're not at

22   the point of this case where we're making legal argument.  We

23   are simply getting to the evidentiary issues which is why

24   we're here today taking testimony.

25             We've taken some.  We have gone well over the time

1    allotted.  We are going to conclude that on the 9th.  In order

2    to simplify that process -- discovery would be very helpful in

3    order to simplify that process.  The court can do one of two

4    things.  I can order the requests for admission admitted which

5    means you've said yes to all of them or I can give you a

6    chance here to respond to them, so those are really the two

7    choices.

8            I'm going to give you the chance to respond.  If you

9    fail to respond by the deadline, they will be deemed admitted

10   under the Rules of Civil Procedure which is completely

11   permitted for the court to do and especially when I'm giving

12   you an extra opportunity to do it, okay?  So we need to get

13   those discovery requests responded to.  And then we will

14   resume the hearing.  And, Mr. Wright, if you have witnesses

15   you wish to present, you may present them on that day as well,

16   okay?

17           MR. CORYELL:  Judge, may I --

18           MR. WRIGHT:  Under the rules of civil discovery,

19   my -- my rights include the fact that I forfeited a website, I

20   forfeited a business name.  And I believe it's Section 2 of --

21   yeah, Section 2V on 26 which -- and also the fact that my

22   answer has never been heard by this court which is -- I

23   believe it's Number 62.

24           THE COURT:  I'm sorry.  Your answer to what

25   question?

1          MR. WRIGHT:  All of these things are normally heard

2     by the court -- all of these things are normally heard by the

3     court before any discovery process occurs.

4          THE COURT:  Okay.  We are not at the beginning of a

5     court case.  We are past the end of a court case, okay?  I'm

6     going to hear your discovery requests because you're going to

7     submit them in writing, so I am going to hear your responses

8     to those questions, okay?  I'm going to hear all of the

9     responses.

10          And presumably you're also going to be able -- after

11     they're done doing your direct testimony, you will be able to

12     respond either having me read a list of questions for you to

13     respond to or you may make a statement either written or in

14     person at that point in time, so you're going to be entitled

15     to have all of those things heard, okay?

16          MR. WRIGHT:  Okay.

17          THE COURT:  All right.  So we are going to have the

18     discovery requests responded to.  You are entitled to send

19     discovery requests to them if you so choose, but everything

20     needs to be wrapped up by the 9th.  Yes?

21          MR. CORYELL:  Point of clarification.  Can I get a

22     sense of how much time the court's allotted on May 9th so we

23     don't run into this same issue?

24          THE COURT:  She has two hours on the calendar for

25     you right now.

1          MR. CORYELL:  We'll do what we can to --

2          THE COURT:  Okay.  If you wish to present any

3    additional witnesses that may not be your prime witnesses by

4    affidavit, those are fine and we can have him cross-examine if

5    we need to, okay?  So if we need to -- to do that and then

6    Mr. Wright can look at it them ahead of time and if he wishes

7    to cross-examine them we can do that, okay?

8          So we'll try to simplify that as much as possible,

9    but we definitely need to get to the point where we expedite

10   this a little bit because I don't think we need to be asking

11   all the questions -- some of these should come from the

12   discovery responses themselves.

13         So I will send out a memorandum from today's hearing

14   ruling on some of these smaller motions -- participation by

15   Zoom and things of that nature -- and resetting this for

16   continuation on May 9th.  Now, I'll remind you both that if

17   you wish to ask questions of witnesses who intend to appear by

18   Zoom, you need to provide those documents to them ahead of

19   time for ease of everyone to understand what we're looking at,

20   okay?  So we will send out that Zoom link in advance of the

21   hearing, all right?  Thank you-all.

22   (Proceedings concluded at 1:11 p.m.)

23

24

25

1          C E R T I F I C A T E

2      I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

3   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4

5

        s/April R. Dowell                    May 21, 2023
6   Official Court Reporter, RMR, CRR         Date

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25