1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF KENTUCKY
2                        LOUISVILLE DIVISION

3

THE HONORABLE ORDER OF          )
4  KENTUCKY COLONELS, INC.,      )
                                 )
5             Plaintiff,         )     Case No. 3:20-CV-132
                                 )
6       VS.                      )
                                 )
7  DAVID J. WRIGHT,              )
                                 )     May 9, 2023
8             Defendant.         )     Louisville, KY

9

10                         * * * * *

11                         VOLUME 2
                  TRANSCRIPT OF SHOW CAUSE HEARING
12          BEFORE HONORABLE REBECCA GRADY JENNINGS
                  UNITED STATES DISTRICT JUDGE

13                         * * * * *

14
   APPEARANCES:
15
   For Plaintiff:          Cornelius E. Coryell
16                         Julye L. Watts
                           Wyatt, Tarrant & Combs
17                         400 W. Market Street, Suite 2000
                           Louisville, KY 40202
18
   For Defendant:          Appearing pro se via Zoom
19

20
                      April Dowell, RMR, CRR
21                    Official Court Reporter
                      232 U.S. Courthouse
22                    Louisville, KY 40202
                        (502) 625-3778
23

24  Proceedings recorded by mechanical stenography, transcript
   produced by computer.
25

```
 1                    (Begin proceedings in open court 10:06 a.m.)

 2              THE COURT:  We are going on the record in

 3    3:20-CV-132.  Can I have appearances?

 4              MR. CORYELL:  Good morning, Your Honor.  Corky

 5    Coryell and Julye Watts on behalf of the plaintiff, The

 6    Honorable Order of Kentucky Colonels, along with the executive

 7    director, Ms. Sherry Crose.

 8              THE COURT:  All right.  We're going to need some

 9    volume, April.

10              (Discussion off the record.)

11              THE COURT:  Mr. Wright?  Okay.  Sir, you are muted

12    right now, if you want to turn your mute off, please.

13              MR. WRIGHT:  I am Colonel David Wright and I'm here

14    on behalf of Kentucky Colonels International --

15              THE COURT:  Okay.

16              MR. WRIGHT:  -- defendant.

17              THE COURT:  All right.  So we are here today for

18    continuation of our hearing from a week or so ago.  At that

19    point in time, we ended on direct examination of Mr. Wright.

20    We had a conversation at that period of time sort of

21    clarifying what we were needing to prove in this hearing which

22    was solely whether there's a violation of the permanent

23    injunction and then damages -- I think there was some

24    discussion of whether or not we were going to work on proving

25    up damages, if any, for the Kentucky Colonels.
```

1          So at that point in time, I asked you to exchange

2     any additional exhibits.  There were additional exhibits that

3     the court received and I have those loaded onto the machine

4     today, so we're just going to pick up where we left off.  We

5     have set aside two hours today for the hearing.

6          As I said before, Mr. Wright, once direct

7     examination is done, you have a choice as to whether to make a

8     statement or have the court ask questions.  I am assuming

9     because no questions have been provided to the court in

10    advance, that it's probably going to be your intention to just

11    make a statement.  Is that correct?

12         MR. WRIGHT:  Yeah.  I mean, I'm -- I'm here trying

13    to understand exactly how we allegedly violated the agreed

14    permanent injunction.

15         THE COURT:  Okay.  So here's what we're going to do.

16    We're going to continue on with the direct examination.  You

17    are permitted then -- you would normally be permitted to cross

18    the witness.  So your choice there -- because I think we're

19    going to try to simplify the hearing as much as possible --

20    would be to allow you to make a statement.

21         The statement needs to go to factual issues, though,

22    because I'm going to give you an opportunity to argue law

23    later, but any factual issues that you are contesting and want

24    to place on the record.  After that we'll hear any additional

25    witnesses from the parties.

1            The purpose of the hearing is to determine whether

2    or not factually there has been a violation of the permanent

3    injunction.  After we get all the facts on the record, then

4    the parties can argue the law which you've already I think in

5    part argued in the papers, but I'll allow you additional

6    argumentation in writing afterwards.

7            I don't think we'll have time today for oral

8    argument.  If we do, that's great.  If not, most likely I'd

9    like you to do it on the record and with citation to the facts

10   that hopefully will be in the record from the transcript,

11   okay?  So if you want to start on then with your examination

12   of Mr. Wright.

13           MR. CORYELL:  Thank you, Your Honor.  Point of

14   clarification.  I just want to make sure that the court

15   received the few additional exhibits that we sent yesterday.

16   So just for the record, the court should now have

17   plaintiff's -- I call them documents, but they're going to

18   be -- we're going to ask for admission as Exhibits 1 through

19   26, ultimately.

20           THE COURT:  Yes.

21           MR. CORYELL:  And, Mr. Wright, did you receive the

22   additional exhibits I sent you yesterday?  Mr. Wright, can you

23   hear me?

24           MR. WRIGHT:  Yes.

25           MR. CORYELL:  Did you receive the additional

1    exhibits I sent you yesterday?

2          MR. WRIGHT:  Yes, I'm opening them now.  I got them

3    here.

4          MR. CORYELL:  Thank you.  If I could get you to

5    open -- we're going to start with Document 10 which is where

6    we left off last time.  April, can I share that on my screen?

7    Thank you very much.

8          Your Honor, may it please the Court, Mr. Wright

9    finally responded to the written discovery requests that were

10   served a number of weeks ago -- to some degree he responded.

11   He did respond to the request for admissions and those

12   responses along with his answers to the interrogatories and

13   the request for production -- production of documents will be

14   introduced with the exhibits that we have tendered.  Those are

15   Documents 20, collectively.

16         The responses to the requests for admissions

17   hopefully will allow us to expedite this direct examination

18   and direct -- and this process of proof because Mr. Wright has

19   admitted that he is responsible for the internet sites and

20   social media postings described in the verified complaint, so

21   we hopefully will not have to go through as laborious a

22   process as we did last time.

23         Importantly, Judge, I want to point out that, for

24   example, Mr. Wright has admitted in his responses to the

25   request admissions that he is responsible for the website

1   that's depicted in Document 10 which is Exhibit 13 to the

2   verified complaint.

3        This is -- he admitted this in his response to

4   request for admission number eight.  This is a website under

5   the address of kycolonelcy.us.  And just to summarize for the

6   court, this website represents that it is a cooperative civil

7   rights interest group made up of Kentucky Colonels and

8   promoting and supporting colonels as goodwill ambassadors for

9   the Commonwealth and abroad.

10       It is a very extensive website.  Just to highlight a

11  couple of the pages, it discusses among other things the

12  International Registry of Kentucky Colonels specifically

13  stating that the registry will offer colonels a certificate of

14  registration, a lifetime ID card, and additional internet

15  services.

16       Also part of this website is a page that's been

17  marked as Document 11 which is Exhibit 14 to the verified

18  complaint which Mr. Wright has acknowledged in his response to

19  request for admission number nine that he was the author of.

20  The website -- this page of that same website is titled

21  Kentucky Colonel Cooperative and it includes a section on

22  identification cards, badges, nameplates, and states that

23  those items will be available in June of 2023.

24       The page further states that to obtain an ID card, a

25  member of the cooperative needs to be enrolled and pay dues in

1    the cooperative for a minimum of 30 days with a $100 or

2    greater investment.  And it goes on to say that the

3    cooperative service organization will be empowered with the

4    same legal rights, privileges, and responsibilities of the

5    Kentucky Colonel.  And it includes, as the court can see, a

6    depiction of what the ID badge that is being offered for sale

7    will look like.  That same page includes a news -- a news for

8    immediate release which is -- essentially it looks like a

9    press statement.

10           Judge, this is -- it appears in Document 11 but it's

11   separately included in Document 12.  Mr. Wright acknowledged

12   that he is the author of this document that appeared on the

13   website in his response to request for admission number ten.

14           THE COURT:  Okay.  I'm sorry.  Will you scroll back

15   up for one second?

16           MR. CORYELL:  Sure.  You want to go back to --

17           THE COURT:  No.  I just want to see this whole page,

18   please.  Can you take the Zoom down like from 130 to like one

19   so that I can see it?

20           MR. CORYELL:  Yeah.  Judge, just so you're -- to

21   make it clear, Document 12 is also shown on Document 11.  It's

22   part of that website.  I just took it and I'm showing it

23   separately on Document 12.

24           THE COURT:  All right.  Scroll to the beginning of

25   the next page where the -- okay.  Stop right there.  So just

1   so I understand what we're looking at, this is the seal of the

2   Commonwealth of Kentucky, correct?

3           MR. CORYELL:  That is correct.

4           THE COURT:  What is the Office of the Kentucky

5   Colonelcy?

6           MR. CORYELL:  That is an office that Mr. Wright has

7   made up.

8           THE COURT:  Okay.  So it is not part of the

9   Commonwealth of Kentucky?  And this --

10          MR. CORYELL:  This is not an official document that

11  was made up by any state representative.  This is a document

12  that was authored by and created by -- including the seal and

13  the title -- created by Mr. Wright.

14          THE COURT:  Okay.  And --

15          MR. CORYELL:  For the purpose, Your Honor, we

16  believe intentionally trying to mislead, misrepresent, and

17  affiliate this organization with the Kentucky Colonels'

18  mark --

19          THE COURT:  Okay.

20          MR. CORYELL:  -- and add legitimacy to -- add

21  legitimacy to his efforts in that regard.

22          THE COURT:  Okay.  Entitled to dividends and as

23  owners with equity to a professional role as an official

24  Kentucky Colonel.  And my understanding is the Kentucky

25  Colonel is you-all, correct?

1            MR. CORYELL:  That is our protected mark.

2            THE COURT:  Okay.  And --

3            MR. WRIGHT:  No.  I object to this.

4            THE COURT:  Hold on, sir.

5            MR. WRIGHT:  Your Honor --

6            THE COURT:  Sir?

7            MR. WRIGHT:  They are not Kentucky Colonel.

8            THE COURT:  Sir, wait.  I will allow you to speak.

9    I need to figure out what this is.  Okay.  So Kentucky Colonel

10   and then we have Honorable Order of Kentucky Colonels?

11           MR. CORYELL:  Yes, Your Honor.

12           THE COURT:  Okay.

13           MR. CORYELL:  So our protected mark, Judge, in seven

14   different registrations is Kentucky Colonels.  The injunction

15   prohibits him from using our protective mark or any mark that

16   is deceptively or confusingly similar to our mark.  It is our

17   position that what he is doing here and elsewhere is an effort

18   to intentionally deceive and confuse people into --

19           THE COURT:  Okay.  Well, I know that's your opinion.

20   Start asking him questions about that 'cause he needs to put

21   on the record what this is.  And obviously he's already

22   admitted to these things, I believe, in the discovery

23   responses that he has -- that this is in fact him and this is

24   what he's done, so -- but I would like you to continue on then

25   and ask him questions in regards to this, okay?

1           MR. CORYELL:  Yes.

2                CONTINUED DIRECT EXAMINATION

3    BY MR. CORYELL:

4    Q.  Mr. Wright, can I get you to look at Document 12, please?

5    A.  Can you tell me which page and which document you're

6    talking about?

7    Q.  Document 12, sir.  This is the news -- the press release

8    that you drafted that the court was just describing; Document

9    12.

10   A.  Is that in this -- additional exhibits?

11   Q.  No.  That was in the original exhibits I sent you two

12   weeks ago.

13   A.  Okay.  Hold on a second.  Go ahead and ask me about it.

14           MR. CORYELL:  Judge, just to make sure, does he need

15   to be sworn in again?

16           THE COURT:  No.  He remains under oath.

17           MR. CORYELL:  Thank you, Your Honor.

18   BY MR. CORYELL:

19   Q.  Mr. Wright, you remain under oath.  You understand what

20   that means, sir, correct?

21   A.  Yes.  Yes, I understand that.

22   Q.  Do you have Document 12 in front of you, sir?  Mr. Wright,

23   do you have Document 12 in front of you?

24   A.  I'm looking for it now.  Okay.

25   Q.  You prepared this press statement, correct?

1    A.   Yeah.

2    Q.   And you prepared the document -- the letterhead that this

3    press statement is printed on, correct?

4    A.   Yes.

5    Q.   You were responsible for putting the Kentucky State seal

6    there and putting the title Office of Kentucky Colonelcy,

7    correct?

8    A.   Yes.

9    Q.   Isn't it true that the Office of Kentucky Colonelcy is an

10   office that you created?

11   A.   No.  It's an office I found in -- in -- in history,

12   actually; The Honorable Order of Kentucky Colonels.

13   Q.   This press release indicates that -- it describes a

14   cooperative; is that correct?

15   A.   Yes, a cooperative.

16   Q.   A cooperative of Kentucky Colonels?

17   A.   Yes.  A cooperative of Kentucky Colonels and --

18   Q.   And it describes the cooperative as being based in

19   Richmond, Kentucky, correct?

20   A.   Yes.

21   Q.   Are you in Richmond, Kentucky now?

22   A.   No.  No, I'm not.

23   Q.   What is located -- what is actually located in Richmond,

24   Kentucky, that is the base for the organization that's

25   described in this press release?

1    A.   That's my son and ex-wife's house and that's where --

2    that's where we have the registered office for -- for Ecology

3    Crossroads and for Globcal International.

4    Q.   So this organization is affiliated with the Ecology

5    Crossroads and Globcal International, correct?

6    A.   No, not necessarily.  They -- they use the platform.

7    This -- this is not an organization.  The organization we had,

8    which was Kentucky Colonels International, that disbanded from

9    the earlier part of this lawsuit --

10   Q.   Yes, sir.

11   A.   -- and since it disbanded and we were allowed to keep

12   certain intellectual property, this manifestation right now is

13   basically a -- an unincorporated coming together of -- of a

14   few colonels that are interested in making the title Kentucky

15   Colonel an official title; a job title again as it -- as it

16   once was known in Kentucky.

