UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

*Electronically Filed*

| | |
|---|---|
| THE HONORABLE ORDER OF KENTUCKY COLONELS, INC. | **)** |
| | **)** |
| | **)** |
| PLAINTIFF | **)** |
| v. | **)**  CIVIL ACTION NO. 3:20-CV-132-RGJ |
| | **)** |
| KENTUCKY COLONELS INTERNATIONAL, et al. | **)** |
| | **)** |
| | **)** |
| DEFENDANTS | **)** |

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff, The Honorable Order of Kentucky Colonels, Inc. ("HOKC"), by counsel, pursuant to the Court's May 18, 2023 Memorandum of Hearing and Order [**DE 120**] hereby tenders its Proposed Findings of Fact and Conclusions of Law regarding the evidentiary contempt hearing, held on April 25, 2023 and continued on May 9, 2023, to determine whether Defendants'[1] continued use of KENTUCKY COLONELS™ violates the Agreed Permanent Injunction entered by the Court on February 23, 2021 [**DE 93**].[2]

---

[1] References to "Wright" are to Defendant David J. Wright individually and in his capacity as representative of Defendants Ecology Crossroads Cooperative Foundation, Inc. ("Ecology Crossroads") and Globcal International ("Globcal"). Ecology Crossroads and Globcal (hereinafter the "Corporate Defendants") are in default. (*See* March 30, 2023 Order [**DE 105**], 3-4). Any sanction for contempt entered pursuant to the instant motion should be entered jointly and severally against Wright and the Corporate Defendants.

[2] By Order dated March 30, 2023 [**DE 105**], the Court converted HOKC's Motion for Temporary Restraining Order and Preliminary Injunction [**DE 99**] into the Motion to Enforce the Permanent Injunction Order presently before the Court.

**FINDINGS OF FACT**

**A. The Court's Permanent Injunction Order**

1.  On or about February 17, 2021, the Parties agreed to a Mediator's Proposal, which Wright signed as "Executive Director and Authorized Agent for Kentucky Colonels International; Globcal International; and Ecology Crossroads Cooperative Foundation, Inc." [Hr'g Tr. Vol. 1, 13:5-7; 18-23; Hr'g Ex. 1].

2.  A permanent injunction was to be issued as part of the settlement reflected in the Mediator's Proposal. [Hr'g Tr. Vol. 1, 14:11-15].

3.  The Mediator's Proposal further provided that HOKC would not "interfere with Defendants' use of the honorable title "Kentucky Colonel" as a personal description" or interfere "with any book Defendants wish to publish regarding the history of the Kentucky Colonel, Kentucky colonels or Kentucky colonelcy so long as the terms of the Agreed Permanent Injunction are abided by." [*Id*. at 13:24-14:10].

4.  The Mediator's Proposal did not provide Defendants with any affirmative rights regarding the use of the KENTUCKY COLONELS Mark or any mark confusingly similar to the KENTUCKY COLONELS Mark. [*See id.* at 15:4-16:7].

5.  Wright had the opportunity to review the permanent injunction before it was presented to the Court for entry. [*Id.* at 14:21-24].

6.  On February 23, 2021, the Court entered the Agreed Permanent Injunction, which was agreed to and signed by both Parties individually or through counsel (the "Agreed Permanent Injunction"). [**DE 93**].

7.  The Agreed Permanent Injunction agreed, ordered, and adjudged:

a.   Defendants and anyone acting on their behalf, including their owners, members, officers, agents, contractors, employees, attorneys, and any other persons in active concert or participation with Defendants, are permanently enjoined and prohibited from using the KENTUCKY COLONELS Mark, **or any mark that is confusingly similar to the KENTUCKY COLONELS Mark**, including, but not limited to, KENTUCKY COLONELS INTERNATIONAL and KENTUCKY COLONEL FOUNDATION, on or in connection with **the sale of any goods or services including, but not limited to, the solicitation of charitable donations and the promotion of charitable and philanthropic causes**.

b.   Defendants and anyone acting on their behalf, including their owners, members, officers, agents, contractors, employees, attorneys, and any other person in active concert or participation with Defendants, are permanently enjoined and prohibited from using the KENTUCKY COLONELS Mark, **or any mark that is confusingly similar to the KENTUCKY COLONELS Mark**, including, but not limited to, KENTUCKY COLONELS INTERNATIONAL and KENTUCKY COLONELS FOUNDATION, **on any website, social media page, or blog in such a way as is likely to cause consumers to be confused, mistaken, or deceived into believing that HOKC has sponsored, sanctioned, approved, licensed, or is any way affiliated with Defendants or any organization or cause sponsored or supported by Defendants**.

