# Exhibit C – Plaintiff's Requested Merger Proposal and Confidentiality Agreement (Previously Sealed)

**Description:** This exhibit contains email correspondence and attachments exchanged between Defendant Col. David J. Wright and Plaintiff's Executive Director, Col. Sherry Crose, in December 2019 and January 2020, including a signed Confidentiality Agreement and a full merger and sponsorship proposal. These communications were initiated at the Plaintiff's request and demonstrate:

- Plaintiff's acknowledgment of Defendant's long-standing public-facing program, "Kentucky Colonels International," and willingness to consider a merger;

- Good-faith intentions by Defendant to form a cooperative structure that would enhance the Plaintiff's mission and services;

- A signed Confidentiality Agreement executed by the Plaintiff, affirming the legitimacy of the discussions and restricting misuse or mischaracterization of the documents;

- Submission of a comprehensive Merger Proposal and Draft Agreement on January 13, 2020, which was later rejected by Plaintiff on January 20, 2020.

**Legal Significance in this Motion:** These documents were misrepresented by Plaintiff's counsel, Cornelius E. Coryell II, in initial pleadings [DE-1] and [DE-7], and **filed under seal** as an alleged "shakedown" and "extortion attempt." This false portrayal was knowingly made in bad faith and constitutes a **material misrepresentation** of the facts. The correspondence instead reflects strategic merger discussions that predate the filing of the lawsuit and contradict Plaintiff's sworn statements that Defendant "appeared suddenly" and "intended to confuse the public."

> Defendant is the original author and rightful owner of the Merger Proposal and related documents submitted as Exhibit C. The Plaintiff waived any confidentiality protections by submitting the proposal to the Court under seal as part of its initial filings, thereby making it a matter of record and mischaracterizing its content in sworn pleadings. Defendant now brings this exhibit forward in full to correct the record, refute false allegations of extortion or bad faith, and demonstrate the Plaintiff's intent to weaponize confidential business discussions as a predicate for retaliatory and malicious litigation.

This exhibit supports the Defendant's assertion that Plaintiff engaged in:

- Fraud upon the Court by concealing material facts;

- Abuse of legal process to retaliate against the Defendant after rejecting his proposal;

- Misuse of the sealing process to hide contradictory evidence from public scrutiny.

This evidence is pivotal to the Rule 11 Motion and corroborates Plaintiff's intentional misstatements to gain improper injunctive relief and gain tactical advantage in the early litigation phase.

3/5/25, 4:58 PM                              Gmail - Fwd: Confidentiality Agreement

                                                Kentucky Colonel <kycolonelcy@gmail.com>

---

## Fwd: Confidentiality Agreement

**David Wright** <david.wright@globcal.net>                    Wed, Mar 5, 2025 at 4:53 PM
To: "Kentucky Colonel (Officer)" <kycolonelcy@gmail.com>

---------- Forwarded message ---------
From: **Sherry Crose** <scrose@kycolonels.org>
Date: Mon, Jan 13, 2020 at 12:51 PM
Subject: Confidentiality Agreement
To: David Wright <david.wright@globcal.net>


Col. Wright, hope your Monday is going well as well.  Attached is the signed confidentiality
agreement.  As you are aware, the Board of Trustees will see the proposal and please know that
they have all signed confidentiality agreements associated with KY Colonels business.


Hope the rest of your day goes well.


Sherry Crose


Colonel Sherry Crose

Executive Director

Headquarters: 502-266-6114

Direct: 502-753-0779




        A 501(c)(3) charitable organization.

 **Kentucky Colonel <kycolonelcy@gmail.com>**

---

## Fwd: [possiblespam] Letter, Proposal Presentation and Merger Agreement

**David Wright** <david.wright@globcal.net>                      Wed, Mar 5, 2025 at 5:13 PM
To: "Kentucky Colonel (Officer)" <kycolonelcy@gmail.com>

---------- Forwarded message ---------
From: **Sherry Crose** <scrose@kycolonels.org>
Date: Mon, Jan 13, 2020 at 4:00 PM
Subject: RE: Letter, Proposal Presentation and Merger Agreement
To: David Wright <david.wright@globcal.net>

Thank you David.  I will review and move to the appropriate committee.  We appreciate the
hard work that has gone into this.

Sherry

Colonel Sherry Crose

Executive Director

Headquarters: 502-266-6114

Direct: 502-753-0779



<span style="color:blue">A 501(c)(3) charitable organization.</span>



3/5/25, 5:18 PM                    Gmail - Fwd: [possiblespam] Letter, Proposal Presentation and Merger Agreement

 Gmail                                    **Kentucky Colonel <kycolonelcy@gmail.com>**

---

## Fwd: [possiblespam] Letter, Proposal Presentation and Merger Agreement

**David Wright** <david.wright@globcal.net>                      Wed, Mar 5, 2025 at 5:17 PM
To: "Kentucky Colonel (Officer)" <kycolonelcy@gmail.com>

---------- Forwarded message ---------
From: **Sherry Crose** <scrose@kycolonels.org>
Date: Mon, Jan 20, 2020 at 8:16 AM
Subject: RE: Letter, Proposal Presentation and Merger Agreement
To: David Wright <david.wright@globcal.net>


Good Morning Colonel Wright, thank you for your text on Friday.  The Board of Trustees have
declined the proposal.


Sherry


Colonel Sherry Crose

Executive Director

Headquarters: 502-266-6114

Direct: 502-753-0779



 A 501(c)(3) charitable organization.

---

## CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement (the "Agreement") is entered into by and between **The Honorable Order of Kentucky Colonels, Inc** ("Receiving Party") and **Kentucky Colonels International** under **Globcal International** ("Disclosing Party") for the purpose of preventing the unauthorized disclosure of Confidential Information as defined below. The parties agree to enter into a confidential relationship with respect to the disclosure of certain proprietary and confidential information ("Confidential Information") beginning **December 31st, 2019.**

**1. Definition of Confidential Information.** For purposes of this Agreement, "Confidential Information" shall include all information or material that has or could have commercial value or other utility in the business in which Disclosing Party is engaged. If Confidential Information is in written form, the Disclosing Party shall label or stamp the materials with the word "Confidential" or some similar warning, unless understood by the Parties. If Confidential Information is transmitted orally, by telephone, or by text message the Disclosing Party shall promptly provide a writing indicating that such oral communication constitutes Confidential Information.

**2. Exclusions from Confidential Information.** Receiving Party's obligations under this Agreement do not extend to information that is: (a) publicly known at the time of disclosure or subsequently becomes publicly known through no fault of the Receiving Party; (b) discovered or created by the Receiving Party before disclosure by Disclosing Party; (c) learned by the Receiving Party through legitimate means other than from the Disclosing Party or Disclosing Party's representatives; or (d) is disclosed by Receiving Party with Disclosing Party's prior written approval.

**3. Obligations of Receiving Party.** Receiving Party shall hold and maintain the Confidential Information in strictest confidence for the sole and exclusive benefit of the Disclosing Party. Receiving Party shall carefully restrict access to Confidential Information to employees, contractors, and third parties as is reasonably required and shall require those persons to sign nondisclosure restrictions at least as protective as those in this Agreement. Receiving Party shall not, without prior written approval of Disclosing Party, use for Receiving Party's own benefit, publish, copy, or otherwise disclose to others, or permit the use by others for their benefit or to the detriment of Disclosing Party, any Confidential Information. Receiving Party shall return to Disclosing Party any and all records, notes, and other written, printed, or tangible materials in its possession pertaining to Confidential Information immediately if Disclosing Party requests it in writing.

**4. Time Periods.** The non-disclosure provisions of this Agreement shall survive the termination of this Agreement and Receiving Party's duty to hold Confidential Information in confidence shall remain in effect until the Confidential Information no longer qualifies as a

trade secret or until Disclosing Party sends Receiving Party written notice releasing Receiving Party from this Agreement, whichever occurs first.

**5. Relationships.** Nothing contained in this Agreement shall be deemed to constitute either party a partner, joint venturer or employee of the other party for any purpose.