17   Q.   So it's a membership organization for people who are --

18   hold the title of Kentucky Colonels, correct?

19   A.   Well, it's not -- it's not really a membership

20   organization in as much as it's a cooperative.  We're starting

21   out as, you know, 1 of 100 and then we're moving to 1 of 1,000

22   and that's the limit, but we're not an organization, so to

23   speak, because the members would not be necessarily

24   like-minded.  The only --

25   Q.   In this press release --

1   A.  -- thing that we have in common is the fact that we're --

2   Q.  In this press release, sir, you say that members of the

3   cooperative, so you're talking about the organization, the

4   cooperative, correct?

5   A.  Right.  And the cooperative -- the cooperative -- the only

6   thing the cooperative is capable of doing is providing

7   networking services, private networking services, that is

8   emails, websites --

9   Q.  But, Mr. Wright, looking at this --

10  A.  We publish people's names.  You seem to be concerned about

11  our list of Kentucky Colonels which was compiled from the

12  Wikipedia website.  And most of those links on that page, they

13  all go straight to Wikipedia and they're all well known as

14  Kentucky Colonels; these people that are in Wikipedia.

15  Q.  Mr. Wright, you say in this press release that members of

16  cooperative will be entitled to dividends as owners with

17  (inaudible) to professional role as an official Kentucky

18  Colonel, correct?

19  A.  Right.  Because they're -- they're essentially part of the

20  website.  They own the website.  That's what their investment

21  is is the website.

22  Q.  And you go on to say in the highlighted portion of this

23  press release, "Members of the cooperative will receive the

24  same rate of annual pay as does a United Nations Goodwill

25  Ambassador, correct?

1    A.   Yeah.   That's -- that's actually $1 if you didn't know.

2    Q.   Why don't you say $1?

3    A.   Because --

4    Q.   Does this press release -- anywhere in this press release

5    do you say -- do you say that that rate is $1?

6    A.   Yes.   I'm saying that rate is $1.

7    Q.   Yes, sir.   But I'm asking you in this document, do you say

8    that?

9    A.   I don't say that because I prefer to compare a Kentucky

10   Colonel to a United Nation Goodwill Ambassador.

11   Q.   And you say in this document through their investments of

12   time and money, they can be paid a dividend for their work

13   efforts, correct?

14   A.   Right.

15   Q.   And you say in this document -- this document quotes you

16   even though you're the person who drafted this document,

17   correct?

18   A.   Yeah.   But all this -- all this stuff that you're talking

19   about, these are things that -- that never got off the ground

20   because 30 days had not elapsed and you guys had filed the

21   lawsuit before we could do anything more than dress up our

22   website a little bit.

23   Q.   So these were -- these were plans that you had, but it's

24   your testimony you haven't launched the plans yet, correct?

25   A.   We haven't launched any of these plans.   We haven't -- we

1    haven't made any -- any ID cards, we haven't made any badges.

2    We haven't done any of these things.

3    Q.  Mr. Wright, do you recall that shortly after we filed the

4    lawsuit, you and I had a conversation on the telephone?

5    A.  Yeah.  Yeah, I remember that.

6    Q.  And do you remember that in that conversation I asked you

7    to terminate your efforts that were described in the

8    lawsuit -- I asked you to stop the activity that we had

9    described in the verified complaint, do you remember that?

10   A.  I remember -- I remember that and I informed you that your

11   store, the Kentucky Colonels store, was very, very much

12   violating the agreed permanent injunction by renaming Kentucky

13   Colonels' products by using the term "Kentucky Colonel" in

14   their description.  I remember very clearly I told you that.

15   Q.  Do you remember -- my question, Mr. Wright, is do you

16   remember me asking you to stop the activity that was described

17   in the verified complaint?

18   A.  I didn't see where any of the activity in the verified

19   complaint was a violation of the agreed permanent injunction.

20   Q.  Mr. Wright, do you remember --

21   A.  I do not see that it's any sort of a violation.

22   Q.  I understand -- I understand that you don't think any of

23   the activity that's described in the verified complaint

24   violates the permanent injunction.  That's not my question,

25   sir.  My question is isn't it true that I asked you to stop

1    the activity described in the verified complaint back in

2    January; isn't that true?

3    A.   Yes.  You asked me after -- after you filed the lawsuit.

4    Q.   And your response to that is, "No, because I don't think

5    any of that activity violates the permanent injunction," isn't

6    that true?

7    A.   Yes.  Yes.  And I'm telling you again that same thing now.

8    Q.   Okay.  Mr. Wright, did you in this -- back to this press

9    statement.  It quotes you even though you're the one who

10   drafted the statement.  It quotes you as saying you won the

11   lawsuit that was filed by The Honorable Order of Kentucky

12   Colonels in 2020, doesn't it?

13   A.   Well, what's the question?

14   Q.   Doesn't this statement -- don't you represent in this

15   statement that you won the lawsuit that was filed back in 2020

16   that resulted in the entry of the permanent injunction?  Isn't

17   that what you say in this lawsuit -- or in this statement?

18   A.   Yes.

19   Q.   And don't you say in this statement --

20   A.   (Inaudible) because -- we won the lawsuit because the

21   lawsuit was dismissed and here we are on a dismissed lawsuit.

22   We have an agreed permanent injunction which is a -- it's

23   always been the rule of the court that any sort of a

24   settlement like this or anything that says agreed permanent

25   injunction will be an equitable type of a settlement.  Our

1    equity exists in paragraph 5 and we're not violating

2    paragraphs 1 through 4.

3    Q.   And in this --

4    A.   We're right there on paragraph 5 and we're focused on

5    paragraph 5 and we're not violating the agreed permanent

6    injunction.

7    Q.   And --

8    A.   Suspicions that we might or perhaps we may or could be --

9    this is all based on your suspicions and you being involved in

10   a confidential group which you're not involved or invested in

11   and you're not -- and you're basically extracting private --

12   private details that have come together under a manifestation

13   of people with their equal civil rights in Facebook and you're

14   breaking in there and taking information out of context as to

15   what we hope to do or plan to do or began to start to do that

16   never actually materialized --

17   Q.   And in this --

18   A.   -- because everything stopped --

19             THE COURT:  Okay.

20   A.   -- as soon as you filed the lawsuit.

21             THE COURT:  Okay.  Hold on a second.  Mr. Wright,

22   can I ask you a question here?  Is the Kentucky Colonelcy that

23   you're talking about here and the entities in here, are

24   they -- you're saying they're not a membership organization?

25             THE DEFENDANT:  No.  It's not a membership

1    organization, so to speak.  It's a cooperative.

2              THE COURT:  Okay.  Is it --

3              THE DEFENDANT:  Cooperatives have members, but

4    they -- they're also associates.  They can be called many

5    different things.  I mean, members are usually where

6    there's -- there's one big leader and everybody else follows

7    such as The Honorable Order of Kentucky Colonels but they're

8    not even a membership organization in reality.

9              THE COURT:  So you're just saying this is just an

10   association of Kentucky Colonels -- association of

11   individuals --

12             THE DEFENDANT:  This is a group of Kentucky Colonels

13   in Facebook.  That's all it is.

14             THE COURT:  Are you attempting to raise money?

15             THE DEFENDANT:  We -- we ask for investments and

16   this is in the website and that is in the book.  For us to

17   publish, we need to raise money -- we needs to raise funds to

18   be able to do research, to dedicate hours to write, and we're

19   well within our rights inside the agreed permanent injunction

20   to do all of these things.

21             THE COURT:  Okay.  Go ahead.

22   BY MR. CORYELL:

23   Q.  Mr. Wright, in this press release you indicate that the

24   sponsor of the cooperative that you're organizing here is the

25   Ecology Crossroads Cooperative Foundation, correct?

1    A.   They are -- they are basically a sponsor and they're

2    providing the network services the same as Facebook provides

3    network services.

4    Q.   Document 13, Mr. Wright.  So is it your testimony, sir,

5    that you're not attempting to raise money for the Kentucky

6    Colonel Cooperative?  Did I understand that correctly?

7    A.   No.  We're not trying to raise money for any sort of

8    charitable purposes.  We're trying to raise money for the

9    purposes of the website, for the purposes of the book --

10   Q.   And as I understand it, the way you're attempting to raise

11   money is by selling memberships -- shares -- in the

12   cooperative, correct?

13   A.   Yeah, there's shares.  Like I said, there's 100 right now

14   and then that will go to 1,000.

15   Q.   And it's your --

16   A.   I think that will be about the limit.

17   Q.   And what you are telling people is that if they will buy a

18   share in the cooperative, there will be certain benefits that

19   are available to them, correct, like a Kentucky Colonel

20   membership ID card, correct?

21   A.   No.  For example, they'll be in the book --

22   Q.   Well, you're also --

23   A.   -- they'll be on the website.

24   Q.   Aren't you also representing to people that they will

25   be -- that they will have the opportunity to purchase Kentucky

1    Colonel ID cards or Kentucky Colonel badges or Kentucky

2    Colonel nameplates or be included in a Kentucky Colonel

3    registry, isn't that true, sir?

4    A.  No, it's not.  We don't plan to sell any of those

5    services.  These are all services and things that we hope to

6    include to anyone that joins and puts up a thousand dollars.

7    I mean, anybody that puts up a thousand dollars deserves to

8    have these things.

9    Q.  So in exchange for a thousand dollars you're going to make

10   ID cards, nameplates, registry available to these Kentucky

11   Colonels, correct?

12   A.  We'll even make them a website.

13   Q.  Mr. Wright, if I could get you to look at Document 13.  Do

14   you see that, sir?

15   A.  Yeah.

16   Q.  That's part of the Kentucky Colonelcy website, correct?

17   A.  Hold on.  This is -- Document 13.  Okay.  Uh-huh.

18   Q.  You're responsible for the creation and the administration

19   of that website, correct?

20   A.  Yes.

21   Q.  And that page -- that website includes a page, if you'll

22   scroll down, entitled Kentucky Colonel apparel, correct?

23   A.  Yeah, I see it.

24   Q.  And it says, "Find out where to buy official and

25   unofficial merchandise from third parties recommended to

1    impress your friends with Kentucky colonelcy including

2    uniforms, period-style clothing, guidelines with photos; what

3    Kentucky Colonels should be wearing."  Did I read that

4    correctly?

5    A.  Yes.  Yes.

6    Q.  And it also says, "Manufacturers and suppliers of hats,

7    string ties, jackets, sunglasses, uniforms, insignia, badges,

8    and other items.  Please send us your link."  And it gives a

9    link.  Did I read that correctly?

10   A.  Right.  There's also a link there for your client also

11   about product reviews that we were hoping to do from the

12   Kentucky Colonels shop.

13   Q.  Can I get you to look at Document 13A, Mr. Wright?  This

14   is Exhibit 19 to the verified complaint.  This is a page from

15   your Kentucky Colonelcy website, correct?

16   A.  Right.

17   Q.  And this page relates to Kentucky Colonel identification,

18   photo ID cards, correct?

19   A.  Yes.

20   Q.  And it says that the first batch of cards for economic

21   purposes needs to be made in batches of at least 100 at a

22   time, correct?

23   A.  Right.

24   Q.  And it shows an image there which I assume is intended --

25   you intended to depict what the -- what that ID card would

1    look like, correct?

2    A.   Right.  Actually, Mr. Coryell, I'd like to interject

3    there.  It says once we reach a hundred.  Apparently there

4    was -- there was some sort of nefarious members that were

5    going around tagging and contacting all the members of our

6    group and we wonder if that had anything to do with The

7    Honorable Order of Kentucky Colonels because we only lost

8    about 50 members out of 2,000 members, but I feel they were

9    all contacted because, you know, everyone sort of is treating

10   this very, very neutrally.  They don't want to say anything

11   positive or negative about what The Honorable Order of

12   Kentucky Colonels is doing, so --

13   Q.   So is it your testimony, Mr. Wright, that you have lost

14   members in your group -- in your organization?

15   A.   Yeah.  We lost -- we lost 50 -- about -- well, about 51.

16   It was actually 51 members from the Kentucky Colonel

17   Community.

18   Q.   Mr. Wright --

19   A.   The Kentucky Colonel Club actually went up in membership

20   and I'm not sure --

21   Q.   I thought I heard you say a minute ago that the

22   cooperative was not a membership organization.

23   A.   No, it's not.

24   Q.   Okay.  But you lost members?

25   A.   But the Kentucky Colonel Community is a membership only

1    organization which is on Facebook.  You understand that that's

2    completely different here.

3    Q.  Mr. Wright, is the ID card that's depicted in Exhibit 13A

4    one of the -- one of the items -- one of the products that

5    are -- you're making available to people who join the

6    cooperative?

7    A.  We haven't made that available.

8    Q.  But was it your -- was it your plan -- aren't you

9    representing -- I'm sorry.

10          MR. CORYELL:  Your Honor, I'm sorry.

11   Q.  Aren't you representing in this website that the plan is

12   to make those ID cards available to people who join the

13   cooperative?

14   A.  We would be giving them access, Mr. Coryell, to be able to

15   produce their own ID cards.  That's how the ID cards are made

16   if they're made at all.  This was our idea so that Kentucky

17   Colonels could make their own ID card.  They could change the

18   banner, they could put whatever information they like to put

19   in there and --

20          THE COURT:  But you're saying they have to be made

21   in batches of a hundred.  Who's going to make them in a batch

22   of a hundred?