c.   Defendants and anyone acting on their behalf, including their owners, members, officers, agents, servants, employees, attorneys, and any other person in active concert or participation with Defendants, are permanently enjoined and prohibited from using the domain names [kycolonels.international], [kentucky.colonels.net], or any other domain name that is confusingly similar to [kycolonels.org], or ***any domain name* that incorporates the KENTUCKY COLONELS Mark, or any mark that is confusingly similar to the KENTUCKY COLONELS Mark, including, but not limited to, KENTUCKY COLONELS INTERNATIONAL and KENTUCKY COLONEL FOUNDATION**.

d.   Defendants and anyone acting on their behalf, including their owners, members, officers, agents, contractors, employees, attorneys, and any other persons in active concert or participation with Defendants, are permanently enjoined and prohibited from using Facebook or any other social media platform usernames "Kentucky Colonels International" or "Kentucky Colonel Foundation" **or any other username or handle that is confusingly similar to the trademark KENTUCKY COLONELS for the purposes of forming a membership organization, a civil society association or other non-commercial activity such as an event or charitable fundraising endeavor**.

e.    Notwithstanding the aforesaid prohibitive terms and conditions, this Agreed Permanent Injunction does not prohibit Defendant, Col. David J. Wright or other Kentucky colonels (as individuals) from using "Kentucky Colonel," "Kentucky colonels" and/or "Kentucky colonelcy" as words or terms to describe Kentucky colonels, as an a [*sic*] honorary title, or for editorial, educational, informative, journalistic, literary or other **non-commercial purposes so long as the use is not related to the trademark or service mark uses registered, or pending, by the HOKC, with the U.S. Patent and Trademark Office**.

f.    The Court shall retain jurisdiction to enforce this Agreed Permanent Injunction and the terms of the Settlement Agreement entered by the parties for no less than ten (10) years.

[Agreed Permanent Injunction [**DE 93**] (emphasis added)].

**B.    Defendants began violating the Agreed Permanent Injunction in May 2022.**

8.    Wright was responsible for a May 2022 Facebook post under the name Kentucky Colonel purporting to sell "the trademark Kentucky Colonel website with four domains," which Wright was offering "[f]or commercial development for advertising." [Hr'g Tr. Vol. 1, 17:25-18:5; 19:13-18; Hr'g Ex. 3].

9.    On May 16, 2022, shortly after Wright made the Facebook post offering to sell "the trademark Kentucky Colonel website," HOKC sent him a cease and desist letter, stating his actions violated the Agreed Permanent Injunction. [Hr'g Tr. Vol. 1, 21:20-22:5; Hr'g Ex. 4]. Specifically, the letter quoted and attached the Agreed Permanent Injunction and identified the continued violations of the Agreed Permanent Injunction, including the creation, maintenance, moderation, and/or involvement with the KYCOLONELCY.US domain name; the KENTUCKY COLONEL COMMUNITY Facebook group; and the KENTUCKY COLONEL Facebook page. [Hr'g Ex. 4]. The letter also explicitly noted the KENTUCKY COLONEL Facebook

page post offering to sell the "trademark KENTUCKY COLONEL website (w/ 4 domain names)." [*Id*.].

10.     HOKC demanded Wright immediately cease and desist from his unlawful activities in violation of the Agreed Permanent Injunction and stated that his refusal to comply with that request would result in action to enforce the Agreed Permanent Injunction. [*Id.*].

11.     Wright did not think counsel for HOKC had "any position to make the [cease and desist] request" and he unilaterally determined he was not violating the Agreed Permanent Injunction. [Hr'g Tr. Vol. 1, 24:5-13].

**C. Defendants continue violating the Agreed Permanent Injunction through their Website.**

12.     Wright is the "trustee, registrant, owner and operator" of kycolonelcy.us; colonelcy.org; and colonels.net and, consistent therewith, he authored and/or posted various information on the www.kycolonelcy.us website (the "Website"), including the "About Us" page; the "Identification Cards, Badges, and Nameplates" section; the "Kentucky Colonel Directory" page; the "Kentucky Colonel Branches" page; the "Kentucky Colonel Guide (Professional)" page; the "Kentucky Colonel Identification (Photo ID Cards)" page; the "Kentucky Colonel Business Cards" page; the "List of Kentucky Colonels" page; the "Kentucky Colonel Registry" page; and the "Kentucky Colonel Club" page. [*See* Hr'g Ex. 20, Def.'s Resps. to Pl.'s Req. for Admis. Nos. 1, 8-9, 11-18]. [3]

---

[3] Specifically, Wright admitted to authoring and/or posting the information specifically referenced in Paragraphs 39, 41, and 43-50 of HOKC's 2023 Verified Complaint [**DE 97**].

13.    Wright "authored" a press release labeled "News for Immediate Release" from the

"Office of the Kentucky Colonelcy," which was linked to the Website and included

letterhead displaying the Kentucky State Seal and title "Office of the Kentucky

Colonelcy." [Hr'g Tr. Vol. 2, 10:25–11:8; Hr'g Ex. 12]. The press release describes

a "cooperative" of Kentucky Colonels based in Richmond, Kentucky, which is the

registered office location for Ecology Crossroads and Globcal International. [Hr'g

Tr. Vol. 2, 11:13-12:3].