**6. Severability.** If a court finds any provision of this Agreement invalid or unenforceable, the remainder of this Agreement shall be interpreted so as best to effect the intent of the parties.

**7. Integration.** This Agreement expresses the complete understanding of the parties with respect to the subject matter and supersedes all prior proposals, agreements, representations, and understandings. This Agreement may not be amended except in writing signed by both parties.

**8. Waiver.** The failure to exercise any right provided in this Agreement shall not be a waiver of prior or subsequent rights.

This Agreement and each party's obligations shall be binding on the representatives, assigns, and successors of such party. Each party has signed this Agreement through its authorized representative.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed, as of the date first written above, by their respective officers thereunto duly authorized.

Honorable Order of Kentucky Colonels, Inc.


*Sherry Crose*
_____
Sherry Crose, Executive Director


Globcal International for Kentucky Colonels International


*Col. David J. Wright*

_____
David J. Wright, Executive Director

Col. David J. Wright, Executive Director
Kentucky Colonels International
david.wright@globcal.net

January 13, 2020

Col. Sherry Crose, Executive Director
Honorable Order of Kentucky Colonels
sherry.crose@kycolonels.org

Merger and Sponsorship Proposal via Email (Confidential)

Greetings Col. Sherry Crose,

It is in our mutual interest as with all Kentucky Colonels in the spirit of "United We Stand, Divided We Fall", that we present our proposal as goodwill ambassadors of the Commonwealth of Kentucky.

Outside of Kentucky (internationally) the Commission of the Kentucky Colonel has great precedence and holds special legal significance, it is recognized globally; some colonels know this, diplomats know this, others would like to know more, and some simply do not care; but they would if they were to regard the meritory award of the honorable title as a genuine commission in higher esteem and understand it better. It is too often considered and referred to as a tongue-in-cheek award, (which it is not) so we believe it should be granted conservatively and should always be associated with a great achievement, a good deed, community service or a noteworthy life event that dignifies the Commonwealth.

We are interested to see a stronger nomination qualification process that requires a strong stated reason for nominations, this perhaps we should better address with the governor? I am certain could organize a petition signed by a few hundred or perhaps a thousand Kentucky Colonels that share our sentiments or it could be something that we can mutually agree upon if enjoined. We believe if it were more difficult you would get better nominations, it would also be a bigger deal to become a Kentucky Colonel.

We believe that by restricting the number of nominations to 12 per year or one per month, that you may also increase the number of overall nominations, engage more people in the nomination process to recognize others as Kentucky Colonels and also the quality of the nominations by requiring postal written or electronic 'long form' nominations. It might be a good idea to ask colonels to nominate at least one new Kentucky Colonel each year in addition to making an annual donation to the Good Works Fund in order to maintain their active status in good standing and to receive an annual membership card.

What our organization hopes to achieve with the Honorable Order of Kentucky Colonels is to introduce Kentucky Colonels to a special digital international membership services program and better connect them to the organization **(you or us)**, as best case examples of Kentucky Colonels serving international roles as Kentucky's goodwill ambassadors, which the commission denotes and is the only way to legally exercise or recognize the honorary award.

Before we contact Governor Beshear, take on private sponsors, raise further questions about HOKC membership, intend to compete, or proceed with our plans to contact the international media to continue the development of our program, we wish to present the attached written presentation and propose an amicable business merger.

The terms and details of the enclosed documents are negotiable and subject to discussion or modification prior to acceptance.

Sincerely yours,

Ambassador Col. David J. Wright
Globcal International
Kentucky Colonels International


**Enclosures Attached:**

Merger Presentation (Proposal)
Confidentiality Agreement
Draft Merger, Acquisition and Consolidation Agreement

Col. David J. Wright, Executive Director
Kentucky Colonels International
david.wright@globcal.net

January 13, 2020

Col. Sherry Crose, Executive Director
Honorable Order of Kentucky Colonels
sherry.crose@kycolonels.org

Merger and Sponsorship Proposal via Email (Confidential)

Greetings Col. Sherry Crose,

It is in our mutual interest as with all Kentucky Colonels in the spirit of "United We Stand, Divided We Fall", that we present our proposal as goodwill ambassadors of the Commonwealth of Kentucky.

Outside of Kentucky (internationally) the Commission of the Kentucky Colonel has great precedence and holds special legal significance, it is recognized globally; some colonels know this, diplomats know this, others would like to know more, and some simply do not care; but they would if they were to regard the meritory award of the honorable title as a genuine commission in higher esteem and understand it better. It is too often considered and referred to as a tongue-in-cheek award, (which it is not) so we believe it should be granted conservatively and should always be associated with a great achievement, a good deed, community service or a noteworthy life event that dignifies the Commonwealth.

We are interested to see a stronger nomination qualification process that requires a strong stated reason for nominations, this perhaps we should better address with the governor? I am certain could organize a petition signed by a few hundred or perhaps a thousand Kentucky Colonels that share our sentiments or it could be something that we can mutually agree upon if enjoined. We believe if it were more difficult you would get better nominations, it would also be a bigger deal to become a Kentucky Colonel.

We believe that by restricting the number of nominations to 12 per year or one per month, that you may also increase the number of overall nominations, engage more people in the nomination process to recognize others as Kentucky Colonels and also the quality of the nominations by requiring postal written or electronic 'long form' nominations. It might be a good idea to ask colonels to nominate at least one new Kentucky Colonel each year in addition to making an annual donation to the Good Works Fund in order to maintain their active status in good standing and to receive an annual membership card.

What our organization hopes to achieve with the Honorable Order of Kentucky Colonels is to introduce Kentucky Colonels to a special digital international membership services program and better connect them to the organization **(you or us)**, as best case examples of Kentucky Colonels serving international roles as Kentucky's goodwill ambassadors, which the commission denotes and is the only way to legally exercise or recognize the honorary award.

Before we contact Governor Beshear, take on private sponsors, raise further questions about HOKC membership, intend to compete, or proceed with our plans to contact the international media to continue the development of our program, we wish to present the attached written presentation and propose an amicable business merger.

The terms and details of the enclosed documents are negotiable and subject to discussion or modification prior to acceptance.

Sincerely yours,

Ambassador Col. David J. Wright
Globcal International
Kentucky Colonels International


**Enclosures Attached:**

Merger Presentation (Proposal)
Confidentiality Agreement
Draft Merger, Acquisition and Consolidation Agreement

## Presentation to Honorable Order of Kentucky Colonels, Inc.

Please take into consideration our chat on Facebook in addition to the following requested information which we are presenting as follows:

Our proposal of combining our efforts and allowing your organization to assume control over KCI involves a voluntary digital international membership program that can exist completely independent of all your other functions and ambitions as a charity. Your organization has a great diverse funding program now as it stands, so we would not want to upset or interfere with that in anyway; however there are many improvements that can be implemented which could help you raise much more public funding (from non-colonels) and discretionary contributions through the implementation of a **'genuine membership program'** which I believe should be seriously considered.

Please view our proposal carefully with sincerity, within several short years, it potentially represents $1,000,000 to $5,000,000 or perhaps more in additional income plus donations, which would not exist otherwise. It is a program that would pay for itself in less than one year, but no more than 18 months, if underwritten with your authority and under our co-management. This program will be voluntary and principly focus on living colonels, record their deeds, develop selected biographies and create a selective active community around some of the most noteworthy 'model colonels.' These records will be carried forward in the historical record for the colonels who register themselves and remain after their death. We should view this objectively, for now it would just be a small section of your website with a page or two of details and a sign-up form.

It is very obvious that some Kentucky Colonels take the honorary award in very high regard.

This program will provide its voluntary members with news about them, an electronic credential, a web-based title registry, create newsworthy events, develop fraternity, and promote social interaction among Kentucky Colonels as well as provide a smartphone based App that provides dozens of user options and member benefits.