23          THE DEFENDANT:  They would have to be processed in a

24   batch of a hundred.  That's -- that would be a service based

25   on our network and our ability to --

```
 1                   THE COURT:  When you say -- okay.

 2                   THE DEFENDANT:  And process things as a group -- as

 3      a -- as a group, an unincorporated association or cooperative,

 4      whatever we are at that point in time.

 5                   THE COURT:  But it's you --

 6                   THE DEFENDANT:  All the development was stopped.

 7                   THE COURT:  But it's you that would be ordering

 8      those cards?

 9                   THE DEFENDANT:  Yeah.  But we haven't determined if

10      these cards are any sort of a violation of anything at all, so

11      I don't -- I don't -- I don't even understand why the cards

12      are being criticized.  These are work identifications.  This

13      is a card which says, "Hey, look, I'm a Kentucky Colonel."

14      That's all it is.

15      BY MR. CORYELL:

16      Q.  Mr. Wright, can I get you to look at Document 14, please,

17      sir?

18      A.  Document 14.  Yeah.

19      Q.  That's another page from your website, correct?

20      A.  Right.

21      Q.  And that describes the Kentucky Colonel honorable title

22      registry, correct?

23      A.  Yes.

24      Q.  And that is a registry of individuals who hold the

25      Kentucky Colonel title that you are representing you will make
```

1    available to people who join the cooperative, correct?

2    A.  Right.

3    Q.  And then the last paragraph of that description, sir,

4    says, "The title registry will be operated by the Honorificus

5    Foundation."

6    A.  Right.

7    Q.  What is the Honorificus Foundation?

8    A.  Honorificus is a trademark and a website that we're in the

9    process of developing.

10   Q.  So that's you?

11   A.  Yeah.  And it's basically so people -- people are not

12   confused as you allege they are all the time.  I don't see any

13   cause for confusion here, Mr. Coryell.

14   Q.  Yes, sir.  So I'm just trying to understand the operator

15   of the registry that is a service that is being available to

16   your cooperative members is going to be operated by the

17   Honorificus Foundation which is another organization that was

18   started by you, correct?

19   A.  Yes, sir.

20   Q.  Okay.  Can I get you to look at Document 15?

21   A.  50?

22   Q.  15.

23   A.  15.  I got 16.  Okay.  Number 15.

24   Q.  It's Exhibit 23 to the verified complaint.  This is

25   another page from your website, correct?

1    A.  Yeah.  This looks like screenshots from a cell phone.

2    Q.  Well, is this a screenshot of something from your website?

3    A.  Yeah.

4    Q.  So you're responsible for authoring this, correct?

5    A.  Yes.

6    Q.  And this -- this deals with or speaks to Kentucky

7    Colonels -- Kentucky Colonel Club, correct?

8    A.  Uh-huh.

9    Q.  And so it looks like from referencing this, isn't it true,

10   Mr. Wright, that what this is referring to is local chapters

11   of individuals who hold the title Kentucky Colonel and how to

12   form those chapters?

13   A.  Where are we talking about here, Mr. Coryell?

14   Q.  I'm asking what this Kentucky Colonel Club page is all

15   about.

16   A.  The Kentucky Colonel Club page is whatever people make of

17   it.  Kentucky Colonel Club.  We hold it at a -- at a slightly

18   lower regard than the Kentucky Colonel Community.  The

19   Kentucky Colonel Community was established first, but the

20   Kentucky Colonel Club was established by my son and it was

21   established by coincidence.

22          He and two other people that became Kentucky

23   Colonels, when they received scholarships to prestigious

24   universities, all started this club and -- and anyway, the

25   club -- he didn't want any restrictions on the club.  He

1    wanted anybody that's a Kentucky Colonel to be able to be

2    admitted there to be able to post their -- their certificate,

3    their --

4    Q.   Can I get you to look at Document 15A, Mr. Wright?

5    A.   15A?

6    Q.   Do you have it in front of you, sir?

7    A.   Uh-huh.  Document 15 -- 15A.  Okay.

8    Q.   Would you agree with me, Mr. Wright, that Document 15A is

9    a posting from the Kentucky Colonel Club Facebook page on

10   December 28, 2022?

11   A.   Yes.  Yes, it's also welcoming new -- new colonels.

12   Q.   And are you the author of this post?

13   A.   Yes.

14   Q.   And you indicate in this post that Kentucky Colonel ID

15   cards will only be provided to members of the Kentucky Colonel

16   community, correct?

17   A.   Right.

18   Q.   And you say, "Please join us there if you are interested

19   and read the post if you're interested in enrolling in the

20   cooperative to work as a professional Kentucky Colonel, please

21   do so."  Did I read that correctly?

22   A.   Yes.  Yes.  The -- the etiology behind this, Mr. Coryell,

23   is to do something completely different than The Honorable

24   Order of Kentucky Colonels, so instead of having volunteers,

25   we have Kentucky Colonels that are working Kentucky Colonels.

1        Our -- our entire motive is to do completely the

2   opposite.  The Honorable Order of Kentucky Colonels believes

3   the first colonel was in 1813.  We believe it was in 1775.  So

4   there's -- there's so many differences.  It's just that for

5   some reason you guys seem to believe that you own the term

6   "Kentucky Colonels" for more than the nine things it's

7   trademarked for and you really don't.

8   Q.  In this posting you also referenced the press release

9   today about information beginning on January 1.  Is that the

10  press release -- are you referencing the press release that we

11  looked at earlier?

12  A.  Yeah.  Yeah.

13  Q.  And then under that -- under that, there's another image;

14  the ID badge that is being made available by the Kentucky

15  Colonel Cooperative, correct?

16  A.  That is basically the first mockup.  That's not the

17  actual -- actual model or idea.  We have our own proprietary

18  state seal that we created ourselves that -- that's

19  actually -- that was actually going to be used, but -- well,

20  as I said, it never got started.

21  Q.  And then, Mr. Wright, if you would go to -- I don't know

22  if you can see my screen.  Can you see the screen that I --

23          THE COURT:  No.

24  Q.  Okay.  Mr. Wright, if you go down -- scroll down slightly.

25  There's some highlighted -- there's an entry there from

1    someone named -- a comment from Anna Catherine Parham.  Do you

2    see that?

3    A.  Let me see.  This is Document 15A, right?

4    Q.  Yes, sir.  Do you see that comment from Ms. Parham?

5    A.  I don't see a highlighted section.

6    Q.  Do you see a comment from Ms. Parham where she says

7    "Excited to be a part of the group"?

8    A.  Yeah, I see it.

9    Q.  "How do we order an ID card?"  And is that your -- did you

10   respond to Ms. Parham?

11   A.  Yeah.

12   Q.  And you told her, "You need to join the cooperative and go

13   to work as a colonel," correct?

14   A.  Right.

15   Q.  And then she responded, "Great.  How do I join the

16   cooperative?"  And did you respond to that?

17   A.  We gave her a form to go fill out.

18   Q.  And you -- you forwarded her a link to that form, correct?

19   A.  Yeah.

20   Q.  Is that -- can I get you to look at Document 17,

21   Mr. Wright?

22   A.  Okay.

23   Q.  Is that the form that you sent to Ms. Parham?

24   A.  Yeah.

25   Q.  Can you tell the court what Document 17 is?

1    A.   That's -- that's a Kentucky Colonel title mark user

2    application.

3    Q.   And if you read through this user application, the -- the

4    position that's being offered here is being offered in

5    exchange for a donation payment, isn't it?

6    A.   Yes.

7    Q.   And that -- that donation payment -- let me just refer you

8    to the bottom of the second page where it says "cost of

9    cooperative ownership."  Do you see that?

10   A.   Right.

11   Q.   And it indicates that the -- that an interested party can

12   join the cooperative based on making a nonrefundable donation

13   to Ecology Crossroads Cooperative Foundation, correct?

14   A.   Right.

15   Q.   And it represents that that donation will be 100 percent

16   tax deductible, correct?

17   A.   Right.  That's essentially because we invested the funds

18   into our carbon stainability project and also into the

19   website.

20   Q.   So funds that are being -- funds that are being donated or

21   that are being paid by individuals who join your cooperative

22   foundation, those funds are going to Ecology Crossroads,

23   correct?

24   A.   Yes.  They're being used by Ecology Crossroads, yeah.

25   Q.   And you go on to indicate that after two full years, a

1    member of your cooperative will be able to sell, transfer, or

2    retire their space in the cooperative based on the actual

3    value of their share, correct?

4    A.  What's that?

5    Q.  Sir, you write here that after two full years, a member of

6    your cooperative will we able to sell, transfer, or retire

7    their space based on the actual value of their share, correct?

8    A.  Right.  That's -- that's based on the plan which never --

9    never moved forward, never got past the --

10   Q.  And then on the next page, on the top of Page 3, it

11   indicates the -- there's a chart there, isn't there, or a list

12   of payment -- of suggested payment levels, correct?

13   A.  Yeah.

14   Q.  And you indicate in this application that an individual

15   can join the cooperative for a thousand dollars now and then

16   $25,000 per month in 2023 and be determined or be deemed to be

17   considered a founder of the organization, correct?

18   A.  Right.

19   Q.  And then -- or they could pay a thousand dollars now and

20   then $250 per year in 2024 and be deemed a charter member,

21   correct?

22   A.  Right.

23   Q.  Or $389.50 and then $300 per year and be considered a

24   professional, correct?

25   A.  Right.

1    Q.  And then in their -- there are two other levels of

2    membership there, correct?

3    A.  Yes.

4    Q.  Then you go on to say in the next paragraph, "If you join

5    the cooperative, you will receive legal forms that need to be

6    printed, signed, and photographed during the month of January

7    and February.  As the necessary services become available, ID

8    cards will be arriving in the mail."  Did I read that

9    correctly?

10   A.  Yes.

11   Q.  And you go on to say, "All members" -- you used the word

12   "members," correct?  "All members" --

13   A.  Sometimes I use the word "members."  They were members of

14   the group -- of the community.

15   Q.  You say, "All members must maintain their monthly payments

16   to maintain services and the shares or proportional shares

17   they have accrued at the end of 2023.  All five and ten

18   percent members will be upgraded to professionals."  Did I

19   read that correctly?

20   A.  Right.  That's where they're perceived as members of the

21   network.  They need to be in the network in order to be able

22   to make edits in network; to be able to change the website or

23   create their own website.  We need to know who they are.  We

24   can't just let anyone in there editing -- editing the website.

25   Q.  Mr. Wright, can I get you to go back to -- I just want to

```
 1    ask you about something on page 2.  This is your description.

 2    You put a notice there, correct?

 3    A.  What's that?  Page what?

 4    Q.  The second page of this application.

 5    A.  Uh-huh.  Okay.

 6    Q.  You indicate, "This Google form is to consolidate a

 7    multifunctional cooperative business entity and cooperative

 8    service organization under 501(f) that can authorize and

 9    facilitate the creation of international employment

10    credentials beginning in 2023."  Did I read that correctly?

11    A.  Yes.  Yes.  And that's -- that's essentially what we

12    were -- what we were looking at doing until -- until the

13    lawsuit was filed and then we stopped.

14            THE COURT:  When you say you stopped, did you take

15    the website down?

16            THE DEFENDANT:  No.  The website's been there -- I

17    mean, our first website is in 1998, Your Honor, and we've been

18    publishing something ever since.

19            THE COURT:  I'm asking about this website.

20            THE DEFENDANT:  No.  This website is an educational

21    website.  This talks about Daniel Boone and has a picture of

22    the governor on the front and has a picture of the Secretary

23    of the State and has Daniel Boone there.  I mean --

24            THE COURT:  I'm looking at the Kentucky Colonel user

25    application.
```

1            THE DEFENDANT:  This is just an application.

2            THE COURT:  Right.  You click a link on the website

3    to get to a user application, correct?

4            THE DEFENDANT:  Right.

5            THE COURT:  Okay.  So the educational website, you

6    click a link and you get to this user application?

7            THE DEFENDANT:  Yes.

8            THE COURT:  Okay.  Then you pay however much you're

9    going to pay to be able to edit the website?

10           THE DEFENDANT:  To be able to edit the website, to

11   be able to get your own -- own -- own vanity email which is

12   basically your name@colonels.net or kycolonelcy.us.

13           THE COURT:  And this is still up on the internet

14   currently?

15           THE DEFENDANT:  Yes.

16           THE COURT:  Okay.

17   BY MR. CORYELL:

18   Q.  Mr. Wright, can I get you to look at Document 16?  We're

19   going back one.  We were just looking at 17, so if I could get

20   you to look at Number 16, sir.

21   A.  Number 16.  Yeah.

22   Q.  Would you agree with me, sir, that Document 16 is a post

23   on the Kentucky Colonel group Facebook page?

24   A.  Yes.

25   Q.  And it's a -- on January -- would you agree with me, sir,

1    that on January 22, 2023, the post on that Kentucky Colonel

2    Facebook group -- Kentucky Colonel Club Facebook group,

3    there's another post about the Kentucky Colonel ID.

4    A.   Right.

5    Q.   And you -- was that post made by you?

6    A.   Yes, I made that post.

7    Q.   And you indicate that it's now the responsibility of the

8    Kentucky Colonel TM group and its members to reach a hundred

9    members prior to printing ID cards, correct?

10   A.   Yes.  Yes, before we could submit a batch.

11            THE COURT:  And you put the "TM" after Kentucky

12   Colonel, correct?

13            THE DEFENDANT:  Yes.  Because in -- in law that's

14   the proper way to indicate that it's an unregistered

15   trademark.