14.    The "News for Immediate Release" authored by Wright further touted his

"cooperative" as a vehicle for Kentucky Colonels to "be invested as stakeholders

entitled to dividends and as owners with equity to a professional role as an Official

Kentucky Colonel." [Hr'g Ex. 12]. He further described the "cooperative" as a:

> [s]ocial enterprise [that] will issue official ID cards, badges and
> nameplates; the cooperative colonels will be connected to a
> virtual workplace, have company email and be required to
> collaborate online or in the community for 50 hours per year.
> They will receive the same rate of annual pay as does a United
> Nations goodwill ambassador and through their investments of
> time and money can be paid a dividend for their work efforts
> and collaborative submissions.

> [*Id.*].

15.    Wright also authored a page on the Website for "Identification Cards, Badges, and

Nameplates" and testified that he would be the person ordering the ID cards in

batches of 100. [Hr'g Tr. Vol. 2, 24:7-9; Hr'g Ex. 20, Def.'s Resp. to Pl.'s Req. for

Admis. No. 9].

16.    Wright also authored a page on the Website for the "Kentucky Colonel Registry,"

which he described as "a service that is being [made] available to [Wright's]

cooperative members [and] is going to be operated by the Honorificus

Foundation," which is another organization started by Wright. [Hr'g Tr. Vol. 2, 25:14-19; Hr'g Ex. 14].

17.    Wright also authored the "Kentucky Colonel™ User Application" Google Form linked through the Website (the "User Application"). [Hr'g Ex. 17; Hr'g Ex. 20, Def.'s Resp. to Pl.'s Req. for Admis. No. 22]. The User Application purports to offer a position in exchange for a non-refundable donation to Ecology Crossroads and represents that all donations are tax deductible. [Hr'g Tr. Vol. 2, 30:11-16; Hr'g Ex. 17]. The User Application further states that after two full years, a member of the cooperative will be able to sell, transfer, or retire their space based on the actual value of their share. [Hr'g Ex. 17]. The cost of purchasing a membership in the cooperative is described as follows:

> Doing the math a person can join the cooperative now during the charter stage under one of four options to get the ID Card, Company Login, Workplace and Cloud Identity (**Join Us Now** using **PayPal**). PayPal users can adjust their **donation payment** to match the amounts displayed below:
>
> 1.    $1,000 now, then $25 per month in 2023; (Founder)
>
> 2.    $1,000 now, then $250 per year in 2024; (Charter)
>
> 3.    $389.50 now, then $300 per year in 2024; (Professional)
>
> 4.    $164.50 now, then $25 per month; (Ten Percenter)
>
> 5.    $139.50 now, then $25 per month; (Five Percenter) (ends February 28, 2023)
>
> [*Id.*].

18.    The User Application further provides that:

> All those that join the cooperative will receive legal forms that need to be printed, signed, and photographed during the month of January and then in February as the necessary services

become available ID Cards will begin arriving in the mail. All members must maintain their monthly payments to maintain services and the shares or proportional shares they have accrued, **at the end of 2023 all 5 & 10 percent members are upgraded to Professionals**.

[Hr'g Tr. Vol. 2, 31:5-13; 32:7-10; Hr'g Ex. 17].

19. According to Wright, you go to the Website to get the User Application, pay whatever amount you choose "[t]o be able to edit the website, to be able to get your own - - own - - own vanity email which is basically name@colonelcy.net or kycolnelcy.us." [Hr'g Tr. Vol. 2, 34:2-12].

20. The User Application refers to "all members" maintaining their monthly payments to maintain services, and Wright testified that they were "members of the group - - of the community." [*Id.* at 32:11-17].

21. Wright did not take down the Website (or the User Application) when the instant action was filed. [*Id.* at 33:14-16]. However, he claims to have lost 51 "members" from the Kentucky Colonel Community. [*Id.* at 22:15-17]. According to Wright, "the Kentucky Colonel Community is a membership only organization which is on Facebook." [*Id.* at 22:25-23:1].

**D. Defendants continue violating the Agreed Permanent Injunction through their social media.**

22. After receiving the May 16, 2022 cease and desist letter, Wright started a new Facebook page under the same name of Kentucky Colonel. [Hr'g Tr. Vol. 1, 25:11-13]. Wright is also the administrator of the Kentucky Colonel Community Facebook group, the Kentucky Colonel Club Facebook group, and the Kentucky Colonel YouTube page, and is responsible for the Kentucky Colonel LinkedIn page,

the Kentucky Colonel Pinterest account, and the Kentucky Colonel Crunchbase crowdfunding site. [*Id.* at 20:1-3, 12-14, 21-23; 21:4-12].