The voluntary international member sub-organization would essentially exist 'online' autonomously using an application (App) based on your website's domain **[kycolonels.org]**. This is a service that members would pay for to access ($35-$100 one-time fee) and then subscribe to for an annual fee ($12/$60/$120) to utilize, depending on the services being provided. Understand that while we have developed the registration and user system access, we do not have an ongoing subscription service beyond the first year in the development phase of the Registry, whereas you do and may be willing to develop subscription services that have value to Kentucky Colonels, as each person is a potential user and donor. The alternative

is that we establish a special [international] domain which would be official enough, but never express full control or ownership by your organization as well as using your own domain name.

In addition to the initial one-time fee and the annual subscription, we want to see "active international members" both make an annual contribution to the Good Works Fund and nominate at least one person each year from their community that is not directly related as a family member or friend.

This suggested price can be adjusted from the $35 up-to $100 for first three years or as much as $10 per month depending on the services that are being offered through the App which are greatly variable, as I will explain. A three tier system exists for the variation in the quantity and types of digital services that can be offered to users.

If we can work out a deal with the Honorable Order of Kentucky Colonels we will focus only on settling from the potential gains of the program over the first 12-18 months and its complete formal development, after which your organization can be well-prepared enough to manage the continuing development and maintenance of the program.

I saw on the December 31 edition of PBS Newshour at the 45 minute mark, they were talking about how the computer-based 'App' will change how people give to charities in 2020, I would suggest that you watch it for yourself.

The "Registry" is the basis for the "App" in our case, it is the same App that all organizations will soon need, it is an open access point where Kentucky Colonels can access a file about themselves that indicates how long they have been colonels, shows a copy of their commission, would indicate their deed and also can show if they were 'active' within two years. The person's street address and other personal data is not recorded because it is not essential in the system, their cell phone becomes their point of contact with the installation of the App, however users can voluntarily enter and edit additional personal data, although they cannot alter the registered data. It will update their physical location based on the App's use and only Kentucky Colonels that register in the program will have access. Since this program is based on voluntary participation it is independent of your current databases and records, think about it as a 2nd tier program.

**IDaaS (Identity-as-a-Service)**, which our program is now based has been implemented by many major corporations, currently it is the best (most secure) way to create and develop membership benefits. There is a lot of value from the system that you already have in place which sends membership cards and mailings using the US Postal Service, which should continue to exist. Since programming a member with IDaaS is an accountable secure procedure, there is a cost involved that includes protecting the privacy of their actual email account which is hidden and replaced in the system with the IDaaS credential. Since it is

currently viewed as a practical bonus communication system, it is best to market it as a product, thus the introduction of the Registry where people want it to be well-known that they are Kentucky Colonels.

Only by viewing our development from various perspectives can you gain the insight that we have built in moderating and administering the Facebook groups. We understand clearly what colonels want and how highly the title is esteemed among so many of them.

The International App can have links and be branded to meet the needs of both your online store and the HOKC website in addition to the International Registry. IDaaS is an all-in-one solution that will soon take over how people communicate by the beginning of the next decade or sooner, since it is used mostly as a corporate tool it has many years to develop.

Once a Kentucky Colonel becomes a member of the Registry they are entitled access to the first level of the identity platform; this includes basic service access to a number of services including Google+, Google Groups, Google Classroom, Facebook Workplace, and their own Google Profile that could be provided by the HOKC. These are services that can be provided without charge or for the minimum cost subscription to all voluntarily registered "system users" and simply involves providing access to each member as international users.

The Cloud Services offered also allow protection of cellular devices, allow users to wipe their device if it is stolen, locate of Kentucky Colonels and much more, since it is a **5G state-of-the-art credential** that has been out for less than 3 years, the technology is only now being developed around its use.

There are many additional services that can be provided with IDaaS such as biographical websites about users that are professionally done and permanent current day records of Kentucky Colonels, these can be categorized geographically based on where they lived when they became a Kentucky Colonel or their current residence as a colonel. Each entry would provide a link back to **your website**. Each sub-organization or chapter that has developed such as Toronto, Philadelphia, Switzerland, Spain, Germany, Hong Kong, Austria and the United Kingdom would also be given a website subdomain such as **[toronto.kycolonels.org]** or **[philadelphia.kycolonels.org]**, meanwhile we could also cross-reference the actual state and country origins by their geographic location **[newjersey.kycolonels.org]** or **[serbia.kycolonels.org]** where colonels are currently less organized. We would suggest that each state and country where there are 10-25 or more active colonels have its own subdomain, this would also inspire more fraternal activity and social interaction resulting in the formation of chapters. All of these subdomains would be officially under your exclusive control, very easily and simply from there in Kentucky.

Members that want to be listed can have pages created for them to ensure editorial content, so Col. John Smith of New Jersey would be expressed as **[newjersey.kycolonels.org/john.smith]**, this is a service that can be provided for a suggested donation of $100-$250 for life with a $25 editing fee to update or modify their established page, time per page development (15-45 minutes).

Additional services can be provided by your social media department, we suggest 1 or 2 people that know essentially what to do, are trainable and familiar with different platforms like Instagram, Facebook, WhatsApp, Twitter, LinkedIn, and capable of providing insightful highlights and support across platforms. Group administrators can now message members directly on Facebook and through the App.

The union of the HOKC and KCI can be as simple as your organization joining our international endeavor, Globcal International, by assigning an ambassador (special envoy) to easily and rapidly facilitate technology transfer and adoption, perhaps Heather Campell or someone else that can handle public relations well, engage me as your consultant for 12-18 months, and negotiate a fair-price for our technological project development under a simple consideration or merger agreement that we have prepared.

It is clear that there are differences in the type of content that is important to many Kentucky Colonels and the image projected by the Honorable Order of Kentucky Colonels as a "charity." We also understand that as a non-profit charity your organization is **not a "real membership" organization** despite providing membership cards, because it does not provide members voting rights or powers normally granted to organization members; moreover it is **clearly stated in your 'Restated and Amended Articles of Incorporation' from 1992 that you "have no members."** As we understand getting a membership card and annual mailings is based on your donors making a minimum annual donation, incorporating our membership organization is a good way to identify and acknowledge the "most active donors" in a genuine way that want to be more functional without creating any confusion or permitting them to have influence over your current operations.

I am very confident that with your support our program could add one to five million dollars or perhaps more within several short years to enhance 'your' annual budget, through the inclusion of our Registry and International Concept. It would also advance your organization significantly in general by becoming more digitally adept. The product is strictly digital, so depending on the number of subscribers the higher the gain will become at lower cost which is only 6-12% of the income it would generate including the overhead.

Your organization simply continues under this proposal, providing the same services that it always has, our organization will be consumed to become a program of your own. Endorse and support this project by engaging me as a full-time (30-35 weekly hours) social media

development consultant, while advancing $100K for the groups, pages, digital assets, the incomplete functional application, international concept, and the registry. The cost of 6-12% will be realized once 3,000 colonels are registered in the program, perhaps sooner if the price is raised. A system like this and its implementation could cost $350K-$650K to engineer, develop, and launch if you were starting from scratch, we already have the program underway and semi-operational, within 45-60 days it can emerge with your own branding with your underwriting.

We would expect as many as 15,000-20,000 of the 150,000+ Kentucky Colonels will potentially participate in this project over the next 2-5 years if it were promoted by HOKC, nearly 20% of the registrants will make an additional contributions to post single page biographies in addition to their roster entry and registry record.

Under our international concept you could also seek some sponsored advertising marketing for products like travel insurance, offer discounts on travel as well as other products or services that cannot be offered elsewhere, perhaps tax-exempted bourbon, you might want to start an online duty-free shop for non-state residents (internationals), which would allow you to ship tax-free products to all non-state residents without any additional burden on your current staff size. Inside Kentucky, you could take your coupon code concept to the next level, engaging thousands of visitors that were invited to the state by your goodwill ambassador corps and stretch the program to neighboring states, travel centers and state visitor information centers.

Tourism in Kentucky is currently worth more than 15 billion dollars per year, the development of our program, headed by your organization, could both boost this number and bring new income sources from those who participate through the HOKC. Alone this tourism aspect of our program would bring an additional 3-10 million to HOKC in annual income within three years, it is also an excellent way to better engage Kentucky Colonels with their official capacity as the **state's goodwill ambassadors**.