16            THE COURT:  And whose trademark do you believe that

17   is?

18            THE DEFENDANT:  That belongs to each and every

19   Kentucky Colonel that exists in the world.

20   BY MR. CORYELL:

21   Q.   Mr. Wright, later on in that post you talk about an

22   investment opportunity, correct?

23   A.   Yes.

24   Q.   You say that the members of the new group --

25   A.   And remember, Mr. Coryell, this is strictly directed to

1    members of a private group --

2    Q.  Right.  And you --

3    A.  -- which are lawfully assembled under their First

4    Amendment rights.

5    Q.  You describe there an asset which is speculatively

6    estimated to be valued at 1 million dollars, correct?

7    A.  Yes.

8    Q.  And is that the Kentucky Colonel Cooperative that we've

9    talked about?

10   A.  That's what we estimate the value of our website to be.

11   Q.  And in this -- in this posting -- it's highlighted

12   there -- you indicate, "We offered a thousand shares of the

13   asset for a thousand dollars each based on donating to the

14   educational, informational, legal, and semantic protection of

15   the posterity of the Honorable Title(s)," correct?  Did I read

16   that correctly?

17   A.  Right.  The semantic protection, that's a very important

18   word here in the court.

19   Q.  Then you go on -- I've circled later on in that Facebook

20   posting, "Thanks to the forward thinking of colonels with

21   legal experience, there should be a legal offshore

22   registration procedure and verification process, but no

23   colonel should be required to become a member of anything in

24   order to get an official ID card."  Did I read that correctly?

25   A.  Yes.

1    Q.  Okay.  Document 19.  Could I get you to look at Document

2    19, Mr. Wright?

3    A.  Yeah, I'm going to get down there.  This only goes to

4    Number 141.  Is this on the other additional exhibits?

5    Q.  Document -- you should have through Document 26,

6    Mr. Wright; Documents 1 through 26.

7    A.  I have 1 through 19.

8    Q.  Yesterday I sent you --

9    A.  Go ahead.  I mean --

10   Q.  Yesterday I sent you --

11   A.  Obviously I've -- obviously I wrote everything that we're

12   talking about, so if you could just tell me what you're

13   talking about and I'll -- I'll tell you if I wrote it or not

14   and also what I -- I mean, this is basically -- this is

15   basically a witch hunt in a hearing to show cause.  You don't

16   have any -- any prima facie evidence that says that anything

17   has actually been violated.

18   Q.  Yes, sir.  Let me ask you to look at Document 18,

19   Mr. Wright.

20   A.  Uh-huh.

21   Q.  Document 18 is a posting -- a Facebook posting from March

22   30th, 2023, correct?

23   A.  Right.  "Great news for the Kentucky Colonel."

24   Q.  And in that Facebook posting, you indicate that The

25   Honorable Order of Kentucky Colonels wants to restrict the

1   colonel or the honorable abbreviation prior to names, correct?

2   A.  Yes.  As I recall in one of your -- one of your

3   pleadings -- one of your -- I think it was in the verified

4   complaint about using the term "colonel" as a moniker.  You --

5   you've gone after more than -- more than ten different

6   companies in the last ten years that are -- that are using the

7   term "Kentucky Colonel" in some way.

8   Q.  And in this Facebook posting, you -- isn't it true,

9   Mr. Wright, that you're representing to the viewers of this

10  Facebook posting that -- that you are prevailing in this

11  lawsuit?

12  A.  I believe I'm prevailing, yes.

13  Q.  Let me ask you to look at Document 19, sir.  That's

14  another Facebook posting, correct?

15  A.  Document what?

16  Q.  19.

17  A.  19.  Let me see.  I got it.

18  Q.  And are you responsible for that post?

19  A.  Yeah.

20  Q.  Okay.  Thank you, Mr. Wright.  Let me ask you to look at

21  Document 21.

22  A.  Those are the ones I don't have.  I have 141 pages of

23  information.

24  Q.  Mr. Wright, yesterday -- yesterday I sent you Documents 20

25  through 26.

1    A.   Okay.

2    Q.   Did you receive those?

3    A.   Okay.  Here I got Document 20.

4    Q.   Let me ask you to look at Document 21.

5    A.   21.

6    Q.   Document 21 is the Certificate of Organization and

7    Articles of Incorporation for Ecology Crossroads.

8    A.   Yes.

9    Q.   Do you have that?

10   A.   Yes.

11   Q.   Is this the current corporate filing -- the current

12   Articles of Incorporation for Ecology Crossroads?

13   A.   Yeah.  Actually we have -- we have a confirmed copy that

14   we live by but we haven't filed as an amendment yet.

15   Q.   And your websites -- the websites that we've looked at and

16   the things that you've produced that we've seen today indicate

17   that Ecology Crossroads is a 501(c)(3) corporation, correct?

18   A.   Right.

19   Q.   When was the application for that 501(c)(3) status

20   originally filed?

21   A.   That was filed in 1994.

22   Q.   Isn't it true that the 501(c)(3) status for Ecology

23   Crossroads lapsed for a significant period of time?

24   A.   Yes.  It lapsed in 2010 until 2020.

25   Q.   And while -- while that status was lapsed, isn't it true,

1    Mr. Wright, that you continued to represent that Ecology

2    Crossroads was a certified 501(c)(3) organization that

3    deductions to would be tax deductible?

4    A.  No.  During that period of time, no.

5    Q.  Okay.  So it's your testimony that you did not make that

6    representation -- or make the representation that

7    contributions to Ecology Crossroads would be tax deductible

8    during the period of time that Ecology Crossroads 501(c)(3)

9    certification had lapsed, is that your testimony?

10   A.  Yeah, that's my testimony.  I mean, we --

11   Q.  Okay.

12   A.  -- we did not operate as Ecology Crossroads.  We operated

13   as Globcal International and donations were not tax deductible

14   during -- during that course of time.

15   Q.  Does the Articles -- or do the Articles of Incorporation

16   for Ecology Crossroads say anything about the purpose of the

17   corporation being related to Kentucky Colonels?

18   A.  No.  No.

19   Q.  Does the 501(c)(3) -- does the 501(c)(3) application for

20   Ecology Crossroads say anything about Kentucky Colonels?

21   A.  No, except that I'm a colonel myself.

22   Q.  Mr. Wright, can I get you took at Document 22?

23   A.  Document 22.

24   Q.  Yes, sir.  That is an email you sent me last week.

25   A.  Right.

1   Q.  Did you send me this email last week?

2   A.  Yes, I did.

3   Q.  And in this email in the third page of this -- or, I'm

4   sorry -- third paragraph of this email -- you say you were in

5   the process of recategorizing and selling all of the assets,

6   websites, copyrights, and social media sites.  Did I read that

7   correctly?

8   A.  Yes.  I'm currently looking for a buyer or someone that's

9   able to help finance this.  We've talked to several people and

10  we haven't found anyone that's -- that actually has enough

11  money to invest.

12  Q.  What websites and social media sites are you referring to

13  there?

14  A.  Well, we're talking about our -- our presence as a book --

15  as a book product.

16  Q.  Are you talking about the social media -- are you talking

17  about the websites that we've looked through over the last

18  hour; the Kentucky Colonelcy website?

19  A.  Yes.  All of this is part of our book.  All this is part

20  of our book.  All this is Creative Commons.  If you look in

21  the footer, all this stuff is connected.  All this stuff is

22  the same thing.  It has to do with the Kentucky Colonel,

23  individual Kentucky Colonels, and it has to do with a Kentucky

24  Colonel's rights, privileges, and responsibilities --

25  Q.  Are you talking about the Kentucky Colonel Cooperative?

1    A.  -- (inaudible) talk about.

2    Q.  Are you trying -- are you indicating to me there in this

3    email that you are looking for a buyer for the Kentucky

4    Colonel Cooperative organization that we've been discussing

5    over the last hour?

6    A.  No.  What I'm talking about here is everything -- all of

7    these assets, my first copyright back in 1998 when I published

8    the website three years prior to The Honorable Order of

9    Kentucky Colonels.  Starting from there all the way to now.

10   I'm looking for someone to take hold and embrace that

11   intellectual property.

12   Q.  Does it include the Kentucky Colonel Cooperative that

13   we've been talking about, Mr. Wright?

14   A.  Right.  But that's what the Kentucky Colonel Cooperative

15   would own.

16   Q.  You indicate in the very last --

17   A.  -- (inaudible) Cooperative is not formed, so in other

18   words, I can't be paid -- I can't benefit in any way

19   financially while -- while all these impediments are in place.

20   Q.  And, Mr. Wright, isn't it true that's what you're looking

21   to do; you're looking to benefit financially?

22   A.  Yeah.  People usually write books and spend several years

23   working on things to benefit financially, Mr. Coryell.

24   Q.  The last sentence of your email to me, you indicate -- you

25   say, "You already know my bottom price.  It is less than ten

1   percent of what they have already spent in charitable

2   donations on this case."  What did you mean by that?

3   A.  What I asked for in the emergency motion.  I'm looking for

4   some sort of a good faith offer in order to let this go.  I've

5   written more than 526 pages and I've researched more than

6   5,000 different articles.

7   Q.  You're looking for the Kentucky Colonels to make a

8   monetary payment to you in order to stop your activities,

9   correct?

10  A.  No.  To assimilate all of the intellectual property which

11  I've researched and accumulated in my Creative Commons

12  encyclopedia there online and the website.

13  Q.  Did I understand you correctly when you just said that you

14  were looking for a good faith offer to let this go?

15  A.  Yeah.

16          MR. CORYELL:  Okay.  Your Honor, can I have just a

17  second?

18          THE COURT:  Yes.

19          MR. CORYELL:  Judge, I don't think I have any other

20  questions.

21          THE COURT:  All right.  Mr. Wright, as I mentioned

22  to you earlier, I haven't received any questions that you'd

23  like the court to ask you to provide answer to.  Do you intend

24  on making a statement or how do you want to proceed?

25          THE DEFENDANT:  I would like to ask the court first

 1    about the disposition of the first motion for dismissal and

 2    the emergency motion for dismissal and the special motion for

 3    dismissal based on the anti-SLAPP.

 4            THE COURT:  Okay.  Mr. Wright, today's hearing is an

 5    evidentiary hearing.  That's why we're taking testimony from

 6    individuals.  So the purpose of today's hearing is to develop

 7    a factual basis from which the court can rule on the motions

 8    before it, specifically the motion as to whether you have

 9    violated the permanent injunction.

10            THE DEFENDANT:  Okay.

11            THE COURT:  So what I'm asking you for today is if

12    you have facts to add, exhibits to add that you would

13    reference in any response to the motion for -- essentially the

14    motion requesting that we enforce the current preliminary --

15    or the current permanent injunction.  You may enter those into

16    the record.  You can make a factual statement into the record.

17            This isn't really a time for legal argument because

18    we're creating an evidentiary record.  You'll be able to make

19    legal arguments at the appropriate time.  Do you wish to add

20    any facts to the record or evidence?

21            THE DEFENDANT:  No.  I believe Mr. Coryell has done

22    a relatively good job of digging up everything that could

23    allegedly be something to do with a Kentucky Colonel, but

24    really Kentucky Colonel is nothing that they own or control.

25    They are not a Kentucky Colonel.  I am a Kentucky Colonel.

1    Only a human being can be a Kentucky Colonel.  And that was --

2    that was -- that was assured by Governor John Brown who

3    accidently made Waldo the dog a Kentucky Colonel and then

4    thereafter he basically stated for the record in an act that

5    nothing other than a human being can be a Kentucky Colonel.

6          And -- well, as John Brown -- you know, John Brown

7    is responsible for the original Kentucky Colonel which was

8    Colonel Sanders, he financed Colonel Sanders, and he's also

9    the -- he was the founder of the Kentucky Colonels basketball

10   team which The Honorable Order of Kentucky Colonels has also

11   filed suit against in 2003 there in that court.

12         But in essence, I don't have anything to add.  I see

13   The Honorable Order of Kentucky Colonels going around the

14   country threatening, writing legal demands.  They stopped the

15   reproduction of old Kentucky Colonel liquor because they said

16   that they -- they were involved in the bourbon industry and

17   they filed their trademark actually after.  It's a pattern of

18   trademark bullying.

19         And I can only say that my use of "Kentucky Colonel"

20   is not relative to The Honorable Order of Kentucky Colonels

21   use of the term "Kentucky Colonel."  The Honorable Order of

22   Kentucky Colonels made it a joke -- a point of a joke in

23   1941 discouraging -- discouraging people racially.  They said

24   the whole purpose of their organization was to basically have

25   a good time and drink bourbon and have, you know, the Derby

1    parties.  That was their actual purpose in 1941, so --

2            THE COURT:  Well, really, Mr. Wright, what I need

3    you to talk to about is the permanent injunction which is

4    currently in place --

5            THE DEFENDANT:  Well, that is -- that is the

6    permanent injunction.

7            THE COURT:  The history piece of it we dealt with

8    before.

9            THE DEFENDANT:  (Inaudible).

10           THE COURT:  Sir, we're not relitigating the old

11   case.  All we're doing is whether or not you've -- you have

12   violated the agreement that was placed into the record as a

13   permanent injunction.

14           THE DEFENDANT:  No, actually I have not violated

15   that agreement.  I've done everything totally contrary.  I

16   left the *s* off.  I used the "TM" whereas the -- the plaintiff

17   is actually required to use the "R" inside the circle when

18   they have their trademark registered in order to show everyone

19   that it's a registered trademark, but that's not a practice

20   that they do which -- which basically means that they can't

21   get an award from a court because they're not properly

22   protecting their trademark with the "R."