23.   Wright authored and/or posted various information on the Kentucky Colonel Facebook page, the Kentucky Colonel Community Facebook group, and the Kentucky Colonel Club Facebook group. [Hr'g Ex. 20, Def.'s Resps. to Pl.'s Req. for Admis. Nos. 4-6, 20-21].[4] Specifically, Wright:

a.   is responsible for the creation of the Kentucky Colonel™ LinkedIn post announcing creation of a "collective licensing program" by the name of Kentucky Colonel Cooperative. [Hr'g Tr. Vol. 2, 26:23-27:3; 28:12-15].

b.   authored a post on the Kentucky Colonel Club Facebook page on December 28, 2022, welcoming newly commissioned colonels and indicating that Kentucky Colonel ID cards will only be provided to members of the Kentucky Colonel Community. [*Id.* at 27:8-17; Hr'g Ex. 15A].

c.   posted on the Kentucky Colonel Facebook group on January 22, 2023 that "it's now the responsibility of the Kentucky Colonel™ group and its members to reach a hundred members prior to printing ID cards." [Hr'g Tr. Vol. 2, 35:1-9].

**E. Defendants have been unjustly enriched through their contempt of the Agreed Permanent Injunction.**

24.   Wright "made the start-up initiative profile" on the crowdfunding website crunchbase.com for "Kentucky Colonel™" and admits that the "about" section of the "Kentucky Colonel™" crunchbase.com website represents that the

---

[4] Wright admitted to authoring and/or posting the Facebook posts specifically referenced in Paragraphs 33-36 and 53-54 of HOKC's 2023 Verified Complaint [**DE 97**].

organization "is the source of Kentucky Colonel trademark and license." [Hr'g Tr. Vol. 1, 39:22-25; Hr'g Ex. 20, Def.'s Resp. to Pl.'s Req. for Admis. No. 7].

25.    Wright is responsible for the information on the "Kentucky Colonel™" crunchbase.com website stating that "[a]s a cooperative work group, we require an investment of $10,000 with a 10% good-faith deposit waiver ($1,000) to get into the cooperative and sign the NDA. . . . Any investor that is not a Kentucky Colonel now will become one by investing in this Kentucky business!" [Hr'g Tr. Vol. 1, 42:8-15; Hr'g Ex. 9].

26.    The "Kentucky Colonel™" crunchbase.com website states that $7,500 has been raised. [Hr'g Tr. Vol. 1, 43:3-5].

27.    Wright confirmed that the funds raised on the "Kentucky Colonel™" crunchbase.com website "have been spent" on setting up another group and the artwork, layout, and scale drawings of a new logo or seal for the state of Kentucky "which is what [Defendants are] calling the official Kentucky Colonel seal." [*Id.* at 40:6-20].

28.    Wright claims that he has "no documents" reflecting the amount of contributions he has received as a result of solicitations on the Website and social media accounts, including the User Application and "Kentucky Colonel™" crunchbase.com website.  [Hr'g Ex. 20, Def.'s Resp. to Req. for Prod. of Doc. No. 2]. However, Wright's written discovery responses acknowledge that the User Application has resulted in donations to Ecology Crossroads of "+/- $4,000" since February 23, 2021. [Hr'g Ex. 20, Def.'s Answer to Pl.'s Interrog. No. 4].

29.     Wright candidly acknowledges that his internet and social media activities are intended to extort a payoff from HOKC, testifying that he is looking for a "good faith offer" to provide "all of the intellectual property which [he's] researched and accumulated in [his] Creative Commons encyclopedia" online and on the Website. [Hr'g Tr. Vol. 2, 43:10-12; *see also* Hr'g Ex. 22]. This testimony is consistent with Wright's admission that his current actions are patterned after an extortionate scheme where he "realized a return of more than $50,000" after cybersquatting on domain names such as Arborday.com. [**DE 103**, 20].  Wright stated that a similar extortionate payment "may be a good option" for HOKC.  [*Id*.].

## F. Defendants' use of marks that are confusingly similar to the KENTUCKY COLONELS Mark continue to cause damage to HOKC.

30.     Multiple witnesses testified that HOKC's reputation and goodwill continue to be damaged by Defendants' attempted misappropriation of the KENTUCKY COLONELS Mark. [*See, e.g.*, Hr'g Tr. Vol. 2, 59:5-60:1; Hr'g Ex. 25, ¶¶11-14; Hr'g Ex. 26, ¶¶9-14].

31.     Jim Rogers, a longtime HOKC member and a current member of the HOKC Board of Directors, testified that in December 2022 he joined a Facebook group he thought was associated with HOKC.  [Hr'g Ex. 26, ¶9].

32.     Shortly after joining the group, Rogers saw a post touting "Kentucky Colonel photo ID cards" and displaying an image stating "REAL ID DEADLINE: MAY 3, 2023." [*Id.*].  The post solicited members for a Kentucky Colonel cooperative and stated "our professional registry will also become a reality and available to all those who are interested from our sponsors."  [*Id.*].  Finally, the post represented, "We have also discovered that as a Kentucky Colonel, employees of our cooperative will

11

have Qualified Immunity in civil matters and will receive many more benefits, privileges and responsibilities than most have ever realized or have understood until now." [*Id.*].