The IDaaS system is very integral and extremely secure, it could be used for a wide range of paid and unpaid services, all resulting in significantly higher donations and closer contact with colonels that voluntarily engage themselves in a secure way under your guidelines.

The system with the registry allows you to geo-locate colonels all over the world, send them instant messages, send birthday greetings, for those who want you to know who and where they are, which is **most of them**. The product as an App can be transparently improved, modified, upgraded and have different access levels, disconnect problem users, however, as a user based system and an identity based information service, you should not expect any complaints or problem users.

We have had registrants that are not even on Facebook, **we understand that you are probably the only way to verify who is or who is not a Kentucky Colonel**, so we added your ID number as one of the registration fields to our program already, just like the governor's office did several years ago for their nomination form. Despite this, the project has become overwhelming for us to do without your support, the support of a corporate sponsor or we will need to base it on an honor system to continue, which we prefer not to do as it may compromise the integrity of the system.

Before we get too far along with this, we would like to see how practical it would be to offer IDaaS as a service of your website **[kycolonels.org]** rather than with our international domain, so those who are colonels can identify with you instead of us, if we work out a merger.

Now it is just a matter of convincing you of the additional benefits, the actual costs, perhaps negotiating and justifying it by proving its sustainability. We want you to join in as the co-founder on this project, or for the Honorable Order of Kentucky Colonels to designate an ambassador for your international members in our organization.

Becoming a Goodwill Ambassador for the United Nations Sustainable Development Goals and developing a decentralized international network of ambassadors were both developed with Globcal International and is in-fact the ideal behind what we have done with the goodwill ambassador concept, many of us are **professional international diplomats, several are United Nations Association executive officers and more than ten were Kentucky Colonels**. There are a lot of organizations out there that tout the use of Goodwill Ambassadors, our organization and the United Nations are very obviously the most advanced in the area.

In our current international concept with KCI, which we began to develop last year, we call chapter heads 'chancellors on a diplomatic mission'.They are designated and selected by the 'Commissioners', or in your case, by the 'Generals' for each country to administer international chapter meetings with specially designated diplomatic honors and a leadership award for being selected.

Each year under our system the chapter members elect a new chapter administrative chief, which is recognized by the Commissioners or Generals, and this person is responsible for collecting donations, holding monthly or quarterly meetings, scheduling events and executing local projects. Establishing chapters would enlace each sub-organization further with the main headquarters reinforced through Kentucky Colonels International Program. Each chapter then pays an annual donation to maintain it in active chapter status, this could be dues or a minimum branch donation based on chapter size. The administrative chief serves for a year, turns in the donations collected and cannot be re-elected for more than two consecutive terms. There is a manual on the operation of each chapter based on their constitutions, which can

also be aided with special forms and official bylaws, independent from you own, but registered under your authority.

The current Toronto formation is one of several we see as exemplary, several current formations follow that style and have adopted the formal uniform, thanks to Col. Lauten and the uniform he developed and is produced in Pakistan. We also view the Philadelphia group as well-presented, so we would want to develop a chapter manual that does not emulate a military ideal, the group in the UK calls itself a Brigade and emulates Civil War ideals, perhaps being part of an HOKC International Program could standardize their presentation and range of activities as a group to send more international visitors to Kentucky.

The international program will also have a focus on the development of unique news content fit for use by the national and local media focused on new colonels, their deeds, chapter activities and ongoing activities as international goodwill ambassadors.

News articles are something we have seen decline significantly since 2016, prior to this date there were weekly articles about Kentucky Colonels across the US. With your assistance there could be at least 3-5 nationally recognized articles about newly appointed Kentucky Colonels.

IDaaS is something of great added value for members that has many features, as we have found there are many ways to present it and incorporate its use in an organization such as yours. So in essence, our product is the Registry, to get IDaaS (ID Key), to access the Registry, the App, special websites, and special training services for goodwill ambassadors. Using IDaaS, any number (perhaps 100's) of other things from books and music to videos can also be made available through YouTube or Drive accounts that can only be viewed by the registered subscribers.

The project would also create a significant amount of new content (shareable social media) about Kentucky Colonels of a newsworthy sort. There are a number of ways this could be done with a high degree of control and your ultimate editorial decisions. We have found that members have some very interesting stories by which they became Kentucky Colonels that, if handled well, would provide great news content.

This is also a good time to become involved in publishing community based news content because newspapers like the Courier-Journal and Lexington-Herald Leader are operating with less reporters on staff every year since 2000, now down 50% more in the last 10 years many community based newspapers and articles about small town America are disappearing. Colonels like to see news about them and other Kentucky Colonels even if they have to pay for it.

All of this is much more than I had first imagined, to operate it transparently it needs to be operated under corporate sponsors, we can propose a number of other options in its development so it is an online product, that you can essentially offer at a premium. So we propose KCI would conveniently become a Google Cloud Based Digital Web Service and program of HOKC, all under your control of course, it would have an App and detailed website based support section at **[app.kycolonels.org]**.

The Facebook Page and Groups were created in 2007-2009 before your organization appeared on Facebook, you probably also know that we were also on the Internet before your organization starting in 1998, after having read my article in October 2019.Your organization's first contact with us under Col. Glen Bastin was in 2000 or 2001, we had 104 members. When Facebook started in 2006 the first group began which I joined and was selected in 2010 as an administrator, then another group was developed by another Kentucky Colonel from Berea who was coincidentally part of our original program which I also joined, then our page was developed in 2009. I was contacted by an attorney representing HOKC again in 2014 or 2015, who insisted we make conspicuous disclaimers in the group descriptions and designate them using the word "International" in our group name instead of just Kentucky Colonels, we obliged as not to create confusion with your organization, something we understood would be reciprocal.

Fortunately someone described the ideal of Kentucky Colonel very well on Wikipedia in August of 2004, which refers to your organization primarily and others secondarily, despite your emergence in the social media very late in December 2014.

We know that there are many Kentucky colonels that actually performed great deeds some of which are very impressive and many have really good stories to tell about becoming a colonel and what being a colonel has meant to them since they became one, these stories deserve and should be treated well as noteworthy individual events.

As specified in the cover letter, I have attached a Confidentiality Agreement, a Merger and Acquisition Agreement and will additionally prepare a Disclosure Schedule and Contractor Agreement based on a formalization of our business or on the presentation content of this letter "Merger and Sponsorship Proposal" and negotiated reply of the HOKC.


Sincerely,

Col. David J. Wright

Col. David J. Wright

## DRAFT MERGER, ACQUISITION AND CONSOLIDATION AGREEMENT

This AGREEMENT AND PLAN OF MERGER, ACQUISITION AND CONSOLIDATION (this "Agreement") is made and entered into as of January 13, 2020, among **KENTUCKY COLONELS INTERNATIONAL (KCI)** an unincorporated non-governmental international civil society organization (the "Subject") belonging to GLOBCAL INTERNATIONAL (the "Former Parent") and its MEMBERS, by the **HONORABLE ORDER OF KENTUCKY COLONELS, INC. (HOKC)**, a Kentucky corporation (the "Parent").

WHEREAS, the Parent and Subject intend to effect a merger (the "Merger") of Subject, its concepts, ideals, members, programs, projects relative to membership services, technology, Internet, public relations, and social media with and into the Parent in accordance with this Merger Plan and Agreement under International Private Law, with the Parent to be the surviving corporation of the Merger (the "Surviving Corporation"), and that the Subject's assets and interests be converted into the right to receive cash in an amount equal to a maximum of $250,000.00 USD, but not less than a minimum of $150,000.00 USD (the "Merger Consideration"), on the terms and subject to the conditions set forth herein during the course of the calendar years of 2020-2021;

WHEREAS, the Board of Trustees of the Parent (the "Parent Board") has (i) determined that the Merger is fair to, and in the best interests of the Parent, (ii) approved and declared advisable this Agreement and the transactions contemplated by this Agreement, including the Merger (collectively, the "Transactions"), and (iii) resolved to recommend that the Parent's Trustees adopt this Agreement;

WHEREAS, the Boards and Interest Parties of Parent and Subject have approved and declared advisable this Agreement and the Merger; and

WHEREAS, concurrently with the execution and delivery of this Agreement, and as a material inducement to Parent's willingness to enter into this Agreement, only certain employees of the Subject are executing and delivering to Parent a Private Contractor Consultation Agreement substantially in the form attached hereto as Exhibit A (the "Contractor Agreement").