23           THE COURT:  Okay.  Why don't you go back -- that's

24   about their actions.  I'm asking you about your actions.  So

25   you just mentioned that you -- you said something about

1    leaving the *s* off.

2             THE DEFENDANT:  Right.  All my use, Your Honor, is

3    fair use.  In my emergency dismissal motion, I cite the law.

4    It's U.S. Section 245.  The law specifically allows for fair

5    use.  It allows for parity.  It allows me to ridicule -- I can

6    ridicule The Honorable Order of Kentucky Colonels for being

7    basically -- having created a mythical origin in 1813 which

8    doesn't have anything to do with reality or the truth.

9             THE COURT:  But your argument, sir -- your argument,

10   sir, is that it's okay to sell shares in the Kentucky Colonel

11   Community and to --

12            THE DEFENDANT:  Kentucky Colonel Cooperative which

13   was -- which was -- well, yes, to sell shares in the Kentucky

14   Colonel Community exactly which is a private group in Facebook

15   which was the forum that we were using in order to attract

16   other colonels to this opportunity of forming the cooperative

17   in order to make the website better, in order to complete the

18   book --

19            THE COURT:  Okay.

20            THE DEFENDANT:  -- and in order for them to be in

21   the book.

22            THE COURT:  But your argument is that you were not

23   in violation of the agreement because instead of saying

24   "Kentucky Colonels" you said "Kentucky Colonel" with no *s*?

25            THE DEFENDANT:  Well, that's the title that the

 1    governor gave me.  Your Honor, I'm a Kentucky Colonel.

 2              THE COURT:  I understand that.

 3              THE DEFENDANT:  That's the title that the governor

 4    gave me.  It doesn't have anything to do with The Honorable

 5    Order of Kentucky Colonels.

 6              THE COURT:  But it's all --

 7              THE DEFENDANT:  I'm not a Kentucky Colonel because

 8    of anything The Honorable Order of Kentucky Colonels ever did.

 9    I'm a Kentucky Colonel because Governor Patton recognized me

10    as a Kentucky Colonel.  He did not award me a membership in

11    The Honorable Order of Kentucky Colonels either.

12              THE COURT:  Okay.  But you're using it -- sir,

13    you're using it as the name of a community and you're raising

14    money through that community.

15              THE DEFENDANT:  I'm inviting members of that

16    community to join another community.

17              THE COURT:  And you're asking them to pay money to

18    do so?

19              THE DEFENDANT:  Yes.  We're asking them to invest.

20              THE COURT:  Okay.  All right.

21              THE DEFENDANT:  Invest, not donate.  They're making

22    a donation, but we're asking them to invest.  It counts as an

23    investment.  In other words, we see in the future them holding

24    on to this investment, them being treated as -- as equals in

25    the organization.  For a membership to actually take place, a

1    person needs to pay dues.  We haven't received any dues from

2    any of these members yet or any of these --

3              THE COURT:  But you've asked them to make a donation

4    or investment?

5              THE DEFENDANT:  Right.  Right.  And we did raise

6    $1,700.

7              THE COURT:  Okay.  Any further questions?

8              MR. CORYELL:  No further questions for Mr. Wright,

9    Your Honor.

10             THE COURT:  All right.  Do we have any additional

11   witnesses?

12             MR. CORYELL:  One more witness, Your Honor.

13             THE COURT:  Okay.

14             MR. CORYELL:  Sherry Crose.

15             THE COURT:  Okay.

16             (SHERRY CROSE, called by plaintiff, sworn.)

17             MR. CORYELL:  Judge, just to expedite things, I'm

18   going to have Ms. Crose take the exhibits with her when you

19   swear --

20             THE COURT:  Well, the exhibits are going to be right

21   in front of her, so she doesn't -- you don't need the

22   exhibits.  They're going to be shown on the screen and then

23   you'll be able to use your finger on the screen.

24                        DIRECT EXAMINATION

25   BY MR. CORYELL:

1    Q.  Ms. Crose, will you state your full name, please?

2    A.  It's Sherry Crose.

3    Q.  What is your current employment position?

4    A.  I'm the executive director of The Honorable Order of

5    Kentucky Colonels.

6    Q.  How long have you held that position?

7    A.  Since February of '17.

8    Q.  Can you just generally describe for the court what your

9    responsibilities are as executive director of the Kentucky

10   Colonels?

11   A.  Management of the organization.  We're a philanthropic

12   organization that gifts out grants to nonprofits and we have a

13   social side, but it's the management working under the board

14   of directors.

15   Q.  Sherry, are you familiar with the prior litigation with

16   Mr. Wright?

17   A.  I am.

18   Q.  Were you executive director of The Honorable Order of

19   Kentucky Colonels at the time of that litigation?

20   A.  I was.

21   Q.  Can you briefly just describe for the court what prompted

22   that litigation?

23   A.  We had Kentucky Colonels email us and call us in regards

24   to Kentucky Colonels International website wondering if they

25   were us and we had to start looking at the confusion factor.

1   Q.   At some point in time did Mr. Wright make a monetary

2   demand on The Honorable Order of Kentucky Colonels prior to or

3   during the course of that litigation?

4   A.   He did.

5   Q.   Can you tell the court about that?

6   A.   I received a phone call in December of '19.  He wanted to

7   know if we would look at a proposal.  As the executive

8   director, I said yes we would look at any proposal.  Took it

9   to the executive committee after review and they declined it.

10  Within that proposal was a significant ask of monetary dollars

11  that would benefit him and family members.

12  Q.   At some point in time during Mr. Wright's activities, his

13  internet and social media activities under the name Kentucky

14  Colonels International, did you become aware that grant

15  recipients from The Honorable Order of Kentucky Colonels were

16  confused about his organization?

17  A.   I did.  So our grant program is an annual program.  We

18  gift out the dollars in June of each year and we had grantees

19  that we gifted out and that year we granted 2.1 million to

20  about 270 nonprofits.  And we had nonprofits post on the

21  Kentucky Colonels International website -- or Facebook page

22  thanking us for the donation -- or thanking him for the

23  donation.

24  Q.   So there was actually a thank you note for -- by one of

25  your grant recipients for money that had actually been donated

1    by The Honorable Order of Kentucky Colonels; is that correct?

2    A.  Correct.

3    Q.  Sherry, I'm going to ask you to -- at some point in time

4    during the initial issues with Mr. Wright and Kentucky

5    Colonels Internationals, did you begin tracking or keeping a

6    log of the inquiries that you received from members of the

7    Kentucky Colonels?

8    A.  That's actually what started the whole process.  I -- we

9    started getting phone calls and emails, so I asked my staff to

10   create an Excel list so we could just address each of the

11   emails that came through or phone calls and how we were

12   addressing them for continuity.  So yes we started the Excel

13   list and it's part of our legal binder on this matter as well

14   as just historical and business matters.

15   Q.  So we marked the document -- a document as Document 23 and

16   I've got it -- I've got it up on the screen here.  Can you

17   identify Document 23?

18   A.  That's our Excel list.

19   Q.  And is this a document that was maintained by The

20   Honorable Order of Kentucky Colonels in the ordinary course of

21   their business?

22   A.  It was.

23   Q.  Can you just kind of generally describe to the court the

24   process that was involved in keeping this log?

25   A.  It was, again, when we took phone calls or email inquiries

1   through the Honorable Order, I would have my staff type the

2   date obviously it was received, the membership number, if it

3   was a colonel or not colonel, and their comments, and then how

4   we responded to it.

5   Q.  And I know that -- and just for clarity's sake, I know

6   that you originally -- the log that you kept had the

7   membership number and the full name of the individuals who

8   were calling to inquire, correct?

9   A.  Correct, yes.

10  Q.  That --

11          MR. CORYELL:  Your Honor, just for clarity purposes,

12  we have redacted the membership number and the first name of

13  individuals just to protect their identity here, so I just

14  wanted to point that out to the court.

15  BY MR. CORYELL:

16  Q.  Sherry, this is -- Exhibit 23 is 18 pages long.  Is this

17  the log from both the prior situation involving Mr. Wright's

18  activities -- the situation prior to the entry of the

19  injunction -- and what's happened since the permanent

20  injunction?

21  A.  Correct.  When the confusion started back again, you would

22  see if you go through these 18 pages, there's a break and then

23  we started tracking again more phone calls we were getting and

24  emails, so yes we just retained the same document.

25  Q.  So just calling your attention to this document, it looks

1    like on Page 11 of 18, there were entries from March 2021 and

2    then there was a gap until June 2021 and then a gap from June

3    2021 to December 2022, is that what you were just describing?

4    A.   Correct.

5    Q.   So there's some highlighted entries here beginning in

6    December 2022, Sherry.  Do you see those?

7    A.   I do.

8    Q.   Can you just kind of generally describe for the court what

9    started happening in December 2022 that create -- that caused

10   the need for these -- or that was behind these entries on this

11   organization -- or on this chart?

12   A.   It was the Facebook post for the photo IDs and the badges.

13   We had quite a few colonels call in regards to the severity --

14   if a colonel would get that badge, that they could end up

15   getting in trouble by any type of law enforcement and they

16   didn't understand what the badge represented.

17          We had colonel -- I think you can denote it down,

18   1-5-23, he actually said, "You've already" -- "I've already

19   done my contribution for the year and you're asking me for

20   another contribution.  Please help me understand why."  So

21   that's really the -- it was the confusion and the badges and

22   the photo IDs.

23   Q.   Were there colonels or members of The Honorable Order of

24   Kentucky Colonels that were expressing concern about the

25   badges and the IDs?

1    A.   Yes.  Yes, sir.

2    Q.   And is that reflected in this -- in these comments on this

3    spreadsheet?

4    A.   Yes.

5    Q.   Can you just -- if you would, just pick a couple if you

6    don't mind and describe what those comments involved.

7    A.   Well, the one I just noted, the 1-5 --

8    Q.   I think you can use --

9    A.   Oh, can I?

10   Q.   Yeah.

11   A.   Oh, sorry.  If you scroll back, there's 12-30-22.  Rogers

12   is the last name.  He saw this, saw the ID badges, and thought

13   that The Honorable Order was issuing them.  He had concerns

14   about that.  That actually is Jim Rogers who is Board of

15   Directors of The Honorable Order.  I texted him back and said

16   that's not our group because he was concerned.  He didn't know

17   what our group was doing.  I said, "That's not us.  That's

18   David Wright's."

19           We've got -- on 1-23 if you can scroll down, Corky,

20   please.  We have a stat in there, 1-23-23, referencing the

21   Colonels Club and the thousand dollar ambassadorship.  He was

22   very concerned that it was not legal to do that.  And that at

23   one point here there's a gentleman that texted us and said,

24   "Well, Mr. Wright's denoting at 1.5 million dollars he would

25   go away if we would pay that."  So it's looking at the

1    legitimacy of HOKC and thinking that Mr. Wright was

2    potentially trying to make money on the Kentucky Colonel --

3    the honorary title that it is.

4    Q.  Can I point out the entry on January 28, 2023, from Beck.

5    Do you see that in front of you?

6    A.  Yes.  Yes.

7    Q.  What do you recall about -- or what do you know about that

8    inquiry?

9    A.  This was an email directly to us.  Obviously you can

10   see -- it's denoted that Mr. Wright tried to solicit to him

11   and when he pushed back they removed him from the group.  That

12   you'll also see is a trend through these emails that if an

13   individual would push back upon Mr. Wright, they would deny --

14   they would, I guess, move them out of the Facebook page.

15   Q.  So between -- there are -- it looks like in December 2022

16   comments started on Page 11 and go through Page 17.  Do you

17   have any sense -- have you counted up how many inquiries or

18   complaints or concerns, confusion, how many individual

19   inquiries there are over that period from December 2022 to

20   late April 2023?

21   A.  I think this Excel lists around 300.  And that's not 300

22   probably distinct individuals but that gives you sort of a

23   sense.

24   Q.  Yeah.  And in interest of time, I'm not going to have you

25   go through and count these up, but I know you're familiar with

1    the spreadsheet just by virtue of the fact that you're the

2    custodian of it, right?

3    A.  Uh-huh.

4    Q.  So you think there have been in excess of a hundred

5    complaints, concerns, inquiries, confusion expressed over the

6    last four months?

7    A.  Oh, yes, sir.

8    Q.  Sherry, were you involved in the mediation process that --

9    involved in the initial -- the attempts to resolve the first

10   lawsuit?

11   A.  Yes.

12   Q.  Did you participate in the settlement conferences with the

13   federal magistrate?

14   A.  I did.

15   Q.  What was your understanding from that mediation regarding

16   what Mr. Wright was interested in maintaining his right to do?

17   A.  To use the honorary title of Kentucky Colonel such as I'm

18   a Kentucky Colonel, I could use it if I choose to, and to do

19   research on the history of Kentucky Colonel to potentially

20   write a book.

21   Q.  Were either of those things things that The Honorable

22   Order of Kentucky Colonels wanted to prohibit or prevent?

23   A.  No.  No.

24   Q.  What were the things -- generally what were the things

25   that The Honorable Order of Kentucky Colonels wanted to

1    accomplish through the entry of the permanent injunction?

2    A.  We wanted to stop the confusion with any type of Facebook

3    group or website that was similar to Kentucky Colonels or The

4    Honorable Order of Kentucky Colonels.  When you have Kentucky

5    Colonel International, Kentucky Colonel Club, Kentucky

6    Colonelcy, that is an infringement upon the trademark because

7    we've got trademarks for memberships as well as clubs and

8    organizations, so it was to take down those pieces with the

9    first preliminary injunction.