33.    When he saw the Facebook post, Rogers immediately became concerned because he was not aware that HOKC was issuing Kentucky Colonel photo ID Cards.  [*Id.* at ¶12].  Rogers also became concerned because he did not believe it would be appropriate for HOKC to market "Real ID" cards, badges, or other products marketed on the post.  [*Id.*].

34.    When Rogers reached out to Sherry Crose, Executive Director of HOKC, to express his concern, Crose explained that Wright, not HOKC, was responsible for the post and that it had not been approved or authorized by HOKC.  [*Id.* at ¶13].

35.    Michael Joseph Little has been a member of HOKC since September 2022. [Hr'g Ex. 25, ¶7].  Shortly after becoming a member of HOKC he was asked to assist in HOKC's efforts to develop a chapter specifically directed at active duty military and veterans.  [*Id.* at ¶10].

36.    Wright and his social media and internet postings have caused significant difficulties impacting Little's efforts at chapter organization by confusing the veterans and active military who are potential participants in an HOKC chapter and discouraging such participation and overall support for HOKC.  [*Id*. at ¶12].

37.    Little testified that he is personally aware of individuals who have been confused by Wright's efforts to establish a competing organization, specifically the Kentucky Colonel Cooperative referenced in Wright's social media and other postings.  [*Id.* at ¶14].

38.    Sherry Crose, HOKC's Executive Director, testified that HOKC has received more than one hundred (100) complaints or inquiries regarding Wright's activities from its members since December 2022.  [Hr'g Tr. Vol. 2, 57:4-7; Hr'g Ex. 23].

39.    HOKC's members have expressed anger, confusion, and concern about Wright's attempts to market the Kentucky Colonels cooperative, his promotion of other membership organizations targeting Kentucky Colonels, his offers to sell ID cards, badges, and other goods, and his solicitation of funds for Ecology Crossroads and other allegedly charitable organizations. [*See, e.g.*, Hr'g Tr. Vol. 2, 54:17-22; 55:11-56:23; Hr'g Ex. 23].

40.    While the specific damages resulting from Wright's activities are difficult to quantify, Wright's actions required HOKC to spend in excess of $65,000.00 in attorneys' fees from December 2022 through April 2023.   [Hr'g Tr. Vol. 2, 60:2-61:2; Hr'g Ex. 24].

## CONCLUSIONS OF LAW

**A.    The Court has inherent power to enforce the Agreed Permanent Injunction.**

41.    A federal court possesses inherent power to enforce its judgments. *See Peacock v. Thomas*, 516 U.S. 349, 356 (1996) ("We have reserved the use of ancillary jurisdiction in subsequent proceedings for the exercise of a federal court's inherent power to enforce its judgments. Without jurisdiction to enforce a judgment entered by a federal court, the judicial power would be incomplete and entirely inadequate to the purposes for which it was conferred by the Constitution.") (internal quotation marks and citation omitted).

42. A court's contempt power is "one weapon in its arsenal" that may be deployed to enforce its orders. *Elec. Workers' Pension Tr. Fund of Loc. Union 58, IBEW v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 378 (6th Cir. 2003).

**B. HOKC provided clear and convincing evidence of Wright's contempt of the Agreed Permanent Injunction.**

43. A party seeking a civil contempt order "must prove by clear and convincing evidence that the respondent violated the court's prior order." *Glover v. Johnson*, 138 F.3d 229, 244 (6th Cir. 1998).

44. "Clear and convincing evidence is not a light burden and should not be confused with the less stringent, proof by a preponderance of the evidence." *Elec. Workers' Pension Tr. Fund of Loc. Union 58, IBEW*, 340 F.3d at 379.

45. The movant must show that the non-movant "violated a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *N.L.R.B. v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 590-91 (6th Cir. 1987) (internal quotation omitted).

46. "The burden of showing that an order is definite and specific is heavy." *Gascho v. Glob. Fitness Holdings, LLC*, 875 F.3d 795, 800 (6th Cir. 2017).

47. The standard "guards against arbitrary exercises of the contempt power" and helps ensure that the sanction is "reserved for those who 'fully understand[ ]' the meaning of a court order and yet 'choose[ ] to ignore its mandate.'" *Id.*

48. Here, HOKC established, by clear and convincing evidence through Wright's own testimony and written discovery responses, as well as the testimony of others, that (1) Wright was fully aware of the Agreed Permanent Injunction because the Parties stipulated and agreed to its entry; (2) the Agreed Permanent Injunction

14

was definite and specific; (3) Wright knowingly and consciously violated the Agreed Permanent Injunction; (4) Defendants did not take reasonable steps to comply with the Agreed Permanent Injunction or provide evidence as to why they were categorically unable to comply with the Agreed Permanent Injunction; and (5) an award of damages is warranted.