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, Parent and Subject hereby agree as follows:

**DEFINITIONS**

Definitions. For purposes of this Agreement:

**"Acquisition Proposal"** means any inquiry, proposal, offer or indication of interest (whether or not in writing) for or relating to (in one transaction or a series of related transactions) any of the following (other than the Transactions): (i) any direct or indirect acquisition or purchase (including by any license or lease) by any Third Party

**"Action"** means any and all litigation, suits, actions, hearings (other than ex parte hearings not involving a party), proceedings, arbitrations and mediations by or before, or otherwise involving, any Governmental Authority.

**"affiliate"** of a specified person means a person who, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified person.

**"Agreement Intellectual Property"** means any and all Intellectual Property Rights that are owned by (solely or jointly), or exclusively licensed to, the Parties (or that the Parties claims or purports to own).

**"business day"** means any day other than a Saturday, Sunday and any day which is a legal holiday under the Laws of the State of Kentucky, or is a day on which banking institutions located in the State of Kentucky are authorized or required by Law or other governmental action to close.

**"Claim"** means any and all allegations, claims, demands and causes of action.

**"Products"** means all services and products of the Merger.

**"Contract"** means any contract, agreement, indenture, deed of trust, license, note, bond, loan instrument, mortgage, lease, purchase or sales order, guarantee and any similar legally binding undertaking, commitment, pledge or understanding or arrangement, whether written, oral, express or implied.

**"control"** (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise.

**"Copyrights"** means any and all U.S. and foreign copyrights, mask works and all other rights with respect to Creative Works of Authorship and all registrations thereof and applications therefor (including moral and economic rights, however denominated).

**"Current Government Contract"** means any Government Contract that has not yet expired or terminated, or for which final payment has not been received.

**"Intellectual Property"** means any and all (i) technology, formulae, algorithms, procedures, processes, methods, techniques, knowhow, ideas, creations, inventions, discoveries and improvements (whether patentable or unpatentable and whether or not reduced to practice), (ii) technical, engineering, manufacturing, product, marketing, servicing, financial, supplier, personnel and other information and materials, (iii) customer, vendor and distributor lists, contact and registration information and correspondence, (iv) specifications, designs, models, devices, prototypes, schematics and development tools, (v) Software, websites, content, images, graphics, text, photographs, artwork, audiovisual works, sound recordings, graphs, drawings, reports, analyses, writings, designs, mask works and other works of authorship and copyrightable subject matter ("Works of Authorship"), (vi) databases and other compilations and collections of data or information ("Databases"), (vii) trademarks, service marks, logos and design marks, trade dress, trade names, fictitious and other business names, and brand names, together with all goodwill associated with any of the foregoing ("Trademarks"), (viii) domain names, uniform resource locators and other names and locators associated with the Internet ("Domain Names"), (ix) information and materials not generally known to the public, including trade secrets and other confidential and proprietary information ("Trade Secrets"), and (x) tangible embodiments of any of the foregoing, in any form or media whether or not specifically listed herein.

**"Intellectual Property Rights"** means any and all rights (anywhere in the world, whether statutory, common law or otherwise) relating to, arising from, or associated with Intellectual Property, including (i) Patents, (ii) Copyrights, (iii) other rights with respect to Software, including registrations thereof and applications therefor, (iv) industrial design rights and registrations thereof and applications therefor, (v) rights with respect to Trademarks, and all registrations thereof and applications therefor, (vi) rights with respect to Domain Names, including registrations thereof and applications therefor, (vii) rights with respect to Trade Secrets, including rights to limit the use or disclosure thereof by any Person, (viii) rights with respect to Databases, including registrations thereof and applications therefor, (ix) publicity and privacy rights, including all rights with respect to use of a Person's name, signature, likeness, image, photograph, voice, identity, personality, and biographical and personal information and materials, and (x) any rights equivalent or similar to any of the foregoing.

**"Interest Parties"** means all international parties under the jurisdiction and control of the Subject, including members, officers, commissioners and donors.

**"Law"** means any U.S. or non-U.S. law (statutory, common or otherwise), including any constitution, statute, convention, ordinance, regulation, rule, code or executive order of a Governmental Authority.

**"Material Adverse Effect"** means any event, condition, circumstance, development, state of facts, change or effect that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on, (x) the business, condition (financial or otherwise), or results of operations of the Company and the Company Subsidiaries, taken as a whole, or (y) the Company's ability to timely consummate the Merger and the other Transactions in accordance with the terms of this Agreement or to perform any of its obligations under this Agreement; provided, however, that with respect to clause (x) above, no event, condition, circumstance, development, state of facts, change or effect (by itself or when aggregated with any and all other events, conditions, circumstances, developments, states of facts, changes and effects) to the extent arising out of or resulting from any of the following shall be taken into account in determining whether a "Material Adverse Effect" has occurred or may or would occur: (i) conditions (or changes after the date hereof in such conditions) in the industry in which the Parent and the Parent's Subsidiaries operate; (ii) general economic conditions (or changes after the date hereof in such conditions) in the U.S. or any other country in the world; (iii) conditions (or changes after the date hereof in such conditions) in the securities markets, credit markets, currency markets or other financial markets in the U.S. or any other country in the world; (iv) political conditions (or changes after the date hereof in such conditions) in the U.S. or any other country in the world, or acts of war, sabotage or terrorism (including any escalation or general worsening of any such acts of war, sabotage or terrorism) in the U.S. or any other country in the world; (v) acts of God, natural disasters, weather conditions or other calamities occurring after the date hereof; (vi) the announcement or pendency of this Agreement, including, to the extent arising out of or resulting therefrom, (A) the termination or potential termination (or the failure or potential failure to renew or enter into) Contracts with actual or potential customers, suppliers, distributors, resellers, licensors or other business partners, or any other negative development (or potential negative development) in the relationship of the Company or any Company Subsidiaries with any of their respective customers, suppliers, distributors, resellers, licensors or other business partners, (B) the loss or departure of any officers or other employees of the Company or any Company Subsidiaries, or (C) any decline or other degradation in the Company's or any Company Subsidiary's customer bookings; (vii) the taking of any action required by this Agreement, or the failure to take any action to which Parent has approved or consented in writing or otherwise requested in writing; (viii) the failure to take any action specifically prohibited by Section 5.1, (ix) changes after the date hereof in Law or other legal or regulatory conditions (or the interpretation thereof) or changes after the date hereof in GAAP or other accounting standards (or the interpretation thereof), (x) changes in the Company's stock price or the trading volume of the Company's stock (but not, in each case, the underlying cause of any such changes unless such underlying cause would otherwise be excepted from this definition), (xi) any failure by the Company to meet any analysts' estimates or projections of the Company's revenue, earnings or other financial performance or results of operations, or any failure by the Company to meet any internal budgets, plans or forecasts of its revenues, earnings or other financial performance or

results of operations (but not, in each case, the underlying cause of such failures unless such underlying cause would otherwise be excepted from this definition), and (xii) any Actions made or brought by any of the current or former stockholders of the Company (on their own behalf or on behalf of the Company, but in any event only in their capacities as current or former stockholders) against the Company or any of its directors or officers arising out of this Agreement, the Merger or any other Transactions; provided, however that the exceptions set forth in clauses (i), (ii), (iii), (iv), (v) and (ix) of the foregoing proviso shall not apply solely to the extent that the Company and the Company Subsidiaries are disproportionately affected thereby relative to other companies of comparable size in the same industries and geographies in which the Company and the Company Subsidiaries operate.