10   Q.  Did The Honorable Order believe that Mr. Wright -- at

11   least prior to the entry of the permanent injunction, it was

12   his intent to create kind of a competing organization?

13   A.  Yes.

14   Q.  Was that something that was important to The Honorable

15   Order in handling and dealing with the initial litigation?

16   A.  The issue we have with a competing organization, if you

17   have Kentucky Colonels or anyone who donate dollars to that

18   organization, we don't know where those dollars go.  We can

19   track the donations that come through The Honorable Order and

20   we know it goes back out to Kentuckians and through

21   nonprofits, but if you're going to create something on the

22   trademarks, then we need to know where that money goes to make

23   sure it gets into the hands because this organization has been

24   gifting dollars out really since the '50s and it has a very

25   strong reputation of thorough vetting procedures of grant

1    applications to nonprofits.  We take that very seriously.  And

2    we know that Kentucky Colonels who contribute to us understand

3    our rigorous vetting, so we want to make sure that money is

4    used effectively.

5    Q.  I know that this is a difficult question to answer,

6    Sherry, but can you describe for the court how The Honorable

7    Order of Kentucky Colonels has been damaged by Mr. Wright's

8    activities over the last five or six months since December

9    2022?

10   A.  Well, outside of the legal fees obviously that we're

11   incurring, today I should be out vetting grants.  We're trying

12   to give away 3.1 million dollars and we're reviewing 350

13   grants and I was scheduled to be in Bowling Green last week

14   and today to vet grants.

15          We've spent enormous time with our executive

16   committee reviewing legal procedures.  We know that we have

17   spent time on the phone talking to colonels and explaining to

18   colonels that your money is well used, we are not part of this

19   organization, and trying to maintain that historic perspective

20   of The Honorable Order.  And we know that he's trying to make

21   money off of the Kentucky Colonel title and that's not what

22   this title is.

23          The title is given by a governor for someone who

24   does good works in your community, could be in Kentucky, could

25   be anywhere in the world, and he's trying to make money on

1    that.

2    Q.  Now, you talked about the legal fees.  I put up a document

3    that we marked Document 24 on the screen.  Do you recognize

4    Document 24?

5    A.  I do.

6    Q.  Are those billing statements from your legal counsel in

7    this matter?

8    A.  It is.

9    Q.  And billing statements just since December of 2022,

10   correct?

11   A.  Correct.

12   Q.  Has -- and so these are the statements that are actually

13   relating to the -- or is it your understanding that these

14   statements relate to legal services regarding Mr. -- trying to

15   deal with Mr. Wright's violation of the permanent injunction?

16   A.  Correct, yes.

17   Q.  These statements don't relate to anything in the prior

18   litigation; is that correct?

19   A.  No.  Correct.  Right.

20   Q.  Has The Honorable Order of Kentucky Colonels either paid

21   or does it intend to pay all of these legal statements?

22   A.  We do, yes.

23   Q.  These statements are through April, correct?

24   A.  Correct.

25   Q.  So there are -- The Honorable Order continues to incur

1   legal fees?

2   A.  Correct.

3            MS. CORYELL:  Your Honor, that's all the questions I

4   have.

5            THE COURT:  All right.  Mr. Wright, do you have any

6   questions for the witness?

7            THE DEFENDANT:  Yes.  Yes, I have quite a few.

8                      CROSS-EXAMINATION

9   BY MR. WRIGHT:

10  Q.  Ms. Crose, you state that The Honorable Order of Kentucky

11  Colonels is a membership organization.  Do the members have

12  rights within the organization?

13  A.  They do not.

14  Q.  They don't have rights?

15  A.  Correct.

16  Q.  So they're not -- they're not actual members; they're

17  honorary members?

18           MR. CORYELL:  Objection.  It's argumentive, Your

19  Honor.

20  Q.  Is that correct?

21           MR. CORYELL:  Objection, Your Honor.  Argumentive.

22           THE COURT:  Okay.  I don't know if he can hear you

23  either.

24           MR. CORYELL:  I'm sorry.

25           THE COURT:  Yeah.  You got to speak into your

1    microphone.  It's hard for him to hear you.

2              MR. CORYELL:  Objection.

3              THE COURT:  Okay.  So he's objecting to the question

4    as argumentive.  Just ask questions.  You can answer.

5              MR. WRIGHT:  I don't believe it's argumentive.

6              THE COURT:  Okay.  Well, ask her a specific factual

7    question.

8    BY MR. WRIGHT:

9    Q.  Do -- does -- does The Honorable Order of Kentucky

10   Colonels provide membership without cost?

11   A.  We do not.

12   Q.  So automatically becoming a lifetime member of The

13   Honorable Order of Kentucky Colonels, that's not a -- that's

14   not a fact?

15   A.  That's not a fact.  You are a lifetime member of the

16   Kentucky Colonel nomination that the governor approved, but

17   you're not a lifetime member of The Honorable Order of

18   Kentucky Colonels.  You never lose your title of Kentucky

19   Colonel until you pass because the governor has bestowed that.

20   We have not.

21   Q.  So do people have to join your organization?

22   A.  People have to contribute to get an annual membership

23   card, yes.

24   Q.  How do you receive their information?

25   A.  We receive it from the governor --

1    Q.  (Inaudible).

2    A.  Excuse me?

3    Q.  In order to connect with them, how do you receive their

4    email address, their street address, their name?

5    A.  We receive a file from the governor's office when they

6    have commission -- when the governor has commissioned someone

7    and then we reach out and congratulate them on being a named

8    Kentucky Colonel.

9    Q.  So is there any connection between The Honorable Order of

10   Kentucky Colonels and the State of Kentucky?

11   A.  There is not except the fact we're a 501(c)(3) and an EIN

12   number within the Commonwealth.

13   Q.  But they give you preferential treatment by providing you

14   the name, address, and email of each person that's

15   commissioned?

16                MR. CORYELL:  Object to the form.  Argumentive.

17                THE COURT:  I understand the form -- objection.  You

18   can go ahead and answer.

19   A.  You would have to ask the governor's office that.

20   Q.  But you know for a fact that -- okay.  And I understand --

21   I understand that when -- when I originally contacted you,

22   you -- I think you said it was in 2000 -- December 2019.  It

23   was actually on the last day, wasn't it?

24   A.  Oh, I don't think it was on the 31st, sir.

25   Q.  Okay.  But it was close to the end of the year and I

1    discussed a merger proposal; is that correct?

2    A.  That's correct.

3    Q.  Okay.  And I soon sent you a merger proposal, but you had

4    been aware of our activities, is that correct, already?

5    A.  Vaguely aware.  And actually, sir, you contacted me in the

6    fall in regards to creating a listing of all Kentucky

7    Colonels.

8    Q.  Right.  We were actually in contact in 2017.

9    A.  Correct.  Right after I started.

10   Q.  Right.  And you know -- do you know Glen Bastin?

11   A.  I do, sir.

12   Q.  Okay.  And who served as the executive director after Glen

13   Bastin?

14   A.  Pardon?  Who served when?

15   Q.  After Glen Bastin.

16   A.  A gentleman named Garry Gupton.

17   Q.  Right.  Right.  And then you started in 2016-2017?

18   A.  Correct.

19   Q.  Okay.  And are you aware that a lot of Kentucky Colonels

20   use their title in order to -- in order to make money?

21   A.  I'm not aware of that outside of Harland Sanders.

22   Q.  I mean, are you aware that a lot of organizations like the

23   American Legion have essentially requested donations in order

24   to become -- or in order to be nominated as a Kentucky

25   Colonel?

1   A.  No, I'm not aware of that.

2   Q.  Are you aware that the Freemasons in West Virginia use

3   your logo and your -- and your name?

4   A.  I'm aware that we have clubs that are organized that use

5   the name, correct.  I can't tell you if there's one in West

6   Virginia.

7   Q.  You have -- you have chapters also; is that correct?

8   A.  Correct.  Clubs are chapters, correct.

9   Q.  When did the chapter programs start?

10  A.  Well, I've got documents dating back to the '80s for it

11  and then officially we brought it back in June of '21, but we

12  had clubs and chapters back in the 1980s or so.

13  Q.  Isn't bringing back -- reintroducing chapters very --

14  isn't that discussed in the confidential merger settlement

15  that I delivered to you?

16  A.  I don't remember if it was or not, but I do know that we

17  had historic chapters already prior to that confidential

18  proposal.

19  Q.  So what responsibility do you have over each individual

20  chapter?

21  A.  We have a set of bylaws that they could choose.  If the

22  chapter chooses to become official with The Honorable Order,

23  they have bylaws that they have to create and they have to

24  sign off on a chapter agreement or that group of colonels can

25  choose not to become an official group of The Honorable Order

1    of Kentucky Colonels.

2    Q.  Right.  And how is that different from anything that I'm

3    doing?

4    A.  Well, I'm not sure that they're asking for money and

5    asking to create websites that are direct confusion.  If a

6    chapter wants to become an organized official Honorable Order,

7    they'll have our blessing to use The Honorable Order, not to

8    create Kentucky Colonelcy websites.

9    Q.  How many -- you know how many trademarks you have, right?

10   A.  Approximately eight or nine.

11   Q.  Okay.  Of those -- of the nine trademarks that you have,

12   two of them refer to your full business name, The Honorable

13   Order of Kentucky Colonels, so there's seven others that are

14   just Kentucky Colonels.  How many of those seven trademarks

15   are -- were -- were established for the purpose of profit?

16   A.  Probably the ones that have the merchandise attached to

17   them because we have to -- we want to use the money that's

18   contributed to us to go out to nonprofits so we have to do a

19   retail side to cover operations.

20   Q.  So that doesn't have anything to do with Kentucky

21   Colonelcy -- with any service of a Kentucky Colonel; is that

22   correct?

23            MR. CORYELL:  Objection.  Argumentive.

24            THE COURT:  I don't even known what the question's

25   asking.  Can you rephrase your question, sir?

1    BY MR. WRIGHT:

2    Q.  Do the trademarks -- do the trademarks that are used for

3    making profit for merchandise which is not a Kentucky Colonel,

4    is -- are those trademarks -- do they have anything to do with

5    a Kentucky Colonel such as myself or such as Donald Trump,

6    he's a Kentucky Colonel, or Mitch McConnell, he's a Kentucky

7    Colonel also, or Jimmy Kimmel who's also a Kentucky Colonel?

8    Do any of these trademarks have anything to do with them?

9              MR. CORYELL:  Object to the form.  Compound.

10             THE COURT:  I understand the objection.  You can

11   respond to the degree you're able.

12   A.  I'm not sure that they relate at all.

13   Q.  Do any of the trademarks have anything to do with all

14   other colonels in the world?

15   A.  No.  The trademarks are protected so we can create items

16   if we want to sell to anyone to help operations.  They're

17   not -- and I don't know trademark laws, but they're not for --

18   to benefit all Kentucky Colonels.  It's to benefit nonprofits.

19   Q.  Is it to benefit nonprofits or is it to benefit the people

20   that license your trademark?

21   A.  It's ultimately to benefit The Honorable Order of Kentucky

22   Colonels.

23   Q.  Through -- through the brand being marketed; is that

24   correct?

25   A.  The trademark items, yes, are being marketed.

1    Q.  So by -- so through marketing in the store -- by creating

2    products that are called Kentucky Colonels but are not

3    actually a Kentucky Colonel, do you feel that that's confusing

4    the -- the public in general as to what a Kentucky Colonel

5    might be?

6              THE COURT:  I'm not sure I understand that question.

7    Can you --

8    Q.  I mean, your organization sued the basketball team in 2003

9    and it's also gone after quite a few other people like the

10   Neeley Family recently.  That was in the United States Patent

11   and Trademark Office where your organization filed an

12   opposition against their trademark.  What I'm saying is your

13   trademark is Kentucky Colonels with an *s* and it's relative to,

14   I guess, key chains, it's relative to tobacco.  There's

15   cigars, correct, called Kentucky Colonels?

16             MR. CORYELL:  Object to the form.

17             THE COURT:  I understand the objection.  I'm not

18   sure you're asking a question, sir.  I -- it -- she can answer

19   as to a factual question, but it seems to me that you're

20   asking her a legal question, so to the extent it's a legal

21   question -- sir, to the -- sir, to the extent it is a legal

22   question, she cannot answer that.  She can only answer a

23   factual question.

24             MR. WRIGHT:  Okay.

25   BY MR. WRIGHT:

1    Q.  Is it a fact that The Honorable Order of Kentucky Colonels

2    licenses its trademark to a corporation, a LLC, in Lexington,

3    Kentucky?

4    A.  It is.

5    Q.  And that is Upper Right Marketing; is that correct?

6    A.  That's correct.

7    Q.  And they produce your -- your merchandise that uses, I

8    guess, your logo which is now your trademark; is that correct?

9    A.  That I'm not sure, sir, 'cause I don't know trademark.

10   They use what we have trademarked on items.

11   Q.  Right.  Right.  So the trademark is a word -- the

12   trademark is a word -- just so you understand -- the word

13   "Kentucky" and "Colonels" put together with a small *r*

14   afterwards is what we're talking about here.  That's your

15   trademark.  And your shield is not a trademark, your name

16   written the way it is is not a trademark.  Those are -- those

17   are logos and creative artwork, concepts, which connect you to

18   your trademark.