49.    The Agreed Permanent Injunction prohibits Wright from using the KENTUCKY COLONELS Mark or any mark that is confusingly similar to the KENTUCKY COLONELS Mark in connection with (1) the sale of goods or services; (2) the solicitation of charitable donations; or (3) the promotion of charitable or philanthropic causes. [**DE 93**, ¶ 1].

50.    Wright knowingly and consciously violated the Agreed Permanent Injunction by, among other things, publishing the "Kentucky Colonel™ User Application" on the Website offering memberships in the Kentucky Colonel cooperative; using the Website to tout the Kentucky Colonel cooperative as a vehicle for commissioned Kentucky Colonels to become professional Kentucky Colonels; using the Website and his Kentucky Colonels cooperative to market badges, nameplates, and a Kentucky Colonels registry; and using the "Kentucky Colonel™ User Application" to solicit donations to Ecology Crossroads.

51.    Wright also knowingly and consciously violated the Agreed Permanent Injunction by establishing the "Kentucky Colonel™" crunchbase.com crowdfunding website, representing that "Kentucky Colonel™" is the "source of Kentucky Colonel Trademark and License," soliciting funds through the "Kentucky Colonel™"

crunchbase.com crowdfunding website, and then using those funds for his own personal enrichment.

52.    Wright also knowingly and consciously violated the Agreed Permanent Injunction when he posted an offer to sell "the trademark Kentucky Colonel website (w/4 domains)" on the Kentucky Colonel Facebook page stating that the website and accompanying social media accounts were "ripe for commercial development."

53.    Wright also violated the Agreed Permanent Injunction in January 2023 when he used his Kentucky Colonel LinkedIn page to promote a "collective licensing program" for Kentucky Colonels which promised Kentucky Colonels over 21 years of age a program to "have a professional career as a Kentucky Colonel and make your old career secondary."  [Hr'g Tr. Vol. 1, 29:7-13; Hr'g Ex. 5].

54.    The Agreed Permanent Injunction also prohibits Wright from using Facebook or any other social media platform usernames or handles that are confusingly similar to the trademark KENTUCKY COLONELS for the purposes of forming a membership organization. [**DE 93**, ¶4].  All of Wright's Facebook, LinkedIn, and other social media postings concerning his Kentucky Colonels cooperative blatantly violate this prohibition.

**C.  Wright's attempted justification of his violations of the Agreed Permanent Injunction are legally without merit.**

55.    It is Wright's position that he and Defendants are not violating the Agreed Permanent Injunction when not using "s" at the end of "colonel" because "using the term Kentucky Colonel is not confusingly similar to the KENTUCKY COLONELS Mark." [Hr'g Tr. Vol. 1, 16:1; 10-14].

56.     When asked whether it was his "position that [he] could start and promote an

organization using the term Kentucky Colonel without an *s* that does not violate

the injunction order," Wright stated:

> "Yeah, I believe so. As long as we're - - we're very clearly
> disambiguating ourselves from the Honorable Order of
> Kentucky Colonels. So we went ahead and added the TM symbol
> because that's an unregistered form of a trademark and we're
> calling it title mark because essentially by using that we're
> telling everyone that we are unregistered and we're also
> individuals. We're using that in the sense of common law which
> is essentially the same way it's used on the certificates that are
> granted by the governor; Kentucky Colonel.

[*Id.* at 17:1-13].

57.     Thus, Wright believes he can sell goods and services, solicit charitable donations,

form membership organizations, and engage in all types of commercial activity as

long as he uses the term "Kentucky Colonel" without an "s."

58.     The Lanham Act prohibits any person from using "in commerce any reproduction,

counterfeit, copy, or colorable imitation of a registered mark in connection with

the sale, offering for sale, distribution, or advertising of any goods or services on

or in connection with which such use is likely to cause confusion, or to cause

mistake, or to deceive." 15 U.S.C. § 1114(1)(a).

59.     Further, the Lanham Act prohibits the false designation of origin that is "likely to

cause confusion, or to cause mistake, or to deceive as to the affiliation, connection

or association of such person with another . . . or as to the origin, sponsorship, or

approval of his or her goods, services, or commercial activities." 15 U.S.C.

§1125(a)(1)(A).

60.     The Lanham Act also provides for civil liability for any person who "registers, traffics in, or uses a domain name that . . . is identical or confusingly similar to" a registered mark. 15 U.S.C. § 1125(d)(1)(A)(ii)(I).

61.     A likelihood of confusion analysis involves an analysis of certain factors, although only those relevant factors for which there is evidence in the record need be considered, with the main two factors being the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation, and commercial impression; and the relatedness of the goods or services. *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (C.C.P.A. 1973).