**"Open Source"** means Software or similar subject matter that is generally available in source code form and that is distributed under a license which, by its terms, (i) does not prohibit licensees of such Software from licensing or otherwise distributing such Software in source code form, (ii) does not prohibit licensees of such Software from making modifications thereof, and (iii) does not require a royalty or other payment for the licensing or other distribution, or modification, of such Software (other than a reasonable charge to compensate the provider for the cost of providing a copy thereof). Open Source Software includes Software distributed under such licenses as the GNU General Public License, GNU Lesser General Public License, New BSD License, MIT License, Common Public License and other licenses approved as Open Source licenses under the Open Source Definition of the Open Source Initiative.

**"Order"** means any injunction, writ. judgment, decree, determination, ruling or other order of a Governmental Authority.

**"Parties"** means Parent and Subject organizations, and my include any other affiliates involved in this Agreement..

**"Patents"** means any and all U.S. and foreign patent rights, including, without limitation, all (i) patents, (ii) pending patent applications, including all provisional applications, substitutions, continuations, continuations-in-part, divisions, renewals and all patents granted thereon, (iii) all patents-of-addition, reissues, reexaminations, confirmations, re-registrations, invalidations, and extensions or restorations by existing or future extension or restoration mechanisms, including supplementary protection certificates or the equivalent thereof, and (iv) all foreign counterparts of any of the foregoing.

**"Person or person"** means an individual, corporation, partnership, limited partnership, limited liability company, syndicate, person (including a "person" as defined in Section 13(d)(3) of the Exchange Act), trust, association or entity or government, political subdivision, agency or instrumentality of a government.

**"Registered Intellectual Property"** means all Patents, registered Trademarks, applications to register Trademarks, registered Copyrights, applications to register Copyrights, and Domain Names that are registered, recorded, or filed by, for, under authorization from, or in the name of (or assigned to) the Parent or any Parent's Subsidiary.

**"Representative"** means, in respect of any person, the directors, officers, employees, authorized agents (including financial and legal advisors) and other authorized representatives of such person or corporation.

**"Required Vote"** means the affirmative vote of the holders of a majority of the Trustees in favor of the adoption of this Agreement.

**"software"** means all (i) computer programs and other software, including software implementations of algorithms, models and methodologies, whether in source code, object code or other form, including libraries, subroutines and other components thereof, (ii) computerized databases and other computerized compilations and collections of data or information, including all data and information included in such databases, compilations or collections, (iii) screens, user interfaces, command structures, report formats, templates, menus, buttons and icons, (iv) descriptions, flow-charts, architectures, development tools and other materials used to design, plan, organize and develop any of the foregoing, and (v) all documentation, including development, diagnostic, support, user and training documentation, related to any of the foregoing.

## 1. THE MERGER

**1.1 The Merger.** Upon the terms and subject to the conditions set forth, at the Effective Time, Subject shall be merged with and into the Parent. As a result of the Merger, the independent unincorporated organizational existence of Subject shall cease and the Parent shall continue as the Surviving Corporation.

**1.2 Effective Time; Closing.** The closing of the Merger (the "Closing") will take place as promptly as practicable, but no later than two (2) business days, following the satisfaction or, if permissible, waiver of the conditions set forth, in Kentucky, at such place as the parties shall agree. The date upon which the Closing occurs is herein referred to as the "Closing Date." On the Closing Date, the parties shall cause the Merger to be consummated by notarizing a certificate (the "Certificate of Merger"), in such form as is required by the Parties, and executed in accordance with the relevant provisions of Kentucky Revised Statutes (the date and time of such filing, or such later time as shall be agreed by Parent and specified in such filing, being the "Effective Time").

**1.3 Effect of the Merger.** At the Effective Time, the effect of the Merger shall be as provided in the applicable provisions of this Agreement. Without limiting the generality of the foregoing, and subject thereto, at the Effective Time, all the property, rights, privileges, powers and franchises of the Subject shall vest in the Surviving Corporation under the agreed terms.

**1.4 Articles of Incorporation; Bylaws.**

(a) At the Effective Time, subject to the provisions of this agreement, the Articles of Incorporation of the Surviving Corporation shall be amended and restated to conform to Merger of the Subject, or the Surviving Corporation shall make plans to amend their certificate to include the Subject, as in effect on the Effective Time until thereafter amended as provided by Law; provided that Article I of the Articles of Incorporation of the Surviving Corporation shall read as follows: "The name of the corporation is "The Honorable Order of Kentucky Colonels International, Inc." The modification of the Parent name shall have no bearing on its original name nor shall it be required to be used.

(b) At the Effective Time, subject to the provisions of the Agreement, the Bylaws of the Surviving Corporation shall be amended and restated to conform to the Bylaws of Subject as in effect immediately prior to the Effective Time until thereafter amended as provided by Law, the Articles of Incorporation of the Surviving Corporation and such Bylaws.

**1.5 Directors and Officers.** The directors of Subject immediately prior to the Effective Time shall come to serve as professional consultant(s) and volunteers for the Surviving Corporation, each to hold rights to office in accordance with the Articles of Incorporation and Bylaws of the Surviving Corporation and, except as determined by Parent or Subject prior to the Effective Time. The Officers, Directors, Administrators and Moderators ("Interest Parties") except the General Members of the Subject will be recognized by the Parent as its International Goodwill Ambassadors with an official letter drafted by the Subject recognizing them that is signed by the Executive Director and one Trustee 'General' of the Parent. The Subject Interest Parties will collaborate in the best interest of the Surviving Corporation under its sole authority in accordance with this Agreement.

**1.6 Conversion.** At the Effective Time, by virtue of the Merger and without any action on the part of Subject, the Parent shall:

(a) Assign an designated representative from the Parent organization as a founding member of the Subject organization's 'Former Parent' for life, the Parent organization will pay the one-time membership patronage of $5,000.00 via PayPal to have their representative assigned as a Goodwill Ambassador for Globcal International.

(b) Execute a notice of funds held in Parent treasury to the Subject evidenced with a letter welcoming the Proposal and Agreement, the signed Agreement, and the delivery of a cashier's check for $100,000.00 USD to the Interest Parties' designated Ambassador who is a Kentucky Resident and known as Globcal International's Treasurer, Col. Nicholas A. Wright, who will be responsible for its distribution and reinvestment within Kentucky under the direction of Globcal International.

(c) Engage Col. David J. Wright, the Executive Officer of the Subject as an independent contractor, technology developer, and professional social media consultant for a period of 12-18 months under the terms of the attached Contractor Agreement with a weekly salary paid in advance each week of $500.00 USD via PayPal.

(d) Provide an international development fund for the Merger, Acquisition and Consolidation membership products and services under its authority for the ongoing development of information communications technology (ICT), Internet or website enhancements and social media advertising of $2,500 per month via PayPal.

**1.7 Assignment and Delivery.** At the Effective Time, by virtue of the Merger and without any action on the part of Parent, the Subject shall:

(a) Deliver directly to Parent's designated 'Goodwill Ambassador' one-on-one exclusive training, assign them as the figurehead of the Subject and provide cooperative administrative access privileges over the Subject organization, ICT, and its social media assets.

(b) Work in cooperation with the Parent designated Goodwill Ambassador to rebrand and reform the Subject organization and membership product into a program that belongs to the Parent organization.

(c) Provide leadership and management of the further development of the Subject as a subsidiary part of the Parent or (Surviving Corporation).

(d) Direct all funds to the Parent for all existing programs at the Effective Time and edit all published and unpublished website details, social media groups, pages, and applications to resolve to the Parent within 60 days following a joint press release based on a Globcal International blog article circulated to the newspapers of Kentucky.

(e) Provide full-time technical support, copyright and authorship of all software, creative works, manuals, handbooks, white papers, intellectual property, and documents for the Subject as an 'International Program' of the Parent, including continuing development of the Subject program components and concepts involving the registry, credentials, goodwill ambassadors, Kentucky tourism, membership program formation, fundraising, promoting statewide economic

development and garnering media exposure internationally for the Parent and the prosperity of the Commonwealth of Kentucky for a period of 12-18 months or until the program is considered successful or autonomous.