19          THE COURT:  Are you asking a question?

20          MR. WRIGHT:  No.  No.  I'm just making a statement

21   indicating that --

22          THE COURT:  You need to ask her a question.  Again,

23   you're -- this is not for her to give legal opinions.  She's

24   indicated she's not a trademark attorney, so you can ask

25   factual questions only.

```
 1    BY MR. WRIGHT:

 2    Q.  On her website -- on your website, Ms. Crose, it says

 3    "about our trademark" and it lists some sort of militia-type

 4    of an organization.  Could you explain that to me?

 5    A.  I'm not -- I'm not sure what you're referring to a

 6    malicious organization.

 7    Q.  Militia.  Militia.

 8    A.  Okay.  Sir, I'm not --

 9    Q.  The honorary militia, the 1813, the -- Colonel Todd; the

10    militia.  I'm not sure if you're aware of it, but I'll -- but

11    I'll make it clear here.  In 1933 until 1957 one type of

12    Kentucky Colonel certificate was issued that dealt with

13    persons being named honorary members of a militia.

14              Now, they stopped this practice in 1957 which

15    coincidentally is the same time The Honorable Order of

16    Kentucky Colonels incorporated themselves and they took the

17    terminology "militia" and "rank" off of the Kentucky Colonel

18    certificate.  So I'm one of these latter colonels that was

19    created post -- after -- after the certificate was changed.

20              So my question to you is what does it mean on your

21    page where it talks about history and what does it mean on

22    your page that talks about "our trademark" about this term

23    "militia"?

24    A.  Well, we haven't trademarked the term "militia."  And we

25    do have what we perceive as history on our website.  So I
```

1    can't address what it means on that.

2    Q.  On the -- on The Honorable Order of Kentucky Colonels

3    membership card, is it signed by generals?

4    A.  It's signed by the chairman of our board, correct.  And

5    our title -- honorary title for the president of the board is

6    General.

7    Q.  Are they real generals?

8    A.  No, sir; they're not.

9    Q.  Okay.  And the origin of Kentucky colonelcy -- where do

10   you attribute the origin of Kentucky currently to?

11   A.  Well, you've come up --

12   Q.  What was the origin of the first Kentucky Colonel?

13            THE COURT:  I'm not -- I think we're getting a

14   little far afield of the issue of whether or not we're

15   complying with the permanent injunction.  This seems like a

16   historical discussion --

17            MR. WRIGHT:  I'm trying to establish a line where

18   I'm focused in education and semantic and Creative Commons

19   type publishing whereas The Honorable Order of Kentucky

20   Colonels is engaged in creating a fictitious myth based in a

21   folklore context and --

22            THE COURT:  Well, the purpose of that I'm not sure

23   is relevant to the permanent injunction.  The uses of it and

24   what they perceive to be the history, I'm not sure that has

25   anything to do with it.  I'll give you limited leeway to ask

1    these questions, but this isn't about the history of the

2    organization.  It's about its current use after the permanent

3    injunction.

4              MR. WRIGHT:  Right.  Well, Your Honor --

5              THE COURT:  So ask her a question about the uses

6    currently or your uses or those types of things.  I'm not --

7    I'm not really understanding the reason we're going all the

8    way back here to the historical nature.

9    BY MR. WRIGHT:

10   Q.  So of all the trademarks that The Honorable Order of

11   Kentucky Colonels has, how many are actually for charity; just

12   one or two?

13   A.  Well, you would have the chapter trademark is for charity.

14   We have a charity trademark for philanthropic services and

15   uses which would be our grants program.

16   Q.  Okay.  So there's two that are exclusively for charity.

17   So of the -- of the nine -- well, let's just say seven because

18   we're only dealing with one trademark.  We're dealing with

19   Kentucky Colonels with an *s*, not the trademark Honorable Order

20   of Kentucky Colonels.  I don't believe anyone has said that

21   that has been infringed upon.  So it's -- you allege that

22   we're infringing on that particular trademark; is that

23   correct?

24   A.  Yes, sir.

25   Q.  One of those two?

1    A.   You're infringing on Kentucky Colonels having confusion of

2    what we -- our trademarks we have and what our mission is and

3    we're seeing that confusion by individuals reaching out to us.

4              MR. CORYELL:   Judge, let me interpose an objection

5    here because the issue of the trademark and violation of the

6    trademark has long been decided.   And it was decided before --

7    the question before the court right now is whether the

8    permanent injunction was violated.   None of these questions

9    have anything to do with that.

10             THE COURT:   So the legal issue of infringement is

11   not for her to answer.   Again, it's got to be factual

12   questions.

13             MR. WRIGHT:   No.   But she has to make the

14   allegation.   It's a verified complaint.

15             THE COURT:   She's making the allegations as a

16   layperson based on the facts that she is seeing.   She can talk

17   about the facts, but she cannot make a determination as to

18   infringement.   And to Plaintiff's counsel's point, that

19   determination of infringement was already made.   The question

20   is whether you're violating the current permanent injunction.

21   But I think she's answered your question to the ability that

22   she has under the circumstances, so you can go on and ask

23   another question.

24   BY MR. WRIGHT:

25   Q.   Well, Colonel Crose, in the -- on the Kentucky Colonel

1    certificate, the governor guarantees each recipient certain

2    rights, privileges, and responsibilities.  Prior to 1957 that

3    list was different and it had to do with (inaudible) and

4    whatnot, but of those rights, privileges, and

5    responsibilities, do you know what those are?

6    A.   I do not.  You would have to ask the governor.

7    Q.   So the governor entitled me to them, I know what they are,

8    but you don't know what they are as colonel?

9    A.   No, sir; I don't.

10        MR. CORYELL:  Object to the form.

11   Q.   Okay.  Okay.

12   A.   What I do know is I was given the honorary title by Paul

13   Patton like yourself for the years I did doing Meals on Wheels

14   within the Louisville community.  There is no rights,

15   privileges, and responsibilities.  It's an honorary title for

16   what I did to give back to others.

17   Q.   Do you believe -- do you believe that Colonel Sanders or

18   maybe Colonel George -- George Chinn or any of these other

19   historic colonels that were around basically while The

20   Honorable Order of Kentucky Colonels was forming, do you see

21   them as having used their Kentucky Colonel title to their

22   advantage?

23        MR. CORYELL:  Object to the form.

24        THE COURT:  Understood.  You can answer.

25   A.   The only -- I don't know who the other colonel is.  I'm

1    assuming Colonel Harland Sanders used it for his financial

2    benefit.

3    Q.   Colonel George Chinn was the director of the Kentucky

4    Historical Society in 1965 to 1972.  He was also a Kentucky

5    Colonel.  He -- he professed that the first Kentucky Colonel

6    was Daniel Boone.  Have you ever heard of the first Kentucky

7    Colonel being Daniel Boone?

8    A.   I have off of what you have put on your website.  Prior to

9    that, no.

10   Q.   So you never heard of -- even though you had Boone family

11   members working there at The Honorable Order of Kentucky

12   Colonels in the past?

13   A.   Oh, I'm not sure that that Boone employ was part of the

14   Boone family, but -- and I don't know that but I have sincere

15   doubts that that is the case.

16   Q.   Okay.  Okay.  And -- well, so are these -- are these

17   chapters that you guys are starting -- I saw one that said

18   Commonwealth Colonels.  I saw one that's Derby Colonels,

19   something like -- are any of these people infringing on your

20   trademark?

21   A.   No, they're not.

22   Q.   But you said they don't necessarily need to be affiliated

23   with The Honorable Order of Kentucky Colonels?

24   A.   Those particular chapters have agreed to and sign -- have

25   bylaws and they signed our charter to become official

1    chapters.

2    Q.  Okay.  And what does this -- what does this charter

3    entitle them to?

4    A.  It entitles them to email distribution where we would

5    reach out to colonels within their area, entitles them to us

6    publicizing events at certain times of the year for them, it

7    entitles them where one of the team members would come and

8    work with them.

9    Q.  Well, they sound like mostly membership functions.  Would

10   you represent them in court?

11   A.  I would not.

12   Q.  So The Honorable Order of Kentucky Colonels wouldn't

13   represent the Commonwealth Colonels, for example, over there

14   in Frankfort?

15   A.  Correct.

16          THE COURT:  Okay.

17   Q.  They would be --

18          THE COURT:  How old on a second, Mr. Wright.  There

19   was an objection, sir.  There was an objection, sir.

20          MR. CORYELL:  It was a form objection, Your Honor.

21          THE COURT:  Okay.  Understood.

22   BY MR. WRIGHT:

23   Q.  So how many chapters are there now?

24   A.  Currently there's over 35.

25   Q.  And I saw one over in Indonesia that has a completely

1    different logo, but it looks like -- it looks like a military

2    type of organization.  Is that also yours?

3    A.  I know we have five that are international.  I don't know

4    if there's one in Indonesia.

5    Q.  Okay.  So do -- do they have any -- any rights at all in

6    their countries?

7    A.  I -- I don't know.  You would have to go to their

8    countries.  I wouldn't be aware of that.

9    Q.  No.  I mean, does your agreement with them, is it -- is it

10   legal?

11   A.  It --

12            THE COURT:  That's a legal question.  She can't

13   answer a legal question.

14            MR. WRIGHT:  Well, I mean, if she signed the

15   agreement with them.

16            THE COURT:  You can ask her if she signed the

17   agreement.

18   BY MR. WRIGHT:

19   Q.  So you signed the agreement with them and you believe this

20   is legal?

21   A.  I signed.

22            MR. CORYELL:  Object to the form, Your Honor.  It

23   calls for a legal conclusion still.

24            THE COURT:  Yeah.  You can answer if you know.

25   A.  I know I signed the agreement.  That's all I know.

1    Q.  Well, you speculated earlier that I was somehow doing

2    something illegal or that was not legal and, I guess -- I

3    guess, she didn't have any basis to say that.

4              MR. CORYELL:  Object to the form.

5              THE COURT:  Understood.

6              MR. CORYELL:  It's argumentive.

7              THE COURT:  I think we'll move on from that

8    question.

9              MR.  WRIGHT:  Sure.

10   BY MR. WRIGHT:

11   Q.  And -- okay.  You mentioned the good works that The

12   Honorable Order of Kentucky Colonels does.  And -- I mean, are

13   you aware that there's over -- well, there's probably over

14   10,000, but I'm not even going to speculate, but there's at

15   least 5,000 organizations in Kentucky that are nonprofit

16   organizations.  How many -- how many of those organizations

17   would you think might be headed by a Kentucky Colonel?

18   A.  Oh, I have no idea, sir.

19   Q.  Would you say it's over a hundred?

20             MR. CORYELL:  Object to the form.  Calls for

21   speculation.  She said she had no idea.

22             THE COURT:  She's answered your question.

23             MR. WRIGHT:  Okay.  Calls for speculation?  Well,

24   sure.

25   BY MR. WRIGHT:

1    Q.  Would there be anything wrong with a Kentucky Colonel that

2    works for the United Way to say, "Hey, donate to the United

3    Way because I'm a Kentucky Colonel"?  Would there be something

4    wrong with that, Ms. Crose?

5    A.  Well, there would be nothing wrong with that, but you're

6    not donating to the Kentucky Colonels.  You're contributing to

7    United Way.

8    Q.  Right.  And in this case, you know, we're donating to

9    Ecology Crossroads, we're not donating to The Honorable Order

10   of Kentucky Colonels which is very, very clear on all of our

11   forms; isn't that correct?

12          MR. CORYELL:  Object to the form.

13   Q.  Are there any -- any -- are there any documents where a

14   person can -- that does not know how to read could get

15   confused?

16          MR. CORYELL:  Object to the form.

17          THE COURT:  I -- you're going to have to ask that

18   question again, sir.  I don't know what you're talking about;

19   a person that cannot read.

20   BY MR. WRIGHT:

21   Q.  Well, can a person that reads well and is a cautious

22   consumer, is there any page that I have out there that if you

23   read through it you would think that we are you?

24   A.  Well, yes, sir.  I've got a document Excel list of phone

25   calls and emails I received wondering what that group is and

1    if it was Honorable Order of Kentucky Colonels.  I have a

2    gentleman who said to me, "I've already contributed to The

3    Honorable Order.  Why are you asking me for more money?"

4    Q.  Well, I mean, as far as you saying "that group," that

5    group automatically places that statement as not being you.

6    A.  "That group" is you, sir.

7    Q.  Right.  That group is us which is not you.  If you come to

8    our page, our website page, is there any confusion at all that

9    is even speculative or possible that our organization or our

10   website is even similar to your website in any way, shape, or

11   form outside of just the idea of the Kentucky Colonel which is

12   what my title is for?

13             THE COURT:  It's been asked and answered.

14             MR. WRIGHT:  No.  I'm asking -- I'm asking is there

15   any confusion when you read my website and read The Honorable

16   Order of Kentucky Colonels website that we are similar in any

17   way?

18             MR. CORYELL:  Asked and answered, Your Honor.

19             THE COURT:  You can answer it again if you'd like.

20   A.  Yes, sir.  There's confusion.

21   Q.  What confusion would that be?

22             MR. CORYELL:  Your Honor, asked and answered again.

23             THE COURT:  I think, Mr. Wright, she is referring to

24   the spreadsheet.  And if you would like to refer to the

25   spreadsheet, you can do that as well.  You have that in front

1    of you.  That's the confusion she's referred to.

2              MR. WRIGHT:  The spreadsheet -- the spreadsheet is

3    based on members contacting her who are not real members --

4    that are honorary members -- and they are contacting her with

5    questions as to our legitimacy or connection with The

6    Honorable Order of Kentucky Colonels.

7    BY MR. WRIGHT:

8    Q.  Just so we're clear, we're not part of The Honorable Order

9    of Kentucky Colonels, are we?