62.     Notably, marks may be confusingly similar in appearance despite the addition, deletion, or substitution of letters or words. *See, e.g.*, *Weiss Assocs. Inc. v. HRL Assocs. Inc.*, 902 F.2d 1546 (Fed. Cir. 1990); *In re Pix of Am., Inc.*, 225 USPQ 691 (TTAB 1985) (finding NEWPORTS and NEWPORT to be essentially identical in appearance).

63.     Therefore, Wright's attempt to justify his actions by omitting an "s" at the end of "Colonel" fails as a matter of law.

**D.  Wright failed to establish that he was unable to comply with the Agreed Permanent Injunction.**

64.     "Once the movant establishes his prima facie case, the burden shifts to the contemnor who may defend by coming forward with evidence showing that he is *presently* unable to comply with the court's order." *Electrical Workers Pension Trust Fund of Local Union 58, IBEW*, 340 F.3d at 379 (emphasis in original).

65.    The respondent can assert an inability to comply, but the "defendant must show 'categorically and in detail' why he or she is unable to comply with the court's order." *Rolex Watch U.S.A., Inc. v. Crowley*, 74 F.3d 716, 720 (6th Cir. 1996).

66.    "Willfulness is not an element of civil contempt, so the intent of a party to disobey a court order is irrelevant to the validity of [a] contempt finding." *Id.* (quotation omitted).

67.    "[T]he test is not whether defendants made a good faith effort at compliance but whether 'the defendants took all reasonable steps within their power to comply with the court's order.'" *Glover*, 138 F.3d at 244 (citing *Glover v. Johnson*, 934 F.2d 703, 708 (6th Cir. 1991)).

68.    Good faith is not a defense to a civil contempt action. *Id.*

69.    An officer of a corporation responsible for its affairs is "subject to the court's order just as the corporation itself." *Electrical Workers Pension Trust Fund of Local Union 58, IBEW*, 340 F.3d at 382.

70.    Here, Wright did not even attempt to establish that he was unable to comply with the Agreed Permanent Injunction. Rather, Wright candidly and repeatedly acknowledged that his actions were intended to promote a competing membership organization for Kentucky Colonels; market ID Cards, badges, and other types of products as inducements to prospective members of that organization; generate donations for Ecology Crossroads; and generate money for his own personal enrichment using marks, domain names, social media handles, and other identifiers confusingly similar to the KENTUCKY COLONELS Mark. In

fact, Wright specifically acknowledged that his activities were intended to, among other things, coerce HOKC to buy his social media handles and Website.

**E.** **The Court must sanction Wright's contempt of the Agreed Permanent Injunction.**

71. When it has been established that a party has violated the court's order, the court may impose both coercive and compensatory sanctions as a civil remedy. *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947).

72. A compensatory fine is payable to the complainant while a coercive fine is payable to the court. *United States v. Bayshore Assocs., Inc.*, 934 F.2d 1391, 1400 (6th Cir. 1991); *Winner Corp. v. H.A. Caesar & Co.*, 511 F.2d 1010, 1015 (6th Cir. 1975) ("Contempt awards to private complainants are to be compensatory.").

73. A compensatory "fine must of course be based upon evidence of complainant's actual loss, and his right, as a civil litigant, to the compensatory fine is dependent upon the outcome of the basic controversy." *United Mine Workers of Am.*, 330 U.S. at 304; *Penfield Co. of Cal. v. Sec. & Exch. Com'n*, 330 U.S. 585, 594 (1947) ("When the court imposes a fine as a penalty, it is punishing yesterday's contemptuous conduct.").

74. In contrast, when a fine is coercive, the court must "consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *United Mine Workers of Am.*, 330 U.S at 304.

75. Sanctions imposed for civil contempt are meant "to compel obedience to a court order and compensate for injuries caused by noncompliance." *Redken Labs. Inc. v.*

*Levin*, 843 F.2d 226, 229 (6th Cir. 1988) (quoting *TWM Mfg. Co., Inc. v. Dura Corp.*, 722 F.2d 1261, 1273 (6th Cir. 1983)).

76.    Under the Lanham Act, 15 U.S.C. § 1125(a) or (d), a successful claimant may recover: (1) the defendant's profits; (2) any damages the plaintiff sustained; and (3) the costs of the action. 15 U.S.C. § 1117(a).

77.    Statutory damages pursuant to 15 U.S.C. § 1117(c) are also available instead of actual damages, with an available amount of not less than $1,000 and not more than $200,000 per occurrence, or not more than $2,000,000 for a willful infringement.

78.    In a claim for an intentional or knowing infringement pursuant to 15 U.S.C. §1114(1)(a), a court shall enter judgment for three times such profits or damages, whichever is greater, together with attorneys' fees.

79.    Finally, pursuant to 15 U.S.C. § 1117(d), a plaintiff may elect to recover, instead of actual damages and profits for a violation of 15 U.S.C. 1125(d)(1), an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name.