## 2. REPRESENTATIONS AND WARRANTIES

Parent and Subject hereby, jointly and severally, represent and warrant to the Parent that except as disclosed in a document of even date herewith delivered by the Parent or Subject organizations prior to the execution and delivery of this Agreement and referring by section or subsection number to the representations and warranties in this Agreement (the "Disclosure Schedule") (provided, however, that any such disclosure shall qualify only the disclosure under the section or subsection number referred to in the Disclosure Schedule and any other section or subsection of the Disclosure Schedule to the extent that it is reasonably apparent on its face, that such disclosure should also qualify such other section or subsection), the Signatory Parties hereby represent and warrant to Parent and Subject as follows:

### 2.1 Organization, Authority and Qualification.

(a) The Parent is a corporation duly organized, validly existing and in good standing under the Laws of the Commonwealth of Kentucky and has the requisite corporate power and authority to own, lease and operate all of its properties and assets and to carry on its business as it is now being conducted. The Parent is duly qualified or licensed as a foreign corporation to do business, and is in good standing, in each jurisdiction where the character of the properties owned, leased or operated by it or the nature of its business makes such qualification or licensing necessary, except where the failure to be so duly qualified or licensed and in good standing would not have, individually or in the aggregate, a Material Adverse Effect on this Agreement.

(b) The Subject is duly organized, validly existing in good standing under International Private Law and Admiralty Law as an International Civil Society Organization (iCSO) of Globcal International and has the requisite authority to dissolve its current formation as a program under the proposed international program development plan to become merged with the Parent or Surviving Corporation. The Subject is duly qualified or licensed to do business, and its officers are in good standing in each jurisdiction where the character of the intellectual property owned, leased or operated by it or the nature of its business makes such qualification or licensing necessary, except where the failure to be so duly qualified or licensed and in good standing would not have, individually or in the aggregate, a Material Adverse Effect on this Agreement.

(c) The Subject warrants that there are no outstanding or assumed debts, liabilities or obligations brought to the Merger other than those created by the Merger itself as defined in Section 1.6 of this Agreement.

**2.2 Execution, Jurisdiction and Time.**

(a) The execution and delivery of this Agreement by Parent and Subject do not, and the performance of this Agreement by Parent and Subject will not, require any consent, approval, authorization or permit of, or filing with, or notification to, any Governmental Authority, except for applicable requirements, if any, the filing and recordation of the Agreement pursuant to Kentucky Law by a Notary Public, and the United States where the failure to obtain such consents, approvals, authorizations or permits, or to make such filings or notifications, individually or in the aggregate, would not prevent or materially delay consummation of the Transactions or otherwise prevent Parent or Subject from performing their material obligations under this Agreement.

(b) There is no Action pending and to the knowledge of Parent or Subject, (i) no inquiry or investigation by any Governmental Authority pending and (ii) no Action, inquiry or investigation by any Governmental Authority threatened in writing against Parent, any subsidiary of Parent, or any property or asset of Parent, or any subsidiary of Parent, that, individually or in the aggregate, is reasonably likely to prevent the consummation of any Transaction or otherwise prevent Parent or Subject from performing their material obligations under this Agreement or seeks to materially delay or prevent the consummation of the Merger and the other Transactions. Neither Parent nor any subsidiary of Parent nor any property or assets of Parent or any subsidiary of Parent is subject to any settlement agreement or similar written agreement with, any Governmental Authority, or any Order of any Governmental Authority that is reasonably likely to prevent consummation of the Merger or otherwise prevent Parent or Subject from performing their material obligations under this Agreement.

(c) No agent, broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission payable by the Parent in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Parent or Subject.

**2.3 Financing**. Parent currently has, and at the Effective Time, Parent will have the funds necessary to satisfy all of Parent's and Subject's obligations under this Agreement, including to pay the aggregate Merger Consideration, to pay all amounts payable pursuant to Section 1.6 and to pay all fees and expenses in connection therewith. Parent's and Subject's obligations hereunder are not subject to a condition regarding Parent's or Subject's obtaining of funds to consummate the Merger and the other Transactions.

**2.4 Vote Required.** No vote of the Members of Subject or the Parent is necessary to approve this Agreement and the Transactions unless required by the Bylaws..

## 3. ADDITIONAL AGREEMENTS

**3.1 Access to Information; Confidentiality.**

(a) From the date hereof until the earlier to occur of the Effective Time and the termination of this Agreement in accordance with its terms, the Parties shall, and shall cause the Parties, auditors and agents of the Parent and the Parent Subsidiaries to, afford the Representatives of Parent and Subject reasonable access during normal working hours upon reasonable advance notice to the officers, employees, agents, assets, properties, offices, plants and other facilities, books and records of the Parent and each Parent Subsidiary and shall furnish Parent and Subject with such financial, operating and other data and information (including the work papers of the Parent's accountants, subject to the prior consent of such accountants, which consent the Parent shall use its reasonable best efforts to obtain as soon as practicable) as Parent or Subject, through their Representatives, may reasonably request, as long as these actions are in compliance with all applicable data privacy/protection Laws; provided, however, that the Subject may restrict or otherwise prohibit access to any documents or information to the extent that (i) any applicable Laws (including any Laws relating to security clearances) requires the Parent to restrict or otherwise prohibit access to such documents or information, including any Laws with respect to a Contract with a Governmental Authority to which the Parent or any of the Parent's Subsidiaries is a party that restricts access without an appropriate security clearance (except to the extent that personnel at Parent or its Representatives has the appropriate security clearance required), (ii) access by Parent or its Representatives to such documents or information would give rise to a material risk (based on the advice of the Parent's outside counsel and after giving due consideration of the existence of any common interest, joint defense or similar agreement between the parties) of waiving any attorney-client privilege, work product doctrine or other applicable privilege applicable to such documents or information, or (iii) access to a Contract to which the Parent or any Parent Subsidiary is a party or otherwise bound would violate or cause a default under, or give a Third Party the right to terminate or accelerate the rights under such Contract; provided further, however, that in the event that the Parent does not provide access or information in reliance on the preceding proviso, the Parent and use its reasonable best efforts to, as promptly as practicable, as the case may be, Subject obtain any necessary clearance or consent in order to permit such access or disclosure and provide such access or communicate such information to Parent (including through its Representatives) in a way that would not violate the applicable Law or Contract or waive any such a privilege. Any investigation conducted pursuant to the access contemplated by this Section 3.1 shall be conducted in a manner that does not unreasonably interfere with the conduct of the business of the Parent and the Parent's Subsidiaries or damage or destroy any property or assets of the Parent or any of the Parent's

Subsidiaries. Any access to the properties and documents of the Parent and the Parent's Subsidiaries afforded pursuant to this Section 3.1(a) shall be provided pursuant to, and subject to, the Parent's reasonable, generally applicable security measures.

(b) All information obtained by Parent or Subject pursuant to this Section 3.1 shall be held confidential in accordance with implicit confidentiality which is understood between Parent and the Subject organizations.

**3.2 Litigation.** Each party shall promptly notify the other parties of any Action that shall be instituted or threatened against such party to restrain, prohibit or otherwise challenge the legality of, or seek damages in connection with, this Agreement or the Merger. The Subject shall promptly notify Parent of any Action and viceversa that may be threatened or asserted in writing, brought or commenced against the Subject or the Parent that would have been listed in the Disclosure Schedule or otherwise, if such Action had arisen prior to the date hereof. Parent shall promptly notify the Parties of any Action that may be threatened or asserted in writing, brought or commenced against Parent or Subject that would have been otherwise, if such Action had arisen prior to the date hereof. The Parent shall have the opportunity to participate in the Parent's expense for the defense or settlement of any Action commenced by any claimant or any of its directors relating to the Merger. The Parent shall not settle or make an offer to settle any litigation against the Merger or any director by any Dissenter relating to this Agreement or the Merger without the prior written consent of Subject (which consent shall not be unreasonably withheld, conditioned or delayed).

**3.3 Cooperation.** Upon the terms and subject to the conditions set forth in this Agreement, Parent and Subject, on the one hand, and the Merger Parties, on the other hand, shall use their reasonable best efforts to take (or cause to be taken) all actions, and do (or cause to be done), and assist and cooperate with the other party or parties in doing, all reasonable things necessary, proper or advisable under applicable Law or otherwise to consummate and make effective the Merger as soon as practicable, including using their respective reasonable best efforts to cause the conditions to the Merger (in the case of Parent and Subject) and Parent's and Subject's (in the case of the Merger) obligations to close the Merger set forth in Article 4 to be satisfied on or before the Outside Date. In addition, the Merger Parties shall use its reasonable best efforts to obtain all consents, waivers and approvals under all Material Contracts in connection with this Agreement and the consummation of the Merger, including those specified in the Disclosure Schedule, so as to maintain and preserve the benefits under such Material Contracts as of the consummation of the Merger, and Parent shall use its commercially reasonable efforts to assist in such endeavors. The parties shall consult with each other with respect to the obtaining of all such permits, consents, approvals and authorizations, and each party will keep the other apprised of the status of matters relating to completion of the Transactions. Notwithstanding the foregoing, Parent and Subject, on the one hand, shall not be required to, and Merger Parties, on the other hand, unless otherwise

directed by Parent (which direction shall not require payment to be made until at or after the Effective Time), shall not, pay any consent fee, "profit sharing" payment or other consideration (including increased rent payments), or provide additional security (including a guaranty) to any Third Party as a condition to receipt of any consent, waiver or approval from any party to any such Material Contract. In addition to the foregoing, subject to the terms and conditions hereof, neither Parent or Subject, shall take any action, or fail to take any action, that is intended to, or has (or would reasonably be expected to have) the effect of preventing or materially impairing or delaying or otherwise adversely affecting the consummation of the Merger or the ability of such party to perform its obligations under this Agreement. Notwithstanding anything in this Section 3.3 to the contrary, the sole obligation of the parties to take, or refrain from taking, any action in respect of any Antitrust Law, including as may otherwise be required by any Antitrust Law in connection with the Merger and the other Transactions, whether in connection with any approvals or consents (or the expiration of any waiting period) that may be required under any Antitrust Law or otherwise.

## 4. CONDITIONS TO CLOSE THE MERGER

**4.1 Conditions to the Merger.** The obligations of each party to effect the Merger shall be subject to the satisfaction, at or prior to the Effective Time, of the following conditions:

(a) Required Parent Vote. The Required Parent Vote shall have been obtained by the Parent in accordance with the Articles of Incorporation and Bylaws of the Parent;

(b) No Order; Illegality. No Order issued by any court of competent jurisdiction or other legal or regulatory restraint or prohibition preventing the consummation of the Merger shall be in effect; nor shall there be any Law enacted, entered, or enforced by any Governmental Authority that prevents or prohibits the consummation of the Merger.

## 5. GENERAL PROVISIONS

**5.1 No Survival of Representations and Warranties.** The representations and warranties of the Parent and Subject contained in this Agreement shall terminate at the conclusion of the terms and conditions set forth by the Agreement which shall not exceed 18 months.

**5.2 Notices.** All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given and shall be deemed to have been duly given if delivered personally (notice deemed given upon receipt), telecopied (notice deemed given upon confirmation of receipt), sent by a nationally recognized overnight courier service such as Federal Express (notice deemed given upon receipt of proof of delivery) or emailed with a return receipt request.

**5.3 Severability.** If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect, so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible, in a mutually acceptable manner, in order that the Transactions be consummated as originally contemplated to the fullest extent possible.

**5.4 Entire Agreement; Assignment.** This Agreement and the implicit Confidentiality Agreement constitute the entire agreement among the parties with respect to the subject matter hereof and supersedes any and all prior and contemporaneous agreements and undertakings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof. This Agreement shall not be assigned (whether pursuant to a merger, by operation of law or otherwise), except that Subject may assign all or any of their rights and obligations hereunder to any wholly-owned subsidiary of Parent; provided, however, that any such assignment shall not relieve Subject of any of its obligations hereunder.

**5.5 Parties in Interest.** This Agreement shall be binding upon and inure solely to the benefit of each party, and nothing in this Agreement, express or implied, is intended to, or shall confer upon, any other person any right, benefit or remedy of any nature whatsoever, under or by reason of this Agreement, other than, after the Effective Time, as set forth in Section 1.2 (which is intended to be for the benefit of the persons covered thereby and may be enforced by such persons).

**5.6 Specific Performance.** The parties agree that irreparable damage would occur in the event any provision of this Agreement were not performed in accordance with the terms hereof or were otherwise breached and that the parties shall be entitled to an immediate injunction or injunctions, without the necessity of proving the inadequacy of damages as a remedy and without the necessity of posting any bond or other security, to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any federal court located in the State of Kentucky or any Kentucky state court, in addition to any other remedy to which the parties may be entitled at Law or in equity.

**5.7 Governing Law.** This Agreement shall be governed by, and construed in accordance with, the laws of the State of Kentucky applicable to contracts executed in and to be performed in the State, without regard to the conflict of law rules of such State. All actions and proceedings arising out of or relating to this Agreement shall be heard and determined in by Arbitration and Mediation procedures under the Laws of the State of Kentucky. The parties hereby (a) submit to the exclusive jurisdiction of the Courts of Kentucky (or, only if the Courts of the State of

Kentucky decline to accept jurisdiction over a particular matter, any federal court within the State of Kentucky) for the purpose of any Action arising out of or relating to this Agreement brought by any party, and (b) irrevocably waive, and agree not to assert by way of motion, defense, or otherwise, in any such Action, any claim that it is not subject to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the Action is brought in an inconvenient forum, that the venue of the Action is improper, or that this Agreement or the Transactions may not be enforced in or by any of the above-named courts.

**5.8 Amendment.** This Agreement may be amended by the parties by action taken by or on behalf of their respective Boards of Directors at any time prior to the Effective Time; provided, however, that, after the approval and adoption of this Agreement by the directors, no amendment may be made that requires the approval of such directors under applicable Law unless such approval is obtained. This Agreement may not be amended, except by an instrument in writing signed by each of the parties.

**5.9 Waiver.** At any time prior to the Effective Time, any party may (a) extend the time for the performance of any obligation or other act of any other party, (b) waive any inaccuracy in the representations and warranties of any other party contained herein or in any document delivered pursuant hereto and (c) waive compliance with any agreement of any other party or any condition to its own obligations contained herein. Any such extension or waiver shall be valid if set forth in an instrument in writing signed by the party or parties to be bound thereby.

**5.10 General Interpretation.**

(a) The descriptive headings contained in this Agreement are included for convenience of reference only, and shall not affect in any way the meaning or interpretation of this Agreement.

(b) Unless otherwise indicated, all references herein to Sections, Articles, Annexes, Exhibits or Schedules shall be deemed to refer to Sections, Articles, Annexes, Exhibits or Schedules of or to this Agreement, as applicable.

(c) Unless otherwise indicated, the words "include," "includes" and "including," when used herein, shall be deemed in each case to be followed by the words "without limitation."

(d) The word "extent" and the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such word or phrase shall not mean simply "if."

(e) The parties agree that they have been represented by counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Law, regulation,

holding or rule of construction providing that ambiguities in an agreement or other document will be construed against the party drafting such agreement or document.

**5.11 Counterparts.** This Agreement may be executed and delivered (including by facsimile or other form of electronic transmission) in one or more counterparts, and by the different parties in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement. Signatures to this Agreement transmitted by facsimile transmission, by electronic mail in PDF form, or by any other electronic means designed to preserve the original graphic and pictorial appearance of a document, will be deemed to have the same effect as physical delivery of the paper document bearing the original signatures.

IN WITNESS WHEREOF, Parent and Subject have caused this Agreement to be executed, as of the date first written above, by their respective officers thereunto duly authorized.

Honorable Order of Kentucky Colonels, Inc.


_____

Sherry Crose, Executive Director

Globcal International for Kentucky Colonels International


_____

David J. Wright, Executive Director


Attachments:

Confidentiality Agreement (Already Delivered)
Disclosure Schedule (Not Attached in Draft)
Contractor Agreement - Exhibit A (Not Attached in Draft)