10   A.  I don't know how many of your -- your group, if they've

11   contributed to us.  I know you have but I'm not sure of the

12   other ones, so I can't answer if you're part of The Honorable

13   Order of Kentucky Colonels.

14   Q.  Well, a person -- there's no conflict of interest for a

15   person to be a member of your organization and also be a

16   member of our -- our Facebook group on Facebook that we've had

17   since 2007, is there?

18   A.  I don't see a conflict.

19   Q.  When did -- when did The Honorable Order of Kentucky

20   Colonels go online on Facebook?

21   A.  I don't know, sir.  That was before my engagement with

22   them.

23   Q.  I believe it was 2014.  Since you've been working

24   there since 2017, have you dealt directly with anyone that --

25   that's confused -- that sent money to the wrong place?

1   A.   I have dealt with individuals that have thanked your

2   organization on dollars that we have contributed to that

3   nonprofit.

4   Q.   But you can't cite examples of someone saying "I donated

5   to them and I thought they were you"?

6   A.   That you would have to go back to the Excel sheet on the

7   confusion.

8   Q.   Right.  There's -- there's no incidence of this otherwise

9   that would be an incidence and it would be something that I

10  know about specifically, so -- okay.

11       MR. WRIGHT:  Well, I don't have any further

12  questions.

13       THE COURT:  Anything else?

14       MR. CORYELL:  Nothing further, Your Honor.

15       THE COURT:  All right.  So we've definitely gone

16  over our time for today.  Are those all of the remaining

17  witnesses?

18       MR. CORYELL:  Judge, per the court's suggestion, we

19  had two witnesses who were here to testify last time.  We

20  submitted their testimony via affidavit which are Exhibits 25

21  and 26.

22       THE COURT:  Okay.

23       MR. CORYELL:  We had those gentlemen lined up and

24  prepared to testify between 10:00 and 12:00 this morning.  If

25  Mr. -- I was not -- I was just going to submit their testimony

1    through affidavit, but if the court wanted to give Mr. Wright

2    an opportunity to cross-examine.  I don't know if they're

3    still available.

4          THE COURT:  Mr. Wright, you've reviewed the

5    affidavit sent to you as exhibits yesterday?

6          MR. WRIGHT:  No.  No, I haven't.  I haven't

7    completely reviewed them, no.

8          THE COURT:  Do you know if you have questions for

9    those two individuals?

10         MR. WRIGHT:  Well, let me take a look at these

11   affidavits.  I don't know either of these individuals and

12   neither of these individuals know me, so if I have questions

13   or feel that their testimony is -- I'll file a motion.

14         THE COURT:  Okay.  My suggestion right now would be

15   that instead of doing -- and I'm sorry, you may step down --

16   instead of doing specific oral legal arguments at this time,

17   my suggestion is that you're each going to have an opportunity

18   to simultaneously file -- well, actually, I think probably the

19   better way to do is to have plaintiff's file findings of fact,

20   conclusions of law as to the -- as to their motion based upon

21   the facts from the transcript.

22         The transcript will be ready approximately 14 days

23   from today.  Is that right, April?  Okay.  So if you order it,

24   it will take two weeks essentially to get to you.  So I'm

25   going to set the guideline out two weeks beyond that in case

1    you'd like to cite to that.  So I'm going to give you 30 days

2    to file findings of fact, conclusions of law.  As part of

3    that, I would like to really include everything in that

4    briefing.  Then, Mr. Wright, you'll have 30 days to respond,

5    okay?

6              MR. CORYELL:  Thank you, Your Honor.

7              MR. WRIGHT:  Thank you, Your Honor.  I have one

8    question.

9              THE COURT:  Sure.

10             MR. WRIGHT:  I filed a motion regarding access to

11   my -- to the other part of the case and I haven't been granted

12   that.  That would be to waive all the Pacer fees that I need

13   to access any -- any documents.

14             THE COURT:  Okay.  There's only one case that

15   currently exists and that case has everything filed in it.  We

16   transferred everything other than the order that was actually

17   entered in that case which administratively closed it.  So

18   there is only one case.  It's the current case that we're

19   talking about here today which is the -- the 20-CR-132 -- I'm

20   sorry -- 20-CV-132.

21             You should have already had free Pacer access to

22   that case from your prior activity in there.  If for some

23   reason it's been turned off or changed, we will remedy that.

24   Yeah.  Let us look into that, but I think in theory you were

25   granted access to that previously.  You should still have

1    access to that.

2             MR. WRIGHT:  Okay.  Actually, I tried to access it

3    and it's charging me the ten cents per view per page.

4             THE COURT:  Okay.  We will make an attempt to remedy

5    that 'cause I think it was previously requested and it was

6    previously granted in the old case.

7             MR. CORYELL:  We don't have an objection to that.

8             THE COURT:  Okay.  We'll take care of that.

9             MR. CORYELL:  Judge, one other item --

10            THE COURT:  Hold on.  I think Mr. Wright is frozen.

11   Mr. Wright, are you able to hear us?

12            MR. WRIGHT:  Yeah, I can hear you now.

13            THE COURT:  Okay.

14            MR. CORYELL:  As a formality, I would move for

15   introduction of documents Exhibits 1 through 26 for the

16   plaintiff.

17            THE COURT:  All right.  For the record, Exhibits 1

18   through 26 will be entered into the record.

19            (Plaintiff Exhibits 1 through 26 admitted in

20   evidence.)

21            THE COURT:  Mr. Wright, you indicated you have no

22   other exhibits?  I think we lost him.  Disconnected entirely.

23   We were so close.  So close.  There we go.  Mr. Wright, did we

24   get you back?

25            MR. WRIGHT:  Yeah.

1              THE COURT:  Okay.

2              MR. WRIGHT:  Yeah, I'm back.

3              THE COURT:  All right.  I was worried we had gotten

4     all the way to the end with the stellar connection and lost

5     you right at the last minute.  Okay.  So we're going to

6     introduce for the plaintiffs Exhibits 1 through 26.

7     Mr. Wright, do you have any exhibits on your side or -- I

8     think you indicated at the last hearing you didn't have any

9     other witnesses.  Is that still the case?

10             MR. WRIGHT:  That's still the case.  I haven't -- I

11    haven't decided if I'm going to file a counterclaim or

12    anything yet.  As I indicated when Mr. Coryell was recalling

13    the conversation, I had pointed out to him that The Honorable

14    Order of Kentucky Colonels licensee was violating paragraph 5

15    really strongly and causing a great deal of harm to all

16    Kentucky Colonels in the world.

17             THE COURT:  I'm not familiar -- I'm not familiar

18    with what you're talking about, but the only issue for today

19    is whether or not you have witnesses or exhibits for this

20    hearing.

21             MR. WRIGHT:  No.  No.  It's in the transcript.  I

22    mean --

23             THE COURT:  Okay.  That's all -- I'm sorry?

24             MR. WRIGHT:  I'm not admitting to anything that I

25    didn't do or -- I understand the hearing has its purpose.

1          THE COURT:  Okay.  All right.  I wanted to give you

2     one final opportunity to introduce anything if you wanted to.

3     That's completely up to you.  Okay.  So we'll do a memorandum

4     from today's hearing that will have the deadlines for the

5     briefing.  We'll resolve it after that point.

6          I think there was -- and let me not speak out of

7     turn.  I think there was a request -- all right.  I think

8     there was a request -- motion for sanctions, Docket Entry 112

9     which was about the discovery.  As the discovery's been

10    responded to, I'm going to moot that motion which still

11    appears.  We already -- we already mooted 114, correct?  All

12    right.  And we'll handle Docket Entry 106 in this order

13    because we'll find out about the Pacer fees and those issues,

14    so we should be able to take care of that in this order from

15    today's hearing.  And then as soon as we get a ruling on that,

16    we'll come back to you with any further information that we

17    need, okay?

18          MR. CORYELL:  Very good, Your Honor.

19          MR. WRIGHT:  The only other thing, Judge, I'm -- I'm

20    interested also to -- well, have the information from the

21    magistrate -- from the confidential settlement conference.

22    And I had certain guarantees and privileges granted there and

23    I don't want to see any of that lost because that's the only

24    thing that's holding together this agreed permanent

25    injunction.  This agreed permanent injunction is not made

1    based on any statutory law.  It's based on the judgment of the

2    court and the agreement of the plaintiff and the defendant to

3    set aside the case, but --

4           THE COURT:  I'm not sure what you're referencing to

5    from the mediation.  The only thing that comes out of the

6    mediation is the agreed permanent injunction which the court

7    entered at the parties' request.  So the only --

8           MR. WRIGHT:  But there's also the agreed -- the

9    court mediator's agreement which needs to be understood first

10   in order to keep in context what occurred in the confidential

11   mediation.

12          THE COURT:  Okay.  The only thing that is of record

13   is the permanent injunction which came out of that mediation.

14   Those are the only -- it's the only order on the permanent

15   injunction.  That's what the parties themselves agreed to do

16   or not do.

17          MR. WRIGHT:  Right.  But there's also a court

18   mediator's agreement -- the court mediator's proposal which

19   matured into an agreement once the agreed permanent injunction

20   was entered into the court.  The court mediator's proposal

21   turned into a court mediator's agreement.  And all of the

22   terms within that agreement are not being followed and they're

23   not --

24          THE COURT:  The only terms that came out of the

25   mediation are those listed at Docket Entry 93.  That's what

1    you signed and what counsel for the plaintiff signed.  That

2    document -- those are the only agreements that came out of the

3    mediation.  There's no other documents -- the court didn't

4    enter --

5         MR. WRIGHT:  That's not true, Your Honor.  That's

6    not true.  There was the court mediator's proposal which says

7    how -- how this type of thing would be handled; that The

8    Honorable Order of Kentucky Colonels would not say that they

9    own anything that I own and they would not claim anything that

10   I claim, etcetera, etcetera, etcetera.  All these rules --

11   rules were -- were established to govern the behavior of the

12   plaintiff and the defendant.

13        THE COURT:  Okay.  To the extent, sir, that you

14   believe there is some other agreement between the parties

15   other than that that's entered at Docket Entry 93, then you

16   need to bring that forward in your own briefing.

17        MR. WRIGHT:  It is.  It's in the emergency

18   injunction -- it's in the emergency dismissal motion that I

19   filed.  There were confidential things that occurred there --

20        THE COURT:  Okay.  The only thing that I know of

21   that is reduced to writing is Docket Entry 93, sir.  Okay.

22   The only thing I know that's reduced to writing is Docket

23   Entry 93.  That was what was entered by the court.  Can the

24   plaintiffs illuminate, is there some other document that I'm

25   unaware of?

1                MR. CORYELL:  There's a mediator's proposal and it's

2       actually one of the exhibits.

3                MR. WATTS:  It's not a docket entry.

4                MR. CORYELL:  It's not a docket entry.

5                THE COURT:  Okay.  Understood.  But that was one of

6       the exhibits we looked at here?

7                MR. WATTS:  It's attached somewhere.  Yes, it's

8       Exhibit 1.

9                THE COURT:  To the?

10               MR. WATTS:  To the plaintiff's exhibits for today.

11               THE COURT:  Okay.  We've already looked at that.

12               MR. CORYELL:  Correct.

13               THE COURT:  We looked at that in the last hearing.

14      Understood.  Well, then it's already been talked about,

15      Mr. Wright.  I thought you were talking about something else.

16      We already discussed that at this hearing.

17               MR. CORYELL:  I should have interceded.  It is in

18      the record.

19               THE COURT:  Okay.  That's -- I didn't know there was

20      something else other than what I've seen.  Okay.  So --

21               MR. WRIGHT:  This agreement I feel -- I feel -- if

22      you read that agreement, that agreement precedes -- precedes

23      and dominates the agreed permanent injunction which is --

24               THE COURT:  Okay.  These are all legal arguments,

25      Mr. Wright, that you are entitled to make in your briefing.

1    I'm happy to entertain them.  Unfortunately we've gone like

2    almost 45 minutes over today, but those arguments are all

3    legal arguments and that's why I'm giving you, Mr. Wright, an

4    opportunity to brief it 'cause those are all on the legal side

5    as opposed to the factual side.  The hearing is just to get

6    all of the facts out on the table and then you're entitled to

7    make whatever legal arguments you believe are appropriate,

8    okay?

9         Now, now that we have all these facts, I am happy to

10   look at all of the other motions that have already been filed

11   and you'll be able to respond to the Plaintiff's finding of

12   facts and conclusions of law which will come out of today's

13   hearing, okay?

14        MR. WRIGHT:  Okay.

15        MR. CORYELL:  Judge, will we have an opportunity to

16   file a reply to his response?

17        THE COURT:  If you wish to you can request to do so,

18   but it will probably be on a pretty short leash because, I

19   mean, it is --

20        MR. CORYELL:  I understand.

21        THE COURT:  It's your request to have it expedited,

22   so it will probably be on a much shorter time frame.

23        MR. CORYELL:  Thank you, Your Honor.

24        THE COURT:  Okay.  All right.  So we'll get this

25   order out from today with all the deadlines.  And then to the

1    extent you wish the transcript from today, you can request

2    that from the court reporter, okay?  Thank you-all.

3    (Proceedings concluded at 12:44 p.m.)

4

5                        C E R T I F I C A T E

6        I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

7    THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

8

9
          s/April R. Dowell              May 21, 2023
10   Official Court Reporter, RMR, CRR          Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                               INDEX

2     WITNESSES:

3     DAVID WRIGHT
          Continued Direct Examination By Mr. Coryell        10
4     SHERRY CROSE
          Direct Examination By Mr. Coryell                  49
5         Cross-Examination By Mr. Wright                     61

6

7                             EXHIBITS

8     GOVERNMENT:
      Exhibits 1 through 26                                  85
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25