80.    In trademark cases, "[d]isgorgement of profits is a traditional remedy." *Cernelle v. Graminex, L.L.C.*, 437 F. Supp. 3d 574, 606 (E.D. Mich. 2020) (citing *Balance Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d 683, 695 (6th Cir. 2000)).

81.    Disgorgement of profits "is intended to compensate, not to punish." *Id.* (citing *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 487 F. Supp. 2d 861, 891 (E.D. Ky. 2007)).

82.  Disgorgement of profits is available in contempt proceedings, wherein the court may consider "the state of mind of the contemnor" in fashioning an appropriate sanction, even though willfulness was not an element of the underlying civil contempt. *Id.* at 606-07 (quoting *Gnesys, Inc. v. Greene*, 437 F.3d 482, 493 (6th Cir. 2005) (citing *Rogers v. Webster*, 776 F.2d 607, 612 (6th Cir. 1985))).

83.  The Sixth Circuit recognizes that an award of reasonable attorney's fees and expenses to a successful plaintiff in civil contempt proceedings may be appropriate. *TWM Mfg. Co., Inc. v. Dura Corp.*, 722 F.2d 1261, 1273 (6th Cir. 1983) (citation omitted); *see also McMahan & Co. v. Po Folks, Inc.*, 206 F.3d 627, 634 (6th Cir. 2000) ("[A]n award of attorney's fees is appropriate for civil contempt in situations where court orders have been violated.").

84.  Here, HOKC is entitled to disgorgement of Defendants' profits from their post-Agreed Permanent Injunction activity and for that total to be tripled. Specifically, HOKC should be awarded treble disgorgement of the $7,500 shown as the total amount collected by Defendants on their crunchbase.com crowdfunding website.[5] Further, the willfulness of Defendants' contempt compounds compensatory damages under the Lanham Act thus supporting treble damages.

85.  In addition, HOKC attempted to resolve Defendants' violations of the Agreed Permanent Injunction without court intervention. [Hr'g Ex. 4]. Because Defendants refused and continued to violate the Agreed Permanent Injunction,

---

[5] Wright claims that the $7,500 was "over reported." [Hr'g Tr. Vol. 1, 40:1-4; 43:10]. However, that claim is completely unsupported by documentation and is inconsistent with Wright's testimony regarding Defendants' other fundraising efforts. [*See* Hr'g Ex. 20, Def.'s Answer to Pl.'s Interrog. No. 4].

HOKC was forced to initiate these court proceedings.  [*See, e.g.*, Hr'g Tr. Vol. 2, 60:2-19].  HOKC should not be saddled with the legal expenses it incurred in an effort to secure Defendants' compliance with the Agreed Permanent Injunction. At a minimum, the Court should award HOKC its attorneys' fees spent through April 2023.  [*See* Hr'g Ex. 24].[6]

86.    Wright's defiant behavior and blatant refusal to honor the Agreed Permanent Injunction demonstrate that only an award of damages and attorneys' fees will deter him from future contempt of the Agreed Permanent Injunction.

87.    Because Wright's internet and social media activity posting since entry of the Agreed Permanent Injunction indicate that third parties have sponsored, enabled, or otherwise assisted in those activities, HOKC filed a new action naming "Unknown Defendants." [**DE  97**]. The new allegations of misconduct and the potential participation in those activities by new parties constitute grounds for permitting HOKC to proceed with the most recently filed Verified Complaint in addition to pursuing the instant motion for contempt for Wright's breach of the Agreed Permanent Injunction.

88.    Therefore, HOKC has adequately shown cause why an award of damages should be entered against Defendants for contempt, the newly filed Verified Complaint [**DE 97**] should not be dismissed and HOKC should be permitted to proceed with the claims asserted therein.

---

[6] Should the Court award HOKC its attorneys' fees, HOKC would request permission to submit an affidavit updating the attorneys' fees and expenses incurred by HOKC to date.

Respectfully submitted,

*/s/ Cornelius E. Coryell II*
Cornelius E. Coryell II
Julie Laemmle Watts
WYATT, TARRANT & COMBS, LLP
400 West Market Street, Suite 2000
Louisville, KY  40202
(502) 589-5235
ccoryell@wyattfirm.com
jwatts@wyattfirm.com

*Counsel for Plaintiff, the Honorable Order of Kentucky Colonels, Inc.*

### CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. I further certify that a true and correct copy of the foregoing has been served upon the following, via U.S. Mail and/or electronic mail, on the 28th day of June, 2023:

Globcal International
c/o Maya-Lis A. Wright
302 General Smith Drive
Richmond, KY 40475

Ecology Crossroads Cooperative Foundation, Inc.
c/o Maya-Lis A. Wright
302 General Smith Drive
Richmond, KY 40475

David J. Wright
302 General Smith Drive
Richmond, KY 40475
David.wright@globcal.net

*/s/ Cornelius E. Coryell II*
*Counsel for Plaintiff, the Honorable Order of Kentucky Colonels, Inc.*

101155999